**RECEIVED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEB 1 4 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Jeremy Kahn, *pro se*                  )
                                       )
          *Plaintiff,*                 )
                                       )
v.                                     )  CASE: 1:07-cv-02323 (HHK)
                                       )
Federal Motor Carrier Safety Administration   )
                                       )
          *Defendant*                  )

**Plaintiff's Motion For Summary Judgment**

Plaintiff Jeremy Kahn, *pro se*, pursuant to Fed.R.Civ.P.56(a), moves for summary

judgment on his Complaint against Defendant Federal Motor Carrier Safety

Administration ("FMCSA"), on the grounds there are no genuine issues as to any material

fact to warrant a trial of that claim, and Plaintiff is entitled to summary judgment as a

matter of law.

As grounds for this motion, Plaintiff states (1) he has made a proper request under

the Freedom of Information Act, for three specified orders issued by FMCSA, (2) that

FMCSA was obligated under 5 U.S.C. §552(a)(2)(A) to produce such orders, (3) that

FMCSA failed to respond to Plaintiff's request in a timely manner under 5 U.S.C.

§552(a)(6)(A)(i), (4) that FMCSA has refused to provide the orders, (5) that FMCSA has

for at least twenty years made such order readily available to the public without an FOIA

1

request, (6) that FMCSA has publicly stated that the three orders are available upon

request, and (7) that under all the circumstances, the Court should direct FMCSA

immediately to provide such orders to Plaintiff.

In support of this Motion, Plaintiff relies upon his Complaint, his Affidavit, and

Plaintiff's Memorandum in Support of this Motion, filed concurrently herewith.

WHEREFORE, Plaintiff prays that the Court enter summary judgment for

Plaintiff, as requested herein.

Respectfully submitted,

Jeremy Kahn, *pro se*
Business Address For Mail:
1730 Rhode Island Ave., N.W., No. 810
Washington, D.C.  20036
Day Telephone    202.887.0037

## Certificate of Service

I, Jeremy Kahn, certify that I have served a copy of the foregoing Motion,
Memorandum in Support thereof, Statement of Material Facts Not in Dispute, Statement
of Jeremy Kahn, and proposed Order upon counsel for Defendant, Federal Motor Carrier
Safety Administration, by mailing a copy to Beverly M. Russell, Esq., Assistant U.S.
Attorney, U.S. Attorney's Office for the District of Columbia, Civil Division, 555 Fourth
Street, N.W., E-4915. Washington, DC  20530,  by first class mail, postage prepaid.

Dated at Washington, DC this 14th day of February, 2008.

Jeremy Kahn

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Jeremy Kahn, *pro se* | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) CASE: 1:07-cv-02323 (HHK) |
| | ) |
| Federal Motor Carrier Safety Administration | ) |
| | ) |
| *Defendant* | ) |

## Memorandum In Support of
## Plaintiff's Motion for Summary Judgment

This Freedom of Information Act ("FOIA") case differs dramatically from the norm. Plaintiff, who is an active practitioner before the defendant agency, Federal Motor Carrier Safety Administration ("FMCSA"), has requested three formal agency orders, which FMCSA identified in its daily FMCSA *Register* as being readily available to the public on request, but which it now refuses to provide.

Unlike the ordinary FOIA case, there is no issue about identifying the three documents requested. There is no need for FMCSA to conduct a burdensome search. There is no issue about a Vaughn Index. Instead, these are three orders of the agency which FMCSA mandates be disclosed under 5 U.S.C. 552§(a)(2)(A). FMCSA has formally announced these documents are readily available to the public upon request. FMCSA (and predecessor agencies) has routinely released similar documents to the

1

public for at least 20 years with no need FOIA request. What has possessed FMCSA to ignore FOIA, do an about face, and turn its back both on its own published advertisement that its orders are available upon request and more than twenty years of making similar orders available?

Many FOIA cases may involve nuances and balancing competing interests. This one doesn't. FMCSA has issued formal orders; Plaintiff asks this Court to enforce FOIA and require FMCSA to make them available.

### The Essence of this Unique FOIA Action

Plaintiff's request is simple and straightforward. FMCSA has advertised three of its orders as being readily available upon request, just as for at least twenty years it has advertised scores of similar such orders as being available upon request. For some reason, it has now pulled a bait-and-switch, suddenly refusing to provide the orders, even after FOIA requests.

The FOIA analysis and application are easy here. Under FOIA, "Each agency, in accordance with published rules, shall make available for public inspection and copying . . . final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases; . . . . " 5 U.S.C. §552(a)(2)(A). FOIA's mandate that an agency provide copies of its orders to the public is so clear and conceptually so logical that "agency non-compliance" with this basic requirement "is unlikely." *American Mail Line, Limited v. Gulick*, 411 F.2d 696, 702, n.9 (D.C.Cir.1969).

2

Under the "definitions" in 5 U.S.C. §551(6), the sought documents are "orders." By notice in the daily FMCSA *Register*, the three sought documents were said to be available to the public upon request. (Kahn Aff., ¶30, Exs. B, J, K) [1] FMCSA has traditionally released such orders to the public upon request. (Kahn Aff., ¶¶14,15)

Unlike most other FOIA cases, there is no issue here of properly identifying the documents sought. Each is explicitly identified in the FMCSA *Register* publication, and each of Plaintiff's FOIA requests not only made reference to the identity of the order but included a copy of the pertinent *Register* page for easy reference. (Kahn Aff., ¶34) There is no issue of FMCSA being required to undertake any laborious search of its records to find these documents. They are listed in the daily *Register* on the day they are made public (i.e., "served"). There is no issue about a Vaughn Index. The burden is on FMCSA to justify withholding requested documents. *Beck v. Department of Justice*, 997 F.2d 1489, 1491 (D.C.Cir.1993) It is a burden FMCSA cannot meet.

### Summary Judgment Standard

Since this is a legal and not factual dispute, it may be most efficiently and effectively resolved through summary judgment. FOIA cases are typically and appropriately decided by that procedure. *Alyeska Pipeline Service Co. v. EPA*, 856 F.2d 309, 313-14 (D.C.Cir.1988), *Rushford v. Civiletti*, 485 F.Supp. 477, 481 n. 13 (D.D.C.1980). The standards for consideration of a summary judgment pursuant to Rule

---

[1]    "Kahn Aff." Refers to the attached affidavit of Plaintiff Jeremy Kahn.

56 Fed.R.Civ.P. are well established. According to Rule 56(c), summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A genuine issue of material fact which would preclude summary judgment exists only when there is sufficient evidence such that a reasonable juror could find for the party opposing the motion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251-52, (1986). In addition, entry of summary judgment against a party is appropriate if that party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Summary judgment in FOIA cases has its own standards. As this Court explained very recently in *Hodes v. Department of Housing and Urban Development*, 2008 WL 246358 *2 (D.D.C., 2008), "Under FOIA, all underlying facts and inferences are analyzed in the light most favorable to the FOIA requester; as such, only after an agency seeking summary judgment proves that it has fully discharged its FOIA obligations would summary judgment be appropriate in its favor," citing *Moore v. Aspin*, 916 F.Supp. 32, 35 (D.D.C.1996)

*Hodes* explains that in its consideration of a FOIA summary judgment request, the Court conducts a *de novo* review of the record, as the statute provides, 5 U.S.C. § 552(a)(4)(B), and adds, "In the FOIA context, 'de novo review' requires the court to

4

ascertain whether the agency has sustained its burden of demonstrating that the documents requested are not 'agency records' or are exempt from disclosure under the FOIA,'" citing *Assassination Archives & Research Center. v. CIA*, 334 F.3d 55, 57 (D.C.Cir.2003)

FOIA's purpose to allow for public access to government documents is well known. One recent decision described it by saying, "As the legislative history reflects, FOIA was enacted 'to establish a general philosophy of full agency disclosure.' *EPA v. Mink*, 410 U.S. 73, 80 n. 6, (1973) (quoting S.Rep. No. 89-813, at 3 (1965)). Consistent with its animating philosophy, FOIA is 'broadly conceived .... to permit access to official information.' *Id.* at 80". *Center For Public Integrity v. F.C.C.*, 505 F.Supp.2d 106 (D.D.C. 2007)  In *Stern v. FBI*, 737 F.2d 84, 88 (D.C.Cir.1984), the Court explained, "Congress enacted FOIA for the purpose of introducing transparency to government activities."

That goals of full disclosure and transparency are frustrated by FMCSA's withholding these orders.

### Under FOIA, FMCSA Must Produce the Requested Documents

#### The Requested Documents Are "Orders"

There is no question that FMCSA is clearly an "agency" subject to FOIA.  It maintains an FOIA office, and it responds to FOIA requests with reference to its FOIA obligations. (Kahn Aff., Exs. M,O,Q)

FOIA mandates agencies (i.e., "agencies shall") make available final opinions and "orders." FOIA defines an "order" at 5 U.S.C. §551(6) to mean "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." In turn, "licensing" is defined in §551(9) to include an "agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license." Finally, a "license" is defined in §551(8) as including "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission."

By their very terms, the sought FMCSA self-insurance decisions are "orders." Each of the earlier FMCSA self-insurance orders issued in recent years concludes with the statement, "It is ordered: . . . " (Kahn Aff., Exs. C,D,E,F,G,H)  That's consistent with a practice which dates back to at least 1987. (Kahn Aff., Ex.I).  For those orders awarding self-insurance status (i.e., agency "approval" or "permission"), the orders say, "The application is granted." (Kahn Aff., Ex.C, p.11; Ex. D, p.8; Ex.H p.6, Ex.I, p.5). For others, there is some "limitation" or "conditioning" of self-insurance "permission." (Kahn Aff., Ex.E, p.1, "FMCSA will not allow CFI to activate its self-insurance authority . . . . "; Ex.F., p.1, "FMCSA has concluded it will not accept Greyhound's proposal, . . . ." and at p.4., the request for "waiver of the automatic termination of its self-insurance authority upon material change in ownership is granted.")

The very purpose of these documents is to treat a formal application to FMCSA for

permission to satisfy the insurance-related registration requirement for motor carriers at 49 U.S.C. SEC 13902 by the alternative method of "self-insurance." A carrier's registration "remains in effect only as long as the registrant continues to satisfy the [insurance] requirements." 13906(a)(1). FMCSA authorized self-insurance is one means of such compliance. The sought orders are those granting, modifying, or conditioning such permission. *See*, *American Mail*, *supra*.

Since they are FMCSA "Orders," FOIA says they must be made available.

### FMCSA Has Admitted These Orders Are Documents Which Should Be Released to the Public By Advertising the Documents as Readily Available to the Public

Not only are the requested documents "Orders" which FOIA mandates FMCSA must make available to the public, FMCSA (and its predecessors) have for at least 20 years treated them as orders readily available to the public, and they have advertised them as such. The three different FMCSA *Register* pages announcing the three sought decisions each says "Copies of Decisions May Be Purchased By Calling DC News and Data." (Kahn Aff. ¶30, Exs. B, J, K) A reasonable reading of this statement is a representation by FMCSA that these orders are to be released to the public upon request as required by FOIA. [2]

---

[2]  Plaintiff cannot imagine a reason why the agency continues to advise that documents may be obtained through "DC News and Data" when the listed phone number has been not a working number for at least ten months. (Kahn Aff., ¶31)

If FMCSA didn't consider them to be orders as defined by FOIA, why did it publish notice of them and say they are available on request?

FMCSA Has Admitted These Are Documents
Which Should Be Released to the Public
By Its Course of Conduct of Making Such
<u>Documents Available to the Public Upon Request</u>

The foregoing makes a strong case that FOIA requires FMCSA to release these orders which FMCSA has advertised as readily available. Yet, the case is made even stronger by the fact that FMCSA has for decades released the very same sort of orders upon request, without any need for an FOIA request.

Similar orders have for years routinely been made available upon informal request after notice of their issuance has been made in the daily FMCSA *Register*. (Kahn Aff. ¶¶14,15)

The practice of issuing such decisions to the public goes back at least twenty years. (Kahn Aff., ¶6) By way of background, in 1986, the ICC modified its prior self-insurance policy, making it more feasible than before for motor carriers to seek this status, and a number of carriers responded by making such application. As one example, a review of the table of contents of the *CCH Motor Carrier Cases, Volume 1986-1987* [3], reveals that 11 different self-insurance orders were listed, each of which was not only released to the public, but also published in CCH's *Federal Motor Carrier Cases* publication: (1) *Beaver Transport, Inc., Application to be a Self-Insurer*, 1986 FedCarCas ¶37,294, (2) *Bechem Transport, Inc., Application to be a Self-Insurer*, 1986 FedCarCas ¶37,268, (3) *Belger*

*Cartage, Inc., Application to be a Self-Insurer*, 1986 FedCarCas ¶37,291, (4) *Colonial Freight Systems, Inc., Application to be a Self-Insurer*, 1986 FedCarCas ¶37,282, (5) *Connecticut Limousine Service, Inc., Application to be a Self-Insurer*, 1986 FedCarCas ¶37,275, (6) *H&W Motor Express Co., Application to be a Self-Insurer,* 1986 FedCarCas ¶37,274, (7) *May Trucking Co., Application to be a Self-Insurer*, 1986 FedCarCas ¶37,232, (8) *McAlister Trucking Co., Application to be a Self-Insurer*, 1986 FedCarCas ¶37,313, (9) *Rich Grant, Inc., Application to be a Self-Insurer*, 1987 FedCarCas ¶37,331, (10) *Speed's Automotive Inc., Application to be a Self-Insurer*, 1986 FedCarCas ¶37,320, and (11) *Swift Transportation Co. Inc., Application to be a Self-Insurer*, 1986 FedCarCas ¶37,270.

The practice has continued since then. Most recently, FMCSA made 18 such orders available to Plaintiff upon his informal request during 2006 and during 2007, until FMCSA refused to provide the *P.A.M. Transport* order in October, 2007. (Kahn Aff.,¶18)

Although there is no requirement for Plaintiff to demonstrate his "need" for the documents in his FOIA request ("appellants' lack of need for the memorandum is irrelevant to their right to obtain it under the Act," *American Mail, supra*, at 704), it is fair to point out that the requested orders are important to Plaintiff, because in its administration of the self-insurance program, FMCSA renders decisions on new requests based on its decisions in earlier requests, and to adequately represent companies before the agency, Plaintiff needs access to precedential orders upon which FMCSA continues to

---

[3]   The Motor Carrier specific Commerce Clearing House specialty publication.

rely. (Kahn Aff., ¶¶16,17)

For example, in the recent *Gordon Trucking* order (Kahn Aff., Ex. H), FMCSA

relied on its earlier decisions, justifying the imposition of conditions by saying, in part,

> This percentage is the same as that imposed on Roehl Transport, Inc., Averitt Express, Inc., Saia Motor Freight , Inc., and Covenant Transport, Inc. (hereafter referred to as the Comparison Group). GTI believes that it is similarly situated financially to all of these motor carriers and should be subject to the same collateral requirements. The FMCSA believes that is not the case. From a financial perspective, the Comparison Group has reported positive liquidity positions, smaller debt levels relative to their equity positions, and stronger EBITDAs. Therefore, GTI's collateral requirements will be set at a higher level than that imposed on the Comparison Group." (p.5)

> In another instance of reliance on precedent, FMCSA also said,

> "In addition, the collateral requirement serves as additional protection since the ATNW requirement is set at a level of twelve (12) times, which is below the 20 times average multiple for motor carriers currently in the self-insurance program. When the ATNW requirement is set at a level which is below the program average, a moderate or high level of collateral is typically imposed on a carrier to offset any risk." (p.6)

In *Bennett* Order (Kahn Aff., Ex.C), FMCSA, in further nods to self-insurance

precedent said, "The FMCSA prefers to use a fully-developed claims value . . . " (p.6);

"These ratios are within acceptable ranges." (p.8); "Typically, when this occurs, FMCSA

requires a motor carrier to maintain collateral among the minimum levels," (p.10); and

noted "This deviation from the standard practice" (p.10).

In the *U.S. Express* order (Kahn Aff., Ex. D), FMCSA clearly relied on earlier

orders, saying, ". . . the collateral requirement is being set at a relatively high

level."(p.6); "The average for carriers in the self-insurance program is 20 times."(p.7);

and "[T]he Parent's minimum ATNW multiples of five (5) times or less are significantly

below the average multiple for carriers currently in the program (20 times)." (p.8)

In the *Greyhound* order (Kahn Aff., Ex. F), FMCSA observed that a newly imposed condition "is a deviation from FMCSA standard reporting requirements." (p.4)

It is clear FMCSA considers such orders to be precedent in guiding its decisions in its administration of the statutorily prescribed self-insurance program. This is additional reason that they be made available.

## Plaintiff's Request to this Court is Timely

Plaintiff's request to this Court is timely and appropriate under the procedure for Judicial enforcement action prescribed in FOIA.

Under §552(6)(A), an agency,

upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall (i) determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination; . . . .

FOIA provides for a "constructive" exhaustion of administrative remedies, required as a prerequisite to bringing a court action, if a lawsuit is instituted before the agency takes substantive action. FOIA provides in §(6)(C)(i),

Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph. If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records.

The statute also defines "exceptional circumstances" justifying delay but says they

do "not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests." §(6)(C)(ii)

Plaintiff's first FOIA request (Kahn Aff., Ex. K) was made on October 10, 2007. FMCSA's October 10, 2007 response (Kahn Aff., Ex. L) acknowledges receipt of the FOIA request, and says that there is a "slight backlog in processing FOIA requests." The FMCSA response does <u>not</u> indicate whether FMCSA will comply with such request, does <u>not</u> notify Plaintiff of such determination and the reasons therefor, and does <u>not</u> notify Plaintiff of his right to appeal to the head of the agency any adverse determination. Therefore, FMCSA has <u>not</u> made a response as required under §552(6)(A), and Plaintiff has constructively exhausted his administrative remedies, so this court action is proper. *Oglesby v. Department of the Army*, 920 F.2d 57, 61 (D.C. Cir., 1990)  See also *Ervin and Associates, Inc. v. Dunlap*, 33 F.Supp.2d 1, 14 (D.D.C. 1997)  Plaintiff's two following FOIA requests included in the Amended Complaint were filed on December 28, 2007 (Kahn Aff. ¶36, Ex. N) and on January 14, 2008 (Kahn Aff., ¶37, Ex. P); these resulted in FMCSA issuing two, non-responsive acknowledgements similar to the first acknowledgement (Kahn Aff., Exs. O,Q)

### FMCSA's Purported Justification

In its January 31, 2008 letter (Kahn Aff., Ex. R), sent more than 30 days after the lawsuit was filed, FMCSA belatedly suggests the *P.A.M. Transport* order might be

withheld because it might contain "confidential commercial information," presumably based on the §(a)(F)(4) FOIA Exemption ("Exemption 4"), which provides as an exception to an agency's obligation to provide documents, an exemption for those which are "trade secrets and commercial or financial information obtained from a person and privileged or confidential." Assuming for argument, FMCSA is now relying on such exemption, such reliance is misplaced.

Set aside for the moment that FMCSA requires by regulation that carriers submit annual financial reports which are made available to the public (discussed below), so carrier financial information is available to the public anyway. The financial and other information submitted in support of a self-insurance application under 49 U.S.C. §13906(d) is *required* by FMCSA if a carrier seeks self-insurance status, so it is not "voluntary." [49 CFR §387.309(a) provides, "The FMCSA will consider and will approve, subject to appropriate and reasonable conditions, the application of a motor carrier to qualify as a self-insurer, *if the carrier furnishes a true and accurate statement of its financial condition and other evidence* that establishes to the satisfaction of the FMCSA the ability of the motor carrier to satisfy its obligation for bodily injury liability, property damage liability, or cargo liability." (emphasis added)] [4] The issue becomes one of "confidentiality." The *Hodes* court at *7 said for purposes of Exemption

---

[4]    A motor carrier *must* maintain prescribed levels of insurance 49 U.S.C. §13906(a)(1) as a condition of maintaining its registration. If it chooses to seek compliance by self-insurance under §13906(d), it *must* comply with FMCSA requirements relating to self-insurance.

4, such "information is confidential if it (1) impairs the government's ability to obtain necessary information in the future, (2) causes substantial harm to the competitive position of the person from whom the information was obtained, or (3) impairs other governmental interests, such as compliance and program effectiveness," citing *National Parks & Conservation Association v. Morton*, 498 F.2d 765, 770 & n. 17 (D.C.Cir.1974) and *Critical Mass Energy Project v. Nuclear Regulatory Commission*, 975 F.2d 871, 879 (D.C.Cir.1992) (*en banc*).  132  See also *Changzhou Laosan Group v. U.S. Customs and Border Protection*, 374 F.Supp.2d 129, 132 (D.D.C. 2005).  For Exemption 4, "The competitive harm prong of *National Parks* has been interpreted to require both a showing of actual competition and a likelihood of substantial competitive injury." *Changzhou*, at 132, citing *CNA Financial Corp. v. Donovan*, 830 F.2d 1132, 1152 (D.C.Cir.1987).   To justify withholding documents, there must be a "likelihood of substantial competitive injury" which must include identifying "a specific victim []or a concrete injury." *Id*, at 134.

In *Gilda Industries, Inc. v. U.S. Customs & Border Protection*, 457 F.Supp.2d 6, 9 (D.D.C.), the Court described it as the "cause substantial harm" element of the test and said it "require[s] both a showing of actual competition and a likelihood of substantial competitive injury," also citing *CNA Financial, supra*.  It went on to say "A 'competitive injury' is one 'flowing from the affirmative use of proprietary information by competitors.'  In assessing whether the second element is met, 'the Court need only 'exercise its judgment in view of the nature of the material sought and competitive

circumstances in which the submitter does business,' . . . " (citation omitted)  While the Court in *Gilda*, after much care, found the documents requested there to fall within Exemption 4, those were records of specific Customs entries showing the names of al parties to a commercial transaction, the dates, and all the other particulars of specific companies' Customs entries which allowed competitors to gain crucial market information.  That's in marked contrast to the aggregate information in the FMCSA self-insurance orders.  It is hard to imagine how knowing a motor carrier's historic Operating revenue, Operating income, EBITDA and tangible net worth (for example, Kahn Aff., Ex.C,p.5) could be used by competitors to cause a "substantial competitive injury."

It's even more puzzling to imagine how FMCSA could consider Exemption 4 to apply since motor carriers have been submitting self-insurance applications and FMCSA has been publishing orders on those applications for decades, all of which include aggregate financial and claims information. (Kahn Aff., Ex.I, pp.2-4)  Carriers making a self-insurance application know in advance that the information they submit will be included in the FMCSA's order. (Kahn Aff., 17)

Moreover, the information, when it is published by FMCSA, is "stale."  Looking at the FMCSA's "financial analysis" in its most recent decisions, *Gordon Trucking* (Kahn Aff., Ex.H, p.2) and *Bennett* (Kahn Aff., Ex. C, pp.3-5), it is clear the financial information is far from detailed, and by reason of the timing of the application process, it is outdated. (Kahn Aff. 17) (*Gordon* was issued in November, 2007; the most recent financial information was for December 31, 2006; and *Bennett* was issued in September,

2007 with the most recent information being for December 31, 2006.)  In a dynamic industry like trucking, 9 (or 11) month old aggregate financial information can hardly be used by a competitor to cause substantial economic harm.

*Hodes* suggests another test, namely possible impairment of the government program.  As amply shown, FMCSA has been making self-insurance orders public for at least twenty years and carriers continue to file for self-insurance, knowing what information the expected orders will contain.  If making the orders public for the past twenty years haven't impaired the self-insurance program yet, it's unlikely that the program will be impaired by continuing to disclose.

While the foregoing makes a strong argument that Exemption 4 can't apply to these orders, FMCSA's own financial reporting regulations at 49 CFR §369 (promulgated under 49 U.S.C. §14123) make a mockery of FMCSA's justification.  Under §369.1, all carriers must file annual financial reports with FMCSA, and the larger carriers (which include those who might try to qualify to self-insure) must also file quarterly financial statements.  In general, §369.10(a) provides that unless the carrier asks for and is granted an exemption, "the data contained in a report . . . shall be made publicly available."  Carriers may request an "exemption from public release" under the rules at §369.9(b).  The first criteria, however, is that "the carrier is not a publicly held corporation or that the carrier is not subject to financial reporting requirements of the Securities and Exchange Commission."  Of the three carriers whose orders are sought, each is a part of a corporate family which is subject to SEC reporting, namely PAM Transportation Services, Inc.,

Celadon Group, Inc., and Con-Way, Inc., so they would not even be eligible to ask that their annual financial information not be released.

Even if they were eligible in theory to make such a request, there are no known instances in which FMCSA has granted such an exemption. The opportunity for exemption from disclosure [49 U.S.C. §14123(c)(2)] was a new provision included in the ICC Termination Act of 1995. (Pub.L. 104-88). Soon after its enactment, a number of carriers sought exemptions, but each request for exemption was denied by the agency.

With carriers already by regulation required to submit detailed annual (and in most cases quarterly) reports of financial information which is already by regulation available to the public, Exemption 4 cannot possibly serve as justification for failing to release the sought self-insurance orders.

### Plaintiff's Need For Prospective Relief

As Plaintiff files his Motion, FMCSA has not yet produced any of the three requested documents. However, it is conceivable that upon consideration of this motion, it may. Were that to occur, Plaintiff argues prospectively that FMCSA's production of these three orders not serve as a basis to dismiss this case as moot, and thereby avoid the entry by the Court of an order directing FMCSA to produce orders of this sort. In dealing with a similar situation, the Court in *Oregon Natural Desert Association v. Gutierrez*, 409 F.Supp.2d 1237, 1245 (D.Ore.2006) said,

> [A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.... A case might become moot if

subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of Earth v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 191, 189, (2000) (internal quotation omitted). The voluntary cessation exception to mootness has been applied to FOIA cases in which the agency released the documents prior to the court's decision. *Payne Enterprises, Inc. v. United States*, 837 F.2d 486 (D.C.Cir.1988). Even though the party had obtained relief for the specific request, the release of documents did not moot the claim that the agency policy or practice impaired the party's lawful access to information in the future. *Id.* at 491.

Such rationale applies equally in this case, since FMCSA issues self-insurance orders on an ongoing basis, and failure of the Court to rule that such orders are subject to disclosure under FOIA would only result in the need for further lawsuits.

## Conclusion

Wherefore, on the basis of the foregoing, the Court is respectfully requested to enter Summary Judgment for Plaintiff and grant the relief requested.

Respectfully submitted,

Jeremy Kahn, *pro se*
Business Address For Mail:
1730 Rhode Island Ave., N.W., No. 810
Washington, D.C.  20036
Day Telephone    202.887.0037

18

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Jeremy Kahn, *pro se* | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) CASE: 1:07-cv-02323 (HHK) |
| | ) |
| Federal Motor Carrier Safety Administration | ) |
| | ) |
| *Defendant* | ) |

**Statement of Material Facts for Which Plaintiff
Contends There is No Genuine Issue
In Connection With Plaintiff's Motion for Summary Judgment**

In connection with his Motion for Summary Judgment, following are material facts

for which Plaintiff contends there is no genuine issue.

1.      Federal Motor Carrier Safety Administration ("FMCSA") at page 19 of the

October 2, 2007 FMCSA *Register* published notice of an agency order in a matter titled,

*P.A.M. Transport, Inc.*, FMCSA Docket MC-150496, which order was served that day.

(Kahn Aff., ¶12, Ex.B) [1]

2.      On October 10, 2007, Plaintiff submitted an appropriate FOIA request to

FMCSA requesting the *P.A.M. Transport* order. (Kahn Aff., ¶34, Ex.L)

---

[1] "Kahn Aff." Refers to the statement of Plaintiff Jeremy Kahn, submitted with the Motion for
Summary Judgment.

3.    On October 10, 2007, FMCSA acknowledged the FOIA request. (Kahn Aff., ¶34, Ex.M) The FMCSA response did not indicate whether FMCSA would comply with such request; it did not notify Plaintiff of such determination and the reasons therefor; and it did not notify Plaintiff of his right to appeal to the head of the agency any adverse determination.

4.    FMCSA did not make any other response to the FOIA request prior to the institution of this lawsuit on December 27, 2007. (Kahn Aff., ¶34, Ex.M)

5.    FMCSA at page 20 of the December 28, 2007 FMCSA *Register* published notice of an agency order in a matter titled *Celadon Trucking Services, Inc.*, FMCSA Docket MC-185116, which order was served that day. (Kahn Aff., ¶29, Ex.J)

6.    On December 28, 2007, Plaintiff submitted an appropriate FOIA request to FMCSA requesting the *Celadon* order. (Kahn Aff., ¶36, Ex.N)

7.    On December 31, 2007, FMCSA acknowledged the December 28 FOIA request. (Kahn Aff., ¶36, Ex.O) The FMCSA response did not indicate whether FMCSA would comply with such request; it did not notify Plaintiff of such determination and the reasons therefor; and it did not notify Plaintiff of his right to appeal to the head of the agency any adverse determination.

8.    FMCSA at page 50 of the January 14, 2008 FMCSA *Register* published notice of an agency order in a matter titled *Con-Way Truckload, Inc.*, FMCSA Docket MC-119399, which order was served that day. (Kahn Aff., ¶29, Ex.K)

9.    On January 14, 2008, Plaintiff submitted an appropriate FOIA request to

FMCSA for the *Con-Way* order. (Kahn Aff., ¶37, Ex.P)

10.    On January 15, 2008, FMCSA acknowledged the January 14 FOIA request. (Kahn Aff., ¶37, Ex.Q)  The FMCSA response did not indicate whether FMCSA would comply with such request; it did not notify Plaintiff of such determination and the reasons therefor; and it did not notify Plaintiff of his right to appeal to the head of the agency any adverse determination.

11.    Other than those three acknowledgements of Plaintiff's FOIA requests, the only other communication FMCSA has sent Plaintiff is its January 31, 2008 letter. (Kahn Aff., ¶38, Ex.R)

12.    Each FMCSA *Register* publication included immediately below the listing of the described Order in the FMCSA Register, FMCSA printed in bold type the legend, "Copies of Decisions May Be Purchased by Calling DC News and Data, Inc. at (240) 632-8591." (Kahn Aff., ¶30)

13.    FMCSA and its predecessor agencies for at least twenty years have been issuing orders relating to motor carrier requests to satisfy their mandatory insurance obligations through self-insurance. (Kahn Aff., ¶¶5,6,11,25, Ex.I)

14.    Prior to October, 2007, FMCSA and its predecessor agencies have made such self-insurance orders immediately and readily available upon request either directly or through a contractor, with no need for the requester to make a formal FOIA request. (Kahn Aff., ¶¶14,15)

15.    Since October, 2007, FMCSA has refused to make such self-insurance

orders available upon request.  (Kahn Aff., ¶23)

Respectfully submitted,

Jeremy Kahn, *pro se*
Business Address For Mail:
1730 Rhode Island Ave., N.W., No. 810
Washington, D.C.  20036
Day Telephone    202.887.0037

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Jeremy Kahn, *pro se*                          )
                                               )
        *Plaintiff,*                    )
                                               )
v.                                             ) CASE: 1:07-cv-02323 (HHK)
                                               )
Federal Motor Carrier Safety Administration    )
                                               )
        *Defendant*                      )

**Statement of Plaintiff Jeremy Kahn**
**In Support of Plaintiff's Motion for Summary Judgment**

    1.    I am Jeremy Kahn, *pro se* Plaintiff in this Freedom of Information Act

("FOIA") matter.  I am submitting this Statement in Support of my motion for Summary

Judgment.

    2.    Although I am filing this matter *pro se*, I am an attorney, licensed to

practice in the District of Columbia.  My office address is 1730 Rhode Island Ave., N.W.,

Suite 810, Washington, DC  20036.

    3.    Since my admission to practice in 1974, I have specialized exclusively in

the representation of motor carriers in regulatory matters.  A great deal of my practice

consists of representation of carriers before defendant Federal Motor Carrier Safety

Administration ("FMCSA"), and its predecessor agencies, primarily the Interstate

Commerce Commission ("ICC"), which was abolished in 1996.

    4.    As a part of my professional involvement, I have been an active member of

the motor carrier bar, and particularly the Transportation Lawyers Association, an

international association of nearly 1,000 attorney members throughout North America, all

engaged to some degree in representing motor carriers in regulatory matters. As a part of

my activities within the bar, I have made motor carrier-related presentations before annual

and periodic educational conferences and have written extensively on transportation law

related matters and FMCSA (and ICC) regulatory issues.

    5.    In the Complaint, as amended, I am seeking three identified documents

from FMCSA. As I shall explain in detail, each is a formal order of the agency dealing

with administration of the FMCSA's self-insurance program; each was noticed in the

daily FMCSA *Register* as a formal agency order available to the public on request; and

each has been improperly withheld without justification. Moreover, decisions materially

the same as those sought in this action have routinely been made available to the public

for at least 20 years, prior to this court action.

    6.    I believe this FOIA action is quite different from the ordinary FOIA

request, because the documents requested are formal agency orders, of exactly the sort

which have been made available to the public for at least 20 years, and the agency

officially published a notice to the public that the documents were available on request.

FMCSA's Traditional Policy Regarding
Publication of Its Self-Insurance Decisions

7.      Each of the three orders I seek are formal orders issued by FMCSA as an ordinary part of its administration of federal transportation law.

8.      By way of background, for a motor carrier to register with FMCSA to engage in interstate commerce, the motor carrier must maintain adequate security for the protection of the public (i.e., insurance) under 49 U.S.C. §13906. Although most motor carriers satisfy that requirement through commercial insurance coverage, the law expressly provides that "A motor carrier may submit proof of qualifications as a self-insurer to satisfy the security requirements." §13906(d)

9.      FMCSA has promulgated regulations at 49 CFR 387.309 (they have actually been carried forward from similar regulations promulgated by the ICC) governing the self-insurance process. Under that process, an applicant submits an application with supporting documentation, including detailed financial and aggregate claims history information, and the FMCSA either grants or denies the application. Such action is taken through the issuance of a formal agency order, *infra.*

10.    In some instances, a motor carrier which is already self-insured may seek to modify the conditions which govern its self-insurance, or FMCSA on its own, may seek to modify such conditions. In either case, FMCSA undertakes such a modification through issuance of a formal agency order, *infra.*

11.    On personal experience, for more than 20 years, FMCSA (and predecessor agencies) have listed every order involving self-insurance in its daily publication of

agency actions, currently known as the FMCSA *Register*. For reference, I have attached as Exhibit A a printout of the first page of the February 7, 2008 FMCSA *Register* to illustrate what it is and what it contains. At the top of the first page, it states clearly that it is "A daily summary . . . of Decisions and Notices issued by the Federal Motor Carrier Safety Administration."

12.    For many years, and to the present, on those days when FMCSA issues an order relating to self-insurance, it lists such decision under the "Miscellaneous" heading. Exhibit B is a copy of page 19 of the October 2, 2007 FMCSA *Register*, which shows the listing of one of the orders Plaintiff seeks. For at least the last 10 years if not more, the only way to learn about self-insurance orders was to monitor the FMCSA *Register*, and particularly information under the "Miscellaneous" heading.

13.    As an ordinary and customary part of my law practice, I monitor the FMCSA *Register* on line via the Internet each day.

14.    During at least the past three years, whenever I have seen in the FMCSA *Register* that a self-insurance order had been issued, I have immediately, informally requested a copy from FMCSA, as a copy of a formal order issued by the agency. On some occasions the request was made by phone call; on some occasions by letter; on some occasions by e-mail. In each instance, the agency promptly made a copy of the order available upon my informal request.

15.    At one time, the agency had a contractor which administered the issuance of such orders. While the contractor was in business, dating back perhaps 10 years, more or

4

less, I would request a copy of the self-insurance order from the contractor.  To do so, I would personally visit the contractor's office (most recently to my knowledge in a building at 1925 K Street, N.W.).  I would ask for a stack of all the FMCSA documents issued on the pertinent date and the contractor would give me a large stack of documents which constituted all of the written agency actions "served" that day.  I would thumb through the stack until I found the self-insurance decision in which I was interested, and I would make a copy using the contractor's self-service copying machine.  I discontinued dealing with the contractor at least three or four years ago (possibly longer), because I found FMCSA would make copies of these decisions available directly to me upon informal request.

16.     I have requested such orders when they were issued, because as a part of my practice, I represent motor carriers with respect to their entry in and/or ongoing participation in the self-insurance program.  FMCSA self-insurance orders customarily make reference to the circumstances of a particular application in relation to other decisions involving other self-insured carriers.  My access to these formal, precedential decisions is therefore necessary in order for me adequately to represent motor carriers in self-insurance-related matters.

17.     One of my uses of such orders is to show them to clients considering seeking self-insurance status (or modifying their status) to show how FMCSA analyzes such applications and the sort of financial and claims information it includes in the published decisions.  I make it clear to carriers when counseling them that FMCSA has a

history of publishing decisions which contain certain financial and claims information, and if they seek self-insurance status, they should expect the similar publication of their financial and claims information, consistent with that in earlier FMCSA decisions. I do point out that since the application process generally takes about a year, when financial information is included in such an order, it is to some extent "stale."

18.    I have reviewed my records, and based on that review, the following are the self-insurance orders I received from FMCSA during 2006 and 2007 upon my informal request, following publication in the FMCSA *Register,* without any need for filing an FOIA request. (I received many, many orders in earlier years, as well.) :

     a.  *Contract Freighters, Inc., Reopening of Self-Insurance Authorization*, MC-119399 (served September 11, 2007)

     b.  *Greyhound Lines, Inc., Modification of Self-Insurance Authority*, MC-1515 (served September 10, 2007)

     c.  *Bennett Motor Express, LLC, et al., Applications for Authority to Self-Insure*, MC-129712 (served September 5, 2007)

     d.  *Transport Corporation of America, Inc., Decision on Petition for Reconsideration*, MC-151556 (served July 19, 2007)

     e.  *U.S. Express, Inc., Application for Authority to Self-Insure*, MC-188121 (June 14, 2007)

     f.  *Western Express, Inc., Application for Authority to Self-Insure*, MC-260323 (served June 5, 2007)

     g.  *Ace Transportation, Inc., et al., Decision on Petition for Reconsideration*, MC-164740 (served March 7, 2007)

     h.  *Star Transport, Inc., Decision on Petition for Reconsideration*, MC-120737 (corrected decision served January 17, 2007)

i. *Star Transport, Inc., Decision on Petition for Reconsideration*, MC-120737 (served January 17, 2007)

j. *Ace Transportation, Inc., et al., Modification of Self-Insurance Authorization*, MC-164740 (served October 17, 2006)

k. *Roehl Transport, Inc., Modification of Self-Insurance Authorization*, MC-127651 (served October 17, 2006)

l. *Greyhound Lines, Inc., Modification of Self-Insurance Authority*, MC-1515 (served July 27, 2006)

m. *KLLM, Inc., Revocation of Authority*, MC-138308 (served June 13, 2006)

n. *Transport Corporation of America, Inc., Motion to Stay the Decision Served February 2, 2006, Granted*, MC-151556 (served June 12, 2006)

o. *Roehl Transport, Inc., Application for Authority to Self-Insure*, MC-127651 (served April 6, 2006)

p. *KLLM, Inc., Decision on Petition for Reconsideration*, MC-138308 (served March 1, 2006)

q. *Ace Doran Hauling & Rigging Co., Authorization to Be a Self-Insurer – Show Cause Order*, MC-112304 (served February 10, 2006)

r. *Transport Corporation of America, Inc., Reopening of Self-Insurance Authorization to Amend Self-Insurance Conditions*, MC-151556 (served February 2, 2006)

19.     Some of these orders involved initial authorization of a motor carrier or a group of carriers to qualify for self-insurance status. Examples are the *Bennett* order (#c) and the *U.S. Express* order (#e). Based on my experience, these two orders are reasonably representative of orders in which an entity or group of carriers seek self-insurance authorization. I have attached a copy of the former as Exhibit C and the latter as Exhibit D, to illustrate what information these sorts of orders contain.

20.    Some of these orders involve dealing with a request by a self-insured carrier to modify its authorization. Examples are the *Contract Freighters* (#a) order and the *Greyhound* order (#b). I have attached a copy of the former as Exhibit E and the latter as Exhibit F, to illustrate what information these sorts of orders contain.

21.    Some of these orders involve FMCSA proposing to take action on its own initiative with respect to a motor carrier already in the self-insurance program. An example is described in the *Transport Corporation of America* decision (#n). I have attached a copy as Exhibit G to illustrate what information these sorts of orders contain.

22.    Five of the eighteen FMCSA orders identified above involved matters in which I represented the motor carrier, although in making my requests to FMCSA, I never made such a distinction.

23.    At some time between the September 11, 2007 publication of the *Contract Freighters* order (Ex. E) and the publication of notice of the *P.A.M. Transport* order on October 2, 2007, FMCSA apparently decided it would no longer issue self-insurance orders to the general public, as evidenced by its ongoing refusal to provide copies of the three self-insurance orders which are the subject of this action.

24.    However, upon my informal request after having seen notice appear in the FMCSA *Register,* FMCSA did provide me with a copy of one further self-insurance order from FMCSA, that in *Gordon Trucking, Inc., Application for Authority to Self-Insure*, Docket MC-152187 (served November 9, 2007). I believe FMCSA provided me that

copy, because I was counsel of record for that carrier. I have attached at copy of the *Gordon Trucking* order as <u>Exhibit H</u>.

25.    As an example of how these self-insurance orders have been issued in much the same format as they are today for 20 years, I have attached as <u>Exhibit I</u> a randomly chosen 1987 order, that in *Crete Carrier Corporation, Application to Be a Self-Insurer*, Docket MC-126118 (served June 11, 1986).

26.    The *Gordon Trucking* order involved a request by a carrier for initial self-insurance authorization. Comparing that order with the *Bennett* and *U.S. Express* orders, (Exhibits C and D), I see nothing substantially different between the orders on new applications issued prior to October, 2007 and those issued subsequent.

27.    From the foregoing, it can be seen that FMCSA (and predecessor agencies) have a long history of making self-insurance orders available upon informal request, after notice has been given to the public that such an order has been issued. As an active and avid practitioner before FMCSA, I am unaware of any formal or informal statement of any nature by FMCSA relating to any such change in policy.

The FOIA Requests

28.    In the Amended Complaint, in this action I am requesting three FMCSA orders, namely those (1) served October 2, 2007, in a matter titled, *P.A.M. Transport, Inc.*, FMCSA Docket MC-150496, (2) served December 28, 2007, in a matter titled, *Celadon Trucking Services, Inc.*, FMCSA Docket MC-185116, and (3) served January 14, 2008, in a matter titled, *Con-Way Truckload, Inc.*, FMCSA Docket MC-119399.

9

29.    I became aware of these three orders through FMCSA's publication of its daily FMCSA *Register*, which lists formal agency actions and is made available daily to the public through FMCSA's website at www.fmcsa.dot.gov. FMCSA published notice of the *P.A.M. Transport* decision at page 19 of the October 2, 2007 FMCSA *Register* as a formal order of the agency. I have attached a copy of that page (to which I made reference earlier) as Exhibit B. FMCSA published notice of the *Celadon Trucking* decision at page 20 of the December 28, 2007 FMCSA *Register* as a formal order of the agency. A copy of that page is attached as Exhibit J. FMCSA published notice of the *Con-Way Truckload* decision at page 50 of the January 14, 2008 FMCSA *Register* as a formal order of the agency. A copy of that page is attached as Exhibit K.

30.    In each publication in Exhibits B, J, and K, immediately below the listing of the Decision in the FMCSA *Register*, FMCSA printed in bold type the legend, "Copies of Decisions May Be Purchased by Calling DC News and Data, Inc. at (240) 632-8591."

31.    I first sought the FMCSA's *P.A.M. Transport* order through an informal request to the agency, consistent with the manner in which I had requested such self-insurance orders for many years. I was advised orally by FMCSA staff my request was denied.

32.    To try to obtain each of the three orders, I next called the telephone number for "DC News and Data" as published in the FMCSA *Register*, and received a recorded announcement that the phone number was not in service. Based on other experience, I

believe the same phone number has been listed as the source for FMCSA orders and has not been in service for at least ten months, if not far longer.

33.    I then made an informal call to the Office of Chief Counsel at FMCSA, where I discussed my request with an attorney in that office, Frederic Wood. I was told someone would get back to me, but no one ever did.

34.    To attempt to obtain the FMCSA order, I next sent a letter dated October 10, 2007 requesting a copy of the order under FOIA. A copy is attached as Exhibit L. FMCSA's FOIA office acknowledged my request by its letter dated the same day. A copy of that letter is attached as Exhibit M. (For all three of the FOIA requests I made, I also attached the corresponding page of the FMCSA Register, Exhibits B, J, and K.)

35.    Shortly following that letter, I received a call from an individual in the FOIA office, whose name I believe was Paul Seace(?) (telephone 385-2331). We had several conversations regarding my request, but he told me even several weeks after my request he had not yet seen the *P.A.M.* order, nor did he know anything about why the agency was refusing to release it.

36.    When notice of the *Celadon* order was published in the FMCSA *Register*, I promptly filed another FOIA request (A copy is attached as Exhibit N), and FMCSA's FOIA office acknowledged it three days later by its own letter on December 31, 2007 (a copy is attached as Exhibit O).

37.    When notice of the *Con-Way Truckload* order was published in the FMCSA Register, I promptly filed another FOIA request (a copy is attached as Exhibit P), and

FMCSA's FOIA Office acknowledged that request by its own letter (a copy is attached as Exhibit Q).

38.    The only other communication I have received from FMCSA is its January 31, 2008 letter advising that at some unspecified future time it would seek "permission" from P.A.M. Transport before it would consider making the P.A.M. order available.  A copy of that letter is attached as Exhibit R.

39.    As of the date of this statement, I have not received any other response to my three FOIA requests from FMCSA.

### Verification

I, Jeremy Kahn, Plaintiff, verify under penalty of perjury under the laws of the United States, that I have read the foregoing statement, that I am qualified to make that statement, and that all the information therein is true and correct.

_____
Jeremy Kahn, Plaintiff

Dated:  February 13, 2008

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Jeremy Kahn, *pro se* ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | CASE: 1:07-cv-02323 (HHK) |
| ) | |
| Federal Motor Carrier Safety Administration ) | |
| ) | |
| *Defendant* ) | |

**Order on Plaintiff's Motion For Summary Judgment**

THIS MATTER having come before the Court on Plaintiff's Motion For Summary Judgment, including its supporting Memorandum and the affidavit of Plaintiff, and the Opposition thereto by Defendant, including a supporting affidavit.

Plaintiff has submitted a proper request under the Freedom of Information Act, 5 U.S.C. §552 for three specified Orders issued by defendant Federal Motor Carrier Safety Administration in the administration of its motor carrier self-insurance program as authorized by 49 U.S.C. §13906(d). Plaintiff made his first request on October 10, 2007. FMCSA acknowledged the request on October 10, but such acknowledgement did not indicate whether FMCSA would comply with such request; it did not notify Plaintiff of such determination and the reasons therefor; and it did not notify Plaintiff of his right to appeal to the head of the agency any adverse determination as required by

1

§552(a)(6)(A)(i).  Plaintiff, as allowed by §552(a)(6)(C)(i), then instituted this action.

Subsequent to filing the lawsuit, FMCSA published notice of two other, similar "self-insurance" orders on December 28, 2007 and January 14, 2008.  Plaintiff submitted FOIA requests for such orders on the date of their publication; FMCSA acknowledged the requests in the same manner it acknowledged the October 10 request.

It appears that the three requested FMCSA documents are "orders" as defined by 5 U.S.C. §551(6), and therefore must be made available to plaintiff under 5 U.S.C. §552(a)(2)(A).  This conclusion flows easily from the definition, but the Court also recognizes that FMCSA, and its predecessors before it, for at least 20 years have consistently published notice of the availability of such orders and have made such orders readily available to the public upon request.  Even more, for the three orders sought here, FMCSA has published notice in the daily FMCSA *Register* that each is available to the public upon request.

Under the circumstances, FMCSA has offered no acceptable justification for failing to provide these orders.

IT IS HEREBY ORDERED, that Plaintiff's Motion is GRANTED, and it is FURTHER ORDERED, that

1)  Defendant shall immediately provide Plaintiff with copies of the three identified orders;

(2)  Defendant has acted arbitrarily and capriciously in withholding these orders from Plaintiff; and

(3) Plaintiff is awarded his costs in this action, as provided by 5 U.S.C.

§552(a)(4)(F).


Entered this ___ day of February, 2008.


_____
United States District Judge



Serve:

Beverly M. Russell, Esq.
Assistant U.S. Attorney
U.S. Attorney's Office for the District of Columbia
Civil Division
555 Fourth Street, N.W., E-4915.
Washington, DC  20530

Jeremy Kahn
1730 Rhode Island Ave., N.W., Suite 810
Washington, D.C.  20036

# S. Department of Transportation
## Federal Motor Carrier Safety Administration
## REGISTER

**A Daily Summary of Motor Carrier Applications and of Decisions and Notices Issued by the Federal Motor Carrier Safety Administration**

---

### DECISIONS AND NOTICES RELEASED February 7, 2008 -- 10:30 AM

#### NOTICE

The Federal Motor Carrier Safety Administration (FMCSA) is notifying the public that the timeframe required to revoke a carrier's operating authority for failing to have sufficient levels of insurance on file is being reduced. The current process takes at least 66 days. The new 33 day process will only allow a carrier to hold operating authority without insurance reflected on our Licensing and Insurance database for up to three (3) days. Revocation decisions will be tied to our enforcement program which will focus on the operations of uninsured carriers. This improvement will further ensure that the public is adequately protected in case of a motor carrier crash. Accordingly, we are adopting the following procedure for revocation of authority: 1) The first notice will go out three (3) days after FMCSA receives notification from the insurance company that the carrier's policy will be cancelled in 30 days. This notification informs the carrier that it must provide evidence that it is in full compliance with FMCSA's insurance regulations within 30 days. 2) If the carrier has not complied with FMCSA's insurance requirements after 30 days, a final decision revoking the operating authority will be issued.

### NAME CHANGES

| NUMBER | TITLE | DECIDED |
|--------|-------|---------|
| MC-143548 | LARRY VITITOW TRUCKING, L.L.C. - SULPHUR SPRINGS, TX | 02/04/2008 |
| MC-241779 | MARTENS BROS. INC. - MINDEN, IA | 02/04/2008 |
| MC-304558 | LEBERT MERCIER, RALPH MERCIER, MELISSA MO - ST. ANNE, IL | 02/04/2008 |
| MC-336086 | BINY AMEEN - STOCKTON, CA | 02/04/2008 |
| MC-357963 | WATKINS CONSTRUCTION CO, LLC - CORSICANA, TX | 02/04/2008 |
| MC-377232 | RODRIGO JACKSON - DIMMITT, TX | 02/04/2008 |
| MC-391661 | DARRELL CAIN TRUCKING, LLC - MANMOUTH CAVE, KY | 02/04/2008 |
| MC-393140 | RANCHERO LLC - MANSFIELD, MO | 02/04/2008 |
| MC-419515 | MID SOUTH TRANSPORTATION, LLC - TUPELO, MS | 02/04/2008 |
| MC-460100 | COATES ENTERPRISES, LLC - ANSLEY, NE | 02/04/2008 |
| MC-484517 | R & T TRUCKING LLP - PORTLAND, OR | 02/04/2008 |
| MC-491778 | BLUEZONE LIMOUSINE LTD. - STAMFORD, CT | 02/04/2008 |
| MC-495745 | MCKAY TRUCKING LLC - EASTON, PA | 02/04/2008 |
| MC-505917 | TEAM ONE DISPLAY SERVICES, INC. - MARIETTA, GA | 02/04/2008 |
| MC-535740 | ZANDRA K SMALL - CHAMBERSBURG, PA | 02/04/2008 |
| MC-553686 | 3 OAKS TRUCKING LLC - WASHTA, IA | 02/04/2008 |
| MC-554527 | AIRPORT TRANSPORTER LLC - WALLINGFORD, CT | 02/04/2008 |
| MC-566045 | CLT TRUCKING, LLC - PENSACOLA, FL | 02/04/2008 |
| MC-566814 | MELTON FARM TRUCKING, LLC - PROPHETSTOWN, IL | 02/04/2008 |
| MC-588828 | MARIA D. SOTO - BALCH SPRINGS, TX | 02/04/2008 |
| MC-593128 | JANICE BURKE - EDGEMOOR, SC | 02/04/2008 |
| MC-601802 | SONIA GILDER - HOUSTON, TX | 02/04/2008 |
| MC-616085 | INTERSTATE CARGO EXPRESS LLC - WISCONSIN RAPIDS, WI | 02/04/2008 |
| MC-625902 | RAW DOG TRANSPORT, LTD. - SYLVANIA, OH | 02/04/2008 |
| MC-627895 | 3-D ENTERPRISES, INC. - BLACKVILLE, SC | 02/04/2008 |
| MC-628423 | BRYANT TRUCKING LLC - PRESTON, MD | 02/04/2008 |
| MC-630163 | FRANCISCO VALDEZ LEON - BALDWIN PARK, CA | 02/04/2008 |
| MC-632932 | MAX TRUCKING - TACOMA, WA | 02/04/2008 |
| MC-633656 | J.C.M. LOGISTICS L.L.C. - REDMOND, OR | 02/04/2008 |

---



**Exhibit A**

DECISIONS AND NOTICES RELEASED October 2007

| MC-616119-C | GROUND FORCE TRANSPORTATION LLC - TOBACCOVILLE, NC | 10/02/2007 | DISCONTINUANCE |
|---|---|---|---|
| MC-616907-C | DEVON CRUMP & ASSOCIATES LLC - HATFIELD, PA | 10/02/2007 | DISCONTINUANCE |
| MC-617244-P | ARTURO SANCHEZ - ANAHEIM, CA | 10/02/2007 | NOTICE |
| MC-617369-P | HEYWOOD ENTERPRISES LLC - KALAMAZOO, MI | 10/02/2007 | DISCONTINUANCE |
| MC-617769-P | SECOND LOOK TRANSPORT INC - CHICAGO, IL | 10/02/2007 | NOTICE |
| MX-254167-C | GUADALUPE OCON & REFUGIO ROMO SAUCEDO - TIJUANA, BA | 10/02/2007 | DISCONTINUANCE |

**MISCELLANEOUS**

| NUMBER | TITLE | DECIDED | SERVED | DECISION TYPE |
|---|---|---|---|---|
| MC-150496 | P.A.M. TRANSPORT, INC. - TONTITOWN, AR | 10/02/2007 | 10/02/2007 | SELF-INSURED |

COPIES OF DECISIONS MAY BE PURCHASED BY CALLING DC NEWS AND DATA, INC. AT(240) 632-8591.

**TRANSFERS**

SMALL CARRIER TRANSFER APPLICATIONS INVOLVING MOTOR CARRIERS, PROPERTY BROKERS, FREIGHT FORWARDERS, AND HOLDERS OF CERTIFICATES OF REGISTRATION.
AGENCY: Federal Motor Carrier Safety Administration.

ACTION: The FMCSA has approved, subject to public comment, the transfer of authority of motor carriers, property brokers, freight forwarders, and holders of certificates of registration, pursuant to the decision in Ex Parte No. MC 111 (Sub No. 1), Transfer Rules, 4 I.C.C.2d 382, (1988), and the regulations at 49 CFR Part 365, Subpart D. The parties may consummate a proposed transaction at any time after 10 days of the filing of the application. Protests may be filed within 20 days of the publication date of the application. If a protest is received, the FMCSA will issue a decision disposing of the protest, and any transaction consummated prior to the FMCSA's decision will be at the parties' own risk, subject to any conditions we subsequently may impose. Similarly, if either party has less than satisfactory safety rating, consummation of the transaction pursuant to the 10 day rule is at the parties' own risk subject to any conditions we subsequently may impose. If no protests are received, or if the FMCSA does not issue a subsequent decision on safety grounds, the publication of the application will become the final action of the FMCSA.

ADDRESSES: Send comments to:(1) Office of Motor Carriers Section of License- MC-RIS RM. 8218 Federal Motor Carrier Safety Administration 1200 New Jersey Ave., S.E., Washington, DC 20590 and (2)Applicant's representative(s) as shown below.
DATES: Comments are due 20 days after publication. FOR STATUS INQUIRIES: (202) 366-9805

SUPPLEMENTARY INFORMATION: Further information concerning the transaction is contained in the application. A copy of the application may be obtained free of charge by contacting applicant's representative. In the alternative, the application may be inspected at the offices of the Federal Motor Carrier Safety Administration during usual business hours. Transferees of motor carrier and property broker authorities may obtain revised authorities reflecting the transfer of ownership by notifying the FMCSA that the transaction has been consummated and by complying with the following requirements set forth in the Code of Federal Regulations: (1) motor carriers: insurance (49 CFR 1043) (liability: Form BMC-91 or BMC-91X; cargo: Form BMC 34); designation of process agents (49 CFR 1044) (Form BOC3); and tariffs (49 CFR 1312); or (2) brokers: insurance (49 CFR 1043) (surety bond: Form BMC-84) and designation of process agents (49 CFR 1044) (Form BOC3).

| NUMBER | FILED | OLD APPLICANT | NEW APPLICANT | REPRESENTATIVE |
|---|---|---|---|---|
| NONE | | | | |



**Exhibit "B"**

# FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION

## DECISION

SERVICE DATE:
September 5, 2007

## DOCKET NO. MC-129712

## BENNETT MOTOR EXPRESS, LLC

## AND

## DOCKET NO. MC-285766

## BENNETT TRUCK TRANSPORT, LLC
(McDonough, Georgia)

## APPLICATIONS FOR AUTHORITY TO SELF-INSURE

Subject to certain conditions, the Applicants are authorized to self-insure their bodily injury and property damage liability.

**Decided: September 4, 2007**

Bennett Motor Express, LLC (BME) and Bennett Truck Transport, LLC (BTT, and collectively referred to as the Applicants) each seek authority to self-insure their $1 million bodily injury and property damage (BI&PD) liability under 49 USC §13906 and 49 CFR 387.309. Evidence presented by the Applicants warrants the granting of BI&PD liability self-insurance authority. The Applicants present a sound financial picture with several years of profitability, adequate cash flows from operations to cover both debt service obligations and capital expenditures, current assets sufficient to cover current liabilities as they become due and modest levels of debt relative to their equity positions.

The Applicants are affiliated with Bennett International Group, LLC (BIG), Trans-Port Services, Inc. (TPS), Bennett International Transportation, LLC (BIT), Conti, Inc. (Conti), Bennett Transportation Services, Inc. (BTS), Transportation Insurance Group, Inc. (TIG), Trans-Port Travel, Inc. (TPT), Bennett Canadian Holding, Inc. (BCH), Bennett Express, Inc. (BEI), Bennett Distribution Services, LLC (BDS), Bennett Motor Express Management, Inc. (BMEM), Bennett Technology Group, LLC (BTG), Pro Lease, LLC (Pro Lease), Bennett Network Systems, LLC (BNS), Alternative Logistics, LLC (ALL), Accu-Track Logistics, LLC (ATL), Show USA, LLC (Show) and CAP Insurance Company, Inc. (CAP, and when included with BIG, TPS, BIT, Conti, BTS, TIG, TPT, BCH, BEI, BDS, BMEM, BTG, Pro Lease, BNS, ALL, ATL, Show and the Applicants, are collectively referred to as the "Consolidated Group"). Only BME and BTT have applied for self-insurance authority, and some of the information included in each

# Exhibit C

limited liability companies ("LLC"), Subchapter S corporations ("S-Corp."), and C corporations (C-Corp.).

Although BME and BTT are commonly owned, each of the Applicants is operated independently of the other, with the exception of certain administrative and finance activities, including some risk management, insurance matters, and safety. These administrative services are performed by BMEM, a company affiliated through common ownership.

BME, headquartered in McDonough, Georgia, provides an array of transportation services, which generally fall within four different classes: (1) flatbed, (2) specialized step-deck and drop-deck, (3) heavy and/or oversize freight in open trailers and (4) drive-away services. BME sells its services through sales agents throughout the United States. Currently, BME has arrangements with agents at approximately 250 locations in 40 states. The BME trucking operations are performed with a fleet of approximately 525 tractors leased from owner-operators, approximately 400 company-owned trailers, and approximately 300 owner-operator owned trailers leased to BME.

BTT, also headquartered at McDonough, Georgia, is a transporter of factory built housing, commercial buildings, and recreational vehicles. BTT has built strategic partnerships with companies that manufacture these commodities to assure availability of appropriate, responsive transportation for the present and for the long-term. BTT has field managers located in proximity to major shippers and owner-operator drivers with pertinent experience.

The Applicants are required to maintain security for the protection of the public in the amount of $1 million per occurrence for BI&PD liability. The Applicants have in effect and on file with the Federal Motor Carrier Safety Administration (FMCSA) the requisite insurance coverage. The Applicants' estimated total combined savings from self-insurance would be between $700,000 and $1,000,000 per year.

The Applicants' insurance program is different from that of many other carriers that have applied for self-insurance authority. CAP, an affiliated entity that is registered as a South Carolina captive insurance company, insures the portion of the Applicants' BI&PD losses not retained by the Applicants. The Applicants pay CAP a premium for this coverage, and CAP pays losses directly to the claimant or to a loss escrow fund maintained by its commercial insurer. Because of CAP's status as a captive insurance company, its cash reserves are restricted to payment of the Applicants' BI&PD claims.

CAP is governed by the South Carolina Captive Insurance regulations, which require it to maintain minimum funding levels and meet certain financial benchmarks. CAP is also prohibited from joining any formal guarantee agreement, but its assets are available for payment of the Applicants' self-insurance claims.

In support of their applications to self-insure, the Applicants provided company-prepared annual financial statements for the years 2003 through 2006. Also provided were the Consolidated Group's 2003 through 2006 audited annual financial statements. No adjustments to the data

have been made except that the "goodwill and other intangible" category has been deducted (when applicable) to arrive at tangible net worth (TNW).

## BENNETT MOTOR EXPRESS, LLC

### Financial Statement Analysis

| ($ In Thousands) | Year Ending 12/31/03 | Year Ending 12/31/04 | Year Ending 12/31/05 | Year Ending 12/31/06 | 2006/2005 % Increase/ (Decrease) |
|---|---|---|---|---|---|
| Operating Revenue | $86,538 | $96,832 | $96,182 | $106,438 | 10.7% |
| Operating Income | $2,047 | $3,204 | $4,603 | $3,629 | (21.2%) |
| Net Income | $1,963 | $3,000 | $3,695 | $4,168 | 12.8% |
| Earnings Before Interest, Taxes, Depreciation and Amortization (Less non-cash items) | $2,737 | $3,550 | $4,109 | $4,527 | 10.2% |
| Operating Ratio | 97.6% | 96.7% | 95.2% | 96.6% | 1.4% |
| Cash Flow Available for Insurance and Claims | 1.26x | 1.19x | 1.28x | 1.45x | 12.7% |
| Cash and Short-Term Investments | $0 | $0 | $0 | $0 | 0.0% |
| Working Capital | $6,886 | $5,864 | $5,549 | $12,963 | 133.6% |
| Working Capital (less Affiliate Rec.) | ($1,120) | ($3,130) | $3,591 | $10,351 | 188.2% |
| Current Ratio | 1.42x | 1.32x | 1.39x | 3.08x | 122.7% |
| Current Ratio (less Affiliate Rec.) | 0.93x | 0.83x | 1.25x | 2.66x | 113.3% |
| Tangible Net Worth | $7,233 | $6,233 | $6,829 | $13,546 | 98.4% |
| Tangible Net Worth (less Affiliate Rec.) | ($816) | ($3,082) | $4,550 | $10,884 | 139.2% |
| Total Liabilities/Tangible Net Worth | 2.52x | 3.34x | 2.27x | 0.49x | (78.3%) |
| Total Liabilities/Tangible Net Worth (less Affiliate Rec.) | (22.33x) | (6.76x) | 3.41x | 0.62x | (82.0%) |

Source of Data:  Bennett Motor Express, LLC's application to self-insure

## BENNETT TRUCK TRANSPORT, LLC

### Financial Statement Analysis

| ($ In Thousands) | Year Ending 12/31/03 | Year Ending 12/31/04 | Year Ending 12/31/05 | Year Ending 12/31/06 | 2006/2005 % Increase/ (Decrease) |
|---|---|---|---|---|---|
| Operating Revenue | $72,273 | $91,678 | $106,685 | $99,156 | (7.1%) |
| Operating Income | $1,297 | $7,470 | $13,449 | $12,696 | (5.6%) |
| Net Income | $1,219 | $7,598 | $11,859 | $9,420 | (20.6%) |
| Earnings Before Interest, Taxes, Depreciation and Amortization (Less: non-cash items) | $1,525 | $7,708 | $11,989 | $9,518 | (20.6%) |
| Operating Ratio | 98.2% | 91.9% | 87.4% | 87.2% | (0.2%) |
| Cash Flow Available for Insurance and Claims | 1.26x | 2.14x | 3.25x | 3.16x | (2.9%) |
| Cash and Short-Term Investments | $0 | $0 | $0 | $0 | 0.0% |
| Working Capital | $389 | $5,413 | $14,802 | $22,931 | 54.9% |
| Working Capital (less Affiliate Rec.) | $375 | $5,413 | $14,777 | $7,945 | (46.2%) |
| Current Ratio | 1.03x | 1.35x | 1.74x | 4.24x | 144.2% |
| Current Ratio (less Affiliate Rec.) | 1.03x | 1.35x | 1.74x | 2.12x | 22.3% |
| Tangible Net Worth | $584 | $7,469 | $18,277 | $25,712 | 40.7% |
| Tangible Net Worth (less Affiliate Rec.) | $570 | $7,469 | $18,252 | $10,726 | (41.2%) |
| Total Liabilities/Tangible Net Worth | 24.27x | 2.15x | 1.14x | 0.29x | (74.6%) |
| Total Liabilities/Tangible Net Worth (less Affiliate Rec.) | 24.86x | 2.15x | 1.14x | 0.69x | (39.1%) |

Source of Data:  Bennett Truck Transport, LLC's application to self-insure

## BENNETT INTERNATIONAL GROUP, INC. & SUBSIDIARIES & AFFILIATES
### (Consolidated Group, Including BME and BTT)
### Financial Statement Analysis

| ($ In Thousands) | Year Ending 12/31/03 | Year Ending 12/31/04 | Year Ending 12/31/05 | Year Ending 12/31/06 | 2006/2005 % Increase/ (Decrease) |
|---|---|---|---|---|---|
| Operating Revenue | $182,046 | $220,044 | $249,996 | $263,034 | 5.2% |
| Operating Income | $4,387 | $10,501 | $14,027 | $14,405 | 2.7% |
| Net Income | $4,004 | $10,231 | $14,147 | $14,267 | 0.8% |
| Earnings Before Interest, Taxes, Depreciation and Amortization (less: non-cash items) | $6,173 | $12,457 | $16,620 | $18,167 | 9.3% |
| Operating Ratio | 97.6% | 95.2% | 94.4% | 94.5% | 0.1% |
| Cash Flow Available for Insurance and Claims | 1.31x | 1.53x | 1.73x | 1.92x | 11.3% |
| Cash and Short-Term Investments | $0 | $1,552 | $8,067 | $10,352 | 28.3% |
| Working Capital | $2,488 | $4,689 | $15,931 | $17,826 | 11.9% |
| Working Capital (Less: Op. Leases) | $2,488 | $3,415 | $14,601 | $16,002 | 9.6% |
| Current Ratio | 1.08x | 1.12x | 1.29x | 1.46x | 13.4% |
| Current Ratio (Less: Op. Leases) | 1.08x | 1.08x | 1.26x | 1.40x | 10.9% |
| Tangible Net Worth | $9,543 | $13,650 | $23,906 | $34,928 | 46.1% |
| Tangible Net Worth (Less: Affiliate Accts.) | $8,007 | $11,051 | $22,914 | $32,795 | 43.1% |
| Total Liabilities/Tangible Net Worth | 3.31x | 3.16x | 2.46x | 1.19x | (51.7%) |
| Total Liabilities/Tangible Net Worth (Less: Affiliate Accts.) | 3.94x | 3.90x | 2.56x | 1.26x | (50.7%) |
| Total Liabilities + Op. Leases / Tangible Net Worth (Less: Affiliate Accts.) | 3.94x | 4.33x | 2.73x | 1.37x | (49.8%) |

Source of Data: Bennett Motor Express, LLC's and Bennett Truck Transport, LLC's application to self-insure

Both the safety program and claims administration for the Applicants is administered by a commonly-owned entity, BMEM, at the corporate offices in McDonough, Georgia. Because of the interrelationship between claims and safety, the staffs of the Claims and Safety Departments share the same work area. The Vice President of Safety, Recruiting and Risk Management has 31 years of motor carrier experience and heads the Safety and Claims Departments. The Safety Department consists of 34 individuals, including five Safety Managers to supervise particular areas of federal compliance. The Claims Department is comprised of six staff members, of which four are licensed insurance adjusters. Members of the Safety and Claims Departments have experience levels ranging from 6 months to 31 years.

Safety begins with the driver selection process. All owner-operator drivers are screened using different standards based on the division for which they will drive. For each applicant, a criminal background check is administered and every work reference for the most recent 10 years is checked. BMEM turns down as many as 70% of driver applicants who do not meet company standards or demonstrate an unwillingness to adhere to specified operating practices.

Each new driver goes through a two-day company orientation, either at the corporate office or at other terminal locations for the respective Applicant's divisions across the country. The current

orientation agenda includes presentations on drug and alcohol abuse and compliance with DOT standards; defensive driving techniques; driving in different traffic conditions; maintenance of the vehicle, accident and breakdown procedures; load securement; and the "Highway Watch" program. In addition to the initial safety orientation, all drivers must attend a minimum number of safety meetings each year. BMEM held more than 160 different safety meetings throughout the country in 2006. There is also a heavy emphasis on hours of service compliance. BMEM electronically reviews 100% of driver logs for compliance. When the review reveals a possible problem, the operator is dealt with according to a progressive penalty program, which includes termination. In addition, BMEM maintains a strict "no drug, no excuses, no exceptions" policy. All accidents are reviewed, and if the circumstances warrant, the driver is terminated. Drivers involved in a DOT reportable accident must attend a defensive driving course. Each of the Applicants has a satisfactory safety fitness rating from the DOT.

The Claims Department is involved in the administration of all BI&PD and cargo claims, but the extent of its involvement in BI&PD claims adjudication depends on the nature of the claim and the type of insurance coverage. Currently, BMEM is responsible for in-house administration of most property damage claims with no personal injury. The commercial insurer administers personal injury claims and some large property damage claims. Even for the claims handled by the commercial insurer, BMEM continues to monitor the claims administration until the claim is ultimately resolved. BMEM has direct access to the commercial insurer's claim system, which allows BMEM to monitor these claims on a real-time basis.

If granted authority to self-insure, administration of BI&PD and cargo claims will remain relatively the same, except for one change. For those personal injury and large property damage claims now administered by the commercial insurer, BMEM will retain a third party administrator ("TPA") to handle such claims.

The data in the following tables represent the total claims that are incurred, paid, and outstanding for each respective period-end. It was obtained from the application and management responses to subsequent FMCSA requests. In addition, the outstanding claims amounts represent only the amount the Applicants estimate paying for pending claims based on information gathered to date. The FMCSA prefers to use a fully-developed claims value based on actuarial estimates using historical patterns. This information is calculated and reported only on CAP's statements. It is for this reason that the Applicants' will be required to maintain collateral on a combined basis.

At December 31, 2006, the Applicants' Total Reserves (defined as BME and BTT's combined self-insurance claims reserves as reported on the most recent period-end balance sheet plus CAP's Accrued Loss Adjustment Liability account) totaled $6.4 million. Of this amount, $1.05 million is the Applicants' financial responsibility, $4.3 million is CAP's financial responsibility ($0.5 million for claims and $3.8 million for Incurred But Not Reported, i.e., IBNR) and the remaining $1.05 million is the responsibility of the commercial insurance carrier.

## BENNETT MOTOR EXPRESS, LLC
### BI&PD CLAIMS EXPERIENCE

| (In Actual $) | 1/01/03 - 12/31/03 | 1/01/04 - 12/31/04 | 1/01/05 - 12/31/05 | 1/01/06 - 12/31/06 | Percent Increase/ (Decrease) 2006/2005 |
|---|---|---|---|---|---|
| Claims Received (#) | 114 | 116 | 181 | 211 | 16.6% |
| Claims Received ($) | $1,479,545 | $1,346,843 | $438,827 | $305,347 | (30.4%) |
| Average Claims Filed ($) | $12,978 | $11,611 | $2,424 | $1,447 | (40.3%) |
| Claims Received ($) / Revenue | 1.5% | 1.4% | 0.4% | 0.2% | (0.2%) |
| Number of Claims Paid | 155 | 58 | 196 | 213 | 8.7% |
| Losses Paid ($) | $1,047,195 | $779,673 | $603,727 | $866,042 | 43.4% |
| Number of Pending Claims | 48 | 106 | 91 | 66 | (27.5%) |
| Outstanding Claims Reserves ($)* | $1,189,241 | $1,756,411 | $1,703,785 | $1,030,816 | (39.5%) |
| Average Pending Claims ($) | $24,776 | $16,570 | $18,723 | $15,618 | (16.6%) |
| Outstanding Claims Reserves ($) / ATNW | (145.7%) | (57.0%) | 37.4% | 9.5% | (28.0%) |
| Outstanding Claims Reserves to be Paid by BME & CAP ($)* | $421,053 | $1,026,593 | $896,511 | $512,507 | (42.8%) |
| Outstanding Claims to be Paid by Insurance Carrier ($) | $768,188 | $729,818 | $807,274 | $518,309 | (35.8%) |
| Premiums Paid to Insurance Carrier ($) | $2,697,073 | $3,920,258 | $3,740,743 | $1,990,202 | (46.8%) |

* Does not include IBNR

## BENNETT TRUCK TRANSPORT, LLC
### BI&PD CLAIMS EXPERIENCE

| (In Actual $) | 1/01/03 - 12/31/03 | 1/01/04 - 12/31/04 | 1/01/05 - 12/31/05 | 1/01/06 - 12/31/06 | Percent Increase/ (Decrease) 2006/2005 |
|---|---|---|---|---|---|
| Claims Received (#) | 208 | 200 | 370 | 392 | 5.9% |
| Claims Received ($) | $2,303,651 | $2,773,907 | $1,608,003 | $985,757 | (38.7%) |
| Average Claims Filed ($) | $11,075 | $13,870 | $4,346 | $2,515 | (42.1%) |
| Claims Received ($) / Revenue | 2.4% | 2.9% | 1.5% | 0.5% | (1.0%) |
| Number of Claims Paid | 251 | 121 | 376 | 427 | 13.6% |
| Losses Paid ($) | $2,262,147 | $2,106,767 | $2,113,632 | $2,923,956 | 38.3% |
| Number of Pending Claims | 106 | 185 | 179 | 134 | (25.1%) |
| Outstanding Claims Reserves ($)* | $3,381,551 | $4,048,691 | $3,543,062 | $1,604,863 | (54.7%) |
| Average Pending Claims ($) | $31,901 | $21,885 | $19,794 | $11,977 | (39.5%) |
| Outstanding Claims Reserves ($) / ATNW | 593.3% | 54.2% | 19.4% | 15.0% | (4.4%) |
| Outstanding Claims Reserves to be Paid by BTT & CAP ($)* | $723,471 | $1,617,087 | $2,026,064 | $1,075,900 | (46.9%) |
| Outstanding Claims to be Paid by Insurance Carrier ($) | $2,658,080 | $2,431,604 | $1,516,998 | $528,963 | (65.1%) |
| Premiums Paid to Insurance Carrier ($) | $2,319,620 | $2,429,093 | $2,768,478 | $1,954,903 | (29.4%) |

* Does not include IBNR

## DISCUSSION

A full review of the financial statements and claims data submitted by the Applicants shows the following:

*BME*

From 2003 to 2006, BME's revenues rose 23.0%, up from $86.5 million to $106.4 million. During this same period, BME's net income trended upward to $4.2 million in 2006 from $2.0 million in 2003. BME's earnings before interest, taxes, depreciation, and amortization (EBITDA) was positive for each of the periods reviewed with such funds adequately supporting both debt service requirements and capital expenditures in all four years.

At each year-end reviewed, BME reported satisfactory working capital positions (defined as current assets minus current liabilities) and current ratios (defined as current assets divided by current liabilities) above the acceptable level of 1.0 times. From 2003 to 2005, working capital declined from $6.9 million to $5.5 million and the current ratio fluctuated within a narrow range of between 1.42 times and 1.32 times. In 2006, these two liquidity measures more than doubled, rising to $13.3 million and 3.27 times as cash from rising profits was used to pay down liabilities. In addition, during the year BME improved its days sales outstanding and days payable outstanding ratios. Sales were converted into cash in 47 days versus 57 days, and in turn, trade creditors were paid more quickly, in 17 days compared to 40 days a year earlier. These ratios are within acceptable ranges.

The working capital and current ratio include affiliate accounts receivable. If the affiliates were unable to meet their obligations to BME, the liquidity measures would become tighter. These measures would remain at acceptable levels in two of the four years reviewed. At December 31, 2006, working capital was at $10.7 million and the current ratio was at 2.82 times

BME's leverage, in terms of its ratio of total liabilities to TNW, declined over the four years and is at a low level. BME had very few liabilities in relationship to its equity at the 2006 year-end. While BME's TNW was at a relatively stable level from fiscal year-ends 2003 through 2005, it more than doubled to $13.5 million at the 2006 year-end. When the December 31, 2006 TNW is adjusted to exclude affiliate receivables and shareholder notes receivable, its adjusted tangible net worth (ATNW), falls to $10.9 million, and leverage continues to be modest at 0.62 times.

Guarantees by the Consolidated Group (except BME and CAP) will be required to protect against the outflow of BME's funds to the entities within the Consolidated Group. As an additional measure of protection, affiliate receivables will be excluded from the minimum ATNW calculation. This will ensure that BME retains a sufficient level of equity to support the payment of self-insurance claims. CAP will only insure 90% of BME's self-insurance liabilities.

*BTT*

As did its sister company BME, BTT reported satisfactory working capital positions and current ratios above the acceptable level of 1.0 times at each of the year-ends reviewed. BTT's working capital increased from $389 thousand at the 2003 year-end to $22.9 million at the 2006 year-end. In addition, during this same period, the current ratio rose from 1.03 times to 4.24 times. These two liquidity measures benefited from the collection of slow-pay government receivables that were related to hurricane relief efforts. BME utilized these funds to fully repay borrowings under its line of credit and significantly reduce accounts payable, accrued liabilities, and affiliate payables. The working capital positions and current ratios include affiliate accounts receivables. If the affiliates were unable to meet their obligations to BTT, the liquidity measures would be lower, but remain at acceptable levels. At December 31, 2006, working capital would fall to $7.9 million and the current ratio would be at 2.12 times.

BTT was profitable in each of the years reviewed. From 2003 to 2005, revenues of $72.3 million rose to $106.7 million, up 47.6%. During this same period, operating and net incomes also trended upward, reaching four-year highs in 2005 at $13.4 million and $11.9 million, respectively. The revenue and profitability indicators in 2005 benefited from services provided for relief efforts following hurricane Katrina. BTT's 2006 revenue and net income levels at $99.2 million and $9.4 million fell short of those reported in 2005, but remained at satisfactory levels. EBITDA was positive for each of the periods reviewed with such funds adequately supporting both debt service requirements and capital expenditures by margins ranging between 7.3 times and 43.3 times.

BTT's TNW position grew by 43.0% over the four years reviewed. At the 2003 year-end, TNW was small at $584 thousand. By year-end 2006, TNW had increased to $25.7 million. At the 2006 year-end, BTT had very few liabilities in relationship to its equity. This is evidenced by its leverage ratio at 0.29 times, which is a significant improvement from the very high 24.3 times shown at the 2003 year-end. When the December 31, 2006 TNW is adjusted to exclude affiliate related receivables and shareholder notes receivable, its ATNW falls to $10.7 million, and leverage continues to be modest at 0.69 times.

Similar to BME, guarantees by the Consolidated Group (except BTT and CAP) will be required to protect against the outflow of BTT's funds to the entities within the Consolidated Group. In addition, affiliate receivables will be excluded from the minimum ATNW calculation to ensure that BTT retains a sufficient level of equity to support the payment of self-insurance claims that occur. This is important because CAP will only insure 90% of BTT's self-insurance liabilities.

The review of the Consolidated Group's financial statements indicates that it has the financial wherewithal to support the self-insurance obligations of the Applicants. Similar to the Applicants, the Consolidated Group is profitable; EBITDA was sufficient to cover both current debt obligations and capital expenditures, and the balance sheet items of liquidity, leverage and equity all displayed satisfactory positions.

Two considerations should be noted with respect to the Consolidated Group. First, over 95% of the Consolidated Group's net income is derived from the Applicants. This indicates that the

Consolidated Group's financial strength is drawn from BME and BTT, not from the other entities that are providing guarantees. While this lessens the quality of the Consolidated Group's guarantee, the primary function of this guarantee is to protect against the outflow of money to the entities within this group. In addition, any risk is mitigated by the more than 100% coverage provided by the restricted cash balance maintained by CAP, a South Carolina captive insurance company. CAP's cash balances are designated specifically for the payment of the Applicants' BI&PD claims.

The second consideration is that the Applicants' Total Reserves, which totaled $6.4 million at December 31, 2006, is at a high level when compared to the Consolidated Group's ATNW. Typically, when this occurs, FMCSA requires a motor carrier to maintain collateral above the minimum level. Such a requirement is not being imposed in this case because the Applicants' Total Reserves are more than 100% covered by the restricted cash balances maintained by CAP.

As a result of the Applicants' and the Consolidated Group's satisfactory financial positions, specifically, solid profitability, adequate levels of liquidity, and low levels of debt in relation to equity, the collateral requirement is being set at a minimum level of 25% and the ATNW requirement is being set at a minimum level of five (5) times.

The Applicants' collateral and minimum ATNW requirements reflect their specific financial and claims situations. It is prudent that any decision be based upon an applicant's financial condition, claims experience, and corporate structure. All requirements are set on a case-by-case basis so that the level of risk to the public is minimized.

Another relevant factor in this decision is that the Applicants' Total Reserves are more than 100% funded with cash restricted for the payment of such claims. Because FMCSA is placing a greater reliance on CAP's restricted cash balances, an additional requirement will be imposed. CAP's cash and cash equivalents must provide at least 100% coverage of the Applicants' Total Reserves.

The Applicants will also be required to maintain collateral on a combined basis. This deviation from the standard practice is necessary because the reserves for incurred but not reported (IBNR) claims is calculated jointly and only recorded on CAP's books. In addition, IBNR is not easily divided for it to be assigned to each of the Applicants' BI&PD claims.

I conclude, based on the above analysis, that each Applicant, with the support of the Consolidated Group has adequate resources to self-insure its bodily injury and property damage liability for the minimum limits of $1 million per occurrence.

**I find**:

The Applicants' self-insurance of its BI&PD liability, subject to conditions, will afford the security for the protection of the public contemplated by 49 USC §13906.

**It is ordered**:

The applications are granted, subject to the following conditions:

1. The Applicants must establish an irrevocable letter of credit or trust fund for their combined BI&PD claims liabilities in the amount of $2,000,000 or 25% of the combined level of CAP's Accrued Loss Adjustment Liability and both BTT's and BME's auto liability reserves as reported on the most recent period-end balance sheet, whichever is greater. The initial amount of the Applicants' BI&PD letter of credit or trust fund will be $2,000,000 ($1,000,000 self-insurance authority x 2 motor carriers). The required letter of credit or trust fund is designed to change annually and will be measured at each December 31. At no time will the Applicants' BI&PD letter of credit or trust fund balance be less than $2,000,000. If an increase in the collateral level is needed, then the adjustment must be made within 105 days from December 31 (i.e., 15 days from the due date for year-end financial statements).

The Applicants must submit, within 60 days of the service date of the decision, a copy of the agreement with the financial institution establishing the letter of credit or trust fund. The FMCSA must approve the terms of the letter of credit or trust fund before any effective date for activation of the letter of credit or trust fund. Any changes in their terms must be given prior approval by the FMCSA.

The Applicants must file the original of any letter of credit with FMCSA's Commercial Enforcement Division.

Furthermore, if the Applicant elects to use trust funds, it must have unrestricted access to the trust funds and drawdowns may only be made to satisfy claims for BI&PD and/or cargo liabilities. Any drawdown from the trust funds must be reported immediately to the FMCSA, along with an explanation as to how the Applicant proposes to respond to additional liability claims.

To ensure the protection of the public, it is further required that any trust fund agreement contain the following provisions:

(a) The trustee must be identified and a statement must be given of its relationship to the Applicants and the Consolidated Group. The address(es) of the trustee must also be provided.

(b) The beneficiary of the trust fund agreement must be clearly designated as BI&PD liability claimants of BME and BTT. No other parties may have rights of recovery against the respective funds.

(c) The trust fund agreement must be established so that it may not be revoked until all cognizable claims arising during the time the carrier holds FMCSA authority to self-insure have been resolved.

(d) Payments under the trust agreement must be made directly to BI&PD claimants.

Any drawdown from the letters of credit or trust funds must be replenished within 30 days, and any failure to replenish the amount of a drawdown within 30 days must be reported immediately to the FMCSA.

2. Within 60 days of the service of this decision, all of the entities (except CAP, BME and BTT) listed in the Consolidated Group's annual audited financial report must file a formal written agreement with the FMCSA stating that all will guarantee payment of the self-insurance obligations of the Applicants. Should other entities join the "Consolidated Group" covered in the audited statements, such entities must also provide guarantees.

3. Each applicant must maintain a minimum Adjusted Tangible Net Worth ("ATNW"). It is defined as TNW less all affiliate and shareholder asset accounts. BME's and BTT's minimum ATNW level must be equal to two (2) times each entities' self-insurance authority, in this case, $2,000,000. In addition, the Consolidated Group must maintain a minimum ATNW. The Consolidated Group's minimum ATNW level must be equal to the greater of (a) five (5) times Total Reserves, or (b) two times the Applicants' self-insurance authorities. The minimum ATNW requirement is designed to change quarterly, and will be measured on March 31, June 30, September 30, and December 31, annually.

Notice must be given to the FMCSA if the ATNW balances fall below these levels. If this occurs, the Applicants and/or the Consolidated Group will then have 30 days to correct the situation or face termination of the authority to self-insure. At present, each Applicant's minimum ATNW requirement will be $2,000,000 ($1,000,000 x 2 times the self-insurance authority) and the Consolidated Group's minimum ATNW requirement will be $4,000,000 ($1,000,000 x 2 times the self-insurance authority x 2 motor carriers). This measurement is meant to fluctuate based upon the reserve level of combined pending BI&PD liabilities. However, at no time will the minimum ATNW requirement be less than two times the self-insurance authority, or in this case, $2,000,000 for the Applicants and $4,000,000 for the Consolidated Group.

4. CAP must maintain cash and cash equivalents equal to 100% of Total Reserves. Notice must be given to the FMCSA if at any time, the coverage provided by CAP's restricted cash balance falls below 100%. If this occurs, the Applicants and/or the Consolidated Group will then have 30 days to correct the situation or face termination of the authority to self-insure. This condition will be measured on March 31, June 30, September 30, and December 31, annually.

5. The Applicants and CAP must submit unaudited annual and quarterly financial statements. The Consolidated Group must submit unaudited quarterly and audited annual financial statements, including all applicable consolidating notes and schedules, within 60 and 90 days, respectively, after the end of each quarterly or annual period. The audited annual financial statements must be independently prepared, contain unqualified opinions and be prepared in accordance with Generally Accepted Accounting Principles. All of

the financial statements must include a certification by an appropriate company official verifying the accuracy of the information provided.

6. The Applicants must submit their December 31, company-specific quarterly claims report within 30 days from the quarter-end. All other quarterly claims reports must be submitted within 60 days of the quarter-end. The report must detail the number, aggregate dollar amount, the nature of the applicant's claims experience and include the dollar amount of reserves established, if any. Claims in excess of $50,000 and court cases must be itemized separately, and each report is to be certified as accurate by an officer of each company, who is independent of risk management activities.

7. The Applicants must notify the FMCSA immediately of any pending or contingent BI&PD liability claims(s) that individually exceeds $50,000 or collectively exceed $250,000.

8. The Applicants must have continuously in place from the inception of their self-insurance programs excess insurance coverage for BI&PD claims liabilities covering between $1 million and $10 million. Proof of this additional excess BI&PD liability coverage must be submitted to the FMCSA via ACCORD form or a policy premium statement. Immediate notice must be given if there are any changes to this coverage. If there is any lapse in coverage(s), the Applicants will have 30 days to correct the situation or face termination of their self-insurance authorization.

9. The FMCSA is to be notified within five (5) days of a default under the terms of any loan agreements with a financial institution or bonded indebtedness by any participant in the Consolidated Group. Full disclosure should be provided about the consequences, actual or potential, of such default. Any default could be cause for termination of the self-insurance authority.

10. The Consolidated Group must submit quarterly loan and lease covenant compliance calculations within 60 days of each quarter/year-end. An appropriate company official must certify these quarterly loan and lease covenant compliance calculations.

11. The Applicants must notify FMCSA of any material change in their or the Consolidated Group's ownership or control within 10 days of the change. A material change in ownership or control will automatically terminate the Applicants' self-insurance authorization the date the change is effective. In the event the Applicants fail to notify FMCSA of a material change in their or the Consolidated Group's ownership and FMCSA subsequently becomes aware of the change, FMCSA reserves the right to terminate the Applicants' self-insurance authorities immediately. For purposes of this Condition, "material ownership or control" means a majority ownership interest.

12. The Applicants must notify FMCSA within 10 days of any extraordinary event effecting a material change to their or the Consolidated Group's financial health. In the event the Applicants fail to notify FMCSA of developments pertaining to extraordinary events and

FMCSA subsequently becomes aware of the change, FMCSA reserves the right to terminate the Applicants' self-insurance authorities immediately.

13. The Applicants must notify the FMCSA no later than 90 days prior to the effective date of any change in the terms or cancellation of the letter of credit or trust fund agreement. In addition, the FMCSA must receive renewal notices for the letter of credit within 60 days from the renewal date. If trust funds are established, then copies of the trust fund statement showing its balance must be furnished to the FMCSA within 30 days of each quarter-end.

14. The FMCSA retains the authority to terminate the Applicants' self-insurance authorization at any time if it appears to the FMCSA that their financial arrangements, or those of the Consolidated Group, fail to provide satisfactory protection for the public; or the Applicants or the Consolidated Group fail to file timely any of the information required by the FMCSA.

15. The FMCSA reserves the right to require the Applicants, and the entities in the Consolidated Group to provide any additional information deemed necessary.

16. The FMCSA retains the right to impose such additional conditions in the future as may be necessary for the protection of the public.

17. Within 60 days of the quarter/year-end, CAP must submit copies of the cash and cash equivalent account statements to verify its cash balances.

18. This decision is effective on the date of service. The Applicants, however, may not activate their self-insurance authorizations less than 30 days after submitting documents to the FMCSA demonstrating that the required trust funds have been established. The Applicants must also notify the FMCSA of the date they will activate their self-insurance authority.

By the Federal Motor Carrier Safety Administration,

Robert W. Miller

Acting Director, Office of
Enforcement and Compliance

Page 14

# FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION

## DECISION

**SERVICE DATE:**
**June 14, 2007**

## DOCKET NO. MC- 188121

### U.S. XPRESS, INC.
### (Chattanooga, Tennessee)

## APPLICATION FOR AUTHORITY TO SELF-INSURE

Subject to certain conditions, the Applicant is authorized to self-insure its bodily injury and property damage liability, and its cargo liability.

**Decided:** **June 13, 2007**

U.S. Xpress, Inc. (Xpress or Applicant), seeks authority to self-insure its $1 million bodily injury and property damage (BI&PD) liability and its $10,000 cargo liability under 49 USC §13906 and 49 CFR 387.309. Evidence presented by the Applicant warrants the granting of BI&PD and cargo liability self-insurance authority provided certain conditions are met.

The Applicant is a wholly-owned subsidiary of U.S. Xpress Enterprises, Inc. (Parent). Xpress is primarily a truckload carrier with operations divided into three service types, including long-haul/over-the-road transport, regional transport, and dedicated contract carriage. The Applicant services the continental United States, parts of Canada, and Mexico through its Long Haul Division, and operates regionally in the West, Midwest, and Southeastern United States. The Applicant operates six major service centers in Tunnel Hill, Georgia, Medway, Ohio, Oklahoma City, Oklahoma, Lincoln, Nebraska, Salt Lake City, Utah, and Colton, California. General commodities transported by Xpress include: appliances, metals, paper products, consumer goods, apparel, building materials, machinery, mail, electronics, consumables, and hazardous materials. Currently, the Applicant operates approximately 4,500 company-owned tractors, 13,000 trailers, and 1,000 tractors owned by independent contractors.

The Applicant is required to maintain security for the protection of the public in the amount of $1 million per occurrence for BI&PD liability and $5,000 per vehicle ($10,000 aggregate) for cargo liability. The Applicant has in effect and on file with the Federal Motor Carrier Safety Administration (FMCSA) the requisite insurance coverage. The Applicant estimates total annual savings from self-insurance to be between $1,465,000 and $2,580,000 per year.

## Exhibit D

In support of its application to self-insure, the Applicant provided company-prepared annual financial statements for the years 2003 through 2006. Also provided were the Parent's 2003 through 2006 audited annual financial statements. No adjustments to the data have been made except that the "goodwill and other intangible" category has been deducted (when applicable) to arrive at tangible net worth (TNW).

### U.S. XPRESS, INC.
### Financial Statement Analysis

| ($ In Thousands) | Year Ending 12/31//03 | Year Ending 12/31/04 | Year Ending 12/31/05 | Year Ending 12/31/06 | 2006/2005 % Increase/ (Decrease) |
|---|---|---|---|---|---|
| Operating Revenue | $788,348 | $901,602 | $929,137 | $915,662 | (1.5%) |
| Operating Income | $36,651 | $56,713 | $42,785 | $41,250 | (3.6%) |
| Net Income | $18,334 | $30,056 | $21,793 | $14,351 | (34.1%) |
| Earnings Before Interest, Taxes, Depreciation and Amortization (Less: non-cash items) | $43,595 | $62,668 | $49,709 | $50,211 | 1.0% |
| Operating Ratio | 95.4% | 93.7% | 95.4% | 95.5% | 0.1% |
| Cash Flow Available for Insurance and Claims | 1.90x | 2.07x | 1.91x | 2.04x | 6.6% |
| Cash and Short-Term Investments | ($1,071) | ($128) | ($572) | $1,407 | 346.0% |
| Working Capital | $44,655 | $94,668 | $99,574 | $116,999 | 17.5% |
| Current Ratio | 1.42x | 1.71x | 1.62x | 1.69x | 4.1% |
| Tangible Net Worth | $53,031 | $82,931 | $104,652 | $119,023 | 13.7% |
| Tangible Net Worth (less Affiliate Rec.) | ($7,752) | $11,796 | $25,471 | $5,197 | (79.6%) |
| Total Liabilities/Tangible Net Worth | 2.57x | 2.25x | 2.03x | 1.96x | (3.7%) |
| Total Liabilities/Tangible Net Worth (less Affiliate Rec.) | (17.61)x | 15.79x | 8.35x | 44.83x | 437.0% |

Source of Data: U.S. Xpress, Inc.'s application to self-insure

## U.S. XPRESS ENTERPRISES, INC.
### Financial Statement Analysis

| ($ In Thousands) | Year Ending 12/31/03 | Year Ending 12/31/04 | Year Ending 12/31/05 | Year Ending 12/31/06 | 2006/2005 % Increase/ (Decrease) |
|---|---|---|---|---|---|
| Operating Revenue | $930,509 | $1,105,656 | $1,164,232 | $1,471,764 | 26.4% |
| Operating Income | $24,416 | $40,267 | $23,970 | $56,908 | 137.4% |
| Net Income | $7,643 | $16,426 | $9,432 | $20,104 | 113.1% |
| Earnings Before Interest, Taxes, Depreciation and Amortization (less: non-cash items) | $64,020 | $95,630 | $67,128 | $138,190 | 105.9% |
| Operating Ratio | 97.4% | 96.4% | 97.9% | 96.1% | (1.8%) |
| Cash Flow Available for Insurance and Claims | 1.58x | 2.21x | 1.76x | 2.14x | 22.0% |
| Cash and Short-Term Investments | $168 | $66 | $9,488 | $913 | (90.4%) |
| Working Capital | $37,143 | $50,915 | $38,124 | $17,158 | (55.0%) |
| Working Capital (Less: Op. Leases) | ($27,678) | ($17,984) | ($29,159) | ($68,845) | (136.1%) |
| Current Ratio | 1.39x | 1.39x | 1.23x | 1.07x | (12.9%) |
| Current Ratio (Less: Op. Leases) | 0.22x | 0.19x | 0.23x | 0.26x | 15.0% |
| Tangible Net Worth | $93,058 | $159,188 | $160,269 | $158,192 | (1.3%) |
| Tangible Net Worth (Less: Affiliate Accts.) | $87,243 | $146,522 | $140,818 | $149,127 | 5.9% |
| Total Liabilities/Tangible Net Worth | 2.95x | 1.99x | 2.34x | 4.11x | 75.9% |
| Total Liabilities/Tangible Net Worth (Less: Affiliate Accts.) | 3.15x | 2.17x | 2.66x | 4.36x | 63.9% |
| Total Liabilities + Op. Leases / Tangible Net Worth (Less: Affiliate Accts.) | 5.02x | 3.33x | 3.74x | 5.97x | 59.6% |

**Source of Data:** U.S. Xpress, Inc.'s application to self-insure

Xpress maintains a high commitment to safe operations at all levels of the organization. Prospective drivers are subject to a background screening, including criminal background checks. All drivers are required to attend a pre-hire orientation that is devoted to the safe operation of the equipment and safe practices on the road. All new hires must complete a minimum of 150 hours of driving time that is observed by an experienced driver. Training programs are conducted to enhance driver knowledge and skill. A Safety Review Committee examines all accidents, and where appropriate, driver counseling, training, or discipline is employed to encourage safe practices and correct poor habits. Xpress's emphasis on safety is also demonstrated in its fleet specifications. Company-owned tractors are equipped with electronic logs, anti-lock brakes, electronic speed controls, special mirrors, side tracker cameras, and the Eaton Vorad Collision Avoidance System. This system provides drivers with additional response time to prevent accidents. The Applicant has a satisfactory safety fitness rating from the U.S. Department of Transportation.

The Applicant's safety program includes a variety of initiatives, including root cause analysis of major motor vehicle accidents, design and implementation of numerous prevention programs, such as rollover awareness campaigns and installation of mirror adjustment stations at all service centers, a monthly safety briefing program, which encompasses a cohesive, repeated, multimedia focus on a single safety topic enhanced by one-on-one supervisor/fleet manager discussion of the topic with the driver, weekly safety and loss prevention communications to the driver force

through a variety of media, including the Driver Info Line (a toll free call-in line), a company newsletter, web-based communications, and satellite communications. The Applicant also offers a variety of incentive programs to encourage safe habits, including a safety recognition program for drivers completing each year of accident-free driving, a Million Miler Club for drivers who have completed at least one million accident free miles, a fuel incentive program for drivers who govern their speed to conserve fuel, a truck rodeo to promote skill development, and the Master Driver Certification to encourage continuing driver safety education.

Xpress maintains a full staff of safety and loss prevention professionals, which is overseen by the Director of Safety, Vice President of Safety & Recruiting, Vice President of Safety and Vice President of Risk Management. There are 15 full-time employees devoted to safety and loss prevention at the management level. The Safety Department employs an additional 53 persons in clerical positions to assist with compliance matters. There are also three claims examiners for internal physical damage claims, and five full-time employees devoted to workers compensation. These individuals have experience levels ranging between 1 year and 30 years.

Administration of all BI&PD and cargo claims within the respective $1,000,000 deductible for BI&PD claims and $250,000 deductible for cargo claims is handled by its in-house claims department. If granted authority to self-insure, administration of BI&PD and cargo claims will remain the same.

The data in the following tables represent the total claims that are incurred, paid, and outstanding for each respective period-end. As of December 31, 2006, the Applicant had $38.2 million in combined pending BI&PD and cargo claims. The Applicant's maximum financial responsibility for its pending claims was $36.7 million. The remaining $1.5 million is the responsibility of the insurance carrier.

4

## BI&PD CLAIMS EXPERIENCE

| (In Actual $) | 1/01/03 - 12/31/03 | 1/01/04 - 12/31/04 | 1/01/05 - 12/31/05 | 1/01/06 - 12/31/06 | Percent Increase/ (Decrease) 2006/2005 |
|---|---|---|---|---|---|
| Claims Received (#) | 2,080 | 2,357 | 2,757 | 3,103 | 12.5% |
| Claims Received ($) | $18,580,994 | $22,359,923 | $20,756,560 | $25,468,047 | 22.7% |
| Average Claims Filed ($) | $8,933 | $9,487 | $7,529 | $8,208 | 9.0% |
| Claims Received ($) / Revenue | 2.4% | 2.5% | 2.2% | 2.8% | 0.5% |
| Number of Claims Paid | 2,377 | 2,631 | 2,567 | 2,692 | 4.9% |
| Losses Paid ($) | $13,503,454 | $14,546,686 | $22,258,688 | $19,644,333 | (11.7%) |
| Number of Pending Claims | 1,438 | 1,169 | 1,359 | 1,777 | 30.8% |
| Outstanding Claims Reserves ($) | $19,049,743 | $28,275,251 | $37,765,867 | $36,979,153 | (2.1%) |
| Average Pending Claims ($) | $13,247 | $24,188 | $27,789 | $20,810 | (25.1%) |
| Outstanding Claims Reserves ($) / ATNW | 21.8% | 19.3% | 26.8% | 24.8% | (2.0%) |
| Outstanding Claims Reserves to be Paid by Xpress ($) | $10,954,147 | $23,943,370 | $35,653,067 | $35,444,126 | (0.6%) |
| Outstanding Claims to be Paid by Insurance Carrier ($) | $8,095,596 | $4,331,881 | $2,112,800 | $1,535,027 | (27.3%) |
| Premiums Paid to Insurance Carrier ($) | $8,338,974 | $7,173,310 | $6,682,875 | $6,681,089 | (6.8%) |

* Claims that are closed with zero paid are not treated as claims after their closing. This can cause a decrease in the overall number of claims from one year to the next.

## CARGO CLAIMS EXPERIENCE

| (In Actual $) | 1/01/03 - 12/31/03 | 1/01/04 - 12/31/04 | 1/01/05 - 12/31/05 | 1/01/06 - 12/31/06 | Percent Increase/ (Decrease) 2006/2005 |
|---|---|---|---|---|---|
| Claims Received (#) | 935 | 1,016 | 971 | 710 | (26.9%) |
| Claims Received ($) | $1,886,640 | $2,445,220 | $2,361,810 | $2,243,198 | (5.0%) |
| Average Claims Filed ($) | $2,018 | $2,407 | $2,432 | $3,159 | 29.9% |
| Claims Received ($) / Revenue | 0.2% | 0.3% | 0.3% | 0.2% | 0.1% |
| Number of Claims Paid | 956 | 857 | 1,101 | 670 | (39.1%) |
| Losses Paid ($) | $1,894,621 | $2,109,790 | $2,441,405 | $1,886,951 | (22.7%) |
| Number of Pending Claims | 302 | 471 | 341 | 381 | 11.7% |
| Outstanding Claims Reserves ($) | $645,836 | $981,266 | $901,671 | $1,257,918 | 39.5% |
| Average Pending Claims ($) | $2,139 | $2,083 | $2,644 | $3,302 | 24.9% |
| Outstanding Claims Reserves ($) / ATNW | 0.7% | 0.7% | 0.6% | 0.8% | 0.2% |
| Outstanding Claims to be Paid by Xpress ($) | $645,836 | $981,266 | $901,671 | $1,257,918 | 39.5% |
| Pending Claims to be Paid by Insurance Carrier ($) | $0 | $0 | $0 | $0 | 0.0% |
| Premiums Paid to Insurance Carrier ($) | $1,024,195 | $662,817 | $699,641 | $728,325 | 5.6% |

## DISCUSSION

A full review of the financial statements and claims data submitted by the Applicant shows the following:

Xpress was profitable in each of the years reviewed. From 2003 to 2006, revenues of $788.3 million rose to a $925.9 million level, up 16.1%. Operating and net incomes in 2004 were at four-year highs at $56.7 million and $30.1 million, respectively. Since that time, these two profitability measures have steadily declined, ending 2006 at the respective levels of $41.3 million and $14.4 million. The cash flow measurement of earnings before interest, taxes, depreciation and amortization ("EBITDA") was positive for each of the periods reviewed with such funds adequately supporting the combined yearly debt service requirements and capital expenditures by margins ranging between 1.9 times and 5.6 times.

At each year-end reviewed, Xpress reported satisfactory working capital positions (defined as current assets less current liabilities) and current ratios (defined as current assets divided by current liabilities) above the acceptable level of 1.0 times. For the last three years, working capital has fluctuated within a moderate range between $94.7 million and $117.0 million. However, the working capital includes a significant level of affiliate-related accounts receivable. If the affiliates were unable to meet their obligations to Xpress, the liquidity measures would become tighter. At December 31, 2006, working capital would be sharply lower at $3.2 million and the current ratio would be at 1.02 times.

There is also a concern with the type of assets on Xpress's balance sheet. At each year-end presented in the chart on page 2, affiliate-related accounts receivable, deferred tax assets and goodwill comprised over 40% of Xpress's total assets. This is a concern because deferred tax assets and goodwill are difficult to turn into cash under distressed conditions, therefore limiting the potential payments to claimants.

Because of the high concentration of affiliate-related accounts receivable and the illiquid nature of deferred tax assets and goodwill, the Parent is being required to provide a guarantee of Xpress's self-insurance liabilities and the collateral requirement is being set at a relatively high level.

Xpress's leverage, in terms of its ratio of total liabilities to TNW, was at a moderate level and trended downward over the periods reviewed. This ratio decreased from 2.57 times at FYE 2003 to 1.96 times at FYE 2006. Over the four-year period reviewed, TNW increased by 124.4%, up from $53.0 million at the 2003 year-end to $119.0 million at the 2006 year-end. However, the December 31, 2006 adjusted tangible net worth, ("ATNW"), is sharply lower, at $5.2 million, because affiliate-related receivables are eliminated from the calculation. At this level, Xpress's ATNW is only slightly higher than the required minimum level to be admitted into the self-insurance program of $2.0 million. Also, when ATNW is used in the leverage calculation, the leverage ratio rises to a very high level at 44.83 times.

The following chart reflects Xpress's combined outstanding BI&PD and cargo claims reserves that fall within the proposed self-insurance levels. The amounts range from $19.7 million to

6

$38.7 million. As can be seen, Xpress's combined BI&PD and cargo claims reserves are greater than its ATNW, which is an unacceptable level of risk to the public. When using the Parent's ATNW, the multiples of ATNW to claims reserves are 5.0 times or less, which is also an unacceptable level of risk to the public. However, when the collateral requirement is set at 80%, the Parent's multiples improve to an acceptable level of more than 18.0 times. The average for carriers in the self-insurance program is 20 times.

| ($ In Thousands) | 12/31/03 | 12/31/04 | 12/31/05 | 7/31/06 |
|---|---|---|---|---|
| Combined BI&PD and Cargo Claims within S-I Retention | $19,696 | $29,256 | $38,668 | $38,237 |
| Xpress's ATNW | ($7,752) | $11,796 | $25,471 | $5,197 |
| Parent's ATNW | $87,243 | $146,522 | $140,818 | $149,127 |
| Xpress's ATNW / S-I-Claims | N/M | 0.4x | 0.7x | 0.1x |
| Parent's ATNW / S-I Claims | 4.4x | 5.0x | 3.6x | 3.3x |
| Parent's ATNW / S-I Claims Reserves – Collateral (80%) | 22.1x | 25.0x | 18.2x | 19.5x |

Even though the Applicant is profitable, on a stand-alone basis, it would not be a viable candidate for the self-insurance program. This determination is based on several facts. First, even though Xpress is profitable, there is a high concentration of balance sheet assets that are either intangible (such as goodwill) or potentially illiquid (deferred tax assets and affiliate-related accounts receivable) if the Applicant's performance declines. These three items account for more than 40% of the total assets on Xpress's books. Secondly, Xpress's combined BI&PD and cargo claims within the proposed self-insurance limits are significantly greater than ATNW.

Xpress's request was considered with the condition that the Parent guarantees the self-insurance obligations of Xpress. The analysis of the Parent indicates that while there are concerns regarding the Parent's financial state, a guarantee provides an adequate level of support for Xpress to be accepted into the program, subject to certain conditions. On the positive side, the Parent has recorded profitable operations for fiscal years 2003 through 2006; its EBITDA was sufficient to cover debt service obligations in each of the years reviewed; and it has maintained a stable ATNW position over the past four years.

Concerns regarding the Parent's financial position and the mitigating conditions are as follows:

- There was a significant increase in the Parent's overall debt levels in 2006 by $275.9 million. As a result, the Parent's 2006 year-end balance sheet was highly leveraged, and it also had a high level of off-balance sheet debt (i.e., operating leases). It is for this reason that Xpress is being required to maintain trust funds instead of letters of credit.

- Trust funds provide an increased measure of protection for the public because if a carrier files for bankruptcy, the cash in the trust fund is not part of the bankrupt estate, but is held in trust for the public. The benefit is that the bankruptcy proceeding can not affect the trust.

- Furthermore, there is a pre-determined trustee named, who is required to carry out the disbursement of funds per the terms of the trust agreement.

- As illustrated in the above chart, the Parent's minimum ATNW multiples of five (5) times or less are significantly below the average multiple for carriers currently in the program (20 times). Therefore, Xpress is being required to maintain an increased level of collateral (80%) and the Parent is being required to maintain a minimum ATNW set as a multiple of Xpress's combined self-insured BI&PD and cargo claims reserves. Also supporting the FMCSA's conclusion that the Parent must maintain a minimum ATNW is the fact that Xpress's combined BI&PD and cargo claims reserves within the proposed retention level are greater than its ATNW.

- At any given time, the Parent has equity investments in other entities. The ATNW calculation addresses these activities.

The collateral and minimum ATNW benchmarks required by this decision reflect Applicant's specific financial and claims situation. It is prudent that consideration for these provisions be based upon an applicant's financial condition, claims experience, and corporate structure. All requirements are set on a case-by-case basis so that the level of risk to the public is minimized.

I conclude, based on the above analysis, that Xpress, with the support of its Parent and subject to the specified set of conditions, has adequate resources to self-insure its bodily injury and property damage and cargo liability for the minimum limits of $1 million per occurrence for BI&PD and $5,000 per vehicle and $10,000 aggregate for cargo liability.

**I find**:

The Applicant's self-insurance of BI&PD and cargo liabilities, subject to conditions, will afford the security for the protection of the public contemplated by 49 USC §13906.

**It is ordered**:

The application is granted, subject to the following conditions:

1. The Applicant must establish a trust fund for BI&PD claims liabilities in the amount of $1,000,000 or 80% of the pending self-insured BI&PD claim reserve reported on the most recent period-end balance sheet, whichever is greater. Furthermore, the Applicant must maintain a trust fund for cargo claims in the amount of $10,000 or 80% of the pending cargo claim reserve reported on the most recent period-end balance sheet, whichever is greater. The initial amount of the Applicant's BI&PD and cargo trust funds will be $1,000,000 and $10,000, respectively. The required trust funds are designed to change quarterly and will be measured at each March 31, June 30, September 30, and December 31. At no time will the Applicant's BI&PD and cargo trust fund balances be less than $1,000,000 and $10,000, respectively. If an increase in the collateral levels is needed, then the adjustment must be made within 105 days from December 31 and 75

8

days from March 31, June 30 and September 30 (i.e., 15 days from the due date for year-end and quarterly financial statements).

The Applicant must submit, within 60 days of the service date of this decision, a copy of the agreements with the financial institution establishing the trust funds. The FMCSA must approve the terms of the trust funds before any effective date for activation of the trust funds. Any changes in their terms must be given prior approval by the FMCSA.

Furthermore, the Applicant must have unrestricted access to the trust funds and drawdowns may only be made to satisfy claims for BI&PD and/or cargo liabilities. Any drawdown from the trust funds must be reported immediately to the FMCSA, along with an explanation as to how the Applicant proposes to respond to additional liability claims. Any drawdown from the trust funds must be replenished within 30 days, and any failure to replenish the amount of a drawdown within 30 days must be reported immediately to the FMCSA.

To ensure the protection of the public, the trust fund agreements must contain the following provisions:

(a) The trustees must be identified and a statement must be given of their relationship to the Applicant. The addresses of the trustees must also be provided.

(b) The beneficiaries of the trust fund agreements must be clearly designated as BI&PD or cargo liability claimants, respectively, of the Applicant. No other parties may have rights of recovery against the respective funds.

(c) The trust fund agreements must be established so that they may not be revoked until all cognizable claims arising during the time the carrier holds FMCSA authority to self-insure have been resolved.

(d) Payments under the trust agreements must be made directly to BI&PD or cargo claimants.

2. Within 60 days of the service of this decision, U.S. Xpress Enterprises, Inc. must file a formal written agreement with the FMCSA stating that it will guarantee payment of the self-insurance obligations of the Applicant.

3. The Applicant must maintain a minimum Adjusted Tangible Net Worth ("ATNW"). It is defined as TNW less all affiliate and shareholder asset accounts. The Applicant's minimum ATNW level must be equal to two (2) times the self-insurance authority, in this case, $2,020,000. In addition, the Parent must maintain a minimum ATNW. The Parent's minimum ATNW level must be equal to the greater of (a) three (3) times Xpress's combined self-insured BI&PD and cargo claims reserves as reported on Xpress's quarter/year-end balance sheet, or (b) two times Xpress's self-insurance authority. Notice must be given to the FMCSA if the ATNW balances fall below these levels. If this occurs, Xpress and/or the Parent will then have 30 days to correct the

situation or face termination of the authority to self-insure. At present, Xpress's and the Parent's minimum ATNW requirement will be $2,020,000 ($1,010,000 x 2 times the self-insurance authority). This measurement is meant to fluctuate quarterly based upon the reserve level of combined pending BI&PD and cargo liabilities. However, at no time will the minimum ATNW requirement be less than two times the self-insurance authority, or in this case, $2,020,000.

4. The Applicant must submit unaudited quarterly and annual financial statements. The Parent must submit unaudited quarterly and audited annual financial statements, including all applicable notes and consolidating schedules. Both the Applicant's and the Parent's financial information must be submitted within 60 and 90 days, respectively, after the end of each quarterly or annual period. The Parent's annual financial statements must be independently prepared and contain unqualified opinions. Both the Applicant's and the Parent's annual and quarterly statements must be prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and must include a certification by an appropriate company official verifying the accuracy of the information provided.

5. The Applicant must submit quarterly claims reports within 60 days of each quarter-end. The reports must detail the number, aggregate dollar amount, the nature of the Applicant's claims experience and include the dollar amount of reserves established, if any. BI&PD claims in excess of $50,000, cargo claims in excess of $10,000, and court cases must be itemized separately. The reports are to be certified as accurate by an officer who is independent of risk management activities.

6. The Applicant must notify the FMCSA immediately of any pending or contingent BI&PD liability claim(s) that individually exceeds $50,000 or collectively exceed $250,000 or any cargo liability claim that individually exceeds $25,000.

7. The Applicant must have continuously in place from the inception of its self-insurance program excess insurance coverage for BI&PD claims liabilities covering between $1 million and $100 million. Proof of this additional excess BI&PD liability coverage must be submitted to the FMCSA via ACCORD form or a policy premium statement. Immediate notice must be given if there are any changes to this coverage. If there is any lapse in coverage(s), the Applicant will have 30 days to correct the situation or face termination of its self-insurance authorization.

8. The FMCSA is to be notified within five (5) days of a default under the terms of any loan agreements with a financial institution or bonded indebtedness. Full disclosure should be provided about the consequences, actual or potential, of such default. Any default could be cause for termination of the self-insurance authority.

9. The Applicant must notify the FMCSA no later than 90 days prior to the effective date of any change in the terms or cancellation of the trust fund agreements.

10. Copies of the BI&PD and cargo trust fund statements showing the balance for each must be furnished to the FMCSA within 60 days of each quarter-end.

11. The Applicant must notify FMCSA of any material change in its or the Parent's ownership or control within 10 days of the change. A material change in ownership or control will automatically terminate Xpress's self-insurance authorization the date the change is effective. In the event the Applicant fails to notify FMCSA of a material change in its or its Parent's ownership and FMCSA subsequently becomes aware of the change, FMCSA reserves the right to terminate Xpress's self-insurance authority immediately. For purposes of this Condition, "material ownership or control" means a majority ownership interest.

12. The Applicant must notify FMCSA within 10 days of any extraordinary event effecting a material change to the Applicant's or the Parent's financial health. In the event the Applicant fails to notify FMCSA of developments pertaining to extraordinary events and FMCSA subsequently becomes aware of the change, FMCSA reserves the right to terminate Xpress's self-insurance authority immediately.

13. The Parent must submit quarterly loan and lease covenant compliance calculations within 60 days and 90 days of each respective quarterly or annual period. An appropriate company official must certify these quarterly loan and lease covenant compliance calculations.

14. The FMCSA reserves the right to require the Applicant and the Parent to provide any additional information deemed necessary.

15. The FMCSA retains the right to impose such additional conditions in the future as may be necessary for the protection of the public.

16. The FMCSA retains the authority to terminate Xpress's self-insurance authorization at any time if it appears to the FMCSA that the Applicant's and/or the Parent's financial arrangements fail to provide satisfactory protection for the public or if these entities fail to file timely any of the information required by the FMCSA.

17. This decision is effective on the date of service. The Applicant, however, may not activate its self-insurance authorization less than 30 days after submitting documents to the FMCSA demonstrating that the required trust funds have been established. The Applicant must also notify the FMCSA of the date it will activate its self-insurance authority.

By the Federal Motor Carrier Safety Administration, William A. Quade, Director, Office of Enforcement and Compliance.

## FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION

## DECISION

**SERVICE DATE:**
**September 11, 2007**

### DOCKET NO. MC-119399

### CONTRACT FREIGHTERS, INC.
### (Joplin, Missouri)

## REOPENING OF SELF-INSURANCE AUTHORIZATION

<u>**Decided:**</u>  **September 10, 2007**

By the decision served March 27, 2007 (the Decision), Contract Freighters, Inc. (CFI) was authorized to self-insure up to $1 million of its statutory bodily injury and property damage (BI&PD) liability and $10,000 of its cargo liability, under 49 USC § 13906 and 49 CFR 387.309, subject to certain conditions.

By a petition dated April 24, 2007, CFI requests that the Federal Motor Carrier Safety Administration (FMCSA or the Agency) modify condition one (1) of the Decision, relating to CFI's collateral requirement and delete condition two (2) of the Decision, which requires CFI's parent company, Transportation Resources, Inc. (TRI or the Parent), to guarantee CFI's self-insurance obligations. CFI proposes to post a greater level of collateral at 50% of pending claims reserves as consideration for eliminating the Parent's guarantee.

While conducting its review of CFI's reconsideration request, FMCSA learned that on July 16, 2007, CFI's Parent entered into a merger agreement with Con-way, Inc. in a transaction valued at $750 million. The anticipated closing date for this transaction is the third calendar quarter of 2007.

At this time, FMCSA is addressing CFI's acquisition announcement. Because of this recent development, FMCSA will not allow CFI to activate its self-insurance authority and it is putting the reconsideration request on hold until certain merger documents are remitted for review.

The FMCSA is taking this position for several reasons. First, CFI's post-merger financial condition is not known. More specifically, FMCSA is not able to ascertain if CFI's balance sheet will change as a result of the merger. Second, it is not known to what extent, if any, the secured creditors of Con-way will encumber CFI's assets and common stock. Without this information, FMCSA is unable to determine whether CFI's financial condition following the merger supports its respective $1.0 million and $10,000 self-insurance authority for BI&PD and cargo claims. Accordingly, CFI is required to remit certain merger documents for review.

## <u>Exhibit E</u>

Lastly, we note that CFI did not notify FMCSA of the material change in CFI's ownership even though its self-insurance authorization provides clear notice that such a material change is extremely relevant to the Agency's self-insurance determination. CFI was aware of the conditions in the self-insurance authorization and there is an expectation that CFI would have been more forthcoming about the merger of its Parent. Information about this merger and change of ownership is critical to FMCSA's final decision.

**It is ordered**:

Within 60 days of the service date, the following items must be submitted to FMCSA.

1. A description of the precise terms of the transaction, including a copy of the acquisition agreement.

2. The estimated closing date for the transaction.

3. A "before" and "after" corporate organizational chart showing Parent, subsidiaries, shareholders, and affiliate entities, if any. The chart must also indicate ownership percentages.

4. A description of the extent to which the carrier will retain management and key personnel, and any other factors providing a continuity of the same sort of operation under new ownership.

5. Pro-forma financial statements to explain exactly what is proposed and what the impact will be on the CFI's financial condition, as viewed by FMCSA self-insurance standards. These would compare CFI's financial condition both immediately preceding consummation and immediately following consummation of the merger, with a thorough explanation noting the changes and the assumptions made.

6. An explanation of the debt arising from the transaction, including a complete description of the subordination of any debt or any intercompany debt.

7. An Adjusted Tangible Net Worth (defined as net worth less intangible assets and any shareholder, related-party or intercompany asset accounts) analysis on a pro forma basis.

8. The willingness of any corporate entities to guarantee CFI's self-insurance obligations. If a corporate guarantee is offered, the proposed guarantor's audited annual financial statements for the most recent three fiscal years must be provided. If appropriate, the guarantor's most recent year-to-date quarter-end financial statement must also be submitted.

9. A description of any other self-insurance issues identified based on the particulars of the transaction and how the parties propose to address those issues.

10. A statement by the contemplated new owner of commitment to the FMCSA self-insurance program.

11. A statement indicating the type of collateral to be posted and all pertinent details should be provided such as the financial institution providing the collateral plus the terms and conditions of the arrangement, if available.

12. A statement describing the changes to CFI's insurance coverages, including names of insurance companies, limits of liability, deductibles and level of excess insurance.

13. A statement describing any anticipated changes to CFI's safety program and claims administration.

This decision is effective on the service date.

By the Federal Motor Carrier Safety Administration,

Robert W. Miller

Acting Director, Office of
Enforcement and Compliance

3

# FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION

## DECISION

**SERVICE DATE:**
**September 10, 2007**

## DOCKET NO. 1515

## GREYHOUND LINES, INC.
### (Dallas, Texas)

## MODIFICATION OF SELF-INSURANCE AUTHORITY

**Decided:** **September 10, 2007**

By self-insurance decisions served February 16, 1989, June 6, 1990, June 27, 1990, September 21, 1992, September 30, 1993, March 23, 1995, July 25, 2003, May 4, 2004, September 7, 2004, and July 27, 2006, Greyhound Lines, Inc. (Greyhound or the Company) was authorized to self-insure up to $3 million of its $5 million statutory bodily injury and property damage (BI&PD) liability requirement under 49 USC §13906 and 49 CFR 387.309, subject to certain conditions.

On February 8, 2007, Greyhound's parent, Laidlaw International, Inc. (Laidlaw), entered into a merger agreement with FirstGroup, Plc (FirstGroup, and hereafter referred to as the Transaction). FirstGroup is a United Kingdom (UK) based international transportation group providing passenger type services in the UK, Canada and the United States (US). At this time, the merger has not been completed. It is awaiting approvals from each entity's shareholders and certain US and Canadian regulatory authorities. Upon consummation of the merger, Laidlaw will become an indirect wholly-owned subsidiary of FirstGroup.

Because of this pending merger, by a letter dated April 30, 2007, Greyhound requests that the Federal Motor Carrier Safety Administration (FMCSA or the Agency) modify Condition 12 by substituting the existing Laidlaw guarantee of Greyhound's self-insurance liabilities with a guarantee from FirstGroup Acquisitions, Inc. (FG Acquisitions), a wholly-owned subsidiary of FirstGroup. Greyhound also requests the waiver of Condition 16 relating to the automatic termination of self-insurance authority upon a material change in ownership.

FMCSA has concluded that it will not accept Greyhound's proposal to substitute the Laidlaw guarantee with a guarantee from FG Acquisitions. Instead, FMCSA will require that Laidlaw's guarantee remain in effect and that FG Acquisitions execute a second guarantee agreement. There is also sufficient basis to justify a waiver of the condition automatically terminating Greyhound's self-insurance authority upon a material change in ownership, subject to certain other terms and conditions.

## Exhibit F

## DISCUSSION

Greyhound's Parent, Laidlaw, has agreed to be acquired by FirstGroup. FirstGroup conducts operations in the UK, Canada and the US. Upon completion of the acquisition, Laidlaw will become an indirect, wholly-owned subsidiary of First PTS, Inc. (First PTS), which is a holding company for all of FirstGroup's US-based subsidiaries. First PTS is a direct subsidiary of the proposed guarantor, FG Acquisitions.

FMCSA's review of the Transaction identified several areas of concern, including:

      a.  The financial wherewithal of FirstGroup.

      b.  Securitization of Greyhound's assets by FirstGroup's lenders.

      c.  The allocation of the acquisition debt to FirstGroup subsidiaries and its corresponding financial implications for Laidlaw and Greyhound.

      d.  The ability to continue to receive audited financial reports for Laidlaw.

      e.  The financial wherewithal of the proposed guarantor FG Acquisitions.

      f.  FG Acquisitions' atypical financial reporting periods, which are semi-annual instead of quarterly.

Each of the above concerns was communicated to Greyhound, and Greyhound provided responses to each issue. FMCSA's findings and any corresponding actions being taken are addressed within the body of this decision.

Because FirstGroup's financial statements are denominated in British Pounds, a full financial assessment of the Transaction was more difficult. However, through discussions with FirstGroup's management, coupled with information extracted from various public documents, it appears that FirstGroup has the financial wherewithal to repay the $3.75 billion in new debt used to finance the Laidlaw acquisition. It also appears that FirstGroup has the capacity to provide financial support to both Laidlaw and Greyhound, if necessary. These findings warrant the waiver of the automatic termination of self-insurance authority condition.

The pending merger between Laidlaw and FirstGroup is valued at more than $3.6 billion and will be financed through both debt and equity. The debt financing will consist of two multicurrency facilities with FirstGroup being the named borrower. This debt totaling $3.75 billion will be unsecured and will be guaranteed by certain subsidiaries in the FirstGroup family of companies, including seven subsidiaries in the UK and two subsidiaries in the United States (First Student, Inc. and First Transit, Inc.). Certain Laidlaw subsidiaries may be added as guarantors after the acquisition is completed. Greyhound is not expected to be one of the Laidlaw subsidiaries providing a guarantee. In addition, in view of the fact that the debt is unsecured, Greyhound's assets will not be pledged as collateral. Accordingly, the status of Greyhound's assets is no longer in question.

Once the merger is completed, the acquisition debt will be allocated to various FirstGroup subsidiaries. Some, or all, of the $3.75 billion in debt will be further allocated to the US-based subsidiaries, but the specific details are not known at this time.

Still, the allocation of the acquisition debt is a relevant factor in assessing the financial strength of FG Acquisitions, the proposed guarantor for Greyhound's self-insurance liabilities.

The extent to which, if any, Greyhound and Laidlaw's balance sheets will be impacted is of obvious concern. This is especially important since it was only a little over a year ago that FMCSA lowered Greyhound's collateral level because of the financial strength gained from obtaining a guarantee from Laidlaw.

Given the limited information available on this issue at this time, FMCSA will assume that the financial condition of FG Acquisitions will not change significantly once the acquisition is finalized. However, should the post-merger financial condition of FG Acquisitions change materially from the pre-merger financial condition, FMCSA will reopen Greyhound's self-insurance authorization and issue modifications where warranted. Condition three, which requires the submission of semi-annual financial statements from First PTS, will allow FMCSA to monitor FG Acquisitions' financial condition. Condition twenty-one, requiring a statement from the independent auditor certifying that there are no material adverse differences between the financial statements of FG Acquisitions and First PTS, will also serve this purpose.

Presently, Laidlaw guarantees the BI&PD self-insurance obligations of Greyhound. As the sole guarantor, Laidlaw is required to submit unaudited quarterly and audited annual financial statements. However, when the Transaction is completed, annual audited financial statements will no longer be prepared for Laidlaw. Greyhound has proposed a two-fold solution for replacing Laidlaw's guarantee and reporting requirements. First, it is offering that FG Acquisitions, the highest US-based FirstGroup corporate entity, guarantee Greyhound's self-insurance obligations. Second, because FG Acquisitions' financial statements are not audited, Greyhound has proposed that First PTS submit its audited annual financial statements, as well as semi-annual internally-prepared statements. First PTS is a wholly-owned subsidiary of FG Acquisitions and is the indirect holding company of Laidlaw and Greyhound. This proposal is somewhat unusual and not one that FMCSA has considered in the past. However, given FirstGroup's complex corporate structure, FMCSA will require that Greyhound's guarantee come from the highest US-based FirstGroup corporate entity.

Greyhound asserts that the primary difference between the financial statements of FG Acquisitions and First PTS is that the consolidated financial statements for First PTS include inter-company items, namely debt and interest expense with the UK and exclude the Canadian operations. Conversely, FG Acquisitions financial statements exclude inter-company items and include the Canadian operations. Therefore, in this particular case, FMCSA is accepting First PTS's financial statements with the condition that a letter is provided on an annual basis from the independent auditor stating that there is no material adverse difference between FG Acquisitions and First PTS's financial condition.

From its review of First PTS's March 31, 2005 and 2006 audited annual financial statements, FMCSA has concluded that First PTS has the financial wherewithal to support Greyhound's self-insurance liabilities. This determination was based on its profitable operations, solid cash flow as measured by earnings before interest, taxes, depreciation and amortization (EBITDA), adequate working capital (defined as current assets minus current liabilities), and low level of debt relative to its tangible net worth (TNW). A guarantee from First PTS is not required because it is a direct subsidiary of FG Acquisitions. Nevertheless, as previously stated, there is limited information available at this time regarding the allocation of the Transaction debt. Should First PTS's financial condition exhibit a material change once the Transaction is completed, FMCSA reserves the right to reopen Greyhound's self-insurance authorization to impose any additional conditions or to modify existing conditions as necessary for the protection of the public.

The financial review also uncovered the fact that First PTS's income statement does not report separate line items for "Depreciation and Amortization" or "Insurance and Claims" expenses. These two expense categories are an important part of FMCSA's on-going quarterly and annual review process. It is for this reason that a condition has been added that requires First PTS to report this information on a going forward basis.

All of FirstGroup's external financial reporting is done on a semi-annual basis. Greyhound asserts that it would be extremely burdensome to require quarterly financial reporting from First PTS. The lack of quarterly reporting is a deviation from FMCSA standard reporting requirements. Therefore, to mitigate the fact that First PTS will only provide semi-annual financial reporting, FMCSA is requiring Laidlaw's existing guarantee to remain in effect. Laidlaw must also continue to provide unaudited quarterly financial statements. It is prudent to impose these two conditions because Laidlaw is the direct owner of Greyhound.

### I find:

The evidence of record warrants waiver of the automatic termination of Greyhound's self-insurance authority upon a material change in ownership, subject to the conditions detailed below. Greyhound's continued self-insurance of its BI&PD liabilities will afford the security for the protection of the public contemplated by 49 USC §13906.

### It is ordered:

1. Greyhound's request for waiver of the automatic termination of its self-insurance authority upon a material change in ownership is granted.

2. Condition (12) is modified to read as follows:

   Laidlaw International, Inc. and FirstGroup Acquisition, Inc. must file formal written agreements with FMCSA stating that they will unconditionally guarantee payment of the self-insurance obligations of Greyhound. The guarantee agreements must be approved by FMCSA.

3. Condition (3) is modified to read as follows:

   Greyhound and Laidlaw must submit unaudited annual and quarterly financial statements. First PTS, Inc. must submit unaudited six-month and audited annual financial statements, including all applicable consolidating notes and schedules, within 60 and 90 days, respectively, after the end of each semi-annual or annual period. The audited annual financial statements must be independently prepared, contain unqualified opinions and be prepared in accordance with Generally Accepted Accounting Principles. All of the financial statements must include a certification by an appropriate company official verifying the accuracy of the information provided.

4. Condition (7) is modified to read as follows:

   The FMCSA is to be notified within 5 days of a default under the terms of any loan agreements with a financial institution or bonded indebtedness by Greyhound, Laidlaw, FirstGroup Acquisition or FirstGroup. Full disclosure should be provided about the consequences, actual or potential, of such default. Any default could be cause for termination of the self-insurance authority.

5. Condition (9) is modified to read as follows:

The FMCSA retains the authority to terminate Greyhound's self-insurance authorization at any time if it appears to the FMCSA that its financial arrangements, or those of Laidlaw, FirstGroup Acquisition or FirstGroup, fail to provide satisfactory protection for the public; or Greyhound, Laidlaw, FirstGroup Acquisition or FirstGroup fail to file timely any of the information required by the FMCSA.

6. Condition (10) is modified to read as follows:

The FMCSA reserves the right to require Greyhound, Laidlaw, FirstGroup Acquisition, or FirstGroup to provide any additional information deemed necessary.

7. Condition (16) is modified to read as follows:

Greyhound, Laidlaw, FirstGroup Acquisition and FirstGroup must notify the FMCSA of any material change in their ownership or control within 10 days of the change. A material change in ownership or control will automatically terminate Greyhound's self-insurance authorization the date the change is effective. In the event Greyhound fails to notify the Agency of a material change in its, Laidlaw's, FirstGroup Acquisition's or FirstGroup's ownership or control and FMCSA subsequently becomes aware of the change, the Agency reserves the right to terminate Greyhound's self-insurance authority immediately. For purposes of this Condition, "material ownership or control" means a majority ownership interest.

8. Condition (17) is modified to read as follows:

Greyhound must notify the FMCSA within 10 days of any extraordinary event effecting a material change to Greyhound's, Laidlaw's, FirstGroup Acquisitions' or FirstGroup's financial health. In the event Greyhound fails to notify the Agency of developments pertaining to extraordinary events and FMCSA subsequently becomes aware of the change, the Agency reserves the right to terminate Greyhound's self-insurance authority immediately.

The following conditions are added to Greyhound's self-insurance authorization:

9. Condition (18) If the post-merger financial condition of FirstGroup Acquisitions, as reported by First PTS, is materially different from that reported as of March 31, 2006, FMCSA reserves the right to reopen Greyhound's self-insurance authorization and issue modifications where warranted.

10. Condition (19) The FMCSA retains the right to impose such additional conditions in the future as may be necessary for the protection of the public.

11. Condition (20) First PTS must submit, on a semi-annual basis and within 60 days of each period-end, a schedule detailing the total amount paid for all insurance and claims expense. The schedule must also include the total amount charged against income for depreciation and amortization.

12. Condition (21) Within 90 days of each March 31, First PTS must submit a statement from its independent auditor certifying that there are no material adverse differences between the financial statements of FG Acquisitions and First PTS.

The following conditions remain in effect:

13. Condition (1) Greyhound's trust fund for BI&PD claims liabilities shall be equal to the greater of: (a) $15 million or (b) 60% of the self-insured BI&PD claim reserves reported on the most recent period-end balance sheet, except reserves for expenses associated with the processing and handling of self-insured BI&PD claims. The required amount in the trust fund is designed to change quarterly, and will be measured on each March 31, June 30, September 30, and December 31. Based on Greyhound's February 28, 2006 balance sheet, which shows pending BI&PD claims reserves of $33.6 million, the required amount in the trust fund would be $20.14 million.

At no time will the BI&PD trust fund balance be less than $15 million. If an increase in the trust fund is needed, then Greyhound shall make a cash contribution within 105 days from December 31 and 75 days from March 31, June 30 and September 30 (i.e., 15 days from the due date for year-end and quarterly financial statements).

FMCSA must approve the terms of the trust fund agreement prior to its effective date. Any changes in its terms must be given prior approval by FMCSA. Furthermore, Greyhound must have unrestricted access to the trust fund and draw downs (other than in excess of the minimum level) may only be made to satisfy claims for BI&PD liability. Any draw down (other than in excess of the minimum level) from the trust fund must be reported immediately to FMCSA, along with an explanation as to how Greyhound proposes to respond to additional liability claims. Any draw down from the trust fund (other than in excess of the minimum level) must be replenished within 30 days, and any failure to replenish the amount of a draw down within 30 days must also be reported immediately to FMCSA.

To ensure the protection of the public, FMCSA will further require that the trust fund agreement contain the following provisions:

   a. The trustee must be identified and a statement must be given of its relationship to Greyhound. FMCSA must also have the address of the trustee.

   b. The beneficiaries of the trust fund agreement must be clearly designated as BI&PD liability claimants of Greyhound. No other parties may have rights of recovery against the fund.

   c. The trust fund agreement must be established so that it may not be revoked until all cognizable claims arising during the time the carrier holds FMCSA authority to self-insure have been settled.

   d. Payments under the trust agreement must be made directly to BI&PD claimants.

14. Condition (2) Greyhound must maintain a minimum Adjusted Tangible Net Worth (ATNW). The ATNW is defined as TNW (net worth less intangibles) less all intercompany, affiliate, related party and/or shareholder asset accounts (on a net basis). The minimum ATNW level must be equal to the greater of (a) two (2) times the self-insured BI&PD claims liabilities as reported on its quarter/year-end balance sheet, except reserves for expenses associated with the processing and handling of self-insured BI&PD claims, or (b) $10.0 million. The minimum ATNW requirement is designed to change quarterly, and will be measured on each March 31, June 30, September 30, and December 31.

Notice must be given to FMCSA if the ATNW balance falls below the minimum level at any quarter-end or year-end period. If this occurs, Greyhound will then have 30 days to correct the situation or face termination of the authority to self-insure. Based on Greyhound's February 28, 2006 balance sheet, which shows pending BI&PD claims reserves of $33.6 million, the minimum ATNW would be $67.1 million. This measurement is meant to fluctuate based upon the level of pending BI&PD liabilities. However, at no time will the minimum ATNW requirement be less than $10 million.

15. Condition (4) Within 60 days from the quarter-end, Greyhound shall submit its BI&PD claims report detailing the number, aggregate dollar amount, and pending court cases or other actions that arise from its claims experience. Appropriate carrier officials shall certify the accuracy of these reports.

16. Condition (5) Greyhound must notify FMCSA immediately of any pending or contingent BI&PD liability claim(s), which individually exceeds $50 thousand or collectively exceed $250 thousand.

17. Condition (6) Greyhound must notify FMCSA no later than 90 days prior to the effective date of any change in the terms or cancellation of the trust fund agreement, or excess insurance and must notify FMCSA of the renewal of the trust fund agreement, or excess insurance, no later than 6 months prior to their expiration dates.

18. Condition (8) Greyhound must have continually in place, from the date it self-insures up to the first $3 million per occurrence of BI&PD liability, excess insurance coverage for BI&PD claims covering the difference between the self-insured BI&PD liability and $100 million. Greyhound must have the excess liability insurance company certify to FMCSA that the insurer will give the Agency 90 days advance notice of cancellation.

19. Condition (13) Within 60 days from the quarter-end and beginning with the quarter-ended March 31, 2004, Greyhound shall submit a reconciliation of the BI&PD claims reserves as reported on the FMCSA Quarterly Claims Report to the General Ledger.

20. Condition (14) Within 60 days from each quarter-end, Greyhound shall submit a schedule detailing the components of IBNR and Claim Development.

21. Condition (15) Within 60 days from each quarter-end, Greyhound shall submit a breakdown of the balance sheet line item "Claims Liability" and the income statement line item "Insurance/Safety Expenses."

22. This decision is effective on the service date. Greyhound must comply with the amended conditions of its self-insurance authorization within 60 days from the date of this decision. Any Petition for Reconsideration of this decision must be filed within 30 days of the service date of the decision.

By the Federal Motor Carrier Safety Administration,

Robert W. Miller

Acting Director, Office of
Enforcement and Compliance

## FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION

## DECISION

**SERVICE DATE:**
**July 19, 2007**

### DOCKET NO. MC-151556

### TRANSPORT CORPORATION OF AMERICA, INC.
**(Eagan, Minnesota)**

### DECISION ON PETITION FOR RECONSIDERATION

**Decided:** July 18, 2007

By virtue of the ICC Termination Act of 1995, Pub. L. 104-88, the responsibility for making determinations regarding the self-insurance program for for-hire motor carriers and all authorizations pursuant thereto was transferred from the former Interstate Commerce Commission (ICC) to the Secretary of Transportation.  Subsequently, this responsibility was delegated to the Federal Highway Administration (FHWA) and then to the Federal Motor Carrier Safety Administration. (FMCSA).

In a decision served April 3, 1996, the FHWA granted an application by Transport Corporation of America, Inc. (Transport or the Company) for authority to self-insure $1 million of its bodily injury and property damage (BI&PD) liability and its $10,000 cargo liability under 49 USC § 13906 and 49 CFR 387.309, subject to specified conditions.

On February 28, 2006, Transport completed a merger with Patriot Holding Corp. ("Parent"), an entity controlled by the private equity investment firm of Goldner, Hawn, Johnson & Morrison, Inc. ("GHJ&M").  In conjunction with the change in ownership, Transport was converted from a publicly-traded company to a privately-held entity.  The Parent has submitted financial information showing that its financial statements and those of Transport are the same. Accordingly, any discussion in this decision pertaining to the Parent's financial condition is equally applicable to Transport.

Because of concerns related to Transport's merger announcement, poor financial results in recent years, and rising claims levels, FMCSA issued a decision on February 2, 2006, (the "Decision"), requiring the Company to adopt certain financial and credit enhancements within 60 days.  The most significant change to the conditions imposed on the 1996 grant of self-insurance authority was to increase the required amounts of the BI&PD and cargo letters of credit from the amount of each self-insurance authorization, $1 million and $10,000, respectively, to an amount equal to the greater of each self-insurance authorization or 100% of self-insured claims reserves as reported on the Company's balance sheet. Based on claims data reported as of September 30,

## Exhibit G

2005, the new required amounts for the letters of credit would be $9,977,000 for BI&PD liability and $88,000 for cargo liability. A second significant change made in the Decision was to amend the definition of tangible net worth (TNW) to exclude related party/shareholder asset accounts, creating instead an adjusted tangible net worth (ATNW) requirement. On March 10, 2006, the Company submitted a motion to stay the Decision to enable it to file a petition for reconsideration. The FMCSA subsequently granted the Company's motion to stay the Decision.

On June 2, 2006, the Company submitted its petition for reconsideration. In its petition, the Company seeks reconsideration of the increased collateral requirement. Specifically, Transport requests that the minimum collateral requirement be reduced from 100% of Transport's pending self-insured claims to $1,010,000 as required in the 1996 grant of self-insurance authority. Thus, Transport contends that its irrevocable letters of credit for BI&PD and cargo claims should remain at the level of its self-insurance authorizations.

FMCSA has concluded that retaining the current collateral requirements would not provide the level of protection to the public contemplated by 49 USC § 13906. To adequately protect the public, the collateral levels established in the Decision must be maintained. FMCSA believes that the collateral requirements imposed in the Decision are necessary because: (1) historically, Transport's working capital position has consistently been at a negative level, (2) the Parent's working capital position is negative at December 31, 2006, (3) Transport's BI&PD liabilities at 2006 year-end are greater than the Parent's TNW and ATNW, (4) the Parent's distribution of $20 million in cash to the shareholders caused its and the Company's TNW and ATNW to fall to negative levels, (5) the Parent's negative TNW position is below Transport's minimum TNW requirement, (6) the Parent's secured debt levels are more than double Transport's pre-acquisition debt levels, (7) substantially all of the Parent's assets are encumbered, and (8) there is a substantial business risk from customer concentration.

### Discussion

Transport makes two primary arguments in its request for reconsideration. First, it asserts that the Decision represents a substantial change in the FMCSA's interpretation of the self-insurance regulations, specifically in the method for establishing collateral requirements, and is therefore invalid for failure to comply with rulemaking procedures under the Administrative Procedure Act (APA), 5 U.S.C. §§ 500-596. Second, Transport argues that its post-merger financial condition remains strong and provides sufficient security to the public for purposes of ensuring that Transport will pay its self-insured claims, thus negating any need for the higher collateral requirements.

In its petition, Transport contends that the imposition of a collateral requirement reflecting the level of pending claims represents a substantial change in the way the FMCSA and its predecessor agencies previously interpreted the self-insurance regulations and what constitutes sufficient collateral for purposes of protecting the public. Transport contends that FMCSA was required to engage in notice and comment rulemaking under the APA before implementing such a change. It asserts that FMCSA has failed to comply with the fundamental requirements of notice and comment rulemaking and, as a result, the Decision is invalid and the

original collateral requirement, tied solely to Transport's level of self-insurance authority, should be reinstated.

The self-insurance regulations at 49 CFR 387.309(a)(2) identify irrevocable letters of credit and trust fund agreements as two possible components of a sound self-insurance program. They are not designated as required components of a self-insurance program, and there is no mention in the regulations of a specific standard for setting the amounts of such financial instruments. Rather, the regulations as a whole were drafted to allow FMCSA the flexibility to craft conditions in self-insurance authorizations which will protect the public to the extent contemplated by 49 USC § 13906 and the minimum security requirements of 49 CFR 387.303.

Transport is correct that FMCSA's predecessor agencies generally set the amount of any trust fund agreement or letter of credit at the same level as the level of the self-insurance authorization. More recently, as a result of experience gained in the administration of the self-insurance program, grants of self-insurance authority have set the required amount for letters of credit and trust fund agreements at the higher of the self-insurance authorization or the amount of pending claims. These more recent collateral requirements are designed to minimize risk to the public against uncompensated losses, not only at the time the authorization is granted, but in future years as well. The early grants of self-insurance authority lacked this foresight. Moreover, the fact that the amount changes annually to reflect the level of current claims provides a strong incentive for the self-insured carrier to improve its safety posture. Improving its safety posture reduces the number and level of claims and thus the amount required for any letter of credit.

Even Transport concedes that FMCSA's predecessor agencies did not follow an invariable practice of setting collateral requirements at the level of the self-insurance authorization. Transport notes in its petition, that in No. MC-2860, National Freight, Inc. (August 19, 1994), the ICC required the self-insured carrier to maintain a trust fund in the amount of $2 million, considerably in excess of its self-insurance authorization. Inexplicably, Transport asserts that this clear exercise of discretion under the self-insurance regulations to ensure adequate protection of the public has no relevance to the present case.

The agency was not required to engage in notice and comment rulemaking when the collateral requirements imposed in recent self-insurance decisions, including the 2006 Transport decision, were adopted. The existing self-insurance regulations already contemplate approaching each application and the conditions pertaining to a grant of authority on a case-by-case basis. This approach gives the FMCSA flexibility to evaluate a carrier's ability to meet its obligation to the public by assessing its financial size and strength, scope of operations, and past claims history. The regulations do not include defined financial measurements or specific collateral requirements as general rules because it was determined that it would be too difficult to formulate broad conditions that would apply in all situations. Instead, the FMCSA has the latitude to request specific information from each carrier and to impose individually tailored conditions.

Under the regulations, FMCSA has the ability to place restrictions on any grant of authority to self-insure that it deems necessary to guarantee that a carrier will meet its financial

responsibility to the public. The ability to impose conditions when required enables the FMCSA to effectively monitor any approved self-insurance plan, and reconsider its approval when warranted. Accordingly, in Transport's case, the Decision stated that the collateral levels were increased to ensure that the public remained adequately protected against risk of loss. The FMCSA perceived that there was an increased level of risk to the public because of uncertainties surrounding the financial impact of the merger, the high level of BI&PD claims relative to its TNW position, and the public's subordinated position to the secured creditors, since substantially all assets and capital stock would collateralize its post-merger secured debt.

Transport's second argument asserts that the FMCSA should reconsider its collateral requirement given Transport's allegedly strong financial position. The Company argues that FMCSA has placed too much weight on working capital for purposes of assessing Transport's ability to satisfy its current debt obligations, including its self-insurance obligations. Specifically, Transport states that it has available credit and substantial unencumbered assets to secure self-funded claims. Further, Transport contends that it has experienced a substantial improvement in its financial condition over the past 5 years and that it has implemented new hiring and safety initiatives which have substantially reduced claims in recent years and are anticipated to create similar benefits on a going forward basis.

While Transport contends that it exhibits a strong financial position, a full review of the financial statements and claims data submitted by Transport's Parent for FY 2006 leads to a different conclusion. Although these statements indicate an improvement in profitability and a reduction in BI&PD claims liabilities, the Parent's financial condition at 2006 year-end exhibits the substandard post-merger financial position recognized as a possibility at the time the Decision was served. Accordingly, FMCSA reiterates its position that, as a result of the carrier's substantially changed financial and claims status, the conditions imposed in the 1996 self-insurance authorization now expose the public to undue risk. The modifications made to the collateral and TNW conditions in the February 2, 2006, Decision are necessary to eliminate this risk.

Some of the unfavorable financial trends contributing to this determination include:

- At December 31, 2006, liquidity, as measured by the current ratio (defined as current assets divided by current liabilities) and working capital (defined as current assets less current liabilities) were at unsatisfactory levels of 0.87 times and a negative $6.3 million, respectively. These levels of liquidity indicate that there is a reliance on operating cash flows and available borrowings under credit facilities to satisfy its short-term capital and debt-service requirements.

- The December 31, 2006, balance sheet shows that the Parent's TNW is a negative $8.7 million, reflecting the fact that the total liabilities of the Parent far exceed the book value of the tangible assets. This compares to Transport's December 31, 2005, TNW of over $57 million. At its current level, TNW is well below the $2.0 million minimum level required in Transport's self-insurance authorization, and this carrier is the only carrier in the program with a negative TNW.

- Debt levels more than doubled to fund the acquisition, rising from $55.9 at the 2005 year-end to $120.4 million at the 2006 year-end.

- Per the notes to the Parent's 2006 annual audited financial statements, substantially all of its assets collateralize notes payable and loans from banks and other financial institutions. This places the public at a greater risk for unpaid claims.

- In August 2006, equity was negatively impacted by a dividend payment of $20 million. The dividend repaid 80% of the shareholder's initial $25 million in capital contributed on the closing date of the acquisition. This dividend was directly responsible for the minimum TNW violation noted below. Funds to pay this dividend were obtained through a combination of additional borrowings under its revolving facility and a $10.5 million supplemental term loan.

- Even though Transport asserts in its petition that it has a significant amount of unencumbered real estate assets that can be used to secure self-insured claims, the notes to the 2006 audited annual financial statements indicate these assets now secure the $10.5 million supplemental term loan.

- In 2006, sales to Transport's 5 largest customers represented 40.6% of total revenues. This customer concentration is a concern because the loss of 1 of these 5 customers could have a significant downward impact on Transport's operations and revenues.

Each of the items above are listed as separate concerns. When imposing conditions on self-insurance authority, however, FMCSA considers the combined financial impact of all relevant issues. Accordingly, Transport's assertion that FMCSA's reliance on working capital is misplaced fails to consider the role of working capital in the context of a combination of factors including, but not limited to: liquidity, leverage, guarantees, collateral, corporate and capital structure, claims history, and the level of self-insurance authority. Furthermore, the mere fact that the Parent has available under its working line of credit funds to pay ongoing self-insurance claims by itself does not justify participation in the self-insurance program. If the carrier's financial situation deteriorates, there is no assurance that the line of credit will continue to be available. Again, conditions are set based on a combination of factors, and in Transport's case, these factors mandate that the collateral levels set forth in the Decision must be met to ensure the protection of the public.

It is FMCSA's understanding that Transport's pre- and post-merger operations are essentially the same. While, historically, Transport has demonstrated the ability to generate a sufficient level of cash flow to support debt service and to pay self-funded claims, there is no guarantee that it will continue to be able to do so going forward. In addition, the balance sheet at the 2006 year-end is significantly weaker than at any point in the past 5 years. The debt and equity levels shown at December 31, 2006, indicate that the Parent has very little financial flexibility to withstand unfavorable economic conditions. This places a greater reliance on the letters of credit. However, Transport's BI&PD and cargo letters of credit do not provide an adequate level of protection, at less than 13% coverage of outstanding claims reserves at December 31, 2006. This is one more reason that FMCSA will retain the collateral levels set forth in the Decision.

Training and safety programs are also important factors in FMCSA decisions to grant or modify self-insurance authorizations. In this case, however, the merits of the Decision were driven by financial indicators and were not based on any reservations about Transport's safety

program or record. The improvements in training and safety are commendable. However, the effect of any new safety measures on claims reserves is not immediately or readily quantifiable. Nevertheless, Transport will still be able to benefit from any future decrease in claims experience resulting from enhanced safety programs because its collateral requirements are designed to fluctuate based on the rise and/or fall in Transport's BI&PD and cargo claims reserves.

At the time the Decision was served, Transport's post-merger corporate structure was not known. Thus, the Decision did not contain any conditions pertaining to Transport's new corporate structure. In light of the acquisition, the financial statements of the Parent and those of Transport are now the same. Therefore, for clarification purposes, the Parent's financial statements were used as the basis for this decision and will be used for all future analyses of Transport. Accordingly, the Parent must provide a guarantee of Transport's self-insurance liabilities to protect against the upstreaming of funds. Transport is also being required to submit on an annual basis a statement from its independent auditors certifying that the Parent's and Transport's financial statements are essentially the same and differ in no material respects.

Certain events since issuance of the February 2, 2006, Decision lend even greater weight to the need for adequate collateralization of Transport's self-insured claims liabilities. Condition #2 to Transport's self-insurance authorization provides:

> Applicant must maintain at all times a tangible net worth of at least $2 million and must notify the [FMCSA] at any time during the effectiveness of the self-insurance authorization, if its net worth balance falls below the $2 million minimum. If this occurs, applicant will then have 30 days to correct the situation or face termination of the authority to self-insure.

As noted above, the August 2006 payment of $20 million in dividends financed by further borrowings resulted in a negative TNW for both Transport and the Parent. In clear violation of condition #2, Transport has failed to report this situation to FMCSA. In fact, the agency only became aware of the TNW violation early in 2007 during its review of Transport's third quarter financial statements. The failure of any self-insured carrier to scrupulously comply with all the conditions to its self-insurance authority raises serious questions concerning the protection to the public afforded by that carrier's self-insurance program. In these circumstances, an adequately funded letter of credit or trust fund dedicated to the payment of liability claimants becomes even more crucial for this protection. In this particular case, the violation by Transport of condition #2 is ironic in light of its arguments concerning the agency's lack of discretion in interpreting and implementing the 1996 conditions.

New condition 15 related to a change in ownership is being adopted as a standard condition in all new grants of self-insurance authority and in all modifications of existing self-insurance authorizations, *See* the Decision in Docket No. MC-1515, *Greyhound, Inc.*, served July 27, 2006. This condition terminates self-insurance authority in the event of a change in ownership. Nevertheless, in limited circumstances where there will not be an adverse financial or operational impact on the company, FMCSA will entertain timely requests to waive this condition.

In summary, Transport's petition for reconsideration is being denied because its post-merger balance sheet is significantly weaker than that displayed prior to the merger. The two largest differences were in debt and equity. As previously stated, total debt levels more than doubled, which also led to substantially all of the assets being encumbered. From an equity perspective, TNW is negative and well below the minimum equity required in Transport's authority to self-insure. This situation must be resolved for Transport to retain its self-insurance authority.

**It is ordered:**

The petition for reconsideration filed by Transport Corporation of America, Inc., is denied.

Transport has 20 days from the service date of this decision to submit a plan to FMCSA detailing the steps it will take to raise its ATNW to the $2.0 million minimum requirement per condition number 2 below. Within 30 days of the service date, Transport's ATNW must be above the minimum level. Failure to do so will result in the termination of Transport's self-insurance authority.

The conditions set out in the FMCSA Decision dated February 2, 2006, are affirmed and are as follows.

1) Condition No. 1: Transport must maintain a letter of credit or trust fund for BI&PD claims liabilities equal to the greater of: (a) $1,000,000 or (b) 100% of the pending self-insured claims reserve reported on the most recent period-end balance sheet. Furthermore, the letter of credit or trust fund for cargo claims will be $10,000 or 100% of the pending self-insured cargo claim reserve reported on the most recent period-end balance sheet, whichever is greater. Based on claims data dated December 31, 2006, the amount of the letter of credit or trust funds will be $8,018,031 for BI&PD and $81,000 for cargo claims. The required letters of credit or trust funds are designed to change annually and will be measured at each December 31. At no time will the Applicant's BI&PD and cargo letters of credit or trust fund balances be less than $1,000,000 and $10,000, respectively. If an increase in the collateral levels is needed, then the adjustment must be made within 30 days from the measurement date.

FMCSA must approve the terms of the letters of credit or trust funds prior to their effective date. Any changes in their terms must be given prior approval by FMCSA.

Transport must file the original of any Letters of Credit with FMCSA's Commercial Enforcement Division.

Furthermore, if Transport elects to use trust funds, it must have unrestricted access to the trust funds and drawdowns may only be made to satisfy claims for BI&PD and/or cargo liabilities. Any drawdown from the trust funds must be reported immediately to the FMCSA,



along with an explanation as to how Transport proposes to respond to additional liability claims.

To ensure the protection of the public, FMCSA will further require that trust fund agreements contain the following provisions:

    a.  The trustees must be identified and a statement must be given of their relationship to Transport. We must also have the addresses of the trustees.

    b.  The beneficiaries of the trust fund agreements must be clearly designated as BI&PD or cargo liability claimants, respectively, of Transport. No other parties may have rights of recovery against the respective funds.

    c.  The trust fund agreements must be established so that they may not be revoked until all cognizable claims arising during the time the carrier holds FMCSA authority to self-insure have been settled.

    d.  Payments under the trust agreements must be made directly to BI&PD or cargo claimants.

Any drawdown from the letters of credit or trust funds must be replenished within 30 days, and any failure to replenish the amount of a drawdown within 30 days must be reported immediately to the FMCSA.

Condition No. 2: Transport must maintain a minimum Adjusted Tangible Net Worth ("ATNW"). The ATNW is defined as TNW less all affiliate, related party and/or shareholder asset accounts. It must be equal to 2 times the self-insurance authority, i.e., $2,020,000. Notice must be given to FMCSA immediately if the ATNW balance falls below this level. If this occurs, Transport will then have 30 days to correct the situation or face termination of the authority to self-insure.

2) Condition No. 3: Transport and/or the Parent must submit quarterly and audited annual financial statements to FMCSA within 60 and 90 days, respectively, after the end of each period during the time the self-insurance authorization is in effect. The financial statements must include a certification from an appropriate company official verifying the accuracy of the information provided.

3) Condition No. 4: Transport must submit its December 31 quarterly claims reports within 30 days from the quarter-end. All other quarterly claims reports must be submitted within 60 days of the quarter-end. The reports must detail the number, aggregate dollar amount, the nature of each applicant's claims experience and include the dollar amount of reserves established, if any. Court cases must be itemized separately, and the report is to be certified as accurate by an officer of the company who is independent of risk management activities

4) Condition No. 5: Transport must notify FMCSA immediately of any pending or contingent BI&PD liability claim(s), which individually exceeds $50,000 or collectively exceed $250,0000, or any cargo liability claim(s), which individually exceeds $25,000

5) Condition No. 6: Transport must notify FMCSA no later than 90 days prior to the effective date of any change in the terms or cancellation of the letters of credit or trust fund agreements. Copies of the renewal notices for the letters of credit or trust fund agreements must be submitted to FMCSA no later than 60 days from the renewal date.

6) Condition No. 7: Transport must notify FMCSA within 5 days upon default of any terms of any loan agreements that exist with financial institutions. Full disclosure should be provided about the consequences, actual or potential, of such default. Any default could be cause for termination of self-insurance authority.

7) Condition No. 8: FMCSA retains the authority to terminate Transport's self-insurance authorization at any time if it appears to FMCSA that Transport's or the Parent's financial arrangements fail to provide satisfactory protection for the public, or Transport fails to file timely any of the information required by FMCSA.

8) Condition No. 9: FMCSA has the right to require Transport or the Parent to submit any additional information FMCSA deems necessary.

9) Condition No. 10: FMCSA reserves the right to impose such additional conditions in the future as it may find necessary for the protection of the public.

10) Condition No. 11: Transport must submit copies of its quarterly financial covenant compliance calculations (as defined in the LaSalle Bank credit agreements) within 60 days of each quarter/year-end. An appropriate company official must certify these quarterly financial covenant compliance calculations.

The following conditions are added to Transport's self-insurance authorization:

1) Condition No. 12: Patriot Holding Corp. must file a formal written agreement with FMCSA stating that it will unconditionally guarantee payment of the self-insurance obligations of Transport. The guarantee agreement must be approved by FMCSA.

2) Condition No. 13: Within 90 days of each December 31, Transport must submit a statement from its independent auditors certifying that the financial statements of the Parent and that of Transport are essentially the same and differ in no material respects.

3) Condition No. 14: Transport must submit, on a quarterly basis going forward and within 60 days of each quarter/year-end, a schedule detailing the balance sheet line item "accrued liabilities" to identify separately its auto and cargo liability accruals.

4) Condition No. 15: Transport and the Parent must notify FMCSA of any material change in its ownership or control at least 30 days prior to the effective date of the change. A material change in ownership or control will automatically terminate Transport's self-insurance authorization the date the change is effective. In the event Transport fails to notify FMCSA of a material change in ownership or control, and FMCSA subsequently becomes aware of the change, FMCSA reserves the right to terminate Transport's self-insurance authority immediately. For purposes of this Condition, "material ownership" means a majority ownership interest.

5) Condition No. 16: Transport must notify FMCSA within 10 days of any extraordinary event effecting a material change to Transport's or the Parent's financial health. In the event Transport fails to notify FMCSA of developments pertaining to extraordinary events, and FMCSA subsequently becomes aware of the change, FMCSA reserves the right to terminate Transport's self-insurance authority immediately.

This decision is effective on the service date. Transport must comply with the amended conditions of its self-insurance authorization within 60 days from the date of this decision. At

such date, the stay will be lifted automatically and Transport must be in full compliance with all conditions in the Decision.  Furthermore, Transport must notify FMCSA of its compliance with all such conditions.

By the Federal Motor Carrier Safety Administration,

William A. Quade

Director, Office of
Enforcement and Compliance

# FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION

## DECISION

**SERVICE DATE:**
**November 9, 2007**

### DOCKET NO. MC-152187

### GORDON TRUCKING, INC.
#### (Pacific, Washington)

## APPLICATION FOR AUTHORITY TO SELF-INSURE

Subject to certain conditions, the Applicant is authorized to self-insure its bodily injury and property damage liability.

**Decided:** **November 8, 2007**

Gordon Trucking, Inc. (GTI or the Applicant) seeks authority to self-insure its $1 million bodily injury and property damage (BI&PD) liability under 49 USC §13906 and 49 CFR 387.319. Evidence presented by the Applicant warrants the granting of BI&PD liability self-insurance authority. The Applicant presents a sound financial picture with several years of profitability, adequate cash flows from operations to cover debt service obligations and a moderate level of debt relative to its equity position.

The Applicant, headquartered in Pacific, Washington, provides truckload transportation services to customers throughout the United States and Canada. It transports a wide range of general commodities, including building materials, fresh produce, meat, chemicals, refrigerated food, beverages, and paper products. The Applicant maintains terminal locations in Oregon, California, Arizona, Utah and Wisconsin. It operates with more than 1,169 company-owned tractors, 153 owner-operators and 4,000 trailers. The trailers are of various configurations to handle the many different commodities it carries.

The Applicant is required to maintain security for the protection of the public in the amount of $1 million per occurrence for BI&PD liability. The Applicant has in effect and on file with the Federal Motor Carrier Safety Administration (FMCSA) the requisite insurance coverage. The Applicant stated that its estimated annual savings from self-insurance were not quantifiable because many of the benefits would be realized over the long term.

In support of its application to self-insure, the Applicant provided audited annual financial statements for the years 2003 though 2006. Also provided were company-prepared financial statements for the six-month interim periods ended June 30, 2006 and 2007. No adjustments to the data have been made except that the "goodwill and other intangible" category has been deducted (when applicable) to arrive at tangible net worth (TNW).

## Exhibit H

# GORDON TRUCKING, INC.

## Financial Statement Analysis

| ($ In Thousands) | Year Ending 12/31/04 | Year Ending 12/31/05 | Year Ending 12/31/06 | 6 Months Ending 6/30/07 | 2006/2005 % Increase/ (Decrease) |
|---|---|---|---|---|---|
| Operating Revenue | $162,890 | $185,148 | $202,174 | $107,103 | 9.2% |
| Operating Income | $6,143 | $8,795 | $9,914 | $2,757 | 12.7% |
| Net Income | $4,030 | $6,380 | $6,992 | $1,013 | 9.6% |
| Earnings Before Interest, Taxes, Depreciation and Amortization (less: non-cash items) | $20,624 | $24,781 | $28,347 | $12,392 | 14.4% |
| Operating Ratio | 96.2% | 95.2% | 95.1% | 97.4% | (0.2%) |
| Cash Flow Available for Insurance and Claims | 1.77x | 2.14x | 1.96x | 1.55x | (8.2%) |
| Cash and Short-Term Investments | $2,278 | $98 | $662 | $7,550 | 575.5% |
| Working Capital | ($4,595) | ($3,228) | ($3,159) | ($3,579) | 2.1% |
| Working Capital (Less: Op. Leases) | ($8,610) | ($7,717) | ($10,303) | N/A | (33.5%) |
| Current Ratio | 0.85x | 0.91x | 0.92x | 0.92x | 1.7% |
| Current Ratio (Less: Op. Leases) | 0.75x | 0.80x | 0.78x | N/A | (2.2%) |
| Tangible Net Worth | $32,981 | $39,361 | $46,353 | $47,366 | 17.8% |
| Total Liabilities/Tangible Net Worth | 2.13x | 2.25x | 2.20x | 2.25x | (2.4%) |
| Total Liabilities + Op. Leases / Tangible Net Worth | 2.35x | 2.53x | 2.57x | N/A | 1.3% |

Source of Data: Gordon Trucking, Inc.'s application to self-insure

The Applicant's Safety Department is headed by the Senior Director of Safety and Compliance who oversees three Regional Risk Managers, a Director of Driver Services and Safety, a Driver Compliance Manager and six safety clerks. All safety personnel are full-time employees and are responsible for driver training, compliance, retention, claims and security.

Safety at GTI begins with the owners and top-level executives and extends through middle management, driver managers and to the Applicant's drivers. The Applicant's commitment to safety is shown by its comprehensive safety program. The Applicant has a satisfactory safety fitness rating from the U.S. Department of Transportation ("DOT").

Safety for drivers begins with the initial qualification process. All applicants must go through a rigorous selection process including a physical, Motor Vehicle Registration check, criminal background check, and reference checks beyond the requirements of the Federal rules. All applicants must participate in an orientation program that includes road testing of all drivers, completion of the Smith System "Space Cushion Driving" certification, hours of service training, Hazardous Materials ("Haz Mat") compliance and workplace safety.

Continuing education on safety issues for new and existing drivers occurs on a daily, weekly, monthly, quarterly and annual basis. Each day messages are sent to all drivers through Qualcomm satellite-tracking units installed in each tractor. Every week driver managers conduct selected vehicle inspections with drivers to reinforce the importance of vehicle maintenance and inspection. Monthly safety meetings are held at each terminal and a GTI publication, *The Blue Print*, is circulated on a quarterly basis, reinforcing safety and principles of the Smith System.

Annual training is provided on Space Cushion Driving, Hours of Service, Haz Mat and Vehicle Critical Events.

Some of the safety measures employed by the Applicant include individual briefings on Haz Mat compliance issues particular to a load at the time of dispatch and the use of speed governors and Qualcomm Sensor Tracs to monitor operating speed. Excessive speed is reviewed on a weekly basis by driver managers and addressed as a safety issue through a progressive discipline process. In addition, the Applicant uses engine software to track and monitor "hard brake" events to help identify high-risk drivers. All accidents are reviewed and driver disciplinary action is based on driver responsibility and driver history.

Administration of all BI&PD claims within the Applicant's $500,000 deductible is handled by the Claims Department. The Applicant utilizes independent adjustors and outside counsel for every accident involving a potential third-party claim. If it is granted authority to self-insure, administration of BI&PD claims will remain the same.

The data for the following table represent the total claims that are incurred, paid, and outstanding for each respective period-end. They were obtained from the application and management responses to subsequent FMCSA requests. In addition, while the dollar amount of BI&PD claims reserves is shown on a cumulative basis, the number of claims pending at each period-end was calculated as the difference between the number of claims received and the number of claims settled. As a result, certain comparisons could not be performed and are designated as "N/A" in the table. Nevertheless, it is the Applicant's position that if granted self-insurance authority it will be able to provide its claims data to FMCSA in the required format.

At June 30, 2007, the Applicant's outstanding BI&PD claims within the proposed self-insurance limits totaled $3.5 million, of which $3.3 million is the Applicant's financial responsibility and $0.2 million is the financial responsibility of the insurance carrier.

## GORDON TRUCKING, INC.
### BI&PD CLAIMS EXPERIENCE

| (In Actual $) | Year Ending 12/31/04 | Year Ending 12/31/05 | Year Ending 12/31/06 | Percent Increase/ (Decrease) 2006/2005 |
|---|---|---|---|---|
| Claims Received (#) | 599 | 530 | 461 | (13.0%) |
| Claims Received ($) | $3,269,207 | $2,076,363 | $961,596 | (53.7%) |
| Average Claims Filed ($) | $5,458 | $3,918 | $2,086 | (46.8%) |
| Claims Received ($) / Revenue | 2.0% | 1.1% | 0.5% | (0.6%) |
| Number of Claims Paid | 586 | 511 | 357 | (30.1%) |
| Losses Paid ($) | $1,969,445 | $1,215,928 | $2,957,568 | 143.2% |
| Number of Claims Outstanding as of 12/31/06 | 13 | 19 | 104 | 447.4% |
| Outstanding Reserves ($) | $3,002,609 | $4,399,224 | $3,298,006 | (25.0%) |
| Average Outstanding Claims ($) | N/A | N/A | N/A | N/A |
| Outstanding Reserves ($) / ATNW | 9.1% | 11.2% | 7.1% | (4.1%) |
| Outstanding Reserves to be Paid by GTI ($) | $2,852,609 | $3,599,224 | $3,148,006 | (12.5%) |
| Outstanding Reserves to be Paid by Insurance Carrier ($) | $150,000 | $800,000 | $150,000 | (81.3%) |
| Premiums Paid to Insurance Carrier ($) | $1,394,496 | $1,534,424 | $1,769,781 | 15.3% |

### DISCUSSION

A full review of the financial statements and claims data submitted by the Applicant shows the following:

From 2004 to 2006, the Applicant's revenues rose 24.1%, up from $162.9 million to $202.2 million. In 2006, one major customer accounted for 17% of the gross sales. This concentration of revenue from one customer must be addressed. The Applicant's management asserts that it is continuously working to diversify its revenue stream. This is shown by the fact that over the last three-year period, its customer concentration has fallen by more than 2.5%, even though services provided to this one customer have grown. In addition, the overall transportation services provided to this particular customer are spread over multiple locations with differing needs. Nevertheless, to mitigate this risk, the collateral requirement for the Applicant will be set at 50% of pending self-insured BI&PD claims reserves as defined in condition number one.

During this same period, the Applicant's net income exhibited rising trends to $7.0 million in 2006. The improvement in the Applicant's operating performance is also illustrated in the operating ratio, which declined from 96.7% in 2003 to 95.1% in 2006. The Applicant's cash flow measurement of earnings before interest, taxes, depreciation and amortization (EBITDA) was positive for each of the periods reviewed with such funds adequately supporting debt service requirements in each of the three years.

For the 2007 six-month period, the Applicant reported revenues that totaled $107.1 million, which produced operating and net profits of $2.8 million and $1.0 million, respectively. The Applicant's 2007 six-month operating results were off last year's pace. Still, EBITDA of $12.4 million adequately covered debt service obligations by a margin of 1.4 times.

At each year-end reviewed, the Applicant reported negative working capital positions (defined as current assets minus current liabilities) and current ratios (defined as current assets divided by current liabilities) below the acceptable level of 1.0 times. At the 2006 year-end, current liabilities exceeded current assets by $3.2 million, representing a decrease from the 2003 year-end. Contributing to the substandard liquidity measures is the high level of current maturities of long-term debt (CMLTD). These levels of liquidity indicate that there is a reliance on operating cash flows and available borrowings under credit facilities to satisfy short-term capital and debt-service requirements. Also, day's sales outstanding are higher than industry norms, at 50 days, but are within an acceptable range.

At the 2007-second quarter-end, current liabilities of $45.1 million exceeded current assets of $41.6 million. The quarter ended with a current ratio and working capital level of 0.92 times and negative $3.6 million, respectively. To mitigate the substandard liquidity measures, the Applicant is being required to maintain a minimum adjusted tangible net worth (ATNW) based on a multiple of its BI&PD self-insured claims balance sheet reserves, as defined in condition number two. In addition, as noted earlier, the collateral requirement is being set at a level of 50%.

The Applicant's TNW position grew by 40.5% over the three years reviewed due to the retention of profits. At the 2004 year-end, TNW was at $33.0 million and at year-end 2006 it had increased to $46.4 million. Although equity nearly doubled over the three-year period, the Applicant's leverage, in terms of its ratio of total liabilities to TNW, was relatively unchanged. At 2.20 times, the 2006 leverage position was within the moderate range. At June 30, 2007, the Applicant's TNW position increased to $47.4 million, while the leverage ratio held at a moderate 2.25 times.

The Applicant is contingently liable on debt of approximately $4.5 million relating to terminal facilities that it rents from related parties. If this debt became a debt of the Applicant due to a default, the impact on the Applicant's June 30, 2007 total liabilities to TNW ratio would be a slight increase to a moderate level of 2.3 times.

The Company leases various buildings, transportation and office equipment. These leases are classified as operating leases. When considering the obligations required under the operating leases, the Applicant's financial indicators are not materially impacted.

In its application, GTI offers to establish a letter of credit equal to 25% of its pending self-insured claims reserve. This percentage is the same as that imposed on Roehl Transport, Inc., Averitt Express, Inc., Saia Motor Freight Line, Inc. and Covenant Transport, Inc. (hereafter referred to as the Comparison Group). GTI believes that it is similarly situated financially to all of these motor carriers and should be subject to the same collateral requirement. The FMCSA believes that this is not the case. From a financial perspective, the Comparison Group has reported positive liquidity positions, smaller debt levels relative to their equity positions, and stronger EBITDAs. Therefore, GTI's collateral requirement will be set at a higher level than that imposed on the Comparison Group.

In summary, GTI is accepted into the self-insurance program due to its profitable operating performance, satisfactory EBITDA, moderate level of total liabilities relative to its equity

position, and its BI&PD claims being within the moderate range relative to its operation. However, countervailing factors are present. GTI exhibits a substandard liquidity position, its revenues are primarily concentrated in one customer, and its financial measures for efficiency and profitability are on the low end of industry comparables. To mitigate these countervailing factors, the collateral requirement will be set at a moderate level of 50%. In addition, the collateral requirement serves as additional protection since the ATNW requirement is set at a level of twelve (12) times, which is below the 20 times average multiple for motor carriers currently in the self-insurance program. When the ATNW requirement is set at a level that is below the program average, a moderate or high level of collateral is typically imposed on a carrier to offset any risk.

The Applicant's collateral and minimum ATNW benchmarks reflect its specific financial and claims situation. It is prudent that consideration for this provision be based upon an applicant's financial condition, claims experience, and corporate structure. All requirements are set on a case-by-case basis so that the level of risk to the public is minimized.

I conclude, based on the above analysis, that the Applicant has adequate resources to self-insure its bodily injury and property damage liability for $1 million per occurrence, subject to appropriate conditions.

**I find**:

The Applicant's self-insurance of BI&PD liability, subject to conditions, will afford the security for the protection of the public contemplated by 49 USC §13906.

**It is ordered**:

The application is granted, subject to the following conditions:

1. The Applicant must establish an irrevocable letter of credit or trust fund for its BI&PD claims liabilities in the amount of $1,000,000 or 50% of the pending self-insured BI&PD claim reserve (including the amount for additional loss development and/or incurred but not reported, i.e., IBNR) reported on the most recent quarter/year-end balance sheet, whichever is greater. The initial amount of the Applicant's BI&PD letter of credit or trust fund will be $1,000,000. The required letter of credit or trust fund is designed to change annually and will be measured at each December 31. At no time will the Applicant's BI&PD letter of credit or trust fund balance be less than $1,000,000. If an increase in the collateral level is needed, then the adjustment must be made within 105 days from December 31 (i.e., 15 days from the due date for year-end financial statements).

   The Applicant must submit, within 60 days of the service date of the decision, copies of the agreement with the financial institution establishing the letter of credit or trust fund. The FMCSA must approve the terms of the letter of credit or trust fund before any effective date for activation of the letter of credit or trust fund. Any changes in its terms must be given prior approval by the FMCSA.

At each year-end reviewed, the Applicant reported negative working capital positions (defined as current assets minus current liabilities) and current ratios (defined as current assets divided by current liabilities) below the acceptable level of 1.0 times. At the 2006 year-end, current liabilities exceeded current assets by $3.2 million, representing a decrease from the 2003 year-end. Contributing to the substandard liquidity measures is the high level of current maturities of long-term debt (CMLTD). These levels of liquidity indicate that there is a reliance on operating cash flows and available borrowings under credit facilities to satisfy short-term capital and debt-service requirements. Also, day's sales outstanding are higher than industry norms, at 50 days, but are within an acceptable range.

At the 2007-second quarter-end, current liabilities of $45.1 million exceeded current assets of $41.6 million. The quarter ended with a current ratio and working capital level of 0.92 times and negative $3.6 million, respectively. To mitigate the substandard liquidity measures, the Applicant is being required to maintain a minimum adjusted tangible net worth (ATNW) based on a multiple of its BI&PD self-insured claims balance sheet reserves, as defined in condition number two. In addition, as noted earlier, the collateral requirement is being set at a level of 50%.

The Applicant's TNW position grew by 40.5% over the three years reviewed due to the retention of profits. At the 2004 year-end, TNW was at $33.0 million and at year-end 2006 it had increased to $46.4 million. Although equity nearly doubled over the three-year period, the Applicant's leverage, in terms of its ratio of total liabilities to TNW, was relatively unchanged. At 2.20 times, the 2006 leverage position was within the moderate range. At June 30, 2007, the Applicant's TNW position increased to $47.4 million, while the leverage ratio held at a moderate 2.25 times.

The Applicant is contingently liable on debt of approximately $4.5 million relating to terminal facilities that it rents from related parties. If this debt became a debt of the Applicant due to a default, the impact on the Applicant's June 30, 2007 total liabilities to TNW ratio would be a slight increase to a moderate level of 2.3 times.

The Company leases various buildings, transportation and office equipment. These leases are classified as operating leases. When considering the obligations required under the operating leases, the Applicant's financial indicators are not materially impacted.

In its application, GTI offers to establish a letter of credit equal to 25% of its pending self-insured claims reserve. This percentage is the same as that imposed on Roehl Transport, Inc., Averitt Express, Inc., Saia Motor Freight Line, Inc. and Covenant Transport, Inc. (hereafter referred to as the Comparison Group). GTI believes that it is similarly situated financially to all of these motor carriers and should be subject to the same collateral requirement. The FMCSA believes that this is not the case. From a financial perspective, the Comparison Group has reported positive liquidity positions, smaller debt levels relative to their equity positions, and stronger EBITDAs. Therefore, GTI's collateral requirement will be set at a higher level than that imposed on the Comparison Group.

In summary, GTI is accepted into the self-insurance program due to its profitable operating performance, satisfactory EBITDA, moderate level of total liabilities relative to its equity

The Applicant must file the original of any letter of credit with FMCSA's Commercial Enforcement Division.

Furthermore, if the Applicant elects to use a trust fund, it must have unrestricted access to any trust fund and drawdowns may only be made to satisfy claims for BI&PD liabilities. Any drawdown from a trust fund must be reported immediately to the FMCSA, along with an explanation as to how the Applicant proposes to respond to additional liability claims.

To ensure the protection of the public, it is further required that any trust fund agreement contain the following provisions:

> (a) The trustee must be identified and a statement must be given of its relationship to the Applicant. The address of the trustee must also be provided.

> (b) The beneficiary of the trust fund agreement must be clearly designated as BI&PD liability claimants of GTI. No other parties may have rights of recovery against the respective funds.

> (c) The trust fund agreement must be established so that it may not be revoked until all cognizable claims arising during the time the carrier holds FMCSA authority to self-insure have been settled.

> (d) Payments under the trust agreement must be made directly to BI&PD claimants.

Any drawdown from the letter of credit or trust fund must be replenished within 30 days, and any failure to replenish the amount of a drawdown within 30 days must be reported immediately to the FMCSA.

2. The Applicant must maintain a minimum Adjusted Tangible Net Worth (ATNW). It is defined as TNW less all intercompany, affiliate and shareholder asset accounts (on a net basis). The Applicant's minimum ATNW level must be equal to, the greater of (a) twelve (12) times its self-insured BI&PD claims reserve (including the amount for additional loss development and/or IBNR) as reported on its quarter/year-end balance sheet, or (b) two times its self-insurance authority, in this case, $2,000,000. The minimum ATNW requirement is designed to change quarterly, and will be measured on March 31, June 30, September 30, and December 31, annually.

Notice must be given to the FMCSA if the ATNW balance falls below this level. If this occurs, the Applicant will then have 30 days to correct the situation or face termination of the authority to self-insure. At present, the Applicant's minimum ATNW requirement will be $2,000,000 ($1 million x 2 times the self-insurance authority). This measurement is meant to fluctuate based upon the reserve level of combined pending BI&PD liabilities. However, at no time will the minimum ATNW requirement be less than two times the self-insurance authority, or in this case, $2,000,000.

3. The Applicant must submit unaudited quarterly and audited annual financial statements, including all applicable consolidating notes and schedules, within 60 and 90 days, respectively, after the end of each quarterly or annual period. The audited annual financial statements must be independently prepared, contain unqualified opinions and be prepared in accordance with GAAP. All of the financial statements must include a certification by an appropriate company official verifying the accuracy of the information provided.

4. The Applicant's quarterly claims reports must be submitted within 60 days of the quarter-end. The report must detail the number, aggregate dollar amount, the nature of the Applicant's claims experience and include the dollar amount of reserves established, if any. Claims in excess of $50,000 and court cases must be itemized separately, and each report is to be certified as accurate by an officer of the company, who is independent of risk management activities.

5. The Applicant must notify the FMCSA immediately of any pending or contingent BI&PD liability claims(s) that individually exceeds $50,000 or collectively exceed $250,000.

6. The Applicant must have continuously in place from the inception of its self-insurance program excess insurance coverage for BI&PD claims liabilities covering between $1 million and $25 million. Proof of this additional excess BI&PD liability coverage must be submitted to the FMCSA via ACCORD form or a policy premium statement. Immediate notice must be given if there are any changes to this coverage. If there is any lapse in coverage(s), the Applicant will have 30 days to correct the situation or face termination of its self-insurance authorization.

7. The FMCSA is to be notified within five (5) days of a default under the terms of any loan agreements with a financial institution or bonded indebtedness by the Applicant. Full disclosure should be provided about the consequences, actual or potential, of such default. Any default could be cause for termination of the self-insurance authority.

8. The Applicant must submit annual loan and lease covenant compliance calculations within 60 days of each year-end. An appropriate company official must certify the annual loan and lease covenant compliance calculations.

9. The Applicant must notify FMCSA of any material change in its ownership or control within 10 days of the change. A material change in ownership or control will automatically terminate the Applicant's self-insurance authorization the date the change is effective. In the event the Applicant fails to notify FMCSA of a material change in its ownership and FMCSA subsequently becomes aware of the change, FMCSA reserves the right to terminate the Applicant's self-insurance authority immediately. For purposes of this Condition, "material ownership or control" means a majority ownership interest.

10. The Applicant must notify FMCSA within 10 days of any extraordinary event effecting a material change to its financial health. In the event the Applicant fails to notify FMCSA of developments pertaining to extraordinary events and FMCSA subsequently becomes

aware of the change, FMCSA reserves the right to terminate the Applicant's self-insurance authority immediately.

11. The Applicant must submit, on a quarterly basis and within 60 days of each quarter/year-end, a schedule detailing the balance sheet line item "Other Accrued Expenses" to show its self-insured auto liability accruals, additional loss development and IBNR.

12. The Applicant must submit, on a quarterly basis and within 60 days of each quarter/year-end, a schedule detailing the total amount paid for **all** insurance and claims expense.

13. The Applicant must notify the FMCSA no later than 90 days prior to the effective date of any change in the terms or cancellation of the letter of credit or trust fund agreement. In addition, the FMCSA must receive the renewal notice for the letter of credit within 60 days from the renewal date. If a trust fund is established, then copies of the trust fund statement showing its balance must be furnished to the FMCSA within 30 days of each quarter-end.

14. The FMCSA retains the authority to terminate the Applicant's self-insurance authorization at any time if it appears to the FMCSA that its financial arrangements fail to provide satisfactory protection for the public, or the Applicant fails to file timely any of the information required by the FMCSA.

15. The FMCSA reserves the right to require the Applicant to provide any additional information deemed necessary.

16. The FMCSA retains the right to impose such additional conditions in the future as may be necessary for the protection of the public.

17. This decision is effective on the date of service. The Applicant, however, may not activate its self-insurance authorization less than 30 days after submitting documents to the FMCSA demonstrating that the required letter of credit or trust fund has been established. The Applicant must also notify the FMCSA of the date it will activate its self-insurance authority.

By the Federal Motor Carrier Safety Administration,

William A. Quade

Associate Administrator for
Enforcement and Program Delivery

EC

INTERSTATE COMMERCE COMMISSION

DECISION

DOCKET NOS. MC-126118, et al.[1]/

CRETE CARRIER CORPORATION
(Lincoln, NE)

APPLICATION TO BE A SELF-INSURER

Subject to certain conditions, applicants are
authorized to Self-Insure BI&PD and Cargo Liability

Decided:  June 4, 1987

SERVICE DATE

JUN 11 1987

Applicants have filed an application seeking authority to
self-insure their automobile bodily injury and property damage
(BI&PD) and cargo liability under 49 U.S.C. 10927.  In the past,
applicants negotiated all automobile BI&PD and cargo liability
insurance purchases as a single entity.  This application is also
being made as if the three motor carriers were a single entity.

Applicants are irregular route motor common carriers
specializing in the transportation of truckload traffic between
points in the United States (except Alaska and Hawaii).  Crete's
headquarters is located in Lincoln, Nebraska, from which point it
serves approximately 300 shippers.  It is primarily a dry freight
carrier using 1,600 late-model trailers, 100 of which are
refrigerated units.  It uses 835 power units, 665 of which are
supplied by owner-operators; Crete owns the balance.  Crete had
gross revenues in excess of $81 million for the fiscal year
ending June 30, 1986.

Shaffer specializes in the transportation of refrigerated
commodities.  It operates 600 trailers and 391 power units.
Owner-operators supply 234 of the power units.  Its headquarters
is located in New Kingstown, Pennsylvania.  Shaffer had gross
revenues in excess of $34 million for the year ending December
31, 1985.

Sunflower's headquarters is located in York, Nebraska, and
it also specializes in the transportation of commodities
requiring refrigeration.  It owns 283 refrigerated trailers and
55 power units.  Owner-operators supply an additional 152 power
units.  It reported gross revenue in excess of $21 million for
the fiscal year ending June 30, 1986.

The commodities transported by the applicants require each
to maintain security for the protection of the public in the
amount of $1 million per occurrence for BI&PD liability, and in
the amount of $5,000 per vehicle, $10,000 aggregate, for cargo.

In support of the application, the applicants submitted
income statements, balance sheets, and statements of retained
earnings for LRC, Inc. and its subsidiaries for the fiscal years
ending 6/30/84, 6/30/85, and 6/30/86, on a consolidated basis.
They submitted financial data for Crete and Sunflower for the
year ending 6/30/86.  Applicants submitted financial data for

---

1/  Crete Carrier Corporation MC-126118 (Crete), Shaffer
Trucking, Inc. MC-114569 (Shaffer), and Sunflower Carriers, Inc.
MC-150592 (Sunflower), are affiliated through common control and
ownership.  Crete and Sunflower are wholly-owned subsidiaries of
LRC, Inc., a holding company controlled by Duane W. and Phyllis
A. Acklie.  Shaffer is a wholly-owned subsidiary of TransCorp,
Inc., a holding company also controlled by Duane W. and Phyllis
A. Acklie.

# Exhibit I

DOCKET NOS. MC-126118, MC-114569 AND MC-150592

TransCorp, Inc., and subsidiaries for the years ending 12/31/84 and 12/31/85 on a consolidated basis. Shaffer submitted financial statements for 1984 and 1985. An independent accounting firm certified all statements. This data has been supplemented by the 1986 annual reports for each motor carrier. These required reports contain financial information through 12/31/86.

The financial history and current financial state of the applicants are shown in the following tables:

CRETE, SHAFFER, AND SUNFLOWER
Pertinent Financial Data
for the years 1986, 1985, 1984 and 1983

PROFITABILITY AND CASH FLOW

|  | 1986 | 1985 | (000 Omitted) 1984 | 1983 |
|---|---|---|---|---|
| Operating Revenues: |  |  |  |  |
| Crete | $ 80,295 | $ 83,092 | $ 74,096 | $ 62,763 |
| Shaffer | 42,567 | 34,140 | 30,539 | 22,828 |
| Sunflower | 21,066 | 19,838 | 16,146 | 12,481 |
| Total | $ 143,928 | $137,070 | $120,781 | $ 98,072 |
| Net Income: |  |  |  |  |
| Crete | $ 2,548 | $ 2,773 | $ 3,284 | $ 2,302 |
| Shaffer | 2,961 | 1,984 | 2,229 | 1,346 |
| Sunflower | 678 | 692 | 618 | 382 |
| Total | 6,187 | 5,449 | $ 6,131 | $ 4,030 |
| Cash Throw-Off-To Debt Ratio: |  |  |  |  |
| Crete | - 1/ | - 1/ | - 1/ | - 1/ |
| Shaffer | - 1/ | - 1/ | - 1/ | - 1/ |
| Sunflower | 366.4 2/ | - 1/ | 3.7 3/ | - 1/ |
| Total | 2,091.0 | - 1/ | 22.7 | - 1/ |

---

1/ No long-term debt due within one year.
2/ Cash flow provided by operations (net income plus depreciation) was $2.0 million to long-term debt due within one year of $5,000.
3/ Cash flow provided by operations was $1.6 million to long-term debt due within one year of $425,000.

DEBT STRUCTURE 1/

|  | 9/30/86 | 12/31/85 | 12/31/84 | 12/31/83 |
|---|---|---|---|---|
| Crete | 0% 2/ | 0% 2/ | 0% 2/ | 0% 2/ |
| Shaffer | 0% 2/ | 0% 2/ | 0% 2/ | 0% 2/ |
| Sunflower 3/ | 53.1% | 53.0% | 59.2% | 43.3% |
| Total | 8.9% | 9.1% | 9.4% | 4.5% |

---

1/ Ratio of long-term debt due after one year to total debt and equity.
2/ No long-term debt reported for this period.
3/ Sunflower's long-term debt is mostly "advances payable-affiliated companies" in the following amounts: 1986 - $3.6 million; 1985 - $2.8 million; 1984 - $2.7 million; and 1983 - $928,000.

- 2 -

DOCKET NOS. MC-126118, MC-114569 AND MC-150592

## LIQUIDITY

|  |  | 9/30/86 | (000 Omitted) 12/31/85 | 12/31/84 | 12/31/83 |
|---|---|---|---|---|---|
| **Crete:** |  |  |  |  |  |
| 1. | Current Assets | $ 22,206 | $ 22,403 | $ 19,079 | $ 13,086 |
| 2. | Current Liabilities | 6,945 | 7,010 | 6,443 | 4,697 |
| 3. | Working Capital (1-2) | 15,261 | 15,393 | 12,636 | 8,389 |
| 4. | Current Ratio (1-2) | 3.2 | 3.2 | 3.0 | 2.8 |
| **Shaffer:** |  |  |  |  |  |
| 1. | Current Assets | $ 10,978 | $ 6,778 | $ 4,343 | $ 6,240 |
| 2. | Current Liabilities | 4,329 | 2,207 | 1,965 | 2,243 |
| 3. | Working Capital (1-2) | 6,649 | 4,571 | 2,378 | 3,997 |
| 4. | Current Ratio (1-2) | 2.5 | 3.1 | 2.2 | 2.8 |
| **Sunflower:** |  |  |  |  |  |
| 1. | Current Assets | $ 4,862 | $ 3,279 | $ 1,516 | $ 1,427 |
| 2. | Current Liabilities | 1,587 | 1,458 | 1,515 | 749 |
| 3. | Working Capital | 3,275 | 1,821 | 1 | 678 |
| 4. | Current Ratio (1-2) | 3.1 | 2.2 | 1.0 | 1.9 |
| **Total:** |  |  |  |  |  |
| 1. | Current Assets | $ 38,046 | $ 32,460 | $ 24,938 | $ 20,753 |
| 2. | Current Liabilities | 12,861 | 10,675 | 9,923 | 7,689 |
| 3. | Working Capital | 25,185 | 21,785 | 15,015 | 13,064 |
| 4. | Current Ratio (1-2) | 3.0 | 3.0 | 2.5 | 2.7 |

## SHAREHOLDERS' EQUITY

|  | 12/31/86 | (000 Omitted) 12/31/85 | 12/31/84 | 12/31/83 |
|---|---|---|---|---|
| Crete | $ 19,698 | $ 17,150 | $ 14,377 | $ 11,093 |
| Shaffer | 14,502 | 11,540 | 9,556 | 7,327 |
| Sunflower | 3,205 | 2,527 | 1,835 | 1,217 |
| Total | $ 37,405 | $ 31,217 | $ 25,768 | $ 19,637 |

SOURCE: Data for 1986, 1985, 1984 and 1983 were derived from Annual Reports Form M-1.

In addition to their financial data, the applicants have submitted information concerning their safety program. The applicants maintain a consolidated safety program, which is administered by a Vice President of Safety at the Crete corporate headquarters in Lincoln. The Vice President of Safety reports directly to the Chief Executive Officer of the group.

The safety program centers on driver and equipment safety. Applicants state that rigorous standards are observed in the selection of new drivers. All prospective drivers must have a minimum of two years driving experience within the previous five years, and they must be at least 25 years of age. They must also have good commercial and personal driving records. References are required of all prospective drivers, and the references are checked.

The carriers closely supervise drivers to be certain that all safety criteria are followed. Any traffic or safety citation must be reported to the Safety Department immediately. Applicants use an inspection company to monitor the over-the-road operations of their vehicles. The inspection company does this through random stops of vehicles to check driver and equipment safety violations, which are immediately reported to the applicants for correction. Applicants give drivers with good driving records special recognition awards at annual safety banquets.

- 3 -

DOCKET NOS. MC-126118, MC-114569 AND MC-150592

As to equipment safety, applicants indicate that they follow strict inspection and maintenance programs for the equipment used in their transportation services. Applicants state that these programs far exceed the relevant Department of Transportation requirements. Company personnel inspect all equipment on a monthly basis. Furthermore, all equipment receives periodic maintenance work at stated time or mileage intervals. Any defects spotted in these programs are corrected at that time.

Applicants each have a "satisfactory" safety rating from the Department of Transportation.

The applicants have also supplied extensive information concerning their claims handling experience. For several years they have handled all of their own cargo and physical damage claims and assisted the insurance company in handling bodily injury claims under a $25,000 self-retention insurance policy. During the five-year period ending 12/31/85, the applicants incurred total BI&PD losses of $1,489,745 and cargo losses of $175,763. Their share of these losses under the deductible was $869,948 for BI&PD and $152,597 for cargo. They have now increased the deductible to $250,000. Under this higher deductible, they have absorbed all BI&PD and cargo losses.

The higher deductible of $250,000 has also meant that applicants have a more active part in the handling of bodily injury claims. They maintain files on all bodily injury claims and do a substantial number of the investigations needed to settle these claims. Applicants assign outside adjusters, retain counsel, and recommend settlements. They also maintain their own loss reserves.

Applicants indicate that they have experienced an escalation in insurance costs in recent years, and availability has also been a problem. When they decided to increase their self-retention deductible from $25,000 to $250,000 as a method of reducing insurance costs, they found only one company that would accept coverage. Their previous insurance company cancelled their policies. Applicants indicate that they contacted 15 other companies, all of which either refused coverage or simply did not respond. Applicants state that present coverage was purchased at an increase in cost of 150 percent. This premium cost increase was levied despite the fact that the deductible was increased from $25,000 to $250,000 and total coverage was decreased from $10 million to $5 million. The applicants estimate that they will realize an annual savings of $1,335,000 if they are granted authority to self-insure.

The applicants have agreed to furnish any financial and claims handling data that the Commission may require for monitoring purposes. They have also offered to provide trust funds in the amounts of $1 million for BI&PD liability and $250,000 for cargo as additional security to the public.

## DISCUSSION

We are convinced that the evidence presented by the applicants warrants the granting of BI&PD and cargo liability self-insurance authority. Our analysis of their financial statements indicates the applicants have presented a strong financial picture with several years of profitable operations, almost no long-term debt, and solid net worths. Specifically, operations for the three motor carriers have been profitable for 1986 and for each of the years of 1983, 1984, and 1985. Furthermore, Crete and Shaffer report no long-term debt. Sunflower reported long-term debt, but it was comprised mostly of advances to subsidiaries. Current assets substantially exceeded

- 4 -

DOCKET NOS. MC-126118, MC-114569 AND MC-150592

current liabilities for all three carriers, indicating adequate working capital. Furthermore, the carriers report the following large stockholders' equity as of 12/31/86: Crete, $19.7 million; Shaffer, $14.5 million; and Sunflower, $3.2 million.

The two parent holding companies also reported strong equity positions: TransCorp (parent of Shaffer) $13.9 million as of 12/31/85, and LRC (parent of Crete and Sunflower) $40.7 million as of 6/30/86. In sum, the applicants enjoy strong financial positions, with several years of profitable operations. Each carrier also has sufficient net worth to qualify as a self-insurer.

Applicants' extensive claims handling experience strengthens the application. As we would with any self-insurer, however, we will closely monitor their financial situation and claims handling to ensure adequate protection to the public. We are requiring the applicants to report immediately any unusually severe and harmful "shock" losses, individually and collectively. This will permit the Commission to take immediate action should the public's protection be threatened by extremely large losses. This requirement should not be a burden because applicants have had few if any losses above their required reporting threshold in recent experience.

We accept applicants' representation that they do not now, and will not in the future, transport hazardous materials in support of their BI&PD self-insurance request at the $1 million level. We anticipate they will continue to refuse to participate in any such traffic or in any such tariffs.

In addition to their strong financial condition and claims handling experience, applicants' strong safety program supports the granting of this application. Drivers are selected with care. Once hired, they are required to take part in the carriers' extensive safety training and incentive programs. The vehicles used in the operation are also subject to rigorous safety inspection and maintenance programs.

We will accept the applicants' offer of BI&PD and cargo liability trust funds, as conditioned by this decision. Each carrier must provide the Commission with a $1 million dollar trust fund for its BI&PD liability. The single cargo trust fund in the amount of $250,000 is adequate for the three carriers. The funds must, of course, be irrevocable and conditioned to benefit only BI&PD and cargo claimants. We are also requiring each carrier to maintain a minimum net worth of $3 million, which we believe is consistent with the scope and nature of their operations. The carriers must also provide financial and claims handling data to assist our monitoring of their self-insurance program.

WE FIND:

Applicants' self-insurance of BI&PD and cargo liability, subject to conditions, will afford the security for the protection of the public contemplated by 49 U.S.C. 10927. This action will not significantly affect either the quality of the human environment or conservation of energy resources.

IT IS ORDERED:

The self-insurance application of Crete, Shaffer, and Sunflower is granted subject to the following conditions:

(1) Each applicant must submit carrier quarterly and annual financial statements to the Commission, within 60 and 90 days, respectively, after the end of each quarterly or annual period. The statements must include a certification by appropriate carrier officials verifying the accuracy of the provided information.

- 5 -

DOCKET NOS. MC-126118, MC-114569 AND MC-150592

(2)  Each applicant must file with the Commission quarterly claims reports detailing the number, aggregate dollar amount, and the nature of their claims experience and quarterly reports detailing pending court cases or other actions which relate to or arise from their claims experience.  Appropriate carrier officials must certify the accuracy of these reports.

(3)  Each applicant must notify the Commission immediately of any pending or contingent BI&PD liability claim(s) which individually exceeds $50,000 or collectively exceeds $250,000, or any cargo liability claims which exceeds $2,500 individually or $10,000 collectively.

(4)  Each applicant must establish an irrevocable trust fund in the amount of $1 million for BI&PD liability claims.  The applicants must establish an irrevocable trust fund in the amount of $250,000 for cargo liability.  They must submit, before beginning operations as a self-insurer, and in any event not later than 60 days after the service date of this decision, copies of the executed trust fund agreements.  The carriers must notify the Commission immediately upon any drawdown.  The trust funds must be used only for the payment of their BI&PD or cargo liability.  Any drawdown must be repaid to the trust fund within 30 days to maintain a BI&PD trust fund at the $1 million minimum and the cargo trust fund at the $250,000 level.  Any changes in their terms must be given prior approval by the Commission. Furthermore, any payment on these funds and failure to replenish within 30 days must be reported immediately to the Commission, along with an explanation as to how it proposes to respond to further BI&PD claims.

(5)  At the time of any notification of any drawdowns, the applicants will also provide the Commission with a plan detailing how they propose to respond to further liability claims.

(6)  Applicants must notify the Commission no later than 6 months prior to the effective date of any change or cancellation of the trust agreements and must notify the Commission of the renewal of the trust agreements no later than 6 months prior to its expiration date.

(7)  Each applicant must maintain tangible net worth of at least $3 million and must notify the Commission at any time the net worth falls below $3 million.  An applicant will then have 30 days to correct the situation or face termination of the authority to self-insure.

(8)  The Commission retains the authority to terminate any portion or all of this self-insurance authorization at any time if it appears to the Commission that an applicant's financial arrangements fail to provide satisfactory protection for the public or applicant fails to timely file any of the information required by the Commission.

(9)  This decision will be effective on the service date. Applicants, however, may not activate their self-insurance authorization less than 30 days after submitting documents to the Commission demonstrating that the required trust funds have been established.  Applicants must also notify the Commission of the date they will activate their self-insurance authority.

By the Commission, Chairman Gradison, Vice Chairman Lamboley, Commissioners Sterrett, Andre and Simmons.

Noreta R. McGee
Secretary

(SEAL)

DECISIONS AND NOTICES RELEASED December 2007

| | | | |
|---|---|---|---|
| MC-623349-P | EXPEDITE TRANSPORTATION LLC - SHAKOPEE, MN | 12/28/2007 | NOTICE |
| MC-623695-C | VAN TRANSPORT INC - FT LAUDERDALE, FL | 12/28/2007 | DISCONTINUANCE |
| MC-624002-C | ELIAZAR LOERA - LANCASTER, CA | 12/28/2007 | NOTICE |
| MC-624955-C | ABC INTERNATIONAL TRUCKING INC - HIALEAH GARDENS, FL | 12/28/2007 | NOTICE |
| MC-624955-C | ABC INTERNATIONAL TRUCKING INC - HIALEAH GARDENS, FL | 12/28/2007 | REINSTATEMENT |
| MC-625447-P | JAVIER GUTIERREZ - BAKERSFIELD, CA | 12/28/2007 | NOTICE |
| MC-625677-C | D MORRIS TRUCKING INC - WINTHROP HARBOR, IL | 12/28/2007 | DISCONTINUANCE |
| MC-625983-C | CELTIC TRANSPORT LLC - WEST MANCHESTER, OH | 12/28/2007 | DISCONTINUANCE |
| MC-626292-C | TWO-WAY MOVING & FREIGHT CARGO INC - JACKSONVILLE, FL | 12/28/2007 | DISCONTINUANCE |
| MC-626620-C | THE RIGHTWAY TRUCKING LLC - RINCON, GA | 12/28/2007 | NOTICE |
| MC-626861-P | OA TRANSPORT INC - BRIGHAM CITY, UT | 12/28/2007 | NOTICE |
| MC-627922-P | SPARKS CONTRACTORS INC - WALTON, KY | 12/28/2007 | NOTICE |

**MISCELLANEOUS**

| NUMBER | TITLE | DECIDED | SERVED | DECISION TYPE |
|---|---|---|---|---|
| MC-185116 | CELADON TRUCKING SERVICES, INC. - INDIANAPOLIS, IN | 12/28/2007 | 12/28/2007 | SELF-INSURED |

**COPIES OF DECISIONS MAY BE PURCHASED BY CALLING DC NEWS AND DATA, INC. AT (240) 632-8591.**

Run Date:  12/28/2007
Run Time:  10:30


Exhibit 1

Data Source: Licensing & Insurance

li_register

DECISIONS AND NOTICES RELEASED January 2008

| MC-628813-C | RED LINE EXPRESS INC - TUPELO, MS | 01/14/2008 | NOTICE |
| MC-628813-C | RED LINE EXPRESS INC - TUPELO, MS | 01/14/2008 | NOTICE |

**MISCELLANEOUS**

| NUMBER | TITLE | DECIDED | SERVED | DECISION TYPE |
|--------|-------|---------|--------|---------------|
| MC-119399 | CON-WAY TRUCKLOAD, INC. - JOPLIN, MO | 01/14/2008 | 01/14/2008 | SELF-INSURED |

**COPIES OF DECISIONS MAY BE PURCHASED BY CALLING DC NEWS AND DATA, INC. AT(240) 632-8591.**

Run Date:  01/14/2008
Run Time:  10:30



Exhibit K

Data Source: Licensing & Insurance

li_register

1730 RHODE ISLAND AVE., N. W.
SUITE 810
TELEPHONE (202) 887-0037
TELECOPIER (202) 833-1219
E-MAIL jkahn@erols.com

JEREMY KAHN
S. HARRISON KAHN (1933-1980)

KAHN AND KAHN
ATTORNEYS AT LAW
WASHINGTON, D. C. 20036

VIA E-MAIL foia@fmcsa.dot.gov
AND REGULAR MAIL
October 10, 2007

Federal Motor Carrier Safety Administration
Attn: FOIA, Team MC-MMI
1200 New Jersey Ave., S.E.
Washington, DC 20590

Re:   **FREEDOM OF INFORMATION ACT (FOIA) REQUEST**

Dear Sir/Madam:

Please accept this letter as a request under the Freedom of Information Act, 5 U.S.C. §522, for the production of an "agency record," as I shall describe.

I am requesting a copy of the decision of the Federal Motor Carrier Safety Administration in the matter of P.A.M. Transport, Inc., MC-150496, served October 2, 2007. For your convenience, I have attached a copy of page 19 of the FMCSA *Register* of that date on which notice of the decision's release appears. (Although it has no bearing on the legality of the request, I note the phone number listed as a private source of the copy is not a working number and to my personal knowledge has not been a working number for at least 9 months!)

If there are questions relating to this request, your inquiry to me at the number shown above shall receive my immediate attention.

I would appreciate you handling this request as quickly as possible, and I look forward to hearing from you within the time period the law establishes.

Sincerely,

Jeremy Kahn

JK:hs
Enc.

**Exhibit L**



US Department
Of Transportation

Federal Motor Carrier
Safety Administration

400 – Seventh St., SW
Washington, DC 20590

10/10/2007

FOIA Control No:  2008-0028

JEREMY KAHN
KAHN & KAHN
1730 RHODE ISLAND AVENUE, NW
SUITE 810
WASHINGTON DC  20036

Dear Mr. Kahn:

This letter acknowledges receipt of your Freedom of Information Act (FOIA) request dated 10/10/2007, requesting a copy of a decision served on October 2, 2007, pertaining to PAM Transport, Inc. Your request was received in our office on October 10, 2007.

Due to the sustained increase in the number of requests and a reduction in staff, we have a slight backlog in processing FOIA requests, which are processed in a first in, first out manner.

Should the search, review, and photocopy fees associated with processing your request exceed $25.00, you will receive advance notification from our office.

If you have any questions regarding the status of your request, please contact our FOIA Request Service Center at (202) 366-2960 or email at foia@fmcsa.dot.gov. Please be sure to refer to the FOIA Control Number listed above, in your correspondence.  For more information you may visit our website at http://www.fmcsa.dot.gov/foia/index.htm.

Sincerely,

Tiffanie C. Coleman
Freedom of Information Act Officer
Management Information and Directives Division

# Exhibit M

1730 RHODE ISLAND AVE., N. W.
SUITE 810
TELEPHONE (202) 887-0037
TELECOPIER (202) 833-1219
E-MAIL jkahn@erols.com

JEREMY KAHN
S. HARRISON KAHN (1933-1980)

KAHN AND KAHN
ATTORNEYS AT LAW
WASHINGTON, D. C. 20036

VIA E-MAIL foia@fmcsa.dot.gov
AND REGULAR MAIL
December 28, 2007

Federal Motor Carrier Safety Administration
Attn: FOIA Team
1200 New Jersey Ave., S.E.
Washington, DC 20590

Re:    **FREEDOM OF INFORMATION ACT REQUEST**

Dear Sir/Madam:

Please accept this letter as a request under the Freedom of Information Act, 5 U.S.C.
§522, for the production of an agency document, as I shall describe.

I am requesting a copy of the decision of the FMCSA in the matter "Celadon Trucking
Services, Inc., MC-185116," served December 28, 2007.  I have attached a copy of page 20 of
the FMCSA *Register* of December 28, which further identifies the decision.

For your information, due to the lack of your response to my October 10, 2007 FOIA
request for a similar FMCSA document under similar circumstances [FOIA Control No. 2008-
0028], I have on December 27 instituted an action in the U.S. District Court for the District of
Columbia, Civil Action No. 07-2323, to pursue my earlier request for that similar document.

If there are questions relating to this request, I may be reached at the phone number
shown above.

I would appreciate your handling this request as quickly as possible, and I look forward
to hearing from you within the time period the law allows.

Sincerely,

Jeremy Kahn

JK:hs
Enc.

# **Exhibit N**

**US Department
Of Transportation**

**Federal Motor Carrier
Safety Administration**

400 – Seventh St., SW
Washington, DC 20590

12/31/2007

**FOIA Control No: 2008-0230**

JEREMY KAHN
KAHN & KAHN
1730 RHODE ISLAND AVENUE, NW SUITE 810
WASHINGTON DC 20036

Dear Mr. Kahn:

This letter acknowledges receipt of your Freedom of Information Act (FOIA) request dated 12/31/2007, requesting a copy of a decision served on December 28, 2007, to Celadon Trucking Services, Inc. Your request was received in our office on December 28, 2007.

Due to the sustained increase in the number of requests and a reduction in staff, we have a slight backlog in processing FOIA requests, which are processed in a first in, first out manner.

Should the search, review, and photocopy fees associated with processing your request exceed $25.00, you will receive advance notification from our office.

If you have any questions regarding the status of your request, please contact our FOIA Request Service Center at (202) 366-2960 or email at foia@fmcsa.dot.gov. Please be sure to refer to the FOIA Control Number listed above, in your correspondence. For more information you may visit our website at http://www.fmcsa.dot.gov/foia/index.htm.

Sincerely,

Tiffanie C. Coleman
Freedom of Information Act Officer
Management Information and Directives Division

**Exhibit O**

1730 RHODE ISLAND AVE., N. W.
SUITE 810
TELEPHONE (202) 887-0037
TELECOPIER (202) 833-1219
E-MAIL  jkahn@erols .com

JEREMY KAHN
S. HARRISON KAHN (1933-1980)

KAHN AND KAHN
ATTORNEYS AT LAW
WASHINGTON, D. C. 20036

VIA E-MAIL foia@fmcsa.dot.gov
AND REGULAR MAIL
January 14, 2008

Federal Motor Carrier Safety Administration
Attn: FOIA Team
1200 New Jersey Ave., S.E.
Washington, DC 20590

Re:    **FREEDOM OF INFORMATION ACT REQUEST**

Dear Sir/Madam:

Please accept this letter as a request under the Freedom of Information Act, 5 U.S.C. §522, for the production of an agency document, as I shall describe.

I am requesting a copy of the decision of the FMCSA in the matter "Con-Way Truckload, Inc., MC-119399," served January 14, 2008.  I have attached a copy of page 50 of the FMCSA *Register* of January 14, which further identifies the decision.

If there are questions relating to this request, I may be reached at the phone number shown above.

I would appreciate your handling this request as quickly as possible, and I look forward to hearing from you within the time period the law allows.

Sincerely,

Jeremy Kahn

JK:hs
Enc.

**Exhibit P**

**US Department**
**Of Transportation**

**Federal Motor Carrier**
**Safety Administration**

400 – Seventh St., SW
Washington, DC 20590

01/15/2008

**FOIA Control No:  2008-0263**

JEREMY KAHN
KAHN & KAHN
1730 RHODE ISLAND AVENUE, NW SUITE 810
WASHINGTON DC  20036

Dear Mr. Kahn:

This letter acknowledges receipt of your Freedom of Information Act (FOIA) request dated 01/14/2008, requesting a copy of a decision served on January 14, 2008, to Con-Way Truckload, Inc. Your request was received in our office on January 14, 2008.

Due to the sustained increase in the number of requests and a reduction in staff, we have a slight backlog in processing FOIA requests, which are processed in a first in, first out manner.

Should the search, review, and photocopy fees associated with processing your request exceed $25.00, you will receive advance notification from our office.

If you have any questions regarding the status of your request, please contact our FOIA Request Service Center at (202) 366-2960 or email at foia@fmcsa.dot.gov. Please be sure to refer to the FOIA Control Number listed above, in your correspondence.  For more information you may visit our website at http://www.fmcsa.dot.gov/foia/index.htm.

Sincerely,

Tiffanie C. Coleman
Freedom of Information Act Officer
Management Information and Directives Division

**Exhibit Q**



U.S. Department
of Transportation

**Federal Motor Carrier
Safety Administration**

JAN 3 1 2008

1200 New Jersey Ave., S.E.
Washington, D.C. 20590

Refer to: MC-MMI
Control No. 2008-0028

Mr. Jeremy Kahn
Kahn & Kahn - Attorneys at Law
1730 Rhode Island Avenue, N.W., Suite 810
Washington, D.C. 20036

Dear Mr. Kahn:

This is in response to your letter dated October 10, 2007, requesting a copy of the decision served
by the Federal Motor Carrier Safety Administration (FMCSA) on October 2, 2007, in response to
P.A.M Transport, Inc.'s Application for Authority to Self-Insure. We have located the records
meeting the terms of your request and are in the process of preparing our response.

FMCSA has made an initial determination that these records might contain confidential
commercial information. In accordance with 49 CFR § 7.17, the submitter of information will
have to be notified of your Freedom of Information Act (FOIA) request affording them the
opportunity to object to disclosure of the information. The submitter then has ten working days
to object to the disclosure. Should FMCSA disagree in whole or in part with the submitter's
objections, FMCSA will notify both yourself and the submitter. The reasons for which FMCSA
disagreed with the submitter will be contained in the notification letter. In such a case, the
submitter could file a lawsuit in Federal District Court to prevent the disclosure of the
information. If such a lawsuit is filed, we will refrain from disclosing the information, and you
will be notified of both the lawsuit and the decision to withhold the documents.

Sincerely yours,

Tiffanie C. Coleman
FOIA Officer

**Exhibit R**