UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JEREMY KAHN, | ) |
|  | ) |
| Plaintiff | ) |
|  | ) |
| v. | ) Civil Action No.  07-2323 (HHK) |
|  | ) |
| FEDERAL MOTOR CARRIER SAFETY | ) |
| ADMINISTRATION, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

**DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT,
AND DEFENDANT'S MOTION FOR A SCHEDULING ORDER
AND MEMORANDUM IN SUPPORT THEREOF**

In this suit brought pursuant to the Freedom of Information Act ("FOIA"), 5

U.S.C. § 552, Plaintiff requests that the Court compel Defendant Federal Motor Carrier

Safety Administration ("FMCSA" or "Agency") to produce copies of decisions issued in

three administrative cases, *P.A.M. Transport, Inc.*, FMCSA Docket MC-150496, *Celadon*

*Trucking Services, Inc.*, FMCSA Docket MC-185116, and *Con-Way Truckload, Inc.*,

FMCSA Docket MC-119399.  Compl. ¶ 1.  Plaintiff argues that he is entitled to summary

judgment because the FMCSA has routinely released similar documents to the public for

about 20 years without the requirement of a FOIA request, but contrary to this prior

practice, the Agency refuses to do so now.  Pl.'s Mot. Summ. J. at 1-2.

However, as explained below, notwithstanding prior practice, the FMCSA has determined that the types of decisions at issue might contain financial or commercial information protected from disclosure under the FOIA. See 5 U.S.C. § 552(b)(4). Given the interests that could be compromised, the FMCSA has determined that it should review those decisions consistent with the FOIA and, if appropriate, release redacted versions of the decisions to maintain the protections afforded by the FOIA with regard to preserving the confidentiality of commercial and financial information. Because the Agency's position in this regard is eminently reasonable, Plaintiff's Motion for Summary Judgment should be denied. Additionally, Defendant respectfully requests that the Court enter a scheduling Order encompassing a period for the Agency to undertake the analysis required under the FOIA, a date by which the Agency must respond to Plaintiff's FOIA requests, and a date for submission of a joint status report.[1]

## BACKGROUND

For the protection of the public, 49 U.S.C. § 13906 requires motor carriers subject to FMCSA jurisdiction to maintain a bond, insurance policy or other type of approved security in prescribed amounts. See Declaration of Loretta G. Bitner, ¶ 3 (March 14, 2008 (attached hereto). A motor carrier, however, may submit proof of qualifications as a

---

[1]Pursuant to Local Rule 7(m), Defendant's counsel contacted Plaintiff regarding the nondispositive relief requested in this filing. Plaintiff informed Defendant's counsel that, because he has not seen the filing, he is unable to present his position on the requested relief.

self-insurer to satisfy the security requirements of this statutory provision.  49 U.S.C. §

13906(d).  Regulations governing the qualification of self-insurers are set forth at 49

C.F.R.  § 387.309.  That regulation provides:

> The FMCSA will consider and will approve, subject to appropriate and
> reasonable conditions, the application of a motor carrier to qualify as a self-
> insurer, if the carrier furnishes a true and accurate statement of its financial
> condition and other evidence that establishes to the satisfaction of the
> FMCSA the ability of the motor carrier to satisfy its obligation for bodily
> injury liability, property damage liability, or cargo liability. . . .[An]
> applicant[] for authority to self-insure against bodily injury and property
> damage claims should submit evidence that will allow the FMCSA to
> determine:
>
>> (1) The adequacy of the tangible net worth of the motor
>> carrier in relation to the size of operations and the extent of its
>> request for self-insurance authority. Applicant should
>> demonstrate that it will maintain a net worth that will ensure
>> that it will be able to meet its statutory obligations to the
>> public to indemnify all claimants in the event of loss.
>>
>> (2) The existence of a sound self-insurance program.
>> Applicant should demonstrate that it has established, and will
>> maintain, an insurance program that will protect the public
>> against all claims to the same extent as the minimum security
>> limits applicable to applicant under § 387.303 of this part.
>> Such a program may include, but not be limited to, one or
>> more of the following: Irrevocable letters of credit;
>> irrevocable trust funds; reserves; sinking funds; third-party
>> financial guarantees, parent company or affiliate sureties;
>> excess insurance coverage; or other similar arrangements.
>>
>> (3) The existence of an adequate safety program. Applicant
>> must submit evidence of a current "satisfactory" safety rating
>> by the United States Department of Transportation. Non-rated
>> carriers need only certify that they have not been rated.
>> Applications by carriers with a less than satisfactory rating
>> will be summarily denied. Any self-insurance authority

granted by the FMCSA will automatically expire 30 days after
a carrier receives a less than satisfactory rating from DOT.

(4) Additional information. Applicant must submit such
additional information to support its application as the
FMCSA may require.

(b) Other securities or agreements. The FMCSA also will consider applications for
approval of other securities or agreements and will approve any such application if
satisfied that the security or agreement offered will afford the security for
protection of the public contemplated by 49 U.S.C. 13906.

49 C.F.R. § 387.309.

The standards for motor carrier self-insurance authorization were originally

adopted by the Interstate Commerce Commission ("ICC") and were transferred

effectively unchanged to ICC's successor agencies, first to the Federal Highway

Administration ("FHWA"), and then in 2000 to FMCSA.  See Pub. L. 104-88 § 104(h).

Since FMCSA's inception in 2000, the Agency has published in the FMCSA

Register notices of decisions on motor carrier applications for self-insurance

authorization, decisions modifying conditions of self-insurance authorization, and notices

of self-insurance authorization revocation.  See Bitner Decl. ¶ 6.  These notices of

decision consist of one-line announcements of the Agency action, without further

explanation regarding the rationale for the decision or restatement of limitations and

requirements placed on the motor carrier as conditions on its self-insurance authorization.

Id.  As had been the practice at the ICC and FHWA, it became the practice of staff within

the FMCSA Licensing and Insurance Division or the Commercial Enforcement Division

4

to provide copies of the full self-insurance decisions informally to the public upon request.  Id.

During the 1980s and 1990s, while the self-insurance program was administered by the ICC and then FHWA, the written decisions concerning self-insurance authority were somewhat general in nature, and often no more than a page or two.  Id. ¶ 7 and Ex. A, *Contract Freighters, Inc.*, ICC No. MC-119399 (Oct. 22, 1993)(attached to Bitner Decl.).  In response to a perceived need for more thorough explanation of the Agency's rationale for granting or denying motor carrier self-insurance applications, or for imposing certain requirements or limitations on motor carriers as a condition of self-insurance authorization, the FMCSA began to include more detailed information about self-insurance applicants and program participants in the Agency's full decisions.  Bitner Decl. ¶ 7.

Because one of the standards for self-insurance qualification is the adequacy of an applicant's tangible net worth in relation to the motor carrier's size of operations, its request for self-insurance authority and its ability to meet its statutory obligations, see 49 C.F.R. § 387.309(a)(1), the Agency's full decisions now often include detailed and sensitive financial information concerning the company's assets, liabilities, income, expenses, corporate debt, outstanding claims, recent operations and other activities and data.  Id.  The full self-insurance decisions link the motor carrier's financial health, as reflected in these figures, to the amounts of self-insurance authorized and the conditions

5

attached, including the filing of letters of credit or the establishment of trust funds,

guarantees or other collateral as part of a "sound self-insurance program." <u>See</u> 49 C.F.R.

§ 387.309(a)(2); Bitner Decl. ¶ 7.

     Motor carrier companies that submit the information found in these decisions

almost always submit the information under declaration that it is confidential and

proprietary, and not meant to be disclosed outside the FMCSA. <u>Id.</u> ¶ 8. The FMCSA

sees such declarations most frequently in the form of cover letters from companies

submitting required quarterly/annual reports to FMCSA in order to maintain their

previously-granted self-insurance authority. <u>Id.</u> and Ex. B, C, and D to Bitner Decl.

(sample company cover letters, including one from Plaintiff, requesting that the

company's accompanying financial data be treated in a confidential manner).

     In response to the increasing levels of detailed financial information in the

Agency's full decisions on self-insurance matters and the declarations from motor carriers

that their submitted data should be treated as confidential and proprietary, the FMCSA

became concerned that release of information in the Agency's self-insurance decisions

might cause competitive harm to the submitting motor carriers. Bitner Decl. ¶ 9.

Therefore, in October 2007, FMCSA staff were directed to discontinue the practice of

informally providing to the public copies of self-insurance decisions. <u>Id.</u> Instead, staff

were directed to refer public requests for such decisions to the FMCSA FOIA Office. <u>Id.</u>

The Agency continues to publish notices of all self-insurance decisions, as it had

previously, in the FMCSA Register.  Id.

    The FMCSA FOIA Office  is now reviewing the full self-insurance decisions for

material potentially subject to exemption from public disclosure.  Id. ¶ 10.  In the event

that such material is found, the FMCSA will contact the affected motor carrier company

and notify it of the FOIA request and the Agency's intention to release a redacted version

of the decision.  Id.; see also Declaration of Tiffanie C. Coleman, ¶ 7, March 12, 2008

(attached hereto).   The Agency will discuss the scope of the redactions with the motor

carrier, the carrier will be given an opportunity to object to the release of material it

believes will cause it competitive harm if made public, and the Agency will evaluate the

carrier's objections before issuing a FOIA determination concerning the releasability in

whole or in part of the decision.[2] Bitner Decl. ¶ 10; see also Coleman Decl. ¶ 7.

Ultimately the FOIA Office may release a partially redacted version of the full decision

_____

    [2]Tiffanie C. Coleman, the FMCSA FOIA Officer and the individual responsible
for the FMCSA FOIA program, provided additional information as to the obligations of
her office.  See generally Coleman Decl. Ms. Coleman explains that, pursuant to
Presidential Order 12,600 ("Predisclosure Notification Procedures for Confidential
Commercial Information," June 23, 1987) and 49 C.F.R. § 7.17, the FMCSA FOIA
Office is required to notify motor carrier companies when the FMCSA receives a FOIA
reqeust for their business information held by the FMCSA Self-Insurance Program.
Coleman Decl. ¶ 7.  The FOIA Office then has to provide the motor carrier companies a
reasonable time to respond as to whether disclosing the commercial information to the
public would reasonably be expected to cause substantial competitive harm to the
submitting company.  Id.  The FMCSA, however, is not required to provide notification if
the FOIA Office has already determined that the business information should not be
disclosed.  Id., citing 49 C.F.R. § 7.17(c)(1).

which, while explaining the Agency's rationale, also protects the motor carrier to the extent possible from release of competitively harmful information.  Bitner Decl. ¶ 10.

With regard to Plaintiff's FOIA request, the FMCSA's FOIA Office did receive proposed redactions from PAM Transport on February 21, 2008.[3]  Coleman Decl. ¶ 10. The FOIA Office, with the assistance of the FMCSA Chief Counsel's Office, is currently performing a review of the proposed redactions to the *PAM Transport, Inc.* self-insurance decision.  Id.  For Celadon Trucking Services, Inc., the FOIA Office is in the process of communicating with this company as to its position on the self-insurance decision related to the company.  Id.  The requested record on Con-Way Truckload was provided to Plaintiff in full on March 12, 2008, pursuant to his FOIA request.  Id. ¶ 11.  There were no redactions because this record does not contain confidential commercial information. Id.

## ARGUMENT

Exemption 4 exempts from release "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4). In this Circuit, the determination of whether information is "confidential" under Exemption 4 turns first on the question of whether the information was provided to the government on a "voluntary basis" or "under compulsion."  Critical Mass Energy Project

---

[3]Pam Transport's action in this regard further suggests that summary judgment in Plaintiff's favor is not appropriate at this time, i.e., there is an indication of a genuine issue in dispute as to whether Plaintiff is entitled to the relief requested in his Motion.

v. NRC, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc).  Under Critical Mass, if

information is provided to the government voluntarily, it is exempt from release under

Exemption 4 if the submitter can show that it would not customarily release the

information to the public.  Id.  On the other hand, if the government requires the

information to be submitted, it must be released under the FOIA unless its disclosure is

likely to (1) impair the government's ability to obtain necessary information in the future;

(2) cause substantial harm to the competitive position of the person from whom the

information was obtained; or (3) impair agency efficiency or effectiveness.  See National

Parks and Conservation Ass'n v. Morton, 498 F.2d 765, 770 & n l7 (D.C. Cir. 1974).

      Here, as explained in the declarations supporting this opposition memorandum,

Defendant is in the process of reviewing the two remaining documents which are still at

issue in this suit for purposes of determining the applicability of FOIA Exemption 4 to the

commercial and financial information contained in the documents.  Thus, given the

current posture of the FMCSA review and the private interests at stake, Plaintiff's request

for summary judgment is premature and should be denied.

      Instead, Defendant respectfully moves for a scheduling order which would provide

the Agency an opportunity to fully undertake the required review of the two documents

still at issue.  Given workload demands of agency staff and because of the need to

complete the consultation with the two submitting companies involved, see Coleman

Decl. ¶¶ 10 - 15, the FMCSA requests up to and including April 30, 2008 to complete this

review and process those matters still at issue with regard to Plaintiff's FOIA requests.

Additionally, Defendant proposes that the scheduling order provide that the parties have

up to and including May 16, 2008 to file a joint status report to govern further disposition

of this suit to include, for example, a summary of any remaining issues requiring review

by the Court and a proposed briefing schedule.  Given the agency's actions over the next

weeks and Plaintiff's response thereto, the joint report might also serve as indication to

the Court that no justiciable issues remain and the case should be dismissed as moot.

### **CONCLUSION**

For reasons stated herein, Defendant respectfully requests that the Court deny

Plaintiff summary judgment and grant Defendant's request for a scheduling order. A

proposed Order consistent with the relief requested herein is attached.

Date: March 21, 2008

Respectfully Submitted,


/s/ Jeffrey A. Taylor /dch
_____
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney


/s/ Rudolph Contreras /dch
_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

/s/ Beverly M. Russell

Of Counsel:
Kirk Foster, Esq.

_____
BEVERLY M. RUSSELL, D.C. Bar #454257

Federal Motor Carrier Safety
 Administration

Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia,

U.S. Dept. Of Transportation

 Civil Division
555 4th Street, N.W., Rm. E-4915
Washington, D.C. 20530
Ph:  (202) 307-0492
Fax: (202) 514-8780
E-Mail: beverly.russell@usdoj.gov

11

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that service of the foregoing ***Defendant's Opposition to***

***Plaintiff's Motion for Summary Judgment And Defendant's Motion for a Scheduling***

***Order*** was made by the Court's Electronic Case Filing System and by pre-paid, first class

mail, this <u>21st</u> day of March, 2008 to:

Jeremy Kahn, Esq.
Kahn and Kahn
1730 Rhode Island Avenue, N.W., Suite 810
Washington, D.C.  20036

/s/ Beverly M. Russell
_____

BEVERLY M. RUSSELL
Assistant United States Attorney

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JEREMY KAHN, pro se | ) |
| | ) |
| | ) |
| Plaintiff, | ) Case No. 1:07-cv-02323 (HHK) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL MOTOR CARRIER | ) |
| SAFETY ADMINISTRATION | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF LORETTA G. BITNER

1.     I am Chief of the Commercial Enforcement Division, Office of Enforcement and Compliance, Federal Motor Carrier Safety Administration (FMCSA or the Agency), an operating administration within the U.S. Department of Transportation. Among other duties, I oversee the FMCSA program charged with ensuring that motor carriers, brokers and freight forwarders maintain minimum levels of financial responsibility, as required by statute and regulation. I have been an FMCSA employee since October 2004 and have served in my current position since August 2006.

2.     I make this declaration on the basis of personal knowledge. In the event I am called as a witness, I could competently testify to the facts contained in this declaration.

3.      For the protection of the public, 49 U.S.C. § 13906 requires motor carriers subject to FMCSA jurisdiction to maintain a bond, insurance policy or other type of approved security in prescribed amounts. The security must be sufficient to pay not more than the amount of the security for each final judgment against the motor carrier for bodily injury, death or property damage arising out of the motor carrier's operations. The minimum levels of financial responsibility for motor carriers are set forth in 49 U.S.C. §§ 31138 and 31139 and 49 C.F.R. Part 387.

4.      Title 49, U.S. Code, section 13906(d), requires FMCSA to allow motor carriers to submit proof of qualification as a self-insurer to satisfy the security requirements of section 13906. Regulations governing the qualification of self-insurers are set forth at 49 C.F.R. § 387.309. That regulation provides:

**§ 387.309 Qualifications as a self-insurer and other securities or agreements.**

(a) As a self-insurer. The FMCSA will consider and will approve, subject to appropriate and reasonable conditions, the application of a motor carrier to qualify as a self-insurer, if the carrier furnishes a true and accurate statement of its financial condition and other evidence that establishes to the satisfaction of the FMCSA the ability of the motor carrier to satisfy its obligation for bodily injury liability, property damage liability, or cargo liability. Application Guidelines: In addition to filing Form BMC 40, applicants for authority to self-insure against bodily injury and property damage claims should submit evidence that will allow the FMCSA to determine:

(1) The adequacy of the tangible net worth of the motor carrier in relation to the size of operations and the extent of its request for self-insurance authority. Applicant should demonstrate that it will maintain a net worth that will ensure that it will be able to meet its statutory obligations to the public to indemnify all claimants in the event of loss.

2

(2) The existence of a sound self-insurance program. Applicant should demonstrate that it has established, and will maintain, an insurance program that will protect the public against all claims to the same extent as the minimum security limits applicable to applicant under § 387.303 of this part. Such a program may include, but not be limited to, one or more of the following: Irrevocable letters of credit; irrevocable trust funds; reserves; sinking funds; third-party financial guarantees, parent company or affiliate sureties; excess insurance coverage; or other similar arrangements.

(3) The existence of an adequate safety program. Applicant must submit evidence of a current "satisfactory" safety rating by the United States Department of Transportation. Non-rated carriers need only certify that they have not been rated. Applications by carriers with a less than satisfactory rating will be summarily denied. Any self-insurance authority granted by the FMCSA will automatically expire 30 days after a carrier receives a less than satisfactory rating from DOT.

(4) Additional information. Applicant must submit such additional information to support its application as the FMCSA may require.

(b) Other securities or agreements. The FMCSA also will consider applications for approval of other securities or agreements and will approve any such application if satisfied that the security or agreement offered will afford the security for protection of the public contemplated by 49 U.S.C. 13906.

49 C.F.R. § 387.309

5.    The standards for motor carrier self-insurance authorization were originally adopted by the Interstate Commerce Commission (ICC) and were transferred effectively unchanged to ICC's successor agencies, first to the Federal Highway Administration (FHWA), and then in 2000 to FMCSA.  *See* Pub. L. 104-88 § 104(h), which states:

The Secretary of Transportation shall continue to enforce the rules and regulations of the Interstate Commerce Commission [now Surface Transportation Board], as in effect on July 1, 1995, governing the qualifications for approval of a motor carrier as a self-insurer, until such time as the Secretary finds it in the public interest to revise such rules.  The revised rules must provide for-- (1) continued ability of motor carriers to qualify as self-insurers;

3

and **(2)** the continued qualification of all carriers then so qualified under the terms and conditions set by the Interstate Commerce Commission [now Surface Transportation Board] or Secretary at the time of qualification

Except for minor technical amendments FMCSA has not revised the self-insurance standards it inherited from its predecessor agencies.

6.    Since FMCSA's inception in 2000, the Agency has published in the FMCSA Register notices of decisions on motor carrier applications for self-insurance authorization, decisions modifying conditions of self-insurance authorization, and notices of self-insurance authorization revocation. These notices of decision consist of one-line announcements of the Agency action, without further explanation regarding the rationale for the decision or restatement of limitations and requirements placed on the motor carrier as conditions on its self-insurance authorization. As had been the practice at the ICC and FHWA, it became Agency practice for staff within the FMCSA Licensing and Insurance Division or the Commercial Enforcement Division to provide copies of the full self-insurance decisions informally to the public upon request.

7.    During the 1980s and 1990s, while the self-insurance program was administered by the ICC and then FHWA, the written decisions concerning for self-insurance authority were somewhat general in nature, and often no more than a page or two. *See, e.g., Contract Freighters, Inc.*, ICC No. MC-119399 (Oct. 22, 1993) attached as Exh. A. In response to a perceived need for more thorough explanation of the Agency's rationale for granting or denying motor carrier self-insurance applications, or for imposing certain requirements or limitations on motor carriers as a condition of self-

insurance authorization, FMCSA began to include more detailed information about self-insurance applicants and program participants in the Agency's full decisions. Because one of the standards for self-insurance qualification is the adequacy of an applicant's tangible net worth in relation to the motor carrier's size of operations, its request for self-insurance authority and its ability to meet its statutory obligations, *see* 49 C.F.R. § 387.309(a)(1), the Agency's full decisions now often include detailed and sensitive financial information concerning the company's assets, liabilities, income, expenses, corporate debt, outstanding claims, recent operations and other activities and data. The full self-insurance decisions link the motor carrier's financial health, as reflected in these figures, to the amounts of self-insurance authorized and the conditions attached, including the filing of letters of credit or the establishment of trust funds, guarantees or other collateral as part of a "sound self-insurance program." *See* 49 C.F.R. § 387.309(a)(2).

8.      Motor carrier companies that submit the information found in these decisions almost always submit the information under declaration that it is confidential and proprietary, and not meant to be disclosed outside FMCSA. My office sees such declarations most frequently in the form of cover letters from companies submitting required quarterly/annual reports to FMCSA in order to maintain their previously-granted self-insurance authority. I have attached three such cover letters, including one from the Plaintiff himself (Exh. D) dated October 9, 2003. *See* Exhs. B, C and D attached.

9.    In response to the increasing levels of detailed financial information in the Agency's full decisions on self-insurance matters and the declarations from motor carriers that their submitted data should be treated as confidential and proprietary, I became concerned that release of such information in the Agency's self-insurance decisions might cause competitive harm to the submitting motor carriers. Therefore, in October 2007, I directed FMCSA staff to discontinue the Agency practice of informally providing to the public copies of self-insurance decisions. Instead, staff were directed to refer public requests for such decisions to the FMCSA Freedom of Information Act (FOIA) Office. The Agency continued to publish notices of all self-insurance decisions, as it had previously, in the FMCSA Register.

10.    The revised Agency procedure for release of self-insurance decisions is in the process of being implemented. It is my understanding that, consistent with FOIA and with longstanding Agency practice for release of other FMCSA records that contain financial information submitted by a motor carrier company, the FMCSA FOIA Office is now reviewing the full self-insurance decisions for material potentially subject to exemption from public disclosure. In the event that such material is found, FMCSA will contact the affected motor carrier company and notify it of the FOIA request and the Agency's intention to release a redacted version of the decision. The Agency will discuss the scope of the redactions with the motor carrier, the carrier will be given an opportunity to object to the release of material it believes will cause it competitive harm if made public, and the Agency will evaluate the carrier's objections before issuing a FOIA determination concerning the releasability in whole or in part of the decision. Ultimately

the FOIA Office may release a partially redacted version of the full decision which, while explaining the Agency's rationale, protects the motor carrier to the extent possible from release of competitively harmful information.

11.    FMCSA is currently preparing a Federal Register notice to clarify its formalized procedures for release of self-insurance decisions.  I have been advised the notice will be issued later this spring.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

LORETTA G. BITNER

Executed on: March ___14___, 2008

GOVERNMENT
EXHIBIT
A

03/13/2008 12:58 FAX                                                    ☒00
10/20/2003 10:45 FAX 202 385 2422        FMCSA                           ☒036

EC              INTERSTATE COMMERCE COMMISSION

                          DECISION

                   DOCKET NO. MC-119399

                 CONTRACT FREIGHTERS, INC.
                        (Joplin, MO)

                APPLICATION TO BE A SELF-INSURER

┌─────────────────┐
│ **SERVICE DATE** │
│   OCT 2 2 1993   │
└─────────────────┘

         Subject to certain conditions, applicant is
         authorized to self-insure its bodily injury
         and property damage and cargo liability.

              Decided:   October 14, 1993

         Contract Freighters, Inc. (CFI or applicant), seeks
    authority to self-insure its bodily injury and property damage
    (BI&PD) and cargo liability under 49 U.S.C. 10927 and 49 CFR
    1043.5.  Applicant has authority to operate as a common and
    contract carrier by motor vehicle, in interstate or foreign
    commerce, over irregular routes, transporting general commodities
    throughout points in the continental United States.  Applicant's
    operating fleet consists of 1,330 power units and 3,303 van
    trailers.  All drivers are employees of the company.  CFI's
    corporate headquarters is located in Joplin, MO.

         Applicant is required to maintain security for the
    protection of the public in the amount of $1 million per
    occurrence for BI&PD liability[1] and $5,000 per occurrence per
    vehicle, $10,000 aggregate, for cargo liability.  Currently,
    applicant has in effect and on file with the Commission the
    requisite BI&PD and cargo security coverages.  Applicant states
    that its annual savings from self-insurance will be approximately
    $309,040 per year.  Applicant indicates that if allowed to self-
    insure, it will maintain excess insurance between $1 million and
    $15 million.

         In support of its application, CFI has provided audited
    balance sheets, income statements, and cash flow statements for
    the years 1990, 1991, and 1992.  The pertinent data from the
    financial statements are as follows:

                         Contract Freighters, Inc.
                          Pertinent Financial Data
                               (000 omitted)

|  | Year 1992 | Year 1991 | Year 1990 |
|---|---|---|---|
| I.  Profitability and Cash Flow | | | |
| 1.  Operating Revenues | $171,401 | 140,026 | $119,864 |
| 2.  Operating Expenses | 149,676 | 125,432 | 104,885 |
| 3.  Operating Income (1-2) | 21,725 | 14,594 | 14,979 |
| 4.  Net Income | 15,551 | 9,430 | 10,749 |
| | | | |
| 1.  Net Income | 15,551 | 9,430 | 10,749 |
| 2.  Plus Depreciation and Amortization | 18,667 | 15,397 | 11,841 |
| 3.  Cash Flow from Operations (1+2) | 34,218 | 24,827 | 22,590 |
| 4.  Debt Due Within One Year | 21,022 | 23,693 | 17,021 |
| 5.  Cash Throw-Off-To Debt Ratio (3/4) | 1.63 | 1.05 | 1.33 |

_____

    [1]Commission records indicate that CFI's insurance company
    has filed a Form B.M.C. 91X in the amount of $5 million.
    However, CFI states that it does not transport and has no future
    plans to transport commodities requiring that higher level of
    coverage.

Docket No. MC-119399

| II. Liquidity | 12/31/92 | 12/31/91 | 12/31/90 |
|---|---|---|---|
| 1. Cash & Cash Equivalents | $11,556 | $ 3,864 | $ 5,888 |
| 2. Other Current Assets | 21,819 | 20,401 | 14,302 |
| 3. Total Current Assets (1+2) | 33,375 | 24,265 | 20,190 |
| 4. Current Liabilities | 39,094 | 36,644 | 27,672 |
| 5. Working Capital (3-4) | (5,719) | (12,379) | (7,482) |
| 6. Current Ratio (3/4) | .85 | .66 | .73 |

| III. Debt Structure | | | |
|---|---|---|---|
| 1. Long-Term Debt Due After One Year | $ 52,187 | $44,698 | $27,253 |
| 2. Stockholders' Equity (Tangible) | 44,169 | 33,493 | 27,949 |
| 3. Total Debt Plus Equity (1+2) | 96,356 | 78,191 | 55,202 |
| 4. Debt-to-Debt Plus Equity Ratio (1/3) | .54 | .57 | .49 |

Note: Income taxes are not reflected in the company's financial statements, due to election of shareholders to be taxed individually on the company's earnings under S Corporation provisions of the Internal Revenue Code.

CFI's Director of Loss Prevention and Director of Human Resources are responsible for implementing and monitoring the company's compliance with the U.S. Department of Transportation's (DOT) requirements and other Federal and state safety laws and regulations. CFI has a "satisfactory" safety fitness rating from DOT.

Applicant maintains full-time claims personnel who are responsible for loss and damage prevention, customer service, and claims settlements. The following table illustrates applicant's claims experience within the past 3 years:

| | Year 1990 | Year 1991 | Year 1992 (9 mos.) |
|---|---|---|---|
| BI&PD (Paid and Reserved) | $633,665 | $1,102,018 | $678,514 |
| Cargo | 20,870 | 81,410 | 16,549 |

## DISCUSSION

The evidence presented sufficiently warrants our authorization of self-insurance of BI&PD and cargo liability in this case. Operations for the years 1992, 1991, and 1990 were profitable as applicant reported net incomes of $15.6 million, $9.4 million, and $10.7 million, respectively. Cash flow generated from earnings exceeded maturing long-term debt by margins of 1.6 times for the year 1992, 1.1 times for the year 1991, and 1.3 times for the year 1990.

As of December 31, 1992, CFI reported a deficit working capital of $5.7 million, as current liabilities of $39.1 million exceeded current assets of $33.4 million. This deficit had improved from year-end 1991, when the working capital deficit was a substantially larger $12.4 million. CFI's ratio of debt-to-debt plus equity was 54% as of December 31, 1992, and tangible net worth was a substantial $44.2 million. Although CFI reported a deficit working capital at year-end 1992, it should be able to pay normal and recurring self-insurance claims from cash flow generated from operations, or from additional financing, if necessary.

We believe, based on the above analysis, that applicant has adequate resources to self-insure its BI&PD and cargo liability for $1 million per occurrence for BI&PD and $5,000 per occurrence per vehicle, and $10,000 aggregate for cargo. We will grant the application subject

- 2 -

Docket No. MC-119399

to conditions similar to those imposed in previous self-insurance
proceedings.

**We find:**

Applicant's self-insurance of its BI&PD and cargo liability,
subject to our conditions, will afford the security for the protection
of the public contemplated by 49 U.S.C. 10927. This action will not
significantly affect either the quality of the human environment or the
conservation of energy resources.

**It is ordered:**

The application is granted, subject to the following conditions:

(1) Applicant must maintain an irrevocable $10,000 letter of credit or
$10,000 trust fund agreement for cargo liability and a separate $1
million letter of credit or trust fund for BI&PD liability. Applicant
must submit, within 60 days of the service date of this decision, a copy
of the agreements with the financial institution establishing the
letters of credit or trust funds. The Commission must approve the terms
of the letters of credit or trust fund agreements prior to their
effective date. Any changes in their terms must be given prior approval
by the Commission. Furthermore, applicant must have unrestricted access
to the letters of credit or trust funds, and drawdowns may be made only
to satisfy claims for cargo or BI&PD liability, respectively. Any
drawdown from the letters of credit or trust funds must be reported
immediately to the Commission, along with an explanation as to how
applicant proposes to respond to additional liability claims. Any
drawdown from the letters of credit or trust funds must be replenished
within 30 days, and any failure to replenish the amount of a drawdown
within 30 days also must be reported immediately to the Commission.

To ensure the protection of the public, we will further require
that the trust fund agreements contain the following provisions.

a.  The trustees must be identified by name and address, and a
statement must be given of their relationship to the applicant.

b.  The beneficiaries of the trust fund agreements must be
designated clearly as cargo or BI&PD liability claimants, respectively,
of applicant. No other parties may have rights of recovery against
these respective funds.

c.  The trust fund agreements must be established so that they may
not be revoked until all cognizable claims arising during the time the
applicant holds ICC authority to self-insure have been settled.

d.  Payments under the trust fund agreements must be made directly
to cargo or BI&PD claimants, respectively.

(2) Applicant must maintain a tangible net worth of at least $2 million
and must notify the Commission at any time, during the effectiveness of
the self-insurance authorization, if its net worth balance falls below
the $2 million minimum. If this occurs, applicant will then have 30
days to correct the situation or face termination of its authority to
self-insure.

(3) Applicant must submit quarterly and annual financial statements to
the Commission, within 60 and 90 days, respectively, after the end of
each quarterly or annual period during the time the self-insurance
authorization is in effect. The financial statements must include a
certification by an appropriate company official verifying the accuracy
of the information provided.

(4) Applicant must file with the Commission quarterly claims reports
detailing the number, aggregate dollar amount, and the nature of its
claims experience and quarterly reports detailing pending court cases or

- 3 -

03/13/2008 12:59 FAX                                                    ☒004/004

10/20/2003 10:48 FAX 202 385 2422          FMCSA                        ☒039

                                                    Docket No. MC-119399

other actions which relate to or arise from its claims experience. Appropriate officials of applicant must certify the accuracy of these reports.

(5)  Applicant must notify the Commission immediately of any pending or contingent BI&PD liability claim(s) which individually exceeds $50,000 or collectively exceed $250,000, or any cargo liability claim(s) which individually exceeds $2,500 or collectively exceeds $10,000.

(6)  Applicant must notify the Commission no later than 90 days prior to the effective date of any change in the terms or cancellation of the letters of credit or trust fund agreements and must notify the Commission of the renewal of the letters of credit or trust fund agreements no later than 6 months prior to their expiration date.

(7)  Applicant must notify the Commission within 5 days upon default of any terms of any loan agreements that exist with financial institutions. Full disclosure should be provided about the consequences, actual or potential, of such default.  Any default could be cause for termination of applicant's self-insurance authority.

(8)  The Commission retains the authority to terminate its self-insurance authorization at any time if it appears to the Commission that applicant's financial arrangements fail to provide satisfactory protection for the public, or applicant fails to file timely any of the information required by the Commission.

(9)  The Commission has the right to require applicant to submit any additional information that the Commission deems necessary.

(10)  This decision is effective on the date of service.  Applicant, however, may not activate its self-insurance authorization less than 30 days after submitting documents to the Commission demonstrating that the required letters of credit or trust funds have been established. Applicant must also notify the Commission of the date it will activate its self-insurance authority.

     By the Commission, Chairman McDonald, Vice Chairman Simmons, Commissioners Phillips, Philbin and Walden.

                                        Sidney L. Strickland, Jr.
SEAL                                         Secretary

                              - 4 -

GOVERNMENT
EXHIBIT
B

# ABF FREIGHT SYSTEM, INC.

## Combined Financial Statements



**Confidential Information**

To protect the confidential and proprietary information included in this material, it has a restricted distribution. Only employees who have signed the Arkansas Best Corporation "Insider Trading Policy" should review this material. Any non-employee who is in possession of this material should treat it as containing material non-public information under the federal securities laws. This material may not be disclosed or otherwise provided to any non-employee without the express written consent of the Company.

If you have questions, contact Richard F. Cooper, General Counsel, (479) 785-6130.

Federal Hwy. Administration
April 30, 2003



GOVERNMENT EXHIBIT C



Greyhound Lines, Inc.
15110 North Dallas Parkway
Dallas, TX 75248

September 30, 2003

Ms. Dorthea Grymes
Federal Highway Administration
Office of Motor Carrier
Suite 600
400 Virginia Avenue Southwest
Washington, DC   20024

RE:  Greyhound Lines, Inc.
     Self Insurance Authority (MC-1515)

Dear Ms. Grymes:

Pursuant to our financial reporting requirements under the above referenced self insurance authority, enclosed please find the following items for Greyhound Lines, Inc. as of and for the month ended August 31, 2003:

(1)   Bank of New York Collateral Trust Fund Statement.

(2)   New Liability Claims Report in excess of $250,000/$50,000.

(3)   Unaudited consolidating and consolidated financial statements (including statement of cash flows)for Greyhound Lines, Inc.

The above referenced items contain <u>highly confidential and privileged, proprietary information</u>.  We would ask that this information be retained under seal and not allowed to be disclosed or disseminated to any third party. Additionally, I do hereby certify that the above included statements are true and accurate.  However, they are unaudited and therefore subject to final immaterial adjustments.

Sincerely,


Darwin Johnson
Manager, Corporate Insurance


Enclosures

GOVERNMENT
EXHIBIT
D

1730 RHODE ISLAND AVE., N. W.
SUITE 810
TELEPHONE (202) 887-0037
TELECOPIER (202) 833-1219
E-MAIL jkahn@erols.com

KAHN AND KAHN
ATTORNEYS AT LAW
WASHINGTON, D. C. 20036

JEREMY KAHN
S. HARRISON KAHN (1933-1980)

2003 OCT 10 P 12: 30

FMCSA
INSURANCE COMPLIANCE
DIVISION

October 9, 2003

Ms. Dorothea Grymes
Insurance Team Leader
Insurance Compliance Division
Federal Motor Carrier Safety Administration
400 Virginia Avenue, S.W., Suite 600
Washington, D.C. 20024

Re:    Landstar System, Inc., *et al.*
       Self-Insurance Authorization
       Federal Motor Carrier Safety Administration
       Docket MC-115162
       **Quarterly Claims Report**

Dear Ms. Grymes:

In decisions served January 7 and April 28, 1994, and August 26, 1996, the Interstate Commerce Commission and later the Federal Highway Administration authorized seven motor carrier affiliates, all subsidiaries of Landstar System, Inc., to act as self-insured motor carriers, subject to certain conditions.

Under the provisions of the ICC Termination Act of 1995, self-insurance functions initially performed by the Interstate Commerce Commission were assigned to the Federal Highway Administration. By virtue of the Motor Carrier Safety Improvement Act of 1999, the Federal Motor Carrier Safety Administration now performs these functions.

By the terms of the ICC and FHWA decisions, *supra*, Landstar System is required to submit to FHWA information relating to its financial and claims results. Among the conditions is Condition (5) requiring the filing of quarterly claims reports.

To satisfy this requirement, there are transmitted herewith (1) an October 2, 2003 letter from the Vice President and General Counsel of Landstar System, Inc.,

*Atch 2*

Ms. Dorothea Grymes
October 9, 2003
Page 2

making required certifications, and (2) a quarterly claims report for each of the seven
Landstar motor carriers, namely Landstar Poole, Inc., Landstar Inway, Inc., Landstar
Ranger, Inc., Landstar Ligon, Inc., Landstar Gemini, Inc., Landstar T.L.C., Inc. and
Landstar Express America, Inc., describing each carrier's claims experience during the
Third Quarter of 2003.

As a reminder, your office has previously been advised that Landstar Poole, Inc.
discontinued its motor carrier operations on or about August 22, 1998, as reflected in an
FHWA decision served October 7, 1998, although it continues to report "open" claims.

**Request for Confidentiality.** The attached information is submitted to FMCSA
responsive to the requirements of the ICC and FHWA decisions, *supra*. The purpose of
submitting this information is to provide FMCSA with a current picture of the carriers'
operations, so FMCSA may assure itself that the Landstar System carriers continue to
qualify for self-insured status. This information would not otherwise be submitted to
FMCSA in connection with the Landstar System motor carriers' periodic reporting as
regulated carriers. The information transmitted here is highly sensitive, competitive
information. Consistent with practices in other self-insurance cases, it is requested that
the attached claims information be maintained as strictly confidential.

Should anything further be required, your request to the undersigned shall
receive immediate attention.

Respectfully,

Jeremy Kahn
Counsel for
Landstar System, Inc., *et al.*

JK:hs
Enc.
CC:    Dennis Owen, Esq.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JEREMY KAHN, pro se | ) <br> ) <br> ) |
| Plaintiff, | ) Case No. 1:07-cv-02323 (HHK) |
| | ) |
| v. | ) <br> ) |
| FEDERAL MOTOR CARRIER | ) |
| SAFETY ADMINISTRATION | ) <br> ) |
| | ) |
| Defendant. | ) <br> ) |

## DECLARATION OF TIFFANIE C. COLEMAN

1. I am the Freedom of Information Act (FOIA) Officer for the Federal Motor Carrier Safety Administration (FMCSA), an operating administration within the U.S. Department of Transportation. I oversee the FMCSA FOIA Office and program. I have served in this position since April 2004. Before I became the FMCSA's FOIA Officer, I was a contract employee working as a FOIA Analyst for the FOIA Office from October 2002, to April 2004.

2. I make this declaration on the basis of personal knowledge. In the event I am called as a witness, I could competently testify to the facts contained in this declaration.

3. As the FOIA Officer, I am responsible for processing all FOIA requests served upon FMCSA. I am responsible for processing subsequent appeals of FMCSA responses as well. I sign all letters to FOIA requesters except FMCSA FOIA appeal decisions. On the FOIA staff, there are seven FOIA analysts - three Federal employee analysts and four contractor analysts. I am one of the three Federal employee FOIA analysts.

4. I issued the letters (marked as Exhibits M, O, and Q to Plaintiff's summary judgment motion) acknowledging the Plaintiff's FOIA requests, which are marked as Exhibits L ("PAM Transport"), N ("Celadon") and P ("Con-Way") to said motion.

**I.**

**Confidential Commercial Information Submitted to FMCSA by Motor Carrier**

**Companies Applying for Self-Insurance Authority**

5. In this case, Plaintiff requested FMCSA self-insurance decisions. These self-insurance decisions contain commercial/business information submitted by motor carrier companies seeking self-insurance authority from FMCSA. The FOIA Office has a reasonable basis to believe that some or all of the business information contained in these self-insurance decisions is confidential.

6. The FOIA Office's conclusion that some or all of the business information contained in the self-insurance decisions is confidential is based, in part, on the fact that in a prior 2003 FOIA request for similar information, commercial information was redacted because it was confidential. I helped process the 2003 FOIA request, which sought all records kept and generated by the FMCSA Self-

Insurance Program. Many of the responsive records involved in that request had been documents submitted by regulated motor carriers applying for self-insurance authority. The FOIA Office had made an initial assessment that many of these responsive records likely contained confidential commercial information.

7. Pursuant to Presidential Executive Order 12,600 ("Predisclosure Notification Procedures for Confidential Commercial Information," June 23, 1987) and 49 C.F.R. § 7.17, the FOIA Office is required to notify motor carrier companies when FMCSA receives a FOIA request for their business information held by the FMCSA Self-Insurance Program. The FOIA Office then has to provide the motor carrier companies a reasonable time to respond as to whether disclosing their commercial information to the public would reasonably be expected to cause substantial competitive harm to the submitting company. However, FMCSA is not required to provide notification if the FOIA Office had already determined that the business information should not be disclosed. (See 49 C.F.R. § 7.17(c)(1)).

8. In 2003, to be efficient, the FOIA Office selected two motor carrier companies that applied to the self-insurance program. Following the procedures discussed above, we solicited their input as to whether disclosure of all or some of the requested business information would cause substantial competitive harm. Both companies responded and objected to FMCSA disclosing all of their business information under this 2003 FOIA. Attachments 1 and 2 to this Declaration are the companies' responses.

9. Because the self-insurance decisions at issue in this case contain similar

commercial information to which motor carrier companies had objected to disclosing in the 2003 FOIA, the FOIA Office processed Plaintiff's FOIA requests for self-insurance decisions in accordance with Executive Order 12,600 and with DOT regulation 49 C.F.R. § 7.17.

10. The status and processing updates for Plaintiff's records requests on P.A.M. Transport, Inc. and Celadon Trucking Services, Inc. are as follows. For P.A.M. Transport, Inc., the FOIA Office received PAM Transport's proposed redactions on February 21, 2008. The FOIA Office, with the assistance of the FMCSA Chief Counsel's Office, is now performing a second review of the proposed redactions to the PAM Transport self-insurance decision. For Celadon Trucking Services, Inc., the FOIA Office is in the process of preparing the formal correspondence to contact the submitter of the self-insurance application.

11. The requested record on Con-Way Truckload (see Plaintiff's Exhibit P) was provided to Plaintiff in full on March 12, 2008, pursuant to his FOIA request. There were no redactions because this record does not contain confidential commercial information.

12. If other FMCSA divisions or offices were previously disclosing FMCSA self-insurance decisions in full and by methods outside of the FOIA process, their disclosures were not coordinated with the FMCSA FOIA Office and the FMCSA FOIA Office did not concur with the disclosures.

II.

**The FMCSA FOIA Processing Plan**

13. Plaintiff's two remaining FOIA requests (see Plaintiff's Exhibits N and P) are in a

working, successful FOIA processing system established by FMCSA to process FOIA requests from the public. When FMCSA receives a FOIA request for FMCSA records, the FOIA Office first reviews the request to determine its subject matter and complexity. Concerning the complexity determination, the FMCSA FOIA Office designates FOIA requests received as either "simple" or "complex." A FOIA request is labeled "complex" if, among other things, it involves multiple offices/entities (both within and without of FMCSA) or our disclosure decision will require legal review. When a FOIA request receives a "complex" label, it is logged into the FOIA tracking system and assigned a FOIA control number. The request is then placed in a filing system along with other FOIAs recently received, and is processed in the "first in, first out" manner.

14. Plaintiff's FOIAs have the "complex" label. In processing Plaintiff's requests for records, the FMCSA FOIA Office will consult with the FMCSA Self-Insurance Division and with the motor carrier companies who submitted business information contained in these records. In addition, the FMCSA FOIA Office will obtain guidance from the FMCSA Office of Chief Counsel on how to evaluate the comments/objections received concerning disclosure of the requested records.

15. The number of FOIA requests submitted to FMCSA has increased each fiscal year, including the number of complex FOIAs. Due to the increasing number of FOIA requests and the limited resources available to my office, some FOIA requests are still pending at the end of each fiscal year and have to be carried over into the next fiscal year. However, the number of FMCSA FOIA requests carried

over into fiscal year 2008 was less than the number carried over into fiscal year 2007. Due to our working FOIA processing plan, the FMCSA FOIA Office was able to reduce this FOIA backlog despite an ever-increasing FOIA workload.

16. FMCSA is also part of the U.S. Department of Transportation FOIA Action Improvement Plan developed in accordance with Executive Order 13392 ("Improving Agency Disclosure of Information," December 14, 2005).[1]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: March 12, 2008

TIFFANIE C. COLEMAN

---

[1] http://www.dot.gov/foia/actionimprovementplan2006.pdf



# CRETE CARRIER CORPORATION

LEGAL DEPARTMENT

P.O. BOX 83246 • (402) 475-6911 • FAX (402) 475-5865

LINCOLN, NEBRASKA 68501

April 22, 2005

**Via UPS Next Day Air 1Z F41 318 22 1000 913 0**

Tiffanie Coleman, FOIA Officer
U.S. Department of Transportation
Federal Motor Carrier Safety Administration
400 Seventh St., SW
Washington, DC 20590

RE:    MC-MBI FOIA Request for Crete Carrier Corporation Financial Information

Dear Ms. Coleman:

In response to your letter dated April 13, 2005 to Mr. Jeff Schumacher, Vice President of Insurance, Crete Carrier Corporation hereby objects to disclosure of all financial information it has provided the FMCSA in the last three years related to Crete Carrier's self-insurance status. While Crete Carrier is not certain as to all information included in the Freedom of Information Act ("FOIA") request, Crete Carrier assumes you are referring to the Form M Annual Reports and the Form QFR Quarterly Reports. If that is incorrect, please provide me with copies of the information you are referring to in your April 13, 2005 letter.

The FOIA specifically exempts from disclosure trade secrets and commercial or financial information which is privileged or confidential. Crete Carrier Corporation is not a publicly traded company and does not publicly disclose all of the financial information included in the Form M and Form QFR. Disclosure of the financial information included in these forms and specifically the balance sheet and income statement as well as asset information related to revenue equipment and operating information related to drivers and driver pay, could put Crete Carrier at a competitive disadvantage not only with competing motor carriers but with customers and suppliers. For example, if the assets and equity portions of the balance sheet along with the net income and expense portions of the material are disclosed in the specifics provided in Form M., customers may use this information to request lower pricing and competitors and suppliers could specifically determine Crete Carrier's equipment, driver, communications and other costs and use this information to Crete Carrier's disadvantage. Further, while Crete Carrier discloses certain information in the aggregate, such as the number of truck tractors it operates, it does not disclose how many of these tractors are owned versus leased, nor does it disclose its operating expenses related to these truck tractors such as cost of parts and repairs, tires, fuel and other operating expenses. If competitors obtain this information, they would have the ability to compare their relative operating costs categories to Crete Carrier and try to undercut Crete Carrier's costs in specific areas to gain a competitive advantage.

Additionally, a competitor or supplier could extrapolate from all the information other cost points of Crete Carrier. If the information is disclosed, a supplier could determine Crete Carrier's current cost of leasing equipment by taking the amount of leased revenue equipment and comparing that to the miscellaneous expense for equipment rentals. A competitor could also determine exact driver pay by doing the same with comparing total driver compensation with the total number of CDL drivers and miles reported. Further, disclosure of Crete Carrier's insurance expenses could cause it harm when attempting to obtain excess liability insurance from multiple insurance carriers. In the process of obtaining insurance coverage, Crete Carrier is required to provide the amount of claims paid to potential insurance carriers. Those carriers could match that information with the insurance expense information provided in Form M and then calculate the amount of Crete Carrier's current insurance premiums. Thus, a competing insurance carrier may only underbid an incumbent insurance provider by a small amount under the existing premium and not provide the premium savings they would have if the bidding insurance carrier did not know the existing premium.

Finally, with Crete Carrier being a privately held S-Corporation, information regarding the company's overall net income when combined with other public information regarding the corporation could be used to directly attribute value to its individual shareholders and be detrimental to the shareholders on a personal level.

For the above reasons, Crete Carrier respectfully asks that the FOIA request be denied. Please contact me if the FMCSA intends to disclose any information pursuant to the FOIA request. Also please inform me if any of the information requested includes items outside of the Form M and Form QFR.

Very truly yours,

Timothy G. Aschoff
Attorney at Law

TGA:cw

*VARIETY WHOLESALERS, INC.*
Legal Department

218 S. GARNETT STREET<br>
POST OFFICE DRAWER 947<br>
HENDERSON, NORTH CAROLINA 27536<br>
TELEPHONE 252-430-2019 ● FACSIMILE 252-430-2022

April 25, 2005

**VIA FACSIMILE ONLY TO (202)385-2335**
Tiffanie Coleman, FOIA Officer
FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION
400 Seventh Street, SW
Washington DC 20590

RE:  MC-MBI

Dear Ms. Coleman:

With reference to your letter dated April 13, 2005 advising that your office has received a request for a copy of all financial information from the last 3 years that Variety Wholesalers, Inc. ("Variety") has submitted to the FMCSA pertaining to its application for self-insurance, please be advised that Variety vigorously objects to any such disclosure. The submitted information is highly confidential. Variety is a closely held corporation whose financial reports are not legally subject to public disclosure and which include information which could expose Variety to competitive harm. Disclosure of this information could adversely impact Variety's negotiations on store leases, negotiations of claims by third parties, and other key aspects of Variety's business. Please advise me if any further information or documentation is needed to support this objection.

This letter will further serve to request that, in the event FMCSA reaches any initial determination that Variety's confidential financial information may be subject to disclosure, you will notify me of this determination in sufficient time for the company to appeal the decision.

You can reach me on my direct line at (252)430-2020 or by fax to (252)430-2022. Meanwhile, I am —

Very truly yours,

G. Templeton Blackburn, II
Sr. Vice President, General Counsel

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| JEREMY KAHN, | ) | |
| | ) | |
|     Plaintiff | ) | |
| | ) | |
|         v. | ) | Civil Action No.  07-2323 (HHK) |
| | ) | |
| FEDERAL MOTOR CARRIER SAFETY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | |

ORDER

UPON CONSIDERATION of Plaintiff's Motion for Summary Judgment,

Defendant's opposition thereto and Defendant's Motion for a Scheduling Order,  it is by

the Court,

ORDERED that Plaintiff's Motion for Summary Judgment is DENIED; and it is

further

ORDERED that Defendant shall have up to and including April 30, 2008 to

process Plaintiff's FOIA request; and its further

ORDERED that the Parties shall submit a Joint Status Report recommending

further disposition of this suit by May 16, 2008;

SO ORDERED.


_____                    _____
DATE                                      UNITED STATES DISTRICT COURT JUDGE

Copies to:
Jeremy Kahn, Esq.
Kahn and Kahn
1730 Rhode Island Avenue, N.W., Suite 810
Washington, D.C.  20036

Beverly M. Russell
U.S. Attorney's Office for the District of Columbia,
 Civil Division
555 Fourth Street, N.W., Suite E-4915
Washington, D.C.  20530
beverly.russell@usdoj.gov