UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Jeremy Kahn, *pro se* | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) CASE: 1:07-cv-02323 (HHK) |
| | ) |
| Federal Motor Carrier Safety Administration | ) |
| | ) |
| *Defendant* | ) |

**Plaintiff's Reply to
Defendant's Memorandum In Opposition to
Plaintiff's Motion for Summary Judgment**

In this Freedom of Information Act ("FOIA") case, plaintiff, an active transportation practitioner before defendant FMCSA and its predecessor agencies for more than 30 years, is in the position of severely criticizing not only the legal position but also the candor of an agency before which he actively represents clients. Yet, if the emperor is not wearing any clothes, someone must step forward and say so, and that's the case here. Plaintiff's Summary Judgment papers set out a comprehensive argument why the sought documents should be produced immediately. FMCSA's Opposition is not responsive to the complaint in this matter, not responsive to the applicable FOIA law, and worst of all, makes arguments based on statements materially inconsistent with fact.

RECEIVED
MAR 2 8 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

Plaintiff has argued in his initial Memorandum that in an FOIA request, the agency bears the burden of showing the requested documents are exempt from disclosure. *Beck v. Department of Justice*, 997 F.2d 1489, 1491 (D.C.Cir.1993). In this case, the sought documents are clearly "orders" under 5 U.S.C. §551(6), [1] and where "orders" are at issue in an FOIA case, since "agency non-compliance" with the basic requirements of FOIA "is unlikely," *American Mail Line, Limited v. Gulick*, 411 F.2d 696, 702, n.9 (D.C.Cir.1969), FMCSA must present an awfully compelling justification for withholding them.

But there's more! This case is not a *de novo* request for orders which have never been made public before. As FMCSA acknowledges, these sorts of orders have routinely been made available to the public for decades, and so its abrupt abandonment of a decades old policy of making the orders available requires even more justification.

Finally, when FMCSA issued the sought orders, it did so along with its statement that the orders were available upon request. Rather than explain to the Court why the public is not entitled to rely on FMCSA's own announcement, the FMCSA Opposition ignores that fact and that argument as though they had never been presented.

FMCSA has not challenged any of Plaintiff's assertion of facts, so for Summary Judgment purposes they must be accepted as true. FMCSA (and predecessor agencies) have been issuing formal self-insurance orders for decades and routinely making them available to the public, including publishing a statement of their public availability in the

---

[1] Plaintiff's Initial Memorandum at pages 5-7 argued at length why these documents are "Orders." In its Opposition, FMCSA did not challenge or even address that characterization.

FMCSA *Register*. Without notice, FMCSA simply decided in the fall of 2007 no longer to make the orders available.[2] FMCSA justifies to this Court its change in policy in the fall of 2007 by (1) asserting that today's FMCSA self-insurance orders are dramatically greater in length and substance than the one or two page orders which FMCSA claims were typically issued in earlier days, (2) reliance on two letters it received in <u>2005</u> in response to its own correspondence, and (3) reliance on some letters it received in <u>2003</u> in which some carriers requested confidentiality on matters related to self-insurance.

The essence of FMCSA's rationale for this abrupt change appears in paragraphs 7 and 8 of the Bitner Declaration. The witness asserts than during the 1980s and 1990s, "the written decisions for self-insurance authority were somewhat general in nature, and often no more than a page or two." The witness adds, "[T]he agency's full decisions now often include detailed and sensitive financial information concerning the company's assets, liabilities, income, expenses, corporate debt, outstanding claims, recent operations, and other activities and data," and goes on to conclude that this dramatic change from the general, one or two page orders of the past to the more detailed, more lengthy, data intensive orders of the present, merit the change in policy (even if it didn't merit an announcement of that change).

This could be a compelling argument if the premises were true – but they are false!

---

[2] FMCSA admits it changed its policy and such change requires notice to the public. To meet its obligations of notifying the public, it is considering issuing a *Federal Register* notice explaining this policy change, possibly even as soon as 7 or 8 months after it was made! (Bitner Dec., ¶11)

FMCSA begins by asserting those earlier orders were "somewhat general in nature, and often no more than a page or two," certainly suggesting that they were made available to the public because they were devoid of meaningful content. To support that assertion, FMCSA offers not a one page order but a 1993 *Contract Freighters* decision of four full pages (Bitner Dec., Ex. A), which order goes into a good bit of specific detail about the applicant's finances. Although it was already a part of the record, FMCSA ignored Plaintiff's submission of an even more detailed six page June, 1987 decision in *Crete Carrier Corporation* (Kahn Aff., Ex. I), which was submitted "as an example of how these self-insurance orders have been issued in much the same format as they are today for 20 years." (Kahn Aff., ¶25). [3] Is FMCSA trying to say the *Contract Freighters* and *Crete Carriers* orders aberrations, since they were quite specific in content and significantly "more than a page or two"?

According to the Plaintiff's Supplemental Affidavit (¶2), he is aware of 20 self-insurance orders issued during 1992 and 1993 (around the time of the *Contract Freighters* order offered by FMCSA). For orders treating new self-insurance applications on their merits, other than the *Contract Freighters* decision cited by FMCSA in its presentation, and the *New Penn* decision (which related to the less significant cargo insurance only, rather than the far more significant bodily injury and property damage liability treated in most orders) which were each 4 pages, all the others were at least five pages (except for the 4 purely procedural orders of one or two pages). Even looking at every self-insurance

---

[3] FMCSA has not challenged this assertion.

the 4 purely procedural orders of one or two pages). Even looking at <u>every</u> self-insurance order during the period – including the purely procedural one or two page orders – when 80% of the orders during the two years were a minimum of 4 pages (and 60% were longer than that), FMCSA's statement that the orders "were often no more than a page or two" (and the inference that they were inconsequential which would naturally flow from such a dismissive characterization) is not as candid a statement as one would hope would be submitted by a government agency to a Court and certainly does not support the claim that past orders were cursory and devoid of substance.

In his Summary Judgment Affidavit, Plaintiff submitted copies of six more recent orders, five of which had been issued prior to the disclosure policy change. The Court can readily judge for itself if those can properly be characterized as "often no more than a page or two."

Indeed, if one looks at *Contract Freighters* order referred to by FMCSA as an example and the *Crete Carriers* order referred to by Plaintiff, and then compares them with the six more recent orders submitted with Plaintiff's Summary Judgment papers, the most significant difference between older and newer orders is type style and font, which, in addition to more conditions being added in more recent orders, could well explain why the more recent decisions are a page or two longer than the earlier ones. To some extent, the length of more recent orders comes from more conditions imposed [9 in *Crete Carriers* as compared to 18 in *Bennett* (Kahn Aff., Ex. C)], but those are conditions relating to filing certain data in the future for the protection of the public, not a

5

description of the carrier's confidential inner workings. In any event, FMCSA's rationale that the earlier self-insurance orders were "generally no more than a page or two" and without substance does not justify FMCSA's change in policy.

FMCSA next argues to the Court that recent orders are not only longer, but that they are materially different from the older orders, because the newer ones contain information about "assets, liabilities, income, expenses, corporate debt, outstanding claims, recent operations, and other activities and data," while the older ones do not. What can be said of the *Contract Freighters* order which FMCSA chose to submit to bolster its case? The first page of that order includes details for three years of revenues, expenses, operating income, cash flow and debt service. The second page includes three years of details of balance sheet information, and debt and equity details, including tangible net worth. There is also significant claims information. The "Discussion" portion goes into substantial detail as to operating results, cash flow, and debt-to-equity. The earlier, longer *Crete Carriers* decision (Kahn Aff., Ex. A), goes into minute detail at pages 2-3 regarding the applicant's financial condition and operations. Just how do those earlier orders differ from the more recent ones? Is it that the earlier orders don't include "the amounts of self-insurance authorized and the conditions attached, including the filing of letters of credit or the establishment of trust funds, guarantees, or other collateral"? (Bitner Dec, ¶8.) The *Contract Freighters* order (pp. 3-4) includes the amount of self-insurance authorized, the conditions attached, including the letter of credit/trust fund requirements. The *Crete Carriers* order includes the same information at pages 5-6.

How does this differ from the recent *Bennett* order (Kahn Aff., Ex. C, pp. 11-14) issued *prior* to FMCSA's change in policy or the *Gordon* order (Kahn Aff., Ex. H, pp.6-9) issued *after* the FMCSA's change in policy? FMCSA was presented with all these orders in Plaintiff's Summary Judgment papers, and if there was a real distinction between the older and more recent orders, FMCSA *could* have identified the difference, and since it bears the burden of proof, it *should* have identified the difference. Its silence speaks volumes.

In addition to its bogus argument that the old orders were short and the more recent, longer ones contain more sensitive information, FMCSA also argues it abruptly changed it policy because it has been besieged with requests by carriers to maintain self-insurance related material information as confidential. FMCSA asserts, "In response to the increasing levels of detailed financial information in the Agency's full decisions . . . and the declarations from motor carriers that their submitted data should be treated as confidential and proprietary," it decided in October 2007 to change its policy on disclosure. (Bitner Dec., ¶9) Once more, FMCSA is less than candid with the Court.

As further justification for its change in policy, FMCSA makes a statement obviously crafted with great care to make a point which the facts don't support. It says,

> Motor carrier companies that submit the information found in those decisions almost always submit the information under declaration that it is confidential and proprietary, and not meant to be disclosed outside FMCSA. My office sees such declarations most frequently in the form of cover letters from companies submitting required quarterly/annual reports in order to maintain their previously-granted self-insurance authority. (Bitner Dec., ¶8).

FMCSA could support that assertion with any documents in its possession, but it chose to

use three documents from 2003, prior even to the witness being employed by Defendant. (Bitner Dec., ¶1) The witness infers frequent submission of such requests, but, although FMCSA bears the burden of proof, is unable to identify even one such request during the past four years! Beyond the failure to submit any document during the past four years to support this assertion, why does Plaintiff describe this statement as "carefully crafted"? Plaintiff knows as an active agency practitioner that he routinely includes "requests for confidentiality" such as that shown in his 2003 letter (Bitner Dec, Ex. D.), and the other 2003 letter (Ex. C) showing another representative of a self-insured carrier making a similar request. Yet, each such request is a request to maintain as confidential detailed, current financial and claims information which must be filed periodically on behalf of carriers previously authorized to self-insure, not to maintain as confidential information in an initial application which would be expected to be published in any self-insurance order! With reference to the example used by FMCSA, Plaintiff's letter (Bitner Dec., Ex. D) makes explicit reference to the periodic reporting requirements of the order authorizing self-insurance. The other letter (Ex. C) submitted is on behalf of Greyhound. A recent *Greyhound* self-insurance order was submitted as Exhibit F with the Kahn Affidavit. The third ordering paragraph (page 4) and the 11th ordering paragraph (page 5) describe the ongoing reporting requirements for a previously authorized carrier. As another example, the *Bennett* order (Kahn Aff., Ex. C) includes explicit financial and claims as conditions 5, 6, and 17 (pages 12-14) for future reporting. Such reporting includes audited financial statements and the accompanying "notes" as well as even a

further breakdown of expense and balance sheet items, and extremely detailed claims information, including claims reserves for individual incidents. (Kahn Supplemental Aff., ¶4) That's the sort of information which carriers seek to classify as confidential. There is a world of difference between making public complete copies of detailed financial statements and detailed claims information which carriers submit periodically as a requirement of their self-insured status and the summary information which appears in self-insurance orders.

  Plaintiff, as an agency practitioner, claims that carriers which seek self-insurance authority understand before beginning the process the certain information will be published in FMCSA orders. (Kahn Aff., ¶17, and Kahn Supplemental Aff., ¶3) Though given the opportunity to do so, and though required to do so to meet its burden of proof, FMCSA has not presented to the Court <u>any</u> request of <u>any</u> nature by <u>any</u> carrier seeking confidentiality in connection with submission of information which will result in an FMCSA order such as those sought in this action. No carrier applies for self-insurance with the expectation that some financial, claims and operations information won't be included in the order FMCSA ultimately issues; had there ever been a request for confidentiality in such circumstances, – be it in 2003, 2004, 2005, 2006, or 2007 – FMCSA would certainly have included such a request as a part of meeting its burden of proof. The <u>only</u> such "confidentiality" requests FMCSA receives are those in connection with the release of documents submitted as a part of ongoing compliance with an earlier issued FMCSA order. (In other words, the descriptive language "most frequently" in the

FMCSA statement should more accurately and candidly be read as "always.")

Finally, even assuming the two 2003 letters [4] identified a problem, how can the agency assert that the problem is so urgent that it must wait four years after those letters were written and only then take precipitous action to change a decades old policy?

As another leg of its justification, FMCSA relies on the Coleman Declaration. It asserts that by reason of a Presidential Executive Order issued in <u>1987</u> (Coleman Dec., ¶7) (long before FMCSA was even created), FMCSA in 2005 sought a means to "be efficient" in meeting its FOIA obligations. From this, the Court is told that FMCSA in April, <u>2005</u> solicited a response from two previously authorized self-insured carriers. (Coleman Dec., ¶8) The Court is not told what was asked of the carriers, but only given the carriers' response. The Crete Carriers letter (Attachment 1) says explicitly it relates to the release "of all financial information it has provided the FMCSA in the last three years related to Crete Carrier's self-insurance status." (emphasis added) The Variety Wholesalers letter (Attachment 2) says explicitly it relates to the "financial information from the last 3 years that [the carrier] has submitted to the FMCSA pertaining to its application for self-insurance . . ."[5] There is a vast difference between detailed financial

---

[4] It's not clear just what Exhibit A to the Bitner Declaration may be.

[5] As best Plaintiff can ascertain from FMCSA's public database at www.fmcsa.dot.gov, Variety was authorized to self-insure in May, 2003, so it might not have been already authorized. However, from the Variety response as well as the Crete Carrier's response, it is abundantly clear that FMCSA was addressing <u>all</u> the detailed financial statements which had been submitted, not whether the publication of the summary data which has appeared in self-insurance orders for decades should be considered as confidential. That's a significant difference. (Kahn Supplemental Aff., ¶4)

statements (including the "notes" to such statements which are a part of every audited financial statement) and the summary information which appears in FMCSA orders.[6]

Indeed, if these two letters show anything, they show that FMCSA has in place an appropriate procedure to deal with confidentiality concerns arising from requests for the periodic information submitted by previously self-insured carriers which may be considered to be confidential.

Assuming, however, these two letters identify some sort of FOIA problem (the Coleman Declaration points to no such problem), if there was a concern about this issue in April, 2005, how can this be said to justify an abrupt change in policy, without public notice, in Ocrtober, 2007?

Finally, Plaintiff is by no means suggesting that the scales of justice are to be viewed solely in terms of which party cites the most cases, but FMCSA's legal argument is as devoid of legal content as its factual argument is devoid of accuracy. Dealing with FOIA, a topic about which every possible nuance has been often litigated, in the entirety of its presentation, FMCSA deigns to provide the Court with citation to only two 'hornbook" cases. Indeed, as an indication of the cavalier fashion with which it dismisses this claim, it dutifully notes there are different judicial tests to apply if information is

---

[6] Among the many points advanced by Plaintiff which FMCSA chooses to ignore in its Opposition, at page 16 of his Initial Memorandum, Plaintiff refers to FMCSA regulations at 49 CFR §369, which require public disclosure of the required annual financial reports. These are the reports to which Crete makes reference in its letter. They are required by law and FMCSA regulation to be made public anyway.

submitted to the government voluntarily or involuntarily, but it doesn't even assert which of the two tests it believes applies here. This is in stark contrast to Plaintiff's argument on this point (pages 12 -17), in which plaintiff argues, with citation to six court decisions why the information submitted is not "voluntary," the test which applies, and why FMCSA cannot meet that test. FMCSA, which bears the burden of proof, ignores this part of Plaintiff's argument. That's a strange way to meet one's burden of proof.

FMCSA bears a strong burden to justify its withholding the requested documents. It has not met its burden. Plaintiff's unchallenged arguments accurately describe the law and why FMCSA's withholding of the sought documents is unjustified. The Court should order the immediate production of these documents and grant the prospective relief described at pages 17 - 18 of Plaintiff's Initial Memorandum.

### FMCSA's Motion for a Scheduling Order

FMCSA, which has repeatedly sought more time in which to make every filing in this case, includes as a part of its Opposition a request for even more delay, this one for the Court to establish a scheduling order, so FMCSA might have yet more time to complete its review.

Plaintiff has opposed that Motion, because the Motion presupposes that FMCSA is justified in not providing these documents until it has reviewed them and decides what portions, if any, it will release to the public. For all the reasons advanced – including substantial legal precedent to which FMCSA has offered no response, there is no legal justification to withhold these documents even one more day. There is no need for a

scheduling conference when FOIA demands the documents to be produced now.

Further, although the relief sought in the Motion is misplaced, the very nature of this Motion is to once again show FMCSA's disdain for the Court and Plaintiff.[7] In its Motion filed March 21, it asks the Court to take no action so that FMCSA can complete its review of these orders by April 30, citing the Coleman Declaration. Assuming for argument there is any validity for making such a request, according to FMCSA (Coleman Dec. ¶10), FMCSA received the response from one carrier (P.A.M. Transport) on February 21, but as of March 21, more than a month later, it is still undergoing a "second review" of the order, with no target date for completion. Even assuming there are only two reviews, it has now been more than two months since FMCSA first sought to contact P.A.M., and FMCSA still has not completed its review of what it will release. Since FMCSA has not even completed drafting a letter to Celadon, the second carrier (Coleman Dec., ¶10) it is not likely that it will complete the letter, receive a response from that

---

[7] "Disdain" is a harsh, intemperate word. Yet, it is justified in this instance. The lack of candor in FMCSA's presentation has been documented. FMCSA in its Answer to the Amended Complaint asserts. Among other things, that Plaintiff "fails to state a claim upon which relief can be granted." There might be at least an arguable issue as to whether the orders might be included in FOIA Exemption 4, but to assert "failure to state a claim" on a basic FOIA request is an awfully disdainful assertion, belied by hundreds of FOIA court cases and FMCSA's own response to this lawsuit. Next, the Answer asserts Plaintiff's "failure to exhaust administrative remedies." Plaintiff addressed this issue at pages 11-12 of his Memorandum. FMCSA, which bears the burden of proof, did not even address the issue in its response to Plaintiff's dispositive motion. How then can it claim in its Answer Plaintiff did not exhaust administrative remedies? FMCSA asserts "Plaintiff cannot demonstrate" these documents qualify as material which must be made available to the public under 5 U.S.C. §522(a)(2)(A), but Plaintiff addressed this issue at pages 7 and 8 of his Memorandum, to which FMCSA did not even respond. Those sorts of legally groundless statements to the Court constitute "disdain."

carrier, and complete its second (and however many more are required) review in one month! Then what? Just another request to postpone the case even longer. Obviously, FMCSA is proposing the Court issue an order with which compliance is impossible, merely as a premise of returning to ask for even more time, presumably to see if it can wear down Plaintiff in a war of attrition through requests for delay.

At the outset of this proceeding, Plaintiff opposed FMCSA's first request to enlarge time, accurately predicting that the request was just a dilatory tactic. At that time, Plaintiff asserted, "The answers to those two questions, raised in this lawsuit, do not depend on the response by P.A.M. Transport as to whether it objects to the release of information." They still don't, but now Plaintiff, in his Summary Judgment request, has had the opportunity to present his full legal argument why this is so and FMCSA continues to meet its burden to try to justify its position.

FMCSA's dilatory tactics should not be permitted.

## Conclusion

Wherefore, on the basis of the foregoing, the Court is respectfully requested to enter Summary Judgment for Plaintiff and grant the relief requested.

Respectfully submitted,

_/s/ Jeremy Kahn_

Jeremy Kahn, *pro se*
Business Address For Mail:
1730 Rhode Island Ave., N.W., No. 810
Washington, D.C. 20036
Day Telephone  202.887.0037

## Certificate of Service

    I, Jeremy Kahn, certify that I have served a copy of the foregoing Reply and Supplemental Statement of Jeremy Kahn Opposition upon counsel for Defendant, Federal Motor Carrier Safety Administration, by mailing a copy to Beverly M. Russell, Esq., Assistant U.S. Attorney, U.S. Attorney's Office for the District of Columbia, Civil Division, 555 Fourth Street, N.W., E-4915. Washington, DC 20530, by first class mail, postage prepaid.

    Dated at Washington, DC this 28th day of March, 2008.

                                                   Jeremy Kahn

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Jeremy Kahn, *pro se* | ) |
| | ) |
|     *Plaintiff,* | ) |
| | ) |
| v. | ) CASE: 1:07-cv-02323 (HHK) |
| | ) |
| Federal Motor Carrier Safety Administration | ) |
| | ) |
|     *Defendant* | ) |

### Supplemental Statement of Plaintiff Jeremy Kahn
### In Support of Plaintiff's Motion for Summary Judgment

1.  I am Jeremy Kahn, *pro se* Plaintiff in this Freedom of Information Act ("FOIA") matter. I submitted a Statement in Support of my motion for Summary Judgment. Upon review of the Opposition filed by Defendant FMCSA, I identified what I believe are factual inaccuracies in its presentation, This Supplemental Statement addresses those apparent inaccuracies.

2.  There appears to be an issue concerning the nature and substance of self-insurance orders issued by the FMCSA's predecessor, Interstate Commerce Commission, during the period around 1993. I have reviewed my file of self-insurance orders, which I believe is reasonably comprehensive and includes every – or almost every – self-insurance order issued during the period. Based on that review, I have prepared the

RECEIVED
MAR 2 8 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

following list of every ICC self-insurance order of which I am aware issued during 1992 and 1993. The list shows the carrier's name, "MC" number, title, service date, and number of pages:

- *National Freight, Inc., Application to Be a Self-Insurer*, MC-2860 (February 6, 1992) 6 pages

- *Greyhound Lines, Inc., Application to Be a Self-Insurer, Petition Seeking Review of Authorization to Self-Insure Denied*, MC-1515 (April 8, 1992) 8 pages

- *C.R. England & Sons, Inc., Application to Be a Self-Insurer*, MC-124679 (May 14, 1992) 5 pages

- *Mayflower Transit, Inc., Application to Be a Self-Insurer*, Request for Extension in Time to Comply With Decision Granted, MC-2934 (July 10, 1992) 1 page (decision allowed the carrier to further postpone submission of information required for ICC to make an initial decision on its application)

- *Chemical Leamon Tank Lines, Inc., Application to Be a Self-Insurer*, MC-110525 (September 9, 1992) 6 pages

- *J.B. Hunt Transport, Inc., Application to Be a Self-Insurer*, MC-135797 (October 2, 1992) 6 pages

- *Three I Truck Lines, Inc., Application to Be a Self-Insurer*, MC-159643 (December 16, 1992) 7 pages

- *Daily Express, Inc., Authorization to Be a Self-Insurer*, MC-138328 (January 8, 1993) 2 pages (decision allowed the carrier to implement self-insurance which had been granted earlier in an May 29, 1991 decision of 5 pages)

- *Werner Enterprises, Inc., Application to Be a Self-Insurer*, MC-138328 (January 14, 1993) 2 pages (decision allowed the carrier to implement self-insurance which had been granted earlier in an August 14, 1991 decision of 5 pages)

- *Burlington Motor Carriers, Inc., Application to Be a Self-Insurer*, MC-154621 (January 22, 1993) 6 pages

- *Umthum Trucking Company, Application to Be a Self-Insurer*, MC-124813 (January 22, 1993) 5 pages

2

- *AAA Cooper Transportation, Application to Be a Self-Insurer*, MC-55889 (January 27, 1993) 5 pages

- *ABF Freight System, Inc., Application to Be a Self-Insurer*, MC-29910 (April 8, 1993) 7 pages

- *FFE Transportation Services, Inc., Application to Be a Self-Insurer*, MC-108207 (April 8, 1993) 5 pages

- *USA Truck, Inc., Application to Be a Self-Insurer*, MC-161412 (April 23, 1993) 5 pages

- *USA Truck, Inc., Authorization to Be a Self-Insurer,, Request for modification of claims reporting condition granted*, MC-161412 (August 3, 1993) 1 page

- *New Penn Motor Express, Inc., Application to Be a Self-Insurer*, MC-70832 (September 2, 1993) 4 pages (authorizing less significant cargo liability insurance only)

- *Greyhound Lines, Inc., Authorization to Be a Self-Insurer, Modification of Self—Insurance Authorization*, MC-1515 (September 30, 1993) 6 pages

- *Dart Transit Company, Application to Be a Self-Insurer*, MC-114457 (October 21, 1993) 5 pages

- *Contract Freighters, Inc., Application to Be a Self-Insurer*, MC-119399 (October 22, 1993) 4 pages

3.   With its Opposition, FMCSA submitted a copy of my October 9, 2003 letter (Bitner Declaration, Ex. D). As an active practitioner before FMCSA, representing a large proportion of all the self-insured motor carriers, I routinely include a "Request for Confidentiality," similar to that in my October 9 letter, in connection with all periodic filings of financial and claims information made by carriers as a condition of their self-insurance authorization. I have never made a request for confidentiality in connection with filing an application for initial self-insurance authorization. Instead, as I explained in Paragraph 17 of my initial Statement, I routinely counsel clients that FMCSA will

3

publish some information regarding a carrier's finances and claims history in any order it issues either approving or denying an application.

    4.    In its Opposition, FMCSA confuses two different sorts of submissions in self-insurance cases. <u>First</u>, to apply for self-insurance authority, a carrier must submit a substantial amount of information, including several years of financial information (including annual audited statements and accompanying notes of the auditors), further financial analysis related to self-insurance issues, and detailed historic claims information, as well as other information. FMCSA's treatment of that material in its orders is quite clear from the orders now before the Court. It publishes summary data taken from those submissions in a very few categories. It does not, for example, reproduce complete financial statements or "notes" to those statements which would describe sensitive carrier financial arrangements. It does not, for example, publish information about claims reserves for particular claims (a matter of great concern to carriers, in my experience). <u>Second</u>, when FMCSA authorizes a carrier to self-insure, every such authorization includes a requirement that the carrier submit periodically *in the future* detailed, audited financial and claims information, including in many instances, breaking down financial information into more detailed categories than would appear in even audited financial statements. For example, carriers are often required to break down the "insurance expense" category to show expenses for each type of insurance, including BI&PD and cargo as regulated by FMCSA, but also workers compensation, general liability, etc., which are not regulated by FMCSA. In my experience, no carrier ever

requests confidentiality with respect to the application itself, but it is very common for carriers to request confidentiality with respect to periodic, highly detailed submissions required to be made *after* a carrier is qualified to self-insure.

## Verification

I, Jeremy Kahn, Plaintiff, verify under penalty of perjury under the laws of the United States, that I have read the foregoing statement, that I am qualified to make that statement, and that all the information therein is true and correct.

_____
Jeremy Kahn, Plaintiff

Dated: March 27, 2008