# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| JEREMY KAHN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No.  07-2323 (HHK) |
| | ) | |
| FEDERAL MOTOR CARRIER SAFETY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
## SUPPLEMENTAL OPPOSITION TO PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

Defendant, Federal Motor Carrier Safety Administration, by and through its

undersigned attorneys, and pursuant to Rule 56 of the Federal Rules of Civil Procedure,

hereby respectfully moves for summary judgment in its favor in this case brought

pursuant to the Freedom of Information Act, 5 U.S.C. § 552, on the grounds that there are

no material facts in dispute and that, indeed, the facts in the case establish that Defendant

is entitled to judgment as a matter of law.  A statement of material facts as to which there

is no genuine dispute, a memorandum of points and authorities in support of this motion,

the declaration of a responsible agency official consistent with the District of Columbia

Circuit's opinion in <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973)[1], and a proposed

Order are filed herewith.

The accompanying memorandum also includes Defendant's supplemental

opposition to Plaintiff's Motion for Summary Judgment.

Respectfully Submitted,

/s/ Jeffrey A. Taylor /dch
_____
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney

/s/ Rudolph Contreras
_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

/s/ Beverly M. Russell
_____
Of Counsel:                          BEVERLY M. RUSSELL, D.C. Bar #454257
Kirk Foster, Esq.                    Assistant United States Attorney
Federal Motor Carrier Safety         U.S. Attorney's Office for the District of Columbia,
 Administration                       Civil Division
U.S. Dept. Of Transportation         555 4th Street, N.W., Rm. E-4915
                                     Washington, D.C. 20530
                                     Ph:  (202) 307-0492
                                     Fax: (202) 514-8780
                                     E-Mail: beverly.russell@usdoj.gov

_____

[1]The <u>Vaughn</u> decision requires agencies to prepare a document correlating each withheld record (or portion) with a specific FOIA exemption and the relevant part of the agency's nondisclosure justification.

2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JEREMY KAHN, | ) |
|  | ) |
| Plaintiff | ) |
|  | ) |
| v. | ) Civil Action No.  07-2323 (HHK) |
|  | ) |
| FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND SUPPLEMENTAL OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

The Freedom of Information Act ("FOIA") provides that the district courts have "jurisdiction to enjoin [an] agency from withholding agency records and to order the production of agency records improperly withheld from [a] complainant."  5 U.S.C. § 552(a)(B).  The records that Plaintiff seeks in this matter - i.e., administrative decisions issued by the Federal Motor Carrier Safety Administration ("FMCSA" or "Agency") in *P.A.M. Transport, Inc.*, FMCSA Docket MC-150496, *Celadon Trucking Services, Inc.*, FMCSA Docket MC-185116, and *Con-Way Truckload, Inc.*, FMCSA Docket MC-119399 - have been released with the exception of information properly redacted and withheld under FOIA.  Accordingly, since the FMCSA has fully met its obligation under the statute, and there is no material issue in dispute on this point, the FMCSA respectfully

moves for summary judgment in its favor.  Additionally, the FMCSA requests that

Plaintiff's Motion for Summary Judgment be denied.[1]

## I.    BACKGROUND

### A.    Motor Carrier Self-Insurance Program

For the protection of the public, 49 U.S.C. § 13906 requires motor carriers subject

to FMCSA jurisdiction[2] to maintain a bond, insurance policy or other type of approved

security in prescribed amounts.  See R. 15, Def.'s Op. Pl.'s Mot. Summ. J. and Def.'s

Mot. for Scheduling Order, Declaration of Loretta G. Bitner, ¶ 3 (March 14, 2008); see

also Declaration of Tiffanie C. Coleman, ¶ 6 (May 23, 2008) ("Coleman III

Decl.")(attached hereto).  A motor carrier, however, may submit proof of qualifications as

a self-insurer to satisfy the security requirements of this statutory provision.  49 U.S.C. §

---

[1]On March 21, 2008, the FMCSA filed an opposition to Plaintiff's Motion for
Summary Judgment and a Motion for a Scheduling Order.  In its supporting
memorandum, the FMCSA argued that it was in the process of responding to Plaintiff's
FOIA request, and there was the possibility that certain information included in the
requested self-insurance decisions would be exempt from disclosure.  R. 15.  Thus, the
FMCSA argued that Plaintiff's Motion for Summary Judgment was premature and
requested that the Court enter a Scheduling Order to govern further disposition of this
suit.  On April 30, 2008, the Court denied Defendant's Motion for a Scheduling Order,
and provided Defendant until May 5, 2008 to supplement its opposition memorandum.
The Court subsequently granted Defendant an extension of that date to May 26, 2008.
However, because May 26 was a holiday, Defendant's supplemental opposition is due
today, May 27, 2008.  Fed. R. Civ. P. 6.

[2]The standards for motor carrier self-insurance authorization were originally
adopted by the Interstate Commerce Commission ("ICC") and were transferred
effectively unchanged to ICC's successor agencies, first to the Federal Highway
Administration, and then in 2000 to FMCSA.  See Pub. L. 104-88 § 104(h).

13906(d).  To qualify for self-insurance authority under 49 C.F.R. § 387.309, commercial motor carrier companies must submit certain commercial information.  Coleman III Decl. ¶ 7.  The regulations governing the qualifications of self-insurers are set forth at 49 C.F.R.  § 387.309.  That regulation provides:

> The FMCSA will consider and will approve, subject to appropriate and reasonable conditions, the application of a motor carrier to qualify as a self-insurer, if the carrier furnishes a true and accurate statement of its financial condition and other evidence that establishes to the satisfaction of the FMCSA the ability of the motor carrier to satisfy its obligation for bodily injury liability, property damage liability, or cargo liability. . . .[An] applicant[] for authority to self-insure against bodily injury and property damage claims should submit evidence that will allow the FMCSA to determine:

> > (1) The adequacy of the tangible net worth of the motor carrier in relation to the size of operations and the extent of its request for self-insurance authority. Applicant should demonstrate that it will maintain a net worth that will ensure that it will be able to meet its statutory obligations to the public to indemnify all claimants in the event of loss.

> > (2) The existence of a sound self-insurance program. Applicant should demonstrate that it has established, and will maintain, an insurance program that will protect the public against all claims to the same extent as the minimum security limits applicable to applicant under § 387.303 of this part. Such a program may include, but not be limited to, one or more of the following: Irrevocable letters of credit; irrevocable trust funds; reserves; sinking funds; third-party financial guarantees, parent company or affiliate sureties; excess insurance coverage; or other similar arrangements.

> > (3) The existence of an adequate safety program. Applicant must submit evidence of a current "satisfactory" safety rating by the United States Department of Transportation. Non-rated carriers need only certify that they have not been rated.

3

Applications by carriers with a less than satisfactory rating
will be summarily denied. Any self-insurance authority
granted by the FMCSA will automatically expire 30 days after
a carrier receives a less than satisfactory rating from DOT.

(4) Additional information. Applicant must submit such
additional information to support its application as the
FMCSA may require.

(b) Other securities or agreements. The FMCSA also will consider applications for
approval of other securities or agreements and will approve any such application if
satisfied that the security or agreement offered will afford the security for
protection of the public contemplated by 49 U.S.C. 13906.

49 C.F.R. § 387.309.

During the 1980s and 1990s, while the self-insurance program was administered

by the Interstate Commerce Commission ("ICC") and then the Federal Highway

Administration ("FHWA"), the written decisions concerning self-insurance authority

were somewhat general in nature, and often no more than a page or two.  R. 15, Bitner

Decl. ¶ 7 and Ex. A, *Contract Freighters, Inc.*, ICC No. MC-119399 (Oct. 22,

1993)(attached to Bitner Decl.).  In response to a perceived need for more thorough

explanations of the Agency's rationale for granting or denying motor carrier self-

insurance applications, or for imposing certain requirements or limitations on motor

carriers as a condition of self-insurance authorization, the FMCSA began to include more

detailed information about self-insurance applicants and program participants in the

Agency's full decisions.  R. 15, Bitner Decl. ¶ 7.

4

Because one of the standards for self-insurance qualification is the adequacy of a motor carrier applicant's tangible net worth in relation to its size of operations, see 49 C.F.R. § 387.309(a)(1), the Agency's full decisions now often include detailed and sensitive financial information concerning an applicant's assets, liabilities, income, expenses, corporate debt, outstanding claims, recent operations and other activities and data. Id.; see also Coleman III Decl. ¶ 7. The full self-insurance decisions link the motor carrier's financial health, as reflected in these figures, to the amounts of self-insurance authorized and the conditions attached, including the filing of letters of credit or the establishment of trust funds, guarantees or other collateral as part of a "sound self-insurance program." See 49 C.F.R. § 387.309(a)(2); R. 15, Bitner Decl. ¶ 7.

Motor carrier companies that submit the information found in these decisions almost always submit the information under declaration that it is confidential and proprietary, and not meant to be disclosed outside the FMCSA. Id. ¶ 8; Coleman III Decl. ¶ 8. The FMCSA sees such declarations most frequently in the form of cover letters from companies submitting required quarterly/annual reports to FMCSA in order to maintain their previously-granted self-insurance authority. Plaintiff has submitted such a declaration on behalf of a motor carrier that he was representing. R. 15, Bitner Decl. ¶ 8 and Ex. B, C, and D to Bitner Decl. (sample letters requesting that decisions be treated in a confidential manner).

In response to the increasing levels of detailed financial information in the Agency's full decisions on self-insurance matters and the declarations from motor carriers that their submitted data should be treated as confidential and proprietary, the FMCSA became concerned that release of information in the Agency's self-insurance decisions might cause competitive harm to the submitting motor carriers.  R. 15, Bitner Decl. ¶ 9. Therefore, in October 2007, FMCSA staff was directed to discontinue the practice of informally providing to the public copies of self-insurance decisions.  Id. Instead, staff were directed to refer public requests for such decisions to the FMCSA FOIA Office.  Id. The Agency continues to publish notices of all self-insurance decisions, as it had previously, in the FMCSA Register.  Id.

### B.    Agency Processing of Plaintiff's FOIA Request

#### 1.    Con-Way Truckload, Inc. Order Dismissing Self-Insurance Application

The FMCSA provided the Con-Way Truckload dismissal order to Plaintiff with no redactions on March 12, 2008.  R. 15, Declaration of Tiffanie C. Coleman, March 12, 2008 ("Coleman I Decl."), ¶ 11.  There were no redactions because the dismissal order does not contain confidential commercial information.  Id.

#### 2.    Celadon Trucking Decision

Celadon Trucking Services, Inc. ("Celadon Trucking") is a subsidiary of its parent, Celadon Group, Inc., a publicly traded company.  Coleman III Decl. ¶ 9.  When the FMCSA FOIA Office received Plaintiff's FOIA request for FMCSA's December 28,

2007 decision on Celadon Trucking's application for authority to self-insure, the FMCSA

FOIA Office made the determination that the decision might contain commercial or

financial information the disclosure of which might cause substantial harm to the

competitive position of Celadon Trucking.  Id.  Accordingly, the FMCSA FOIA Office

began the notice/comment procedure found in 49 C.F.R. § 7.17(a).[3,4]  Celadon Trucking

received the FMCSA FOIA Office's 49 C.F.R. § 7.17(a) notice letter on April 9, 2008.

---

[3]See 49 C.F.R. 7.17(a) which states,

> If a request is received for information that has been
> designated by the submitter as confidential commercial
> information, or which DOT has some other reason to believe
> may contain information of the type described in § 7.13(c)(4),
> the submitter of such information will. . .be notified
> expeditiously and asked to submit any written objections to
> release. At the same time, the requestor will be notified that
> notice and an opportunity to comment are being provided to
> the submitter. The submitter will, to the extent permitted by
> law, be afforded a reasonable period of time within which to
> provide a detailed statement of any such objections. The
> submitter's statement shall specify all grounds for withholding
> any of the information. The burden shall be on the submitter
> to identify all information for which exempt treatment is
> sought and to persuade the agency that the information should
> not be disclosed.

[4]Pursuant to 49 C.F.R. § 7.17, the FMCSA FOIA Office is required to notify motor
carrier companies when the FMCSA receives a FOIA requrst for their business
information held by the FMCSA Self-Insurance Program.  R. 15, Coleman I Decl. ¶ 7.
The FOIA Office then has to provide the motor carrier companies a reasonable time to
respond as to whether disclosing the commercial information to the public would
reasonably be expected to cause substantial competitive harm to the submitting company.
Id.  The FMCSA, however, is not required to provide notification if the FOIA Office has
already determined that the business information should not be disclosed.  Id., citing 49
C.F.R. § 7.17(c)(1).

On April 29, 2008, the Vice President and General Counsel for Celadon Trucking proposed that FMCSA redact the following information from the second page of the Celadon Trucking self-insurance decision: (i) the dollar amount of Celadon's self-insured bodily injury and property damage ("BI & PD") claims as of the quarter ending March 31, 2007; (ii) the percentage of Celadon's revenue for said quarter that was represented by Celadon's BI & PD claims; (iii) the percentage of Celadon's tangible net worth ("TNW") for said quarter that was represented by Celadon's BI & PD claims; and (iv) the percentage of Celadon's BI & PD claims that was covered by Celadon's existing collateral for said quarter.  Coleman III Decl. ¶¶ 10 and 20.  The Celadon Trucking official stated that to disclose the information at issue "may give the requesting party some competitive benefit that it is not entitled to and [also stated that the] information is not presently public information." Id. (and Attach. 1, thereto).  On May 5, 2008, the FMCSA FOIA Office disclosed to Plaintiff the FMCSA's self-insurance decision on Celadon Trucking, with the exception of the information noted above.  Id. ¶ 11.  The FMCSA withheld the redacted information pursuant to 5 U.S.C. § 552(b)(4).  Id.

### 3.    P.A.M. Transport, Inc. Decision

P.A.M. Transport, Inc. ("P.A.M. Transport") is a subsidiary of its parent company, P.A.M. Transport Services, Inc. ("P.T.S.I."), a publicly traded company.  See Coleman III Decl. ¶ 14.  When the FMCSA FOIA Office received Plaintiff's FOIA request for the FMCSA's October 2, 2007, decision on P.A.M. Transport's application for authority to

self-insure, the FMCSA FOIA Office again made the determination that this decision

might contain commercial or financial information which P.A.M. Transport deemed

privileged or confidential, the disclosure of which might cause substantial harm to the

competitive position of P.A.M. Transport.  Id.  The FMCSA FOIA Office again began the

notice/comment procedure found in 49 C.F.R. § 7.17(a).  Id. P.A.M. Transport received

the FMCSA FOIA Office's 49 C.F.R. § 7.17(a) notice via telephone on February 21,

2008.  Id.

In e-mail correspondence dated February 21, 2008, an official with the parent

company P.T.S.I. requested that FMCSA redact information found on pages 1-7 of the

October 2, 2007, self-insurance decision on P.A.M. Transport.  Id. ¶ 15.  The official

stated the P.A.M. Transport information had been "carved out" of parent company

P.T.S.I's publicly disclosed information in a way not intended by P.T.S.I., and that P.T.S.I

deemed the repackaged P.A.M. Transport information to be privileged and harmful to

P.A.M. Transport if disclosed, as P.A.M. Transport itself is not a publicly held company.

Id. and Attach. 3 and 4 (thereto).   Upon further review, the FMCSA FOIA Office made

the assessment that the proposed P.A.M. Transport redactions were too broad.  Id. ¶ 16.

In a letter dated May 2, 2008, the FMCSA FOIA Office informed P.A.M. Transport of its

disclosure determination, and gave P.A.M. Transport a period of time to respond or to

take action to enjoin FMCSA from disclosing its redacted version of P.A.M. Transport's

self-insurance decision.  Id.  P.A.M. Transport did not respond within the given period,

and on May 15, 2008, the FMCSA FOIA Office disclosed to Plaintiff the FMCSA-redacted version of the P.A.M. Transport self-insurance decision.  Id. (and Attach 5 thereto, final redacted version of the P.A.M. Transport self-insurance decision released to the Plaintiff.)   The primary difference between the FMCSA final redacted version and the redacted version P.A.M. Transport proposed is that the FMCSA version discloses the financial concepts and terms which put the redacted numerical and statistical data into context.  Id. ¶ 17.  As with the Celadon decision, the FMCSA redacted certain information from the P.A.M. Transport decision pursuant to 5 U.S.C. § 552(b)(4).  The FMCSA made the determination that disclosing the following P.A.M. Transport information and 2003-2006 statistics could result in substantial harm to the competitive position of that company:

- Operating Revenue;
- Net Income;
- Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA);
- Cash flow available for insurance and claims;
- Cash and short-term investments;
- Working capital;
-  Current ratio;
- Tangible Net Worth (TNW);
- Total liabilities/TNW (i.e., leverage);
- Percentage of increase or decrease in the above financial statistics between 2005 and 2006;
- Combined annual savings from self-insurance;
- BI & PD insurance deductible;
- Total of outstanding BI & PD cargo claims within the proposed self-insurance limit as of December 31, 2006;
-  BI & PD claims statistics from 2003-2006, with 2005-2006 increase/decrease percentages;

10

- Cargo claims statistics from 2003-2006, with 2005-2006 increase/decrease percentages;
- The percentage of revenue provided by one major customer;
- The percentage of revenue generated by transportation services provided to the automotive industry; and
- A business decision that affected liquidity and days payable outstanding.

Coleman III Decl. ¶ 21.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure mandates summary judgment where "there is no genuine issue as to any material fact and...the moving party is entitled to judgment as a matter of law." Washington Post Co. v. U.S. Dep't of Health and Human Services, 865 F.2d 320, 325 (D.C. Cir. 1989). As the Supreme Court has declared, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

An agency satisfies the summary judgment requirements in a FOIA case by providing the Court and the plaintiff with affidavits or declarations and other evidence which show, if applicable, that the documents are exempt from disclosure. Hayden v. National Security Agency Cent. Sec. Serv., 608 F.2d 1381, 1384, 1386 (D.C. Cir. 1979), cert. denied, 446 U.S. 937 (1980); Church of Scientology v. U.S. Dept. of Army, 611 F.2d 738, 742 (9th Cir. 1980). Summary judgment may be awarded to an agency in a FOIA case solely on the basis of agency affidavits or declarations if the "affidavits are

11

'relatively detailed, non-conclusory, and not impugned by evidence ... of bad faith on the part of the agency.'" <u>Public Citizen, Inc. v. Dept. of State</u>, 100 F.Supp.2d 10, 16 (D.D.C. 2000) (<u>quoting</u> <u>McGhee v. Central Intelligence Agency</u>, 697 F.2d 1095, 1102 (D.C. Cir. 1983).

Specifically, summary judgment is available to a defendant agency upon proof that it has fully discharged its obligations under FOIA. <u>Miller v. U.S. Dept. of State</u>, 779 F.2d 1378, 1382 (8th Cir. 1985.) The declarations of Tiffanie C. Coleman and Loretta Bitner attached hereto and filed previously (<u>see</u> R. 15) were provided by individuals familiar with the steps taken by the FMCSA in responding to Plaintiff's FOIA request. Since the declarations demonstrate that the FMCSA met its obligations under the FOIA, and the pleadings and other filings show no genuine issue as to any material fact. The FMCSA is entitled to judgment as a matter of law, and summary judgment should be granted to the FMCSA. Further, Plaintiff's Motion for Summary Judgment should be denied.

### **ARGUMENT**[5]

I.    **The FMCSA Properly Applied FOIA Exemption 4.**

Exemption 4 of the FOIA covers two broad categories of information in federal agency records: (1) trade secrets; and (2) information that is (a) commercial or financial,

---

[5]Given that the three requested self-insurance decisions have been produced, albeit two with redactions, there is no issue regarding the adequacy of the agency's search. <u>See</u> <u>Oglesby v. U.S. Dept. of Army</u>, 920 F.2d 57, 68 (D.C. Cir. 1990)(discussing agency's responsibility to conduct a reasonable search for responsive records).

and (b) obtained from a person, and (c) privileged or confidential.  5 U.S.C. § 552(b)(4);

Public Citizen Health Research Group v. FDA, 704 F.2d 1280, 1288, 1290 (D.C. Cir.

1983).  Regarding the latter, if information relates to business or trade, courts generally

will accord it the status of "commercial" information for purposes of the FOIA.  It is not

necessary to show that the records reveal basic commercial operations; records are

deemed commercial so long as the submitter has a "commercial interest" in them.  Id. at

1290. Further, "[i]nformation that a person is required to submit to the Government is

considered confidential...if its disclosure is likely either '(1) to impair the Government's

ability to obtain necessary information in the future; or (2) to cause substantial harm to

the competitive position of the person from whom the information was obtained.'" Public

Citizen Health Research Group v. Food and Drug Admin., 185 F.3d 898, 348 (D.C. Cir.

1999), quoting, National Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C.

Cir. 1974).

**A.    Type of Information Withheld Is Within Scope of Exemption 4.**

The FMCSA reviews applications of motor carriers requesting qualification as

self-insurers pursuant to 49 C.F.R. § 387.309.  As indicated above, the rule requires motor

carrier companies, in order to qualify for self-insurance under the regulation, to submit

certain commercial information.  Id.; see also Coleman III Decl. ¶¶ 7, 11 and 18

(discussing that submission of the commercial or financial information by the two motor

carriers was required or "involuntary" for purposes of the Agency making self-insurance

determinations.)  The FMCSA's decisions on the motor carrier self-insurance requests in

13

turn discuss and analyze the submitted financial information concerning the company's assets, liabilities, income, expenses, corporate debt, outstanding claims, recent operations, and other activities and data.  Id.

As explained above, the FMCSA withheld from the Celadon Trucking decision the following information:  (i) the dollar amount of Celadon's self-insured BI & PD claims as of the quarter ending March 31, 2007; (ii) the percentage of  Celadon's revenue for said quarter that was represented by Celadon's BI & PD claims; (iii) the percentage of Celadon's tangible net worth (TNW) for said quarter that was represented by Celadon's BI & PD claims; and (iv) the percentage of Celadon's BI & PD claims that was covered by Celadon's existing collateral for said quarter.  Coleman III Decl. ¶¶ 10 and 20. Similarly, the FMCSA withheld from disclosure very detailed financial and statistical information from the P.A.M. Transport decision.  Id. ¶ 21.  The information withheld is thus commercial or financial in nature.

**B.    Disclosure of Redacted Information Could Cause Competitive Harm to Celadon Trucking and P.A.M. Transport.**

With regard to the confidentiality of the redacted information, the Vice President and General Counsel for Celadon Trucking expressly states that disclosure of the submitted, non-public information could give a party a competitive benefit.  Id. ¶ 10. Similarly, an official with P.T.S.I., the parent company for P.A.M. Transport, Inc., stated that P.T.S.I. deemed the P.A.M. Transport-submitted information to be privileged, and that release of the information would be harmful if disclosed.  Id. ¶ 15.  Thus, given that the information withheld is commercial or financial in nature, disclosure of which would

cause competitive harm to the submitters, the FMCSA appropriately redacted the

information from the self-insurance decisions.  See, e.g. National Parks and Conservation

Ass'n v. Kleppe, 547 F.2d 673, 684 (D.C. Cir. 1976); Inner City Press/Comty. On the

Move v. Bd. of Governors of the Fed. Reserve Sys., No. 98 CIV. 4608, 1998 WL 690371,

at *5 (S.D.N.Y. Sept. 30, 1998), aff'd, 182 F.3d 900 (2d Cir. 1999)("capital situation,

[company's] assets, cash flow, investments, leverage rations, 'cross-selling strategy,' pre-

tax earnings by product line, dividend capacity, revenues, and rate changes for. .

.insurance operations" appropriately withheld under FOIA Exemption 4).

### C.    Plaintiff's Arguments Advocating for Disclosure of Celadon Trucking's and P.A.M. Transport's Confidential Information Lack Merit.

Plaintiff makes two arguments to support his claim that the decisions should be

released presumably in entirety - (1) that the decisions have always been publicly released

and (2) that the decisions are orders required to be disclosed pursuant to 5 U.S.C. §

552(a)(2)(A).  R. 11, Mem. In Support Pl.'s Mot. Summ. J., at 5-11.  Both arguments are

without merit.  Regarding the former, and as noted in Defendant's Reply to Plaintiff's

Opposition to Defendant's Motion for a Scheduling Order [R. 20], the FMCSA did not

waive the right to apply FOIA exemptions by its prior release of similar decisions. Indeed,

even if the FMCSA had released confidential or otherwise exempt materials in publishing

prior decisions, Courts have found that such releases do not undermine the agency's

ability to protect similar materials in the future.  See, e.g. Hertzberg v. Veneman, 273

F.Supp.2d 67, 81-82 (D.C.Cir.2003)(Selective disclosure of some withheld material does

not waive use of exemptions to protect similar, but undisclosed information.); Center for

International Environmental Law v. Office of the U.S. Trade Representative, 237

F.Supp.2d 17, 23 (D.D.C.2002)(public availability of similar but not identical information

does not lead to waiver for all information on the same subject.); Kay v. F.C.C., 867

F.Supp. 11, 23,-24 (D.D.C. 1994)(inadvertent disclosure of six unredacted letters

constitutes no reflection whatsoever on agency's assessment of the sensitivity of

remaining material);  Astley v. Lawson, Civ.A.No. 89-2806(CRR), 1991 WL 7162, *8

(D.D.C. Jan. 11, 1991); Garside v. Webster, 733 F.Supp. 1142, 1147 (S.D.Ohio 1989)("It

is the opinion of this Court that the prior release of some material, either through

inadvertence or as part of another proceeding, does not result in a waiver of any of the

exemptions under 5 U.S.C. § 552(b).").  What Defendant did here is not precedent-

setting, but instead clearly consistent with the tenets of the FOIA statute and the U.S.

Department of Transportation's regulations implementing that statute.  See 49 C.F.R.

7.17.  Applying National Parks here, it is clear that the FMCSA appropriately withheld

the commercial and financial information submitted by the two companies and included

in the self-insurance decisions.  The FMCSA, and indeed, the public, has an interest in

motor carrier companies providing accurate and detailed financial information for

purposes of the FMCSA making determinations on self-insurance requests.   The FMCSA

must have sufficient information to assess whether the applicant-company maintains "a

net worth that will ensure that [the company] will be able to meets its statutory

obligations *to the public* to indemnify all claimants in the event of loss."  49 C.F.R. §

387.308(a)(1)(emphasis added).  The FMCSA, however, also has an interest in not

16

placing a motor carrier company at a competitive disadvantage by revealing the company's financial and commercial information submitted as part of a request to self-insure. Accordingly, given that the companies are required to submit financial and commercial information for purposes of the FMCSA's self-insurance review and balancing that factor against the competitive harm that might result to the companies if their commercial and financial information is publicly released and the resulting adverse impact such release might have on the FMCSA's self-insurance review process, the FMCSA - consistent with Exemption 4 - appropriately withheld the commercial and financial information at issue notwithstanding and irrespective of its prior practice.

Plaintiff also argues that the decisions should be disclosed under 5 U.S.C. § 552(a)(2)(A) which requires agencies to make available for public inspection and copying "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases." Even if the self-insurance decisions are construed as final orders, the Agency can nevertheless withhold information protected under (b)(4) pursuant to the FOIA and its own governing regulation, 49 C.F.R. § 71.17.[6] See, e.g. Grumman Aircraft Engineering Corp. v. Renegotiation Bd., 425 F.2d 578 (D.C. Cir. 1970)(In a

---

[6]It appears that the conflict between 552(a)(2)(A) and the FOIA converges where an Agency attempts to withhold a final decision or order under the deliberative process privilege. The Supreme Court has held that an agency may not withhold a final order on the basis that it contains deliberative information. NLRB v. Sears, Roebuck & Co., 421 U.S. 132 (1965). This makes sense because the public should know the reasoning or bases for government decisions. Id. at 152, n. 19 (Final orders or decisions are "primarily postdecisional[,] looking back on and explaining. . .a decision already reached or a policy already adopted. . ."). In the same case, however, the Court held that a memorandum subject to affirmative disclosure under section 552(a)(2)(A) was nevertheless exempt pursuant to the attorney "work product" privilege.

17

FOIA case filed against the Renegotiation Board, the District of Columbia Circuit stated that "should data which falls within [FOIA Exemption4] appear in any Board opinion or order, both the [FOIA] and the Board's regulations recognize that the interests of confidentiality can be protected by striking identifying details prior to releasing the document."). In close analogy to the FMCSA self-insurance decisions are the final decisions of the Boards of Contract Appeals. These decisions consistently have confidential, commercial information redacted. See Sample Board of Contract Appeals Decisions (attached). The cornerstone of FOIA is to allow the public to know what its government is up to. U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 773 (1989).

In summary, the FOIA recognizes that certain information in the government's files should be protected from disclosure because of the potential harm that could result from disclosure. As demonstrated above, the FMCSA's FOIA determination to redact confidential, commercial information from the requested self-insurance decisions was consistent with the requirements of the FOIA.

## II.    The FMCSA Disclosed All Reasonably Segregable Portions of Records.

The District of Columbia Circuit has held that a District Court considering a FOIA action has "an affirmative duty to consider the segregability issue sua sponte." Trans-Pacific Policing Agreement v. U.S. Customs Service, 177 F.3d 1022, 1028 (D.C. Cir. 1999). The FOIA requires that if a record contains information that is exempt from disclosure, any "reasonably segregable" information must be disclosed after deletion of

18

the exempt information unless the non-exempt portions are "inextricably intertwined with exempt portions."  5 U.S.C. § 552(b); <u>Mead Data Cent., Inc. v. U.S. Dept. of the Air Force</u>, 566 F.2d 242, 260 (D.C. Cir. 1977).  In this case, the FMCSA has demonstrated with reasonable specificity that all reasonably segregable information has been released. Coleman III Decl. ¶ 22.  The FMCSA has made every effort to provide Plaintiff with all reasonably segregable portions of the self-insurance decisions.  <u>Id.</u>  Exempt information was withheld pursuant to and consistent with 5 U.S.C. § 552(b)(4).  For this reason, and those stated above, Defendant respectfully submits that summary disposition in its favor is appropriate.

## <u>CONCLUSION</u>

For the reasons stated herein, Defendant requests that its summary judgment motion be granted, and that Plaintiff's Motion for similar relief be denied.

Respectfully Submitted,


/s/ Jeffrey A. Taylor /dch

_____

JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney


/s/ Rudolph Contreras

_____

RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

                                    /s/ Beverly M. Russell

Of Counsel:                         _____
Kirk Foster, Esq.                   BEVERLY M. RUSSELL, D.C. Bar #454257
Federal Motor Carrier Safety        Assistant United States Attorney
 Administration                     U.S. Attorney's Office for the District of Columbia,
U.S. Dept. Of Transportation         Civil Division
                                    555 4th Street, N.W., Rm. E-4915
                                    Washington, D.C. 20530
                                    Ph:  (202) 307-0492
                                    Fax: (202) 514-8780
                                    E-Mail: beverly.russell@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing ***Defendant's Motion for Summary Judgment and Supplemental Opposition to Plaintiff's Motion for Summary Judgment*** was made by the Court's Electronic Case Filing System and by pre-paid, first class mail, this <u>27th</u> day of May, 2008 to:

Jeremy Kahn, Esq.
Kahn and Kahn
1730 Rhode Island Avenue, N.W., Suite 810
Washington, D.C.  20036


/s/ Beverly M. Russell
_____

BEVERLY M. RUSSELL
Assistant United States Attorney

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| JEREMY KAHN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No.  07-2323 (HHK) |
| | ) | |
| FEDERAL MOTOR CARRIER SAFETY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S STATEMENT OF MATERIAL FACTS AS
## TO WHICH THERE IS NO GENUINE DISPUTE

Pursuant to Local Rule 7(h), Defendant proffers the following statement of material facts which Defendant submits are not in dispute.

1.     Between October 2007 and January 2008, Plaintiff requested a copy of the following decisions issued by the Federal Motor Carrier Safety Administration ("FMCSA"):  *P.A.M. Transport, Inc.*, FMCSA Docket MC-150496, *Celadon Trucking Services, Inc.*, FMCSA Docket MC-185116, and *Con-Way Truckload, Inc.*, FMCSA Docket MC-119399.  Am. Compl. ¶ 1.

2.     The FMCSA provided the Con-Way Truckload self-insurance decision to Plaintiff with no redactions on March 12, 2008.  R. 15, Declaration of Tiffanie C. Coleman, March 12, 2008 ("Coleman I Decl."), ¶ 11.

3.      On May 5, 2008, the FMCSA disclosed to the Plaintiff FMCSA's self-insurance decision on Celadon Trucking, with the following information redacted: (i) the dollar amount of Celadon's self-insured bodily injury and property damage ("BI & PD") claims as of the quarter ending March 31, 2007; (ii) the percentage of  Celadon's revenue for said quarter that was represented by Celadon's BI & PD claims; (iii) the percentage of Celadon's tangible net worth ("TNW") for said quarter that was represented by Celadon's BI & PD claims; and (iv) the percentage of Celadon's BI & PD claims that was covered by Celadon's existing collateral for said quarter.  Declaration of Tiffanie C. Coleman ¶¶ 10 and 20 (May 23, 2008)("Coleman III Decl.").  The FMCSA withheld the redacted information pursuant to 5 U.S.C. § 552(b)(4). Id.  A Celadon Trucking official stated that to disclose the information at issue "may give the requesting party some competitive benefit that it is not entitled to and [also stated that the] information is not presently public information." Id. (and Attach 1, thereto).

4.      On May 15, 2008, the FMCSA disclosed to Plaintiff the P.A.M. Transport self-insurance decision with the following information redacted:

- Operating Revenue;
- Net Income;
- Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA);
- Cash flow available for insurance and claims;
- Cash and short-term investments;
- Working capital;
-  Current ratio;
- Tangible Net Worth (TNW);
- Total liabilities/TNW (i.e., leverage);

2

- Percentage of increase or decrease in the above financial statistics between 2005 and 2006;
- Combined annual savings from self-insurance;
- BI & PD insurance deductible;
- Total of outstanding BI & PD cargo claims within the proposed self-insurance limit as of December 31, 2006;
- BI & PD claims statistics from 2003-2006, with 2005-2006 increase/decrease percentages;
- Cargo claims statistics from 2003-2006, with 2005-2006 increase/decrease percentages;
- The percentage of revenue provided by one major customer;
- The percentage of revenue generated by transportation services provided to the automotive industry; and
- A business decision that affected liquidity and days payable outstanding.

Coleman III Decl. ¶ 21. An official with the parent company of P.A.M. Transport, Inc. stated that the above-noted information was privileged, and additionally, that disclosure of the information would be harmful to P.A.M. Transport. Id. ¶ 15.

Respectfully Submitted,

/s/ Jeffrey A. Taylor /dch
_____
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney

/s/ Rudolph Contreras
_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

3

/s/ Beverly M. Russell

Of Counsel:                              _____
Kirk Foster, Esq.                        BEVERLY M. RUSSELL, D.C. Bar #454257
Federal Motor Carrier Safety             Assistant United States Attorney
 Administration                          U.S. Attorney's Office for the District of Columbia,
U.S. Dept. Of Transportation              Civil Division
                                         555 4th Street, N.W., Rm. E-4915
                                         Washington, D.C. 20530
                                         Ph:  (202) 307-0492
                                         Fax: (202) 514-8780
                                         E-Mail: beverly.russell@usdoj.gov

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JEREMY KAHN, pro se | ) |
| | ) |
| | ) |
| Plaintiff, | ) Case No. 1:07-cv-02323 (HHK) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL MOTOR CARRIER | ) |
| SAFETY ADMINISTRATION | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

DECLARATION OF TIFFANIE C. COLEMAN

1.  I serve as the Freedom of Information Act (FOIA) Officer for the Federal Motor Carrier
    Safety Administration (FMCSA), an operating administration within the U.S. Department
    of Transportation.  I oversee the FMCSA FOIA Office and program. I also provided the
    Declarations signed March 12, 2008, and May 1, 2008, which were previously submitted
    by Defendant in the instant case.

2.  I make this Declaration on the basis of personal knowledge.  In the event I am called as a
    witness, I could competently testify to the facts contained in this declaration.

3.  This Declaration concerns the FMCSA FOIA Office's May 5, 2008, disclosure to the
    Plaintiff of a redacted version of FMCSA's self-insurance decision on *Celadon Trucking*

*Services, Inc. (Celadon Trucking)*, decided on December 28, 2007, and the FMCSA FOIA Office's May 15, 2008, disclosure to the Plaintiff of a redacted version of FMCSA's self-insurance decision on *P.A.M. Transport, Inc. (P.A.M. Transport)*, decided October 2, 2007. The Plaintiff had made FOIA requests for these self-insurance decisions.

4. This Declaration will (i) state the FMCSA FOIA policy; (ii) discuss a commercial motor carrier's practices in applying for FMCSA self-insurance authority; (iii) describe the process undertaken by the FMCSA FOIA Office in processing Plaintiff's request for the *Celadon Trucking* self-insurance decision; (iv) describe the process undertaken by the FMCSA FOIA Office in processing the Plaintiff's request for the *P.A.M. Transport* self-insurance decision; (v) justify the redactions made to these two FMCSA decisions ; and (vi) explain the notations included in the redacted decisions.

(i)

**FMCSA FOIA Policy**

5. The policy of FMCSA is to make its records available to the public to the extent allowed by law. This includes providing reasonably segregable information from documents that contain information that may be withheld. See 49 C.F.R. § 7.13(a). The FMCSA FOIA Office applied this regulation to its redactions to the above two FMCSA self-insurance decisions sought by the Plaintiff.

(ii)

<u>The Commercial Motor Carrier's Practices in Applying for FMCSA Self-Insurance Authority</u>

6. Title 49, U.S. Code, section 13906(d), requires FMCSA to allow motor carriers to submit proof of qualification as a self-insurer to satisfy the security requirements of § 13906. Regulations governing the qualifications of self-insurers are set forth at 49 C.F.R. § 387.309. That regulation provides:

**§ 387.309 Qualifications as a self-insurer and other securities or agreements.**

(a) As a self-insurer. The FMCSA will consider and will approve, subject to appropriate and reasonable conditions, the application of a motor carrier to qualify as a self-insurer, if the carrier furnishes a true and accurate statement of its financial condition and other evidence that establishes to the satisfaction of the FMCSA the ability of the motor carrier to satisfy its obligation for bodily injury liability, property damage liability, or cargo liability. Application Guidelines: In addition to filing Form BMC 40, applicants for authority to self-insure against bodily injury and property damage claims should submit evidence that will allow the FMCSA to determine:

(1) The adequacy of the tangible net worth of the motor carrier in relation to the size of operations and the extent of its request for self-insurance authority. Applicant should demonstrate that it will maintain a net worth that will ensure that it will be able to meet its statutory obligations to the public to indemnify all claimants in the event of loss.

(2) The existence of a sound self-insurance program. Applicant should demonstrate that it has established, and will maintain, an insurance program that will protect the public against all claims to the same extent as the minimum security limits applicable to applicant under § 387.303 of this part. Such a program may include, but not be limited to, one or more of the following: Irrevocable letters of credit; irrevocable trust funds; reserves; sinking funds; third-party financial guarantees, parent company or affiliate sureties; excess insurance coverage; or other similar arrangements.

(3) The existence of an adequate safety program. Applicant must submit evidence of a current "satisfactory" safety rating by the United States Department of Transportation. Non-rated carriers need only certify that they have not been rated. Applications by carriers with a less than satisfactory rating will be summarily denied. Any self-insurance authority granted by the FMCSA will automatically expire 30 days after a carrier receives a less than satisfactory rating from DOT.

(4) Additional information. Applicant must submit such additional information to support its application as the FMCSA may require.

(b) Other securities or agreements. The FMCSA also will consider applications for approval of other securities or agreements and will approve any such application if satisfied that the security or agreement offered will afford the security for protection of the public contemplated by 49 U.S.C. 13906.

49 C.F.R. § 387.309

7. In order to qualify for self-insurance authority under 49 C.F.R. § 387.309, commercial motor carrier companies must submit commercial information. For example, the regulation requires a motor carrier to submit information to demonstrate the adequacy of its tangible net worth in relation to its size of operations. *See* 49 C.F.R. § 387.309(a)(1). FMCSA's non-redacted decisions discuss and analyze detailed and confidential financial information concerning the company's assets, liabilities, income, expenses, corporate debt, outstanding claims, recent operations and other activities and data.

8. The motor carrier companies that submit the documentation for self-insurance authority consistently submit a declaration stating that the information is confidential and proprietary, and should not be disclosed outside FMCSA. I have seen these declarations in the form of cover letters from companies submitting required quarterly/annual reports to FMCSA so that they can maintain their previously-granted self-insurance authority.[1]

(iii)

The Processing of Plaintiff's request for *Celadon Trucking* Decision

9. *Celadon Trucking Services, Inc.* (*Celadon Trucking*) *is* a subsidiary of its parent, *Celadon Group, Inc.*, which is a publicly traded company. When the FMCSA FOIA Office

received Plaintiff's FOIA request for FMCSA's December 28, 2007, decision on *Celadon Trucking*'s application for authority to self-insure, the FMCSA FOIA Office determined that the decision might contain *Celadon Trucking*-submitted commercial or financial information which *Celadon Trucking* deems privileged or confidential, and the disclosure of which might cause substantial harm to the competitive position of *Celadon Trucking*. Accordingly, the FMCSA FOIA Office began the notice/comment procedure found in 49 C.F.R. § 7.17(a) (see my Declaration dated March 12, 2008). *Celadon Trucking* received the FMCSA FOIA Office's 49 C.F.R. § 7.17(a) notice letter on April 9, 2008.

10. On April 29, 2008, the Vice President and General Counsel for *Celadon Trucking* proposed FMCSA redact the following information from page 2 of the *Celadon Trucking* self-insurance decision: (i) the dollar amount of *Celadon*'s self-insured bodily injury and property damage (BI & PD) claims as of the quarter ending March 31, 2007; (ii) the percentage of *Celadon*'s revenue for said quarter that was represented by *Celadon*'s BI & PD claims; (iii) the percentage of *Celadon*'s tangible net worth (TNW) for said quarter that was represented by *Celadon*'s BI & PD claims; and (iv) the percentage of *Celadon*'s BI & PD claims that was covered by *Celadon*'s existing collateral for said quarter. The *Celadon Trucking* official stated that to disclose the information at issue "may give the requesting party some competitive benefit that it is not entitled to and this information is not presently public information." Attachment 1 to this Declaration is *Celadon Trucking*'s April 29, 2008, response to the FMCSA FOIA Office's notice letter pursuant to 49 C.F.R. § 7.17(a).

11. On May 5, 2008, the FMCSA FOIA Office disclosed to the Plaintiff FMCSA's self-

---

[1] Adapted from the March 14, 2008, Declaration of FMCSA Enforcement Compliance Division Chief Loretta Bitner in the instant case. See also my March 12, 2008, Declaration in the instant case.

insurance decision on *Celadon Trucking*, with the exception of the information listed in paragraph 10. FMCSA cites as the basis for this exemption the FOIA exemption found at 5 U.S.C. § 552(b)(4). This exemption allows an agency to withhold privileged or confidential commercial or financial information from agency records – where said information is involuntarily provided to the agency – if disclosing said information would cause substantial competitive harm to the submitter of the commercial or financial information in question. The redacted information in the *Celadon Trucking* decision was submitted "involuntarily" to FMCSA because *Celadon Trucking* must submit this information in order for FMCSA to make a determination regarding the firm's eligibility for self-insurance.[2]

12. FMCSA deems the redacted information to be confidential because of *Celadon Trucking*'s above statement that the information is "not presently public information."

13. Attachment 2 to this Declaration contains the redacted version of the *Celadon Trucking* self-insurance decision disclosed to the Plaintiff.


(iv)

The Processing of the Plaintiff's request for *P.A.M. Transport* Decision


14. *P.A.M. Transport, Inc.* (*P.A.M. Transport*) is a subsidiary of its parent company, *P.A.M. Transport Services, Inc.* (*P.T.S.I.*), which is a publicly traded company.    When the FMCSA FOIA Office received Plaintiff's FOIA request for FMCSA's October 2, 2007, decision on *P.A.M. Transport*'s application for authority to self-insure, the FMCSA FOIA Office again made the determination that this decision may contain *P.A.M.*

---

[2] See the Declaration of FMCSA Enforcement Compliance Division Chief Loretta Bitner previously submitted.

*Transport*-submitted commercial or financial information which *P.A.M. Transport* deems privileged or confidential, and the disclosure of which might cause substantial harm to the competitive position of *P.A.M. Transport*. The FMCSA FOIA Office again began the notice/comment procedure found in 49 C.F.R. § 7.17(a). *P.A.M. Transport* received the FMCSA FOIA Office's 49 C.F.R. § 7.17(a) notice via telephone on February 21, 2008.

15. In e-mail correspondence dated February 21, 2008, an official with the parent company *P.T.S.I.* requested FMCSA redact information found on pages 1-7 of its October 2, 2007, self-insurance decision on *P.A.M. Transport*. The official stated the *P.A.M. Transport* information had been "carved out" of parent company *P.T.S.I*'s publicly disclosed information in a way not intended by *P.T.S.I.*, and that *P.T.S.I* deemed the repackaged *P.A.M. Transport* information to be privileged and harmful to *P.A.M. Transport* if disclosed, as *P.A.M. Transport* itself is not a publicly held company. Attachment 3 to this Declaration is said February 21, 2008, e-mail correspondence; Attachment 4 to this Declaration is the *P.A.M. Transport*-proposed redactions to its October 2, 2007, self-insurance decision.

16. Upon further review, the FMCSA FOIA Office made the assessment that the proposed *P.A.M. Transport* redactions were too broad. In a letter dated May 2, 2008, the FMCSA FOIA Office informed *P.A.M. Transport* of what the FMCSA FOIA Office intended to release over *P.A.M. Transport* objection and gave *P.A.M. Transport* additional time to respond or to take action to enjoin FMCSA from disclosing its redacted version of *P.A.M. Transport*'s self-insurance decision. *P.A.M. Transport* did not respond, and on May 15, 2008, the FMCSA FOIA Office disclosed to the Plaintiff its redacted version of the *P.A.M. Transport* self-insurance decision.

17. Attachment 5 to this Declaration is the final redacted version of the *P.A.M. Transport* self-insurance decision released to the Plaintiff.   The primary difference between the final redacted version and the *P.A.M. Transport*-proposed redacted version is that the final version discloses the financial concepts and terms which put the redacted numerical and statistical data into context.  FMCSA's disclosure of this information is consistent with its duty to segregate and disclose non-exempt information pursuant to 49 C.F.R. § 7.13(a).

18. The FOIA exemption FMCSA cites as the basis for its redactions to the *P.A.M. Transport* self-insurance decision is 5 U.S.C. § 552(b)(4).  As was the case with information redacted from the *Celadon Trucking* self-insurance decision, FMCSA determined that the information redacted from the *P.A.M. Transport* decision is privileged or confidential commercial or financial information from agency records, and which *P.A.M. Transport* involuntarily provided to the agency.  FMCSA finds that disclosing information would cause substantial harm to the competitive position of *P.A.M. Transport*.   *P.A.M. Transport*'s submission of the redacted information was "involuntary" because *P.A.M. Transport* must submit the information in order for FMCSA to make a determination regarding their eligibility to self-insure.[3]   FMCSA determined the redacted information to be privileged/confidential, and concluded that disclosure of this information would cause substantial harm to the competitive position of *P.A.M. Transport*.

---

[3] See fn.2 above.

(v)

Justification of Redactions Made to the *Celadon Trucking* and *P.A.M. Transport* Self-Insurance Decisions before Disclosing them to the Plaintiff

19. As stated above, the FMCSA FOIA Office cited 5 U.S.C. § 552(b)(4) as the basis for the redactions made in FMCSA's *Celadon Trucking* and *P.A.M. Transport* self-insurance decisions. 5 U.S.C. § 552(b)(4) exempts from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." The exemption is intended to protect the interests of both the Government and the provider of information. The exemption affords protection to those information providers who are required to furnish commercial or financial information to the Government by safeguarding them from the competitive disadvantages that could result from disclosure. Information is considered to be "confidential" in the context of Exemption (b)(4) where disclosure of the information is likely to either (1) impair the Government's ability to obtain necessary information in the future, or (2) cause substantial harm to the competitive position of the person from whom the information was obtained.

20. As stated above, the FMCSA FOIA Office determined that if it were to disclose redacted information in the *Celadon Trucking* self-insurance decision, the disclosure would likely cause substantial harm to *Celadon Trucking's* competitive position. After analysis by the FMCSA FOIA Office, and after input from *Celadon Trucking*, the FMCSA FOIA Office has made the determination that disclosing the following information could result in substantial harm to the competitive position of *Celadon Trucking*:

- The dollar amount of *Celadon*'s self-insured bodily injury and property damage (BI & PD) claims as of the quarter ending March 31, 2007;

- The percentage of *Celadon*'s revenue for said quarter that was represented by *Celadon*'s BI & PD claims;

- The percentage of *Celadon*'s tangible net worth (TNW) for said quarter that was represented by *Celadon*'s BI & PD claims; and

- The percentage of *Celadon*'s BI & PD claims that was covered by *Celadon*'s existing collateral for said quarter.

21. As stated above, the FMCSA FOIA Office determined that if it were to disclose redacted information in the *P.A.M. Transport* self-insurance decision, the disclosure would likely cause substantial harm to *P.A.M. Transport's* competitive position. After analysis by the FMCSA FOIA Office, and after input from *P.A.M. Transport*, the FMCSA FOIA Office has made the determination that disclosing the following *P.A.M. Transport* information and 2003-2006 statistics could result in substantial harm to the competitive position of *P.A.M. Transport*:

- Operating revenue;

- Operating income;

- Net income;

- Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA);

- Cash flow available for insurance and claims;

- Cash and short-term investments

- Working capital;

- Current ratio;

- Tangible Net Worth (TNW);

- Total liabilities/TNW (i.e., leverage);

- Percentage of increase or decrease in the above financial statistics between 2005 and 2006;

- Combined annual savings from self-insurance;

- BI & PD insurance deductible;

- Total of outstanding BI & PD cargo claims within the proposed self-insurance limit as of December 31, 2006;

- BI & PD claims statistics from 2003-2006, with 2005-2006 increase/decrease percentages;

- Cargo claims statistics from 2003-2006, with 2005-2006 increase/decrease percentages;

- The percentage of revenue provided by one major customer;

- The percentage of revenue generated by transportation services provided to the automotive industry; and

- A business decision that affected liquidity and days payable outstanding.

22. Every effort was made to provide the Plaintiff with all reasonably segregable portions of the self-insurance decisions requested. No reasonably segregable non-exempt portions of the decisions have been withheld from the Plaintiff. Accordingly, all information withheld is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(4).

(vi)

Explanation of Notation Found in the Redacted Self-Insurance Decisions

23. The *Celadon Trucking* and *P.A.M. Trucking* self-insurance decisions contain, on their face, the code "B4" over the redacted areas. This informs the Plaintiff that the FMCSA FOIA Office cites FOIA exemption 5 U.S.C. § 552(b)(4) as the basis for the redaction.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: May __23____, 2008

_____
TIFFANIE C. COLEMAN

04/29/2008 14:05 FAX  317 898 1366        CELADON TRUCKING                    @001/006

Attach. 1

C E L A D O N   T R U C K I N G   S E R V I C E S ,   I N C .
O N E   C E L A D O N   D R I V E
9 5 0 3   E A S T   3 3 R D   S T R E E T
I N D I A N A P O L I S ,   I N   4 6 2 3 5 - 4 2 0 ⁷

### FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Mr. Paul Saenz | Kenneth L. Core |
| COMPANY | DATE |
| Federal Motor Carrier Safety Administration | 4/29/08 |
| FAX NUMBER | TOTAL NO. OF PAGES INCLUDING COVER |
| (202) 385 - 2335 | 6 |
| PHONE NUMBER | SENDER'S REFERENCE NUMBER |
| RE: | YOUR REFERENCE NUMBER |
| Celadon Response to FOIA Request | |

☐ URGENT   X FOR REVIEW     ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

NOTES/COMMENTS

Mr. Saenz,

Pursuant to your letter that we received on April 9, 2008, we have reviewed the document which has been requested under an FOIA request and the only portions of the documents which we would object to the FMCSA disclosing are 2 sentences which are stricken through on page 2 of the attached copy of the requested document. It is attached hereto and marked Appendix A. We feel disclosure of this information may give the requesting party some competitive benefit that it is not otherwise entitled to and this information is not presently public information. Certainly if the requesting party is concerned about Celadon's ability to pay any its outstanding accident related claims, the unobjected to financial information disclosed in this document should be more than enough to satisfy their needs in this regard.

If you have any questions on the above, please feel free to contact me.

Celadon Trucking Services, Inc.

Kenneth L. Core
Vice President – Risk Management
& General Counsel

Attach. 2

FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION

DECISION

SERVICE DATE:
December 28, 2007

DOCKET NO. 185116

CELADON TRUCKING SERVICES, INC.
(Indianapolis, Indiana)

MODIFICATION OF SELF-INSURANCE AUTHORIZATION

Decided: December 27, 2007

In a decision served July 1, 2002 (the Decision), the Federal Motor Carrier Safety Administration (FMCSA or the Agency) granted Celadon Trucking Services, Inc. (CTSI or the Company) authority to self-insure $1 million of its bodily injury and property damage (BI&PD) liability and $5,000 per vehicle, $10,000 aggregate for its cargo liability under 49 USC § 13906 and 49 CFR 387.309, subject to specified conditions. CTSI's parent, Celadon Group, Inc. (the Parent), guarantees its claims liabilities. CTSI has not activated its cargo self-insurance authority.

By letters dated June 13, 2007, and August 27, 2007, CTSI requests that FMCSA modify condition (1) of the Decision, relating to the timing for adjusting the amount of its BI&PD letter of credit. CTSI's proposal changes the timing for the letter of credit adjustments from quarterly to annually. It also includes postponing the increases that were required at December 31, 2006, and March 31, 2007 until September 30, 2007. This is the date that CTSI's 2007 year-end reports are due (Celadon has a June 30 year-end).

FMCSA has concluded that CTSI's proposed revision to the collateral requirement provides an acceptable level of protection to the public as contemplated by 49 USC § 13906. As discussed in detail below, this determination is based on several factors, including the significant improvement in CTSI's and its Parent's operating performances and financial positions since CTSI's Self-Insurance authorization was granted; the low-to-moderate level of self-insured claims activity relative to CTSI's operations; and the level of support provided by the existing collateral. In addition, for other financially sound motor carriers the collateral requirement generally changes annually.

When CTSI's self-insurance authority was granted in 2002, FMCSA imposed a collateral requirement equal to 100% of the BI&PD pending claims level, which was measured and adjusted quarterly. The quarterly collateral adjustments were required to mitigate certain negative factors. At that time, CTSI exhibited downward profit trends, negative working capital (defined as current assets less current liabilities) and a significant reliance on its Parent for its liquidity needs. In addition, the Parent's profit performance and cash flow were weak, and it reported a high level of debt relative to its equity base.

Since its authorization was granted, CTSI and its Parent have experienced significant financial improvements in all areas measured. The following chart illustrates this point.

| (S In Thousands) | CTSI | | | Parent | | |
|---|---|---|---|---|---|---|
| | Year Ending 6/30/01 | Year Ending 6/30/06 | 2006/2001 % Increase/ (Decrease) | Year Ending 6/30/01 | Year Ending 6/30/06 | 2006/2001 % Increase/ (Decrease) |
| Operating Revenue | $291,911 | $436,525 | 49.5% | $351,818 | $480,194 | 36.5% |
| Operating Income | $5,922 | $31,045 | 424.2% | $4,348 | $34,228 | 687.2% |
| Net Income | $2,593 | $30,799 | 1,087.8% | ($5,336) | $20,548 | 485.1% |
| Earnings Before Interest, Taxes, Depreciation and Amortization (less: non-cash items) | $17,398 | $41,084 | 136.1% | $16,875 | $54,108 | 220.6% |
| Cash Flow Available for Insurance and Claims | 2.38x | 4.45x | 87.0% | 0.68x | 4.72x | 594.1% |
| Working Capital | ($16,570) | $25,691 | 255.0% | $13,352 | $28,882 | 116.3% |
| Current Ratio | 0.77x | 1.60x | 107.8% | 1.23x | 1.60x | 30.1% |
| Tangible Net Worth | $36,618 | $106,327 | 190.4% | $35,361 | $102,290 | 189.3% |
| Total Liabilities/Tangible Net Worth | 2.95x | 0.43x | (85.4%) | 4.04x | 0.67x | (83.4%) |

In addition, CTSI's self-insured BI&PD claims liabilities have remained within a low-to-moderate range relative to its operations. B4

B4

B4

B4

B4                                                                              Since the existing
collateral covers a large portion of pending claims, postponing the collateral increase to September 30, 2007, does not expose the public to undue risk. Moreover, the financial strength of CTSI and the Parent will mitigate any temporary collateral shortfall.

New condition 11 related to a change in ownership is being adopted as a standard condition in all new grants of self-insurance authority and in all modifications of existing self-insurance authorizations. It is necessary to impose such a condition on a going-forward basis primarily for two reasons. First, in general terms, a motor carrier is granted authority to self-insure based on its unique situation in terms of safety, claims experience and financial health. More often than not, the financial health of a motor carrier is materially altered when ownership changes. Accordingly, the public should not be forced to bear any risk pertaining to uncertainties that arise due to a change in ownership. Second, in some cases, there has been a lack of communication on the motor carrier's part in notifying FMCSA of ownership changes.

**It is ordered:**

1. Condition No. 1 is amended to read as follow:

   CTSI must maintain an irrevocable letter of credit or trust fund equal to the greater of: (a) $2.65 million or (b) 100 percent of the pending self-insured BI&PD claims reserve (including incurred but not reported, i.e. IBNR) reported on the most recent balance sheet. CTSI must also establish a separate letter or trust fund agreement equal to the greater of: (a) $525,000 or (b) 100 percent of the pending self-insured cargo claims reserve reported on the most recent balance sheet. The required levels for the letters of credit or trust funds are designed to

2

change every year. The letters of credit or trust funds will be measured each June 30. At no time will the BI&PD and cargo letters of credit or trust fund balances be less than $2.65 million and $525,000 respectively. If an increase in the collateral levels is needed, then the adjustment must be made within 105 days from June 30 (i.e., 15 days from the due date for year-end financial statements).

The Applicant must submit, within 60 days of service of this decision, a copy of the agreements establishing the letters of credit or trust funds. The FMCSA must approve the terms of the letters of credit or trust funds prior to their effective date. Any changes in terms must be given prior approval by the FMCSA.

The Applicants must file the original of any letter of credit with FMCSA's Commercial Enforcement Division.

Furthermore, if the Applicant elects to use trust funds, it must have unrestricted access to the trust funds and drawdowns may only be made to satisfy claims for BI&PD and/or cargo liabilities. Any drawdown from the trust funds must be reported immediately to the FMCSA, along with an explanation as to how the Applicant proposes to respond to additional liability claims.

To ensure the protection of the public, we further require that any trust fund agreements contain the following provisions:

> (a.) The trustees must be identified and a statement must be given of their relationship to the Applicant and the Parent. The addresses of the trustees must also be provided.

> (b.) The beneficiaries of the trust fund agreement must be designated clearly as BI&PD or cargo claimants, respectively, of the Applicant. No other parties may have rights of recovery against the respective funds.

> (c.) The trust fund agreements must be established so that they may not be revoked until all cognizable claims arising during the time the carrier holds FMCSA authority to self-insure have been resolved.

> (d.) Payments under the trust agreements must be made directly to BI&PD or cargo claimants.

Any drawdown from the letters of credit or trust funds must be replenished within 30 days, and any failure to replenish the amount of a drawdown within 30 days must be reported immediately to the FMCSA. In addition, the letters of credit must remain in place until all cognizable claims arising during the time the carrier holds FMCSA authority to self-insure have been resolved.

The following conditions remain in effect:

2. Condition No 2: Celadon Group, Inc. must file a formal written agreement stating that it will guarantee payment of the self-insurance obligations of Celadon Trucking, Inc. The guaranty agreement must be submitted and approved by the FMCSA prior to activation of the self-insurance grant.

3

3. Condition No. 3: Applicant must maintain a minimum adjusted tangible net worth (ATNW). Adjusted tangible net worth is defined as net worth less (a) any intangible assets, including goodwill and (b) any inter-company accounts and/or notes receivable, which is meant to include any inter-company assets accounts. CTSI's minimum ATNW level must be equal to at least ten (10) times the accrued self-insurance BI&PD and cargo claims reserve as reported on its balance sheet. The minimum ATNW requirement is designed to change quarterly, and will be measured on September 30, December 31, March 31, and June 30, annually. Notice must be given to FMCSA if the tangible net worth balance falls below this level. If this occurs, the Applicant will then have 30 days to correct the situation or face termination of the authority to self-insure. This measurement is meant to fluctuate based upon the level of pending BI&PD and cargo claim liabilities.

4. Condition No. 4: The Applicant must submit unaudited annual and quarterly financial statements. The Parent must submit unaudited quarterly and audited, annual financial statements, including all applicable notes and schedules, within 60 and 90 days, respectively, after the end of each quarterly and annual period. The audited annual financial statement must be independent, unqualified opinions and both the annual and quarterly statements must be prepared in accordance with Generally Accepted Accounting Principles. The Parent may file copies of its quarterly Form 10-Q and annual Form 10-K financial statements filed with the SEC concurrently with their filing with SEC. The financial statements must include a certification by an appropriate company official verifying the accuracy of the information provided.

5. Condition No. 5: Applicant and the Parent must submit quarterly covenant compliance calculations within 60 days of each quarter-end. An appropriate company official must certify these quarterly covenant compliance calculations. The FMCSA is to be notified within five (5) days of a default under the terms of any loan agreements with a financial institution or bonded indebtedness. Full disclosure should be provided about the consequences, actual or potential, of such default. Any default could be cause for termination of the self-insurance authority.

6. Condition No. 6: Applicant must submit quarterly BI&PD and cargo claims reports detailing the number, aggregate dollar amount and the nature of its claims experience within 60 days of each quarter-end. Applicant must also submit quarterly reports detailing pending court cases or other actions, which relate to or arise from its claims experience. The quarterly claims report must include a certification by an appropriate company official verifying the accuracy of the information provided.

7. Condition No. 7: Applicant must notify FMCSA immediately of any pending or contingent BI&PD liability claims(s) that individually exceeds $50,000 or collectively exceeds $250,000 or any cargo liability claims(s) that individually exceeds $25,000.

8. Condition No. 8: The Applicant must notify FMCSA no later than 90 days prior to the effective date of any change in the terms or cancellation of the trust fund agreements, and must notify FMCSA of the renewal of the trust fund agreements no later than 6 months prior to their expiration dates.

9. Condition No. 9: The FMCSA retains the authority to terminate this self-insurance authorization at any time if it appears to FMCSA that Applicant's financial arrangements fail

4

to provide satisfactory protection for the public or Applicant fails to file timely any of the information required by the FMCSA.

10. Condition No. 10: The FMCSA has the right to require the Applicant and the Parent to submit any additional information the FMCSA deems necessary.

The following conditions are added to CTSI and the Parent's self-insurance authorization:

1. Condition No. 11: CTSI and the Parent must notify FMCSA of any material change in their ownership within 10 days of the change. A material change in ownership will automatically terminate the companies' self-insurance authorization the date the change is effective. In the event the companies fail to notify the Agency of a material change in ownership and FMCSA subsequently becomes aware of the change, the Agency reserves the right to terminate the companies' self-insurance authority immediately. For purposes of this Condition, "material ownership" means a majority ownership interest.

2. Condition No. 12: CTSI must notify FMCSA within 10 days of any extraordinary event effecting a material change to CTSI's or the Parent's financial health. In the event the companies fail to notify the Agency of developments pertaining to extraordinary events and FMCSA subsequently becomes aware of the change, the Agency reserves the right to terminate the companies' self-insurance authority immediately.

3. Condition No. 13: The FMCSA retains the right to impose such additional conditions in the future as may be necessary for the protection of the public.

4. This decision is effective on the service date.

By the Federal Motor Carrier Safety Administration.

William A. Quade

Associate Administrator for
Enforcement and Program Delivery

Attach. 3

-----Original Message-----
**From:** Tony Longinotti [mailto:longt@pamt.com]
**Sent:** Thursday, February 21, 2008 5:05 PM
**To:** Saenz, Paul CTR <FMCSA>
**Cc:** 'Bob Weaver'
**Subject:** RE: PAM Transport FOIA

Paul. Thank you for your quick reply. The areas you had highlighted in yellow are the ones we did not wish released. If we can go one step further and remove the paragraphs blocked in red under "Discussion" we are in agreement with the release. Those first 6 paragraphs pertain solely to PAM Transport which in not a public company and contains sensitive financial information.
We are agreeable to releasing all information on page 7 that begins with the second paragraph "A review of the Parent's financial statements.........."
Thank you.

**From:** paul.saenz@dot.gov [mailto:paul.saenz@dot.gov]
**Sent:** Thursday, February 21, 2008 3:50 PM
**To:** Tony Longinotti
**Cc:** Bob Weaver
**Subject:** RE: PAM Transport FOIA

Gentlemen,

Thank you for your response. So that we are clear. Please see the attached document. I've boxed in yellow the documentation your firm would like protected, essentially four tables.

Thanks again

Paul Saenz

-----Original Message-----
**From:** Tony Longinotti [mailto:longt@pamt.com]
**Sent:** Thursday, February 21, 2008 3:54 PM
**To:** Saenz, Paul CTR <FMCSA>
**Cc:** 'Bob Weaver'
**Subject:** PAM Transport FOIA

Paul-Sorry I missed your call. I did receive your e-mail and the attachments. I have reviewed this with our CEO. The only item that we object to releasing under this FOI request is the PAM Transport Financial Statement of Analysis contained on pages 2 & 3. This information had been carved out of our consolidated financial statement and we consider this extremely proprietary in nature. It contains confidential financial information of which its disclosure is of no benefit other than to possible industry competitors. We have no objection to the release of the "Decision" as long as this information is redacted. As we stated previously, our consolidated financial statement is available to the public on our website. If your agency feels this information must be supplied, I would request an appropriate amount of time to seek injunctive relief.

Regards-Tony

Attach. 4

# FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION

## DECISION

**SERVICE DATE:**
October 2, 2007

### DOCKET NO. MC-150496

### P.A.M. TRANSPORT, INC.
### (Tontitown, Arkansas)

### APPLICATION FOR AUTHORITY TO SELF-INSURE

Subject to certain conditions, the Applicant is authorized to self-insure its bodily injury and property damage liability, and its cargo liability.

**Decided:**  October 1, 2007

P.A.M. Transport, Inc. (PAM or the Applicant) seeks authority to self-insure $500,000 of its $1 million bodily injury and property damage (BI&PD) liability and its $10,000 cargo liability under 49 USC §13906 and 49 CFR 387.309. Evidence presented by the Applicant warrants the granting of BI&PD and cargo liability self-insurance authority. The Applicant presents a sound financial picture with several years of profitability, adequate cash flows from operations to cover both debt service obligations and capital expenditures, and current assets sufficient to cover current liabilities as they become due.

The Applicant is a wholly-owned subsidiary of PAM Transportation Services, Inc. (the Parent). The Parent has indicated a willingness to provide a guarantee of the Applicant's self-insurance liabilities.

Corporate offices for PAM are located in Tontitown, Arkansas. The Company is primarily a regional carrier providing service throughout the 38 easternmost United States and the provinces of Ontario and Quebec, Canada. PAM specializes in just-in-time service to the automotive, manufacturing and retail industries. PAM maintains terminal locations in Arkansas, Florida, Illinois, Mississippi, New Jersey, Ohio, Oklahoma and Texas. It also has access to trailer drop and relay stations in various other locations across the country. At December 31, 2006, the Parent operated a fleet consisting of 1,998 tractors and 4,540 trailers.

The Applicant is required to maintain security for the protection of the public in the amount of $1 million per occurrence for BI&PD liability. The Applicant has in effect and on file with the Federal Motor Carrier Safety Administration (FMCSA) the requisite insurance coverage. The Applicant's estimated total combined annual savings from self-insurance would be approximately $45 million per year.

In support of its application to self-insure, the Applicant provided company-prepared annual financial statements for the years 2003 through 2006. Also provided were the Parent's 2003 through 2006 audited annual financial statements. No adjustments to the data have been made except that the "goodwill and other intangible" category has been deducted (when applicable) to arrive at tangible net worth (TNW).

### P.A.M. TRANSPORT, INC.

### Financial Statement Analysis



### P.A.M. TRANSPORTATION SERVICES, INC. (Parent)
### Financial Statement Analysis



B4

The majority of PAM's Safety and Risk Management functions are administered at the Parent level. However, there are field personnel at terminal locations that assist in this area in a limited capacity. Heading up the Safety Department is the Vice President of Driver Resources & Compliance. Other key personnel include a Director of Fleet Compliance and a Safety Coordinator. These individuals are devoted to safety and safety administration issues and have experience levels ranging between 6 years and 17 years. PAM has a satisfactory safety fitness rating from the FMCSA.

PAM's Safety Department ensures that it staffs its trucks with the most qualified, conscientious, and safest drivers available. Each company applicant is subjected to numerous screenings, including employment and criminal background checks, plus an in-depth review of driving and accident records. Each driver is required to complete an extensive orientation program before being permitted to operate a vehicle. The orientation program encompasses classroom instruction on company policies and procedures, safety techniques as taught by the Smith System of Defensive Driving, and the proper operation of equipment. Each driver is required to pass both a written and road test. Instruction in defensive driving and safety techniques continues after hiring, with seminars at several terminals. At December 31, 2006, the Parent has 66 employees in its driver recruiting, training and safety instruction programs.

The Risk Management Department is responsible for investigation and administration of claims presented against the company relating to any "third-party claims" including auto, cargo, workers compensation and general liability claims. It is separated into 4 divisions: medical compliance; drug and alcohol testing; workers compensation; and cargo claims. Risk Management coordinates with the Safety Department to implement programs aimed at education and prevention of potential negative loss factors.

The Risk Management Department also works closely with the Casualty Claims Department. This department is staffed with a Casualty Claims Manager who initially assesses the claim and determines the appropriate course of action. A dedicated clerical support staff assists the Claims Manager in overseeing first party claims relating to damage to company equipment, BI&PD claims, business interruption and environmental clams. The Claims Department and the Safety Department work together to review logs, Qualcomm records, etc., as part of any accident investigation.

Administration of all BI&PD and cargo claims within the respective B4. deductibles is handled by the Casualty Claim Department. If granted authority to self-insure, administration of BI&PD and cargo claims will remain with the Casualty Claim Department.

The data for the following tables represent the total claims that are incurred, paid, and outstanding for each respective year-end as of December 31, 2006. A comparison of year-end pending claims levels could not be performed because pending claims at each respective year-end period represent those claims that remained outstanding as of December 31, 2006, and do not represent the total aggregate claim liability as of such date.

Additionally, PAM's commercial insurance carrier provided the outstanding claims data as of December 31, 2006, and the amounts represent only the estimated payment for pending claims based on information gathered to date. FMCSA requests that self-insured carriers submit fully-developed claims values based on actuarial estimates using historical patterns. Accordingly, there is the risk that the Applicant's BI&PD claims levels could be higher than those reported in this application once its self-insurance program matures. It is for this reason that the Applicant and the Parent are being required to report this information on a going forward basis.

At December 31, 2006, the Applicant's combined outstanding BI&PD and cargo claims within the proposed self-insurance limits totaled B4. all of which is the financial responsibility of the insurance carrier.

**P.A.M. TRANSPORT, INC.**

**BI&PD CLAIMS EXPERIENCE**



**P.A.M. TRANSPORT, INC.**

**CARGO CLAIMS EXPERIENCE**



## DISCUSSION

A full review of the financial statements and claims data submitted by the Applicant shows the following:





B4

A review of the Parent's financial statements reveals that it is profitable, EBITDA was sufficient to cover both current debt obligations and capital expenditures, and the balance sheet items of liquidity, leverage and equity all displayed satisfactory positions. Accordingly, the Parent has the financial ability to support the self-insurance obligations of PAM.

As previously stated within the decision, there is an issue with the valuation of the Applicant's BI&PD claims liabilities. Such claims are valued based on information gathered to date and do not include additional loss development or Incurred But Not Reported (IBNR). Accordingly, once the Applicant's self-insurance program matures, BI&PD claims levels could be higher than those reported in this application. To mitigate this risk, the Applicant and the Parent will be required to report this information upon activation of its self-insurance authority.

In addition, a guarantee by the Parent is mandated at this time to protect against the outflow of the Applicant's funds to other wholly-owned entities of the Parent and to the Parent. As an additional measure of protection, intercompany accounts (on a net basis) are being excluded from the minimum ATNW calculation. This will ensure that the Applicant retains a sufficient level of equity to support the risk to the public resulting from self-insurance claims that occur.

Another requirement imposed with this decision is that the Parent must maintain a minimum ATNW based on a multiple of the Applicant's combined BI&PD and cargo claims balance sheet reserves. This multiple is set at a level that is greater than the 20 times average for carriers currently in the self-insurance program and is intended to reduce risk to the public arising from the customer and auto industry concentrations.

Given the Applicant's profitable operations, satisfactory EBITDA, adequate liquidity, combined BI&PD and cargo claims that are low relative to its operation, and the significant amount of financial support gained from the Parent guarantee, the collateral requirement is set at a minimum of 25% of pending self-insured BI&PD claims reserves. The Applicant's collateral and minimum ATNW benchmarks reflect its specific financial and claims situation. It is prudent that consideration for this provision be based upon an applicant's financial condition, claims experience, and corporate structure. All requirements are set on a case-by-case basis so that the level of risk to the public is minimized.

I conclude, based on the above analysis, that the Applicant, with the support of the Parent, has adequate resources to self-insure its BI&PD liability for $500,000 of its minimum limit of $1 million per occurrence and its $10,000 cargo liability.

**I find**:

The Applicant's self-insurance of BI&PD and cargo liability, subject to conditions, will afford the security for the protection of the public contemplated by 49 USC §13906.

**It is ordered**:

The application is granted, subject to the following conditions:

1.  The Applicant must establish an irrevocable letter of credit or trust fund for its BI&PD claims liabilities in the amount of $500,000 or 25% of the pending self-insured BI&PD claim reserve (including additional loss development and IBNR) reported on the most recent quarter/year-end balance sheet, whichever is greater. The Applicant must also establish an irrevocable letter of credit or trust fund for cargo claims liabilities in the amount of $10,000 or 25% of the pending self-insured cargo claim reserve reported on the most recent quarter/year-end balance sheet, whichever is greater. The initial amount of the Applicant's letters of credit or trust funds will be $500,000 for BI&PD and $10,000 for cargo. The required letters of credit or trust funds are designed to change annually and will be measured at each December 31. At no time will the Applicant's BI&PD and cargo letters of credit or trust fund balances be less than $500,000 and $10,000, respectively. If an increase in the collateral level is needed, then the adjustment must be made within 105 days from December 31 (i.e., 15 days from the due date for year-end financial statements).

    The Applicant must submit, within 60 days of the service date of the decision, copies of the agreements with the financial institution establishing the letters of credit or trust funds. The FMCSA must approve the terms of the letters of credit or trust funds before any effective date for activation of the letters of credit or trust funds. Any changes in their terms must be given prior approval by the FMCSA.

    The Applicant must file the originals of any letters of credit with FMCSA's Commercial Enforcement Division.

    Furthermore, the Applicant must have unrestricted access to any trust funds and drawdowns may only be made to satisfy claims for BI&PD and cargo liabilities once all other sources of funds have been exhausted. Any drawdown from the trust funds must be reported immediately to the FMCSA, along with an explanation as to how the Applicant proposes to respond to additional liability claims. Any drawdown from the letters of credit or trust funds must be replenished within 30 days, and any failure to replenish the amount of a drawdown within 30 days must be reported immediately to the FMCSA.

    To ensure the protection of the public, it is further required that the trust fund agreement contain the following provisions:

    (a) The trustee must be identified and a statement must be given of its relationship to the Applicant and the Parent. The addresses of the trustee must also be provided.

(b) The beneficiary of the trust fund agreement must be clearly designated as BI&PD and cargo liability claimants of PAM. No other parties may have rights of recovery against the respective funds.

(c) The trust fund agreement must be established so that it may not be revoked until all cognizable claims arising during the time the carrier holds FMCSA authority to self-insure have been settled.

(d) Payments under the trust agreement must be made directly to BI&PD and cargo claimants.

2.  Within 60 days of the service of this decision, the Parent must file a formal written agreement with the FMCSA stating that it will guarantee payment of the self-insurance obligations of the Applicant.

3.  The Applicant must maintain a minimum ATNW. It is defined as TNW less all intercompany, affiliate and shareholder asset accounts (on a net basis). The Applicant's minimum ATNW level must be equal to, the greater of (a) 15 times its combined self-insured BI&PD and cargo claims reserve (including additional loss development and IBNR) as reported on its quarter/year-end balance sheet, or (b) 2 times its self-insurance authority, in this case, $1,020,000. In addition, the Parent must maintain a minimum ATNW. The Parent's minimum ATNW level must be equal to the greater of (a) 25 times the Applicant's combined self-insured BI&PD and cargo claims reserve (including additional loss development and IBNR) as reported on the Applicant's quarter/year-end balance sheet, or (b) 2 times the Applicant's self-insurance authority. The minimum ATNW requirement is designed to change quarterly, and will be measured on March 31, June 30, September 30, and December 31, annually.

Notice must be given to the FMCSA if the ATNW balances fall below these levels. If this occurs, the Applicant and/or the Parent will then have 30 days to correct the situation or face termination of the authority to self-insure. At present, the Applicant's and the Parent's minimum ATNW requirement will be $1,020,000 ($510,000 x 2 times the self-insurance authority). This measurement is meant to fluctuate based upon the reserve level of combined pending BI&PD and cargo liabilities. However, at no time will the minimum ATNW requirement be less than 2 times the self-insurance authority, or in this case, $1,020,000.

4.  The Applicant must submit unaudited annual and quarterly financial statements. The Parent must submit unaudited quarterly and audited annual financial statements, including all applicable consolidating notes and schedules, within 60 and 90 days, respectively, after the end of each quarterly or annual period. The audited annual financial statements must be independently prepared, contain unqualified opinions and be prepared in accordance with generally accepted accounting principles (GAAP). All of the financial statements must include a certification by an appropriate company official verifying the accuracy of the information provided.

5. The Applicant must submit its December 31, company-specific quarterly claims report within 30 days from the quarter-end. All other quarterly claims reports must be submitted within 60 days of the quarter-end. The report must detail the number, aggregate dollar amount, the nature of the applicant's claims experience and include the dollar amount of reserves established, if any. Claims in excess of $50,000 and court cases must be itemized separately, and each report is to be certified as accurate by an officer of each company, who is independent of risk management activities.

6. The Applicant must notify the FMCSA immediately of any pending or contingent BI&PD liability claims(s) that individually exceeds $50,000 or collectively exceed $250,000.

7. The Applicant must have continuously in place from the inception of its self-insurance program excess insurance coverage for BI&PD claims liabilities covering between $500,000 and $10 million. Proof of this additional excess BI&PD liability coverage must be submitted to the FMCSA via ACCORD form or a policy premium statement. Immediate notice must be given if there are any changes to this coverage. If there is any lapse in coverage(s), the Applicant will have 30 days to correct the situation or face termination of its self-insurance authorization.

8. The FMCSA is to be notified within 5 days of a default under the terms of any loan agreements with a financial institution or bonded indebtedness by the Applicant or the Parent. Full disclosure should be provided about the consequences, actual or potential, of such default. Any default could be cause for termination of the self-insurance authority.

9. The Parent must submit quarterly loan and lease covenant compliance calculations within 60 days of each quarter/year-end. An appropriate company official must certify these quarterly loan and lease covenant compliance calculations.

10. The Applicant must notify FMCSA of any material change in its or the Parent's ownership or control within 10 days of the change. A material change in ownership or control will automatically terminate the Applicant's self-insurance authorization the date the change is effective. In the event the Applicant fails to notify FMCSA of a material change in its or the Parent's ownership and FMCSA subsequently becomes aware of the change, FMCSA reserves the right to terminate the Applicant's self-insurance authority immediately. For purposes of this Condition, "material ownership or control" means a majority ownership interest.

11. The Applicant must notify FMCSA within 10 days of any extraordinary event effecting a material change to its or the Parent's financial health. In the event the Applicant fails to notify FMCSA of developments pertaining to extraordinary events and FMCSA subsequently becomes aware of the change, FMCSA reserves the right to terminate the Applicant's self-insurance authority immediately.

12. The Applicant and the Parent must submit, on a quarterly basis going forward and within 60 days of each quarter/year-end, a schedule detailing the balance sheet line item "Accrued Expenses and Other Liabilities" to show its self-insured auto and cargo liability accruals, additional loss development and IBNR.

13. The Applicant must notify the FMCSA no later than 90 days prior to the effective date of any change in the terms or cancellation of the letters of credit or trust fund agreements. In addition, the FMCSA must receive renewal notices for the letters of credit within 60 days from the renewal date. If trust funds are established, then copies of the trust fund statements showing their balances must be furnished to the FMCSA within 30 days of each quarter-end.

14. The FMCSA retains the authority to terminate the Applicant's self-insurance authorization at any time if it appears to the FMCSA that its financial arrangements, or those of the Parent, fail to provide satisfactory protection for the public; or the Applicant or the Parent fail to file timely any of the information required by the FMCSA.

15. The FMCSA reserves the right to require the Applicant and the Parent to provide any additional information deemed necessary.

16. The FMCSA retains the right to impose such additional conditions in the future as may be necessary for the protection of the public.

17. This decision is effective on the date of service. The Applicant, however, may not activate its self-insurance authorization less than 30 days after submitting documents to the FMCSA demonstrating that the required letters of credit or trust funds have been established. The Applicant must also notify the FMCSA of the date it will activate its self-insurance authority.

By the Federal Motor Carrier Safety Administration,

Robert W. Miller

Acting Director, Office of
Enforcement and Compliance

Page 11

Attach. 5

# FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION

## DECISION

**SERVICE DATE:**
October 2, 2007

### DOCKET NO. MC-150496

### P.A.M. TRANSPORT, INC.
### (Tontitown, Arkansas)

### APPLICATION FOR AUTHORITY TO SELF-INSURE

Subject to certain conditions, the Applicant is authorized to self-insure its bodily injury and property damage liability, and its cargo liability.

**Decided:** October 1, 2007

P.A.M. Transport, Inc. (PAM or the Applicant) seeks authority to self-insure $500,000 of its $1 million bodily injury and property damage (BI&PD) liability and its $10,000 cargo liability under 49 USC §13906 and 49 CFR 387.309. Evidence presented by the Applicant warrants the granting of BI&PD and cargo liability self-insurance authority. The Applicant presents a sound financial picture with several years of profitability, adequate cash flows from operations to cover both debt service obligations and capital expenditures, and current assets sufficient to cover current liabilities as they become due.

The Applicant is a wholly-owned subsidiary of PAM Transportation Services, Inc. (the Parent). The Parent has indicated a willingness to provide a guarantee of the Applicant's self-insurance liabilities.

Corporate offices for PAM are located in Tontitown, Arkansas. The Company is primarily a regional carrier providing service throughout the 38 easternmost United States and the provinces of Ontario and Quebec, Canada. PAM specializes in just-in-time service to the automotive, manufacturing and retail industries. PAM maintains terminal locations in Arkansas, Florida, Illinois, Mississippi, New Jersey, Ohio, Oklahoma and Texas. It also has access to trailer drop and relay stations in various other locations across the country. At December 31, 2006, the Parent operated a fleet consisting of 1,998 tractors and 4,540 trailers.

The Applicant is required to maintain security for the protection of the public in the amount of $1 million per occurrence for BI&PD liability. The Applicant has in effect and on file with the Federal Motor Carrier Safety Administration (FMCSA) the requisite insurance coverage. The Applicant's estimated total combined annual savings from self-insurance would be approximately B4　million per year.

In support of its application to self-insure, the Applicant provided company-prepared annual financial statements for the years 2003 through 2006. Also provided were the Parent's 2003 through 2006 audited annual financial statements. No adjustments to the data have been made except that the "goodwill and other intangible" category has been deducted (when applicable) to arrive at tangible net worth (TNW).

## P.A.M. TRANSPORT, INC.

### Financial Statement Analysis

| ($ In Thousands) | Year Ending 12/31/03 | Year Ending 12/31/04 | Year Ending 12/31/05 | Year Ending 12/31/06 | 2006/2005 % Increase/ (Decrease) |
|---|---|---|---|---|---|
| Operating Revenue | | | | | |
| Operating Income | | | | | |
| Net Income | | | | | |
| Earnings Before Interest, Taxes, Depreciation and Amortization (Less: non-cash items) | | | | | |
| Operating Ratio | | | | | |
| Cash Flow Available for Insurance and Claims | | | | | |
| Cash and Short-Term Investments | | | | | |
| Working Capital | | | | | |
| Current Ratio | | | | | |
| Tangible Net Worth | | | | | |
| Tangible Net Worth (less Interco Accts) | | | | | |
| Total Liabilities/Tangible Net Worth | | | | | |
| Total Liabilities/Tangible Net Worth (less Interco Accts) | | | | | |

Source of Data: P.A.M. Transport, Inc.'s application to self-insure

**P.A.M. TRANSPORTATION SERVICES, INC. (Parent)**

**Financial Statement Analysis**

| ($ In Thousands) | Year Ending 12/31/03 | Year Ending 12/31/04 | Year Ending 12/31/05 | Year Ending 12/31/06 | 2006/2005 % Increase/ (Decrease) |
|---|---|---|---|---|---|
| Operating Revenue | | | | | |
| Operating Income | | | | | |
| Net Income | | | | | |
| Earnings Before Interest, Taxes, Depreciation and Amortization (less: non-cash items) | | | | | |
| Operating Ratio | | | | | |
| Cash Flow Available for Insurance and Claims | | | | | |
| Cash and Short-Term Investments | | | | | |
| Working Capital | | | | | |
| Working Capital (Less: Op. Leases) | | | | | |
| Current Ratio | | | | | |
| Current Ratio (Less: Op. Leases) | | | | | |
| Tangible Net Worth | | | | | |
| Tangible Net Worth (Less: Affiliate Accts.) | | | | | |
| Total Liabilities/Tangible Net Worth | | | | | |
| Total Liabilities/Tangible Net Worth (Less: Affiliate Accts.) | | | | | |
| Total Liabilities + Op. Leases / Tangible Net Worth (Less: Affiliate Accts.) | | | | | |

(Large watermark "B4" appears across the table)

Source of Data: P.A.M. Transport, Inc.'s application to self-insure

The majority of PAM's Safety and Risk Management functions are administered at the Parent level. However, there are field personnel at terminal locations that assist in this area in a limited capacity. Heading up the Safety Department is the Vice President of Driver Resources & Compliance. Other key personnel include a Director of Fleet Compliance and a Safety Coordinator. These individuals are devoted to safety and safety administration issues and have experience levels ranging between 6 years and 17 years. PAM has a satisfactory safety fitness rating from the FMCSA.

PAM's Safety Department ensures that it staffs its trucks with the most qualified, conscientious, and safest drivers available. Each company applicant is subjected to numerous screenings, including employment and criminal background checks, plus an in-depth review of driving and accident records. Each driver is required to complete an extensive orientation program before being permitted to operate a vehicle. The orientation program encompasses classroom instruction on company policies and procedures, safety techniques as taught by the Smith System of Defensive Driving, and the proper operation of equipment. Each driver is required to pass both a written and road test. Instruction in defensive driving and safety techniques continues after hiring, with seminars at several terminals. At December 31, 2006, the Parent has 66 employees in its driver recruiting, training and safety instruction programs.

The Risk Management Department is responsible for investigation and administration of claims presented against the company relating to any "third-party claims" including auto, cargo, workers compensation and general liability claims. It is separated into 4 divisions: medical compliance; drug and alcohol testing; workers compensation; and cargo claims. Risk Management coordinates with the Safety Department to implement programs aimed at education and prevention of potential negative loss factors.

The Risk Management Department also works closely with the Casualty Claims Department. This department is staffed with a Casualty Claims Manager who initially assesses the claim and determines the appropriate course of action. A dedicated clerical support staff assists the Claims Manager in overseeing first party claims relating to damage to company equipment, BI&PD claims, business interruption and environmental clams. The Claims Department and the Safety Department work together to review logs, Qualcomm records, etc., as part of any accident investigation.

Administration of all BI&PD and cargo claims within the respective [B4] deductibles is handled by the Casualty Claim Department. If granted authority to self-insure, administration of BI&PD and cargo claims will remain with the Casualty Claim Department.

The data for the following tables represent the total claims that are incurred, paid, and outstanding for each respective year-end as of December 31, 2006. A comparison of year-end pending claims levels could not be performed because pending claims at each respective year-end period represent those claims that remained outstanding as of December 31, 2006, and do not represent the total aggregate claim liability as of such date.

Additionally, PAM's commercial insurance carrier provided the outstanding claims data as of December 31, 2006, and the amounts represent only the estimated payment for pending claims based on information gathered to date. FMCSA requests that self-insured carriers submit fully-developed claims values based on actuarial estimates using historical patterns. Accordingly, there is the risk that the Applicant's BI&PD claims levels could be higher than those reported in this application once its self-insurance program matures. It is for this reason that the Applicant and the Parent are being required to report this information on a going forward basis.

At December 31, 2006, the Applicant's combined outstanding BI&PD and cargo claims within the proposed self-insurance limits totaled [B4] all of which is the financial responsibility of the insurance carrier.

Page 4

**P.A.M. TRANSPORT, INC.**

**BI&PD CLAIMS EXPERIENCE**

| (In Actual $) | Year Ending 12/31/03 | Year Ending 12/31/04 | Year Ending 12/31/05 | Year Ending 12/31/06 | Year Ending Total as of 12/31/06 | 2006/2005 % Increase/ (Decrease) |
|---|---|---|---|---|---|---|
| Claims Received (#) | | | | | | |
| Claims Received ($) | | | | | | |
| Average Claims Filed ($) | | | | | | |
| Claims Received ($) / Revenue | | | | | | |
| Number of Claims Paid | | | | | | |
| Losses Paid ($) | | | | | | |
| Number of Claims Outstanding as of 12/31/06 | | | | | | |
| Claims Outstanding as of 12/31/06 ($) | | | | | | |
| Average Outstanding Claims ($) | | | | | | |
| Claims Outstanding as of 12/31/06 ($) / ATNW | | | | | | |
| Claims Outstanding as of 12/31/06 to be Paid by PAM ($) | | | | | | |
| Claims Outstanding as of 12/31/06 to be Paid by Insurance Carrier ($) | | | | | | |
| Premiums Paid to Insurance Carrier ($) | | | | | | |

B4

**P.A.M. TRANSPORT, INC.**

**CARGO CLAIMS EXPERIENCE**

| (In Actual $) | Year Ending 12/31/03 | Year Ending 12/31/04 | Year Ending 12/31/05 | Year Ending 12/31/06 | 2006/2005 % Increase/ (Decrease) |
|---|---|---|---|---|---|
| Claims Received (#) | | | | | |
| Claims Received ($) | | | | | |
| Average Claims Filed ($) | | | | | |
| Claims Received ($) / Revenue | | | | | |
| Number of Claims Paid | | | | | |
| Losses Paid ($) | | | | | |
| Number of Claims Outstanding as of 12/31/06 | | | | | |
| Claims Outstanding as of 12/31/06 ($) | | | | | |
| Average Outstanding Claims ($) | | | | | |
| Claims Outstanding as of 12/31/06 ($) / ATNW | | | | | |
| Claims Outstanding as of 12/31/06 to be Paid by PAM ($) | | | | | |
| Claims Outstanding as of 12/31/06 to be Paid by Insurance Carrier ($) | | | | | |
| Premiums Paid to Insurance Carrier ($) | | | | | |

B4

### DISCUSSION

A full review of the financial statements and claims data submitted by the Applicant shows the following:

From 2003 to 2006, the Applicant's revenue base B4
B4            In 2006, one major customer accounted for more than B4    of the Applicant's revenue. In addition, more than B4    of all revenues were derived from transportation services provided to the automobile industry. The concentration of revenue from one customer and one industry is a concern. As such, the Applicant asserts that it actively manages this type and volume of business, which is spread over numerous plants located throughout the United States and Mexico. To mitigate any risk, the minimum adjusted tangible net worth (ATNW) requirements for the Applicant and the Parent will be set at levels somewhat higher than the average for carriers currently in the self-insurance program.

Also, during the 2003 to 2006 period, the Applicant's net income B4
B4            in 2006 compared to B4            in 2003. B4            the Applicant's operating performance is also illustrated in the operating ratio, which B4
2003 to B4    in 2006. The Applicant's cash flow measurement of earnings before interest, taxes, depreciation and amortization (EBITDA) was B4
with such funds adequately supporting debt service requirements and capital expenditures B4
B4

At each of the year-ends reviewed, PAM reported satisfactory working capital positions (defined as current assets minus current liabilities) and current ratios (defined as current assets divided by current liabilities) above the acceptable level of 1.0 times. From 2003 to 2005, working capital
B4                                    and the current ratio B4            to
B4    times. In 2006, these two liquidity measures B4
B4                Affecting liquidity B4
B4
B4                Days payables outstanding is another financial measure that was affected by B4                    Such days B4            at the 2006 year-end compared to B4    days at the previous year-end. B4
B4

B4        the Applicant's leverage, in terms of its ratio of total liabilities to TNW, showed
B4                                                leverage position was displayed at the 2006 year-end B4
B4
B4                            From 2003 to 2006, the Applicant's TNW position exhibited B4
B4

B4
B4                        With this calculation, the Applicant's TNW

Page 6

position at December 31, 2006 B4                         nd its ratio of total liabilities to TNW

B4

A review of the Parent's financial statements reveals that it is profitable, EBITDA was sufficient to cover both current debt obligations and capital expenditures, and the balance sheet items of liquidity, leverage and equity all displayed satisfactory positions. Accordingly, the Parent has the financial ability to support the self-insurance obligations of PAM.

As previously stated within the decision, there is an issue with the valuation of the Applicant's BI&PD claims liabilities. Such claims are valued based on information gathered to date and do not include additional loss development or Incurred But Not Reported (IBNR). Accordingly, once the Applicant's self-insurance program matures, BI&PD claims levels could be higher than those reported in this application. To mitigate this risk, the Applicant and the Parent will be required to report this information upon activation of its self-insurance authority.

In addition, a guarantee by the Parent is mandated at this time to protect against the outflow of the Applicant's funds to other wholly-owned entities of the Parent and to the Parent. As an additional measure of protection, intercompany accounts (on a net basis) are being excluded from the minimum ATNW calculation. This will ensure that the Applicant retains a sufficient level of equity to support the risk to the public resulting from self-insurance claims that occur.

Another requirement imposed with this decision is that the Parent must maintain a minimum ATNW based on a multiple of the Applicant's combined BI&PD and cargo claims balance sheet reserves. This multiple is set at a level that is greater than the 20 times average for carriers currently in the self-insurance program and is intended to reduce risk to the public arising from the customer and auto industry concentrations.

Given the Applicant's profitable operations, satisfactory EBITDA, adequate liquidity, combined BI&PD and cargo claims that are low relative to its operation, and the significant amount of financial support gained from the Parent guarantee, the collateral requirement is set at a minimum of 25% of pending self-insured BI&PD claims reserves. The Applicant's collateral and minimum ATNW benchmarks reflect its specific financial and claims situation. It is prudent that consideration for this provision be based upon an applicant's financial condition, claims experience, and corporate structure. All requirements are set on a case-by-case basis so that the level of risk to the public is minimized.

I conclude, based on the above analysis, that the Applicant, with the support of the Parent, has adequate resources to self-insure its BI&PD liability for $500,000 of its minimum limit of $1 million per occurrence and its $10,000 cargo liability.

**I find:**

The Applicant's self-insurance of BI&PD and cargo liability, subject to conditions, will afford the security for the protection of the public contemplated by 49 USC §13906.

ʃ    **It is ordered**:

The application is granted, subject to the following conditions:

1.  The Applicant must establish an irrevocable letter of credit or trust fund for its BI&PD claims liabilities in the amount of $500,000 or 25% of the pending self-insured BI&PD claim reserve (including additional loss development and IBNR) reported on the most recent quarter/year-end balance sheet, whichever is greater. The Applicant must also establish an irrevocable letter of credit or trust fund for cargo claims liabilities in the amount of $10,000 or 25% of the pending self-insured cargo claim reserve reported on the most recent quarter/year-end balance sheet, whichever is greater. The initial amount of the Applicant's letters of credit or trust funds will be $500,000 for BI&PD and $10,000 for cargo. The required letters of credit or trust funds are designed to change annually and will be measured at each December 31. At no time will the Applicant's BI&PD and cargo letters of credit or trust fund balances be less than $500,000 and $10,000, respectively. If an increase in the collateral level is needed, then the adjustment must be made within 105 days from December 31 (i.e., 15 days from the due date for year-end financial statements).

    The Applicant must submit, within 60 days of the service date of the decision, copies of the agreements with the financial institution establishing the letters of credit or trust funds. The FMCSA must approve the terms of the letters of credit or trust funds before any effective date for activation of the letters of credit or trust funds. Any changes in their terms must be given prior approval by the FMCSA.

    The Applicant must file the originals of any letters of credit with FMCSA's Commercial Enforcement Division.

    Furthermore, the Applicant must have unrestricted access to any trust funds and drawdowns may only be made to satisfy claims for BI&PD and cargo liabilities once all other sources of funds have been exhausted. Any drawdown from the trust funds must be reported immediately to the FMCSA, along with an explanation as to how the Applicant proposes to respond to additional liability claims. Any drawdown from the letters of credit or trust funds must be replenished within 30 days, and any failure to replenish the amount of a drawdown within 30 days must be reported immediately to the FMCSA.

    To ensure the protection of the public, it is further required that the trust fund agreement contain the following provisions:

    (a) The trustee must be identified and a statement must be given of its relationship to the Applicant and the Parent. The addresses of the trustee must also be provided.

(b) The beneficiary of the trust fund agreement must be clearly designated as BI&PD and cargo liability claimants of PAM. No other parties may have rights of recovery against the respective funds.

(c) The trust fund agreement must be established so that it may not be revoked until all cognizable claims arising during the time the carrier holds FMCSA authority to self-insure have been settled.

(d) Payments under the trust agreement must be made directly to BI&PD and cargo claimants.

2.  Within 60 days of the service of this decision, the Parent must file a formal written agreement with the FMCSA stating that it will guarantee payment of the self-insurance obligations of the Applicant.

3.  The Applicant must maintain a minimum ATNW. It is defined as TNW less all intercompany, affiliate and shareholder asset accounts (on a net basis). The Applicant's minimum ATNW level must be equal to, the greater of (a) 15 times its combined self-insured BI&PD and cargo claims reserve (including additional loss development and IBNR) as reported on its quarter/year-end balance sheet, or (b) 2 times its self-insurance authority, in this case, $1,020,000. In addition, the Parent must maintain a minimum ATNW. The Parent's minimum ATNW level must be equal to the greater of (a) 25 times the Applicant's combined self-insured BI&PD and cargo claims reserve (including additional loss development and IBNR) as reported on the Applicant's quarter/year-end balance sheet, or (b) 2 times the Applicant's self-insurance authority. The minimum ATNW requirement is designed to change quarterly, and will be measured on March 31, June 30, September 30, and December 31, annually.

Notice must be given to the FMCSA if the ATNW balances fall below these levels. If this occurs, the Applicant and/or the Parent will then have 30 days to correct the situation or face termination of the authority to self-insure. At present, the Applicant's and the Parent's minimum ATNW requirement will be $1,020,000 ($510,000 x 2 times the self-insurance authority). This measurement is meant to fluctuate based upon the reserve level of combined pending BI&PD and cargo liabilities. However, at no time will the minimum ATNW requirement be less than 2 times the self-insurance authority, or in this case, $1,020,000.

4.  The Applicant must submit unaudited annual and quarterly financial statements. The Parent must submit unaudited quarterly and audited annual financial statements, including all applicable consolidating notes and schedules, within 60 and 90 days, respectively, after the end of each quarterly or annual period. The audited annual financial statements must be independently prepared, contain unqualified opinions and be prepared in accordance with generally accepted accounting principles (GAAP). All of the financial statements must include a certification by an appropriate company official verifying the accuracy of the information provided.

5. The Applicant must submit its December 31, company-specific quarterly claims report within 30 days from the quarter-end. All other quarterly claims reports must be submitted within 60 days of the quarter-end. The report must detail the number, aggregate dollar amount, the nature of the applicant's claims experience and include the dollar amount of reserves established, if any. Claims in excess of $50,000 and court cases must be itemized separately, and each report is to be certified as accurate by an officer of each company, who is independent of risk management activities.

6. The Applicant must notify the FMCSA immediately of any pending or contingent BI&PD liability claims(s) that individually exceeds $50,000 or collectively exceed $250,000.

7. The Applicant must have continuously in place from the inception of its self-insurance program excess insurance coverage for BI&PD claims liabilities covering between $500,000 and $10 million. Proof of this additional excess BI&PD liability coverage must be submitted to the FMCSA via ACCORD form or a policy premium statement. Immediate notice must be given if there are any changes to this coverage. If there is any lapse in coverage(s), the Applicant will have 30 days to correct the situation or face termination of its self-insurance authorization.

8. The FMCSA is to be notified within 5 days of a default under the terms of any loan agreements with a financial institution or bonded indebtedness by the Applicant or the Parent. Full disclosure should be provided about the consequences, actual or potential, of such default. Any default could be cause for termination of the self-insurance authority.

9. The Parent must submit quarterly loan and lease covenant compliance calculations within 60 days of each quarter/year-end. An appropriate company official must certify these quarterly loan and lease covenant compliance calculations.

10. The Applicant must notify FMCSA of any material change in its or the Parent's ownership or control within 10 days of the change. A material change in ownership or control will automatically terminate the Applicant's self-insurance authorization the date the change is effective. In the event the Applicant fails to notify FMCSA of a material change in its or the Parent's ownership and FMCSA subsequently becomes aware of the change, FMCSA reserves the right to terminate the Applicant's self-insurance authority immediately. For purposes of this Condition, "material ownership or control" means a majority ownership interest.

11. The Applicant must notify FMCSA within 10 days of any extraordinary event effecting a material change to its or the Parent's financial health. In the event the Applicant fails to notify FMCSA of developments pertaining to extraordinary events and FMCSA subsequently becomes aware of the change, FMCSA reserves the right to terminate the Applicant's self-insurance authority immediately.

12. The Applicant and the Parent must submit, on a quarterly basis going forward and within 60 days of each quarter/year-end, a schedule detailing the balance sheet line item "Accrued Expenses and Other Liabilities" to show its self-insured auto and cargo liability accruals, additional loss development and IBNR.

13. The Applicant must notify the FMCSA no later than 90 days prior to the effective date of any change in the terms or cancellation of the letters of credit or trust fund agreements. In addition, the FMCSA must receive renewal notices for the letters of credit within 60 days from the renewal date. If trust funds are established, then copies of the trust fund statements showing their balances must be furnished to the FMCSA within 30 days of each quarter-end.

14. The FMCSA retains the authority to terminate the Applicant's self-insurance authorization at any time if it appears to the FMCSA that its financial arrangements, or those of the Parent, fail to provide satisfactory protection for the public; or the Applicant or the Parent fail to file timely any of the information required by the FMCSA.

15. The FMCSA reserves the right to require the Applicant and the Parent to provide any additional information deemed necessary.

16. The FMCSA retains the right to impose such additional conditions in the future as may be necessary for the protection of the public.

17. This decision is effective on the date of service. The Applicant, however, may not activate its self-insurance authorization less than 30 days after submitting documents to the FMCSA demonstrating that the required letters of credit or trust funds have been established. The Applicant must also notify the FMCSA of the date it will activate its self-insurance authority.

By the Federal Motor Carrier Safety Administration,

Robert W. Miller

Acting Director, Office of
Enforcement and Compliance

Page 11

SAMPLE DECISIONS



# B-293049; B-293049.2, Computer Information Specialist, Inc., January 23, 2004



DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below was subject to a GAO Protective Order. This redacted version has been approved for public release.
**Decision**

**Matter of:**   Computer Information Specialist, Inc.

**File:**      B-293049; B-293049.2

**Date:**     January 23, 2004

Kevin P. Mullen, Esq., and David E. Fletcher, Esq., Piper, Rudnick, for the protester.
Mike Colvin, Department of Health and Human Services, for the agency.
Scott H. Riback, Esq., and John M. Melody, Esq., Office of the General Counsel, GAO, participated in the preparation of the decision.

DIGEST

Protest that agency misevaluated proposals is sustained where record shows that agency's evaluation conclusions with respect to protester's proposal were either unrelated to the evaluation criteria or without a factual basis, and agency failed to note two deficiencies in awardee's proposal.

**DECISION**

Computer Information Specialist, Inc. (CIS) protests the award of a contract to Open Technology Group, Inc. (OTG) under request for proposals (RFP) No. NLM-03-101/SAN, issued by National Library of Medicine, National Institutes of Health (NIH) to acquire telecommunications support services at the agency's Bethesda, Maryland campus. CIS maintains that the agency misevaluated proposals and made an unreasonable source selection decision.

We sustain the protest.

The solicitation contemplated the award of a requirements contract with fixed hourly rates to perform telecommunications support services for a base year, with four 1-year options. The RFP advised that the agency intended to make award on a "best value" basis, with several non-price factors, collectively, being significantly more important than price. RFP at 66. The non-price criteria (and their point values, out of 100 possible points) were:  qualifications and availability of personnel (30 points), past

performance (30 points), technical competence (20 points), and management approach (20 points). RFP at 66-67. For pricing purposes, offerors were to submit fully-loaded, fixed hourly rates for various labor categories, RFP at 62; evaluated prices were derived by multiplying the proposed hourly rates by estimated quantities stated in the solicitation. RFP at 51.

The agency received numerous proposals and, after an initial evaluation, established a competitive range of four firms, including the protester and the awardee. Agency Report (AR), exh. 6, at 1-3. The agency conducted discussions with the competitive range offerors and solicited and obtained revised proposals. The final evaluation results were as follows:

| Offeror | Technical Score | Estimated Price | Acceptability |
|---------|----------------|-----------------|---------------|
| OTG | [deleted] | [deleted] | [deleted] |
| Offeror A | [deleted] | [deleted] | [deleted] |
| Offeror B | [deleted] | [deleted] | [deleted] |
| CIS | [deleted] | [deleted] | [deleted] |

AR, exh. 18 at 2. On the basis of these evaluation results, the agency made award to OTG, the firm submitting what the agency deemed the highest-ranked, lowest-priced proposal. Following a debriefing, CIS filed this protest in our Office, asserting that the agency misevaluated both its and the awardee's proposals.

In reviewing protests against an agency's evaluation of proposals, we do not reevaluate the proposals. Rather, we consider only whether the evaluation was reasonable and consistent with the terms of the solicitation and applicable statutes and regulations. CWIS, LLC, B-287521, July 2, 2001, 2001 CPD ¶ 119 at 2. On the basis of the record here, we find the agency's evaluation conclusions with respect to both proposals unreasonable.

CIS

The evaluation record is limited, consisting solely of narrative materials prepared by the evaluators. Of five evaluators, four prepared only cursory narrative comments to support their scoring of the initial or revised CIS proposals. The comments that were prepared during the initial evaluation criticized the proposal principally for not offering personnel that met all of the solicitation's minimum personnel experience requirements. [1] This was brought to CIS's attention during discussions, and CIS revised its proposal in this area. CIS asserts that it cured this deficiency, and that it therefore was unreasonable for the final evaluation to reflect a downgrading of the proposal in the area of personnel qualifications and availability.

We agree with CIS. In evaluating the revised CIS proposal, four of the five evaluators again prepared only cursory narrative materials. In terms of scoring, three of these four evaluators raised CIS's score by [deleted] points; the agency's final consensus technical evaluation report states that two of the three evaluators increased their scores based on their conclusion that the CIS proposal now met the personnel

experience requirements, and that the third increased his score based on CIS's providing "additional information" in its revised proposal. AR, exh. 7, at 5-6. Among these four evaluators, two assigned a final overall technical score of [deleted] points and two assigned a score of [deleted] points. Id. at 7.

The fifth evaluator scored CIS's revised proposal dramatically differently, reducing CIS's score from [deleted] total points initially to [deleted] points on reevaluation. Unlike the other four evaluators, he prepared extensive narrative materials during his rescoring of the proposal, AR, exh. 4, at 25-26, and his unedited comments were ultimately incorporated into the final consensus technical evaluation report, along with a summary of the other evaluators' limited comments. AR, exh. 7, at 5. The agency's source selection decision document, AR, exh. 18, does not reflect any critical or independent analysis or evaluation of the proposals by the source selection official (SSO); instead, it relies entirely upon the numeric scores for purposes of the agency's source selection decision. This being the case, the comments of the fifth evaluator regarding deficiencies in CIS's proposal represent the sole support in the evaluation record for the relatively low ranking of CIS's revised proposal. This is problematic for the agency because we find that the conclusions expressed by the fifth evaluator are unreasonable.

The first paragraph of the fifth evaluator's comments states as follows:

I was dismayed and unfavorably impressed with both the tone and the substance of the proposer's response for answers to technical questions and for additional information. I was shocked with the pedantry and the profound lack of intellect actually written in the response. I was disappointed with the visible disregard for manners and with the actual lack of respect written into and appearing in the lines of the response. In conscience I cannot recommend that the government take this proposer or the material presented as a serious attempt to gain a contract. And I certainly would not wish upon any government representative the responsibility of confronting or dealing with any proposer who allows or perhaps promotes such attitudes or such behavior.
AR, exh.7, at 5.

It is axiomatic that agencies are required to evaluate proposals based solely on the evaluation factors identified in the solicitation, 41 U.S.C. § 253b(a) (2000), Federal Acquisition Regulation § 15.305, and that they must adequately document the reasons for their evaluation conclusions. Future-Tec Mgmt. Sys., Inc.; Computer & Hi-Tech Mgmt., Inc., B-283793.5, B-283793.6, Mar. 20, 2000, 2000 CPD ¶ 59 at 7. The evaluation factors in the RFP here did not provide for downgrading a proposal based on the tone of the proposal or the offeror's manners, attitudes or behavior, and there is nothing in the minimal evaluation record identifying the criterion applied or otherwise explaining the basis for the evaluator's statements. Moreover, having read the proposal, we are at a loss to understand the basis for the evaluator's observations. For example, we are unable to identify any area or aspect of the proposal that could reasonably be said to demonstrate a "lack of respect" (and, since the evaluation apparently was based solely on the written submissions, there would appear to be no other basis for the evaluator's views). We conclude that this portion of the fifth evaluator's comments did not provide a reasonable basis for downgrading CIS's proposal.

The comments next observe that, on page three of the revised proposal, CIS offered [deleted] in task area 2 (task order management) two individuals who do not meet the RFP's experience requirements; the comments go on to reference page 18 of the proposal in support of the observation that these two individuals are being offered in

task area 2. A review of the proposal language, however, establishes that this observation is simply incorrect. In this regard, page 3 of CIS's revised proposal-- responding to the agency's discussion question relating to the experience of its proposed personnel-- specifically states [deleted]. AR, exh. 15, at 2. These two individuals are mentioned again on page 18, but only for purposes of describing the current--as opposed to the proposed--team performing the contract (CIS is the incumbent for this requirement). We conclude that this aspect of the evaluation record does not reflect the contents of CIS's proposal, and thus did not provide a reasonable basis for downgrading the proposal.

The next portion of the narrative observes that CIS's past performance is limited in terms of overall experience, years of experience and number of contracts requiring similar performance. This observation is made in conclusory terms, with no supporting detail from the firm's past performance information. The record shows that CIS initially cited two prior contracts for purposes of demonstrating its past performance, one of which was the prior contract for this requirement. During discussions, the agency asked for additional past performance information, and CIS provided information about three additional contracts. In each instance, CIS organized the information by describing the work in terms of its relevance to the seven task areas outlined in the RFP, and included in each of the listings information relating to each of the seven task areas. CIS's revised proposal thus included five past performance references spanning the timeframe 1996 to the present (approximately 8 years). Since the RFP requested only a list of the last two contracts performed during the past 3 years, as well as those currently being performed, RFP at 56-57, CIS appears to have presented information relating to an adequate number of contracts that appear relevant to the requirement being solicited. In the absence of some explanation for the fifth evaluator's conclusory observations indicating why he found otherwise, we find no reasonable basis for the downgrading of CIS's proposal in this area.[2]

The balance of the narrative is devoted to criticism of proposed enhancements offered by CIS in terms of [deleted]. The narrative criticizes these proposed enhancements for three principal reasons: the enhancements were not provided under the firm's predecessor contract; any efficiencies achieved will benefit the contractor's employees, as opposed to government employees; and the proposal does not state that these enhancements currently exist or explain when they will be implemented during contract performance. The narrative in this area concludes by stating: "Therefore, all of that information is no more than a pipe dream, mere vapor to be disbursed with one's next breath." AR, exh. 7, at 5.

Again, these statements are not supported by the record. First, to the extent that the evaluation criticizes CIS for not providing these enhancements under the predecessor contract, there is nothing in the record showing that CIS offered the same enhancements in its previous proposal, or that they were otherwise required under the earlier contract.

Similarly, nothing in the proposal suggests that these enhancements will not actually be provided at the commencement of performance. In this regard, the proposed enhancements are based on CIS's providing [deleted]. CIS's proposal addresses the enhancements as follows:

[deleted]
AR, exh. 13, at 5. Elsewhere, the proposal states:

[deleted]
AR, exh. 13, at 132. As with the areas discussed above, absent some explanation in the record for the fifth evaluator's conclusions regarding CIS's proposed enhancements, those conclusions are unsupported, and therefore unreasonable.

OTG

CIS asserts that the agency also misevaluated the OTG proposal. According to the protester, the agency improperly accepted the proposal for award notwithstanding that it failed to meet two solicitation requirements: the requirement to provide letters of commitment for all of its proposed personnel, and the requirement to provide a security program plan.

We agree with CIS. Regarding letters of commitment, the RFP provided: "For all proposed personnel who are not currently members of the offeror's staff, a letter of commitment or other evidence of availability is required. A resume does not meet this requirement." RFP at 59. OTG proposed 14 individuals not currently employed by OTG. AR, exh. 8, at 25-52. However, OTG presented only 10 letters of commitment for these 14 individuals; OTG did not submit letters of commitment for the other 4 proposed employees.

The agency asserts that it relied on other language in the OTG proposal in concluding that OTG had satisfied the requirement for evidence of availability. Specifically, the agency cites the following language: "Finally we have requested and received letters of intent from our proposed staff (see Attachment C)." AR, exh. 8, at 2. This representation did not satisfy the requirement. The statement itself is no more than a self-serving representation, and in relying on it the agency ignored the fact that Attachment C to the OTG proposal includes only the 10 letters of commitment referenced above; Attachment C does not include any evidence of the availability of the other 4 proposed employees. Under these circumstances, we find that OTG failed to meet this solicitation requirement.[3]

As noted, CIS also asserts that the OTG proposal did not include an adequate security program plan. The agency responds that CIS's assertion in this respect is simply disagreement with the agency's evaluation conclusion, asserting that it reviewed the information in the OTG proposal and, in its discretion, concluded that it satisfied the security program plan requirement.

The evaluation in this area was unreasonable. The RFP required offerors to submit a detailed outline (commensurate with the size and complexity of the statement of work) of its present and proposed information technology systems security program, demonstrating compliance with the statement of work's security requirements, as well as various statutory and regulatory provisions relating to computer security. RFP at 61. The RFP cautioned offerors as follows:

Proposals which merely offer to conduct a program in accordance with the requirements of the Government's scope of work will not be eligible for award. The offeror must submit an explanation of the proposed technical approach in conjunction with the tasks to be performed in achieving the project objectives.
RFP at 59.

The OTG proposal fails to provide the level of detail required by the solicitation. The

firm's proposed security program is outlined in a half-page portion of its proposal that is comprised of four short paragraphs. The first paragraph states that OTG and its subcontractor understand that their personnel may require access to sensitive data and systems, and that access to these systems and data may require their personnel to submit to and pass "various levels of investigation before employment with the government." AR, exh. 8, at 64. The next paragraph--which includes the language the agency states it relied upon in finding the OTG proposal acceptable--states in its entirety:

The OTG/Verizon Team agrees to comply with the AIS (Automated Information Systems) security requirements set forth in the statement of work upon receipt of the government furnished DHHS Automated Information Systems Security Program (AISSP) Handbook. OTG further agrees to include compliance to these security guidelines in any subcontract awarded pursuant to the Prime contract.
Id. The next paragraph of the proposal reiterates that OTG understands that its employees working on the contract will be subject to various background checks, and the final paragraph states that OTG agrees to adhere to all established security training and awareness requirements, that its employees will maintain the integrity, confidentiality, authenticity, availability and nonrepudiation of data processed, transmitted or stored on systems in use by NIH, and that it agrees to be monitored to ensure compliance with all security requirements. Id. (OTG, in its revised proposal, also stated that it understood that its employees would be required to complete online NIH computer security awareness training, and also that they will be required to review and become familiar with any security information supplied by the government during employee orientation. AR, exh. 10, at 16.)

This language does not set forth a technical approach or an explanation of such an approach, as expressly required by the RFP; it is entirely lacking in any detail relating to OTG's information technology security program, and fails to demonstrate or describe how OTG plans to comply with the various security requirements (statutes, regulations and agency guidance) called out in the RFP. Rather, the proposal does little more than agree to conduct a security program in accordance with the terms of the statement of work; this is precisely the kind of blanket statement that the RFP cautioned offerors against. Accordingly, we find that there was no reasonable basis for the agency's evaluation of the OTG proposal in this area.

In view of the foregoing, we conclude that the agency misevaluated the proposals of both CIS and OTG. We also find that the agency's misevaluation was prejudicial to CIS, since there is a reasonable possibility that, but for the agency's errors, CIS might have been selected for award notwithstanding its higher price. See McDonald-Bradley, B-270126, Feb. 8, 1996, 96-1 CPD ¶ 54 at 3; see also Statistica v. Christopher, 102 F.3d 1,577, 1,581 (Fed. Cir. 1996). We therefore sustain CIS's protest. [4]

RECOMMENDATION

We recommend that the agency at a minimum reevaluate the proposals of the competitive range offerors and make a new source selection decision. However, in light of our finding that the OTG proposal may have been technically unacceptable, the agency also may elect to reopen discussions and obtain revised proposals. Should the agency find that another offeror is properly in line for award, we recommend that the agency terminate the contract awarded to OTG for the convenience of the government and make award to the firm found to be in line for award.[5] We further recommend that CIS be reimbursed the costs associated with filing and pursuing its protest,

including reasonable attorneys' fees. 4 C.F.R.
§ 21.8(d)(1) (2003). CIS's certified claim for costs, detailing the time spent and the costs incurred, must be submitted to the agency within 60 days of receiving of our decision. 4 C.F.R. § 21.8(f)(1).

The protest is sustained.

Anthony H. Gamboa
General Counsel

---

[1] The RFP divided the contract requirements into seven task areas, six of which included experience requirements, expressed in terms of years of experience, for the various personnel categories.
For example, under task area 1, program manager, the proposed program manager was required to have at least 5 years of relevant experience. RFP, Statement of Work (SOW), at 4.
[2] This observation is all the more confusing given that, during the initial proposal evaluation, the fifth evaluator identified CIS's past performance as a strength and stated: "Good experience, especially with NIH." AR, exh. 4, Initial Evaluation Worksheet of the Fifth Evaluator.
[3] The agency, in a supplemental report, asserts, without supporting evidence, that the protester failed to document the availability of three of its proposed employees. However, the record shows that all three are current employees of CIS; there thus was no requirement to furnish evidence of availability for these individuals. We note in any event that CIS's proposal included a signed letter from each of its proposed employees--including the three employees mentioned by the agency--in which the employees commit to their continued availability to perform the requirement in the event that CIS is awarded the contract. AR, exh. 14, attach. 8.
[4] CIS also alleges that OTG and its subcontractor Verizon have an organizational conflict of interest because of prior or current contractual relationships that the two concerns have with the agency. This aspect of the protest is academic in light of our recommendation (discussed below) that the agency reevaluate proposals and make a new source selection decision.
[5] The agency executed a determination and finding to continue performance of the OTG contract notwithstanding CIS's protest on grounds that urgent and compelling circumstances significantly affecting the interests of the government would not permit it to suspend performance of the contract. See 31 U.S.C. § 3553(c)(2) (2000). Nonetheless, because of the ongoing nature of the requirement, we believe the agency can implement our recommendation and continue to meet its need for these services without disruption.

 

# Albert Moving & Storage, B-290733; B-290733.2, September 23, 2002 * REDACTED DECISION

1. Where solicitation defined a "satisfactory" past performance rating as permissibly encompassing minor problems which were satisfactorily corrected, agency reasonably rated awardee's past performance as "satisfactory," based on the agency's consideration of various past performance information, including a past performance questionnaire, the awardee's response to certain performance problems, and other additional information submitted by the awardee. 2. Agency reasonably included awardee's proposal in the competitive range where contracting officer considered and documented various deficiencies that existed in awardee's initial proposal and concluded they were not significant enough to require proposal's elimination from the competitive range. Kenneth S. Nankin, Esq., Nankin & Verma, and Brian W. Craver, Esq., Person & Craver, for the protester. Warren D. Leishman, Esq., and Gregory H. Petkoff, Esq., Department of the Air Force, for the agency. Glenn G. Wolcott, Esq., and Michael R. Golden, Esq., Office of the General Counsel, GAO, participated in the preparation of the decision.

Albert Moving & Storage protests the Department of the Air Force's contract awards to Ace Movers and Dwight Transfer & Storage under request for proposals (RFP) No. F41612-01-R-0119 to perform services related to shipment of personal property for Department of Defense personnel moving to or from Sheppard Air Force Base (SAFB), Texas. Albert protests that the agency misevaluated proposals with regard to past performance and that Dwight's proposal should not have been included in the competitive range.

We deny the protest.

BACKGROUND

The Air Force issued solicitation No. F41612-01-R-0119 on August 29, 2001, seeking fixed-price proposals to perform specified packing and moving services for a 1-year base period with four 1-year option periods. As amended, the RFP divided the required services into three parts: schedule I, which included tasks related to outbound shipments; schedule II, which included tasks related to inbound shipments; and schedule III, which included tasks associated with intra-area moves. /1/ Offerors were required to submit technical proposals, past performance proposals, and price proposals. The solicitation provided that technical proposals would be evaluated for technical acceptability on a "pass/fail" basis, and that, for technically acceptable proposals, award determinations, by schedule and area, would be based on "best value" tradeoffs between past performance and price.

With regard to past performance, offerors were required to identify prior customers for whom they had performed activities similar to those solicited here, and to provide those customers with a "past performance questionnaire" (which was included as part of the solicitation), and request that the customer complete the questionnaire and forward it to the specified SAFB contracting officer. The solicitation provided that offerors' past performance would be evaluated under an adjectival rating system using the terms "exceptional," "very good," "satisfactory," "neutral/not applicable," "marginal," and "unsatisfactory."

Three companies -- Albert, Dwight, and Ace -- timely submitted proposals by the specified closing date. The agency performed a preliminary evaluation of proposals and concluded that all three should be included in the competitive range. Thereafter the agency conducted discussions with each of the offerors, and requested submission of final revised proposals.

Upon receiving and evaluating the final proposals, the agency concluded that all three proposals were technically acceptable, that Albert's and Ace's proposal warranted "very good" past performance ratings, and that Dwight's proposal warranted a "satisfactory" past performance rating. Agency Report, Tab 2, Contracting Officer's Statement, at 3-4. The proposed prices for area 1 of the three schedules were as follows. /2/

. Albert Ace Dwight

Schedule I $ 353,046 $ [deleted] $ [deleted]

Schedule II [deleted] [deleted] 1,802,754

Schedule III [deleted] 2,126,800 [deleted]

Agency Report, Tab 2, Contracting Officer's Statement, at 5-6.

The agency then performed trade-off assessments between the offerors' proposed prices and past performance ratings, awarding the following contracts: schedule I -- Albert ($353,046); schedule II -- Dwight ($1,802,754); schedule III -- Ace ($2,126,800). Albert's protest challenging the awards to Dwight and Ace followed.

DISCUSSION

Albert's Initial Protest

In its initial protest, Albert challenges the agency's "satisfactory" evaluation of Dwight's past performance as unreasonably high, asserting that "the quality of Dwight['s] . . . work, and [its] reputation therefor, is poor." Protest at 3. /3/

With regard to evaluation of offerors' past performance, the solicitation stated:

Means of Evaluation: All offerors will be given a risk assessment rating. The primary means of evaluation will be the Contractor Performance Assessment Questionnaire. However, the government reserves the right to consider any other information obtained through other means . . . . Agency Report, Tab 5, RFP amend. No. 3, at 314.

As noted above, the solicitation advised offerors of the adjectival rating scheme the agency intended to use in evaluating past performance. The solicitation further provided definitions for each term to be used. With regard to the term "satisfactory," the solicitation provided the following definition: "Performance met all contract requirements. There were some minor problems and corrective actions taken by the contractor were satisfactory." Id.

The record shows that, in evaluating Dwight's past performance, the agency relied upon the past performance questionnaire completed by the SAFB Traffic Management Office (TMO). /4/ That questionnaire sought adjectival rating responses (using the same

terms esatablished in the solicitation for evaluation of past performance) to 26 questions. In response, the SAFB TMO rated Dwight's performance [deleted]. /5/ Agency Report, Tab 13, Completed Questionaire for Dwight. Overall, the SAFB TMO stated that it "probably would" award Dwight another contract. Id.

Regarding the [deleted], the contracting officer brought these matters to Dwight's attention during discussions, giving Dwight an opportunity to [deleted]. /6/ With regard to [deleted], Dwight responded that it [deleted]. /7/ Agency Report, Tab 13, Lettter from Dwight to Contracting Officer (Nov. 5, 2001). With regard to [deleted], Dwight provided the contracting officer with its earlier correspondence to the agency, which described the actions Dwight had taken [deleted]. /8/ Id; Agency Report, Tab 13, Letter from Dwight to SAFB TMO (June 20, 2001).

The contracting officer considered all of the information provided and ultimately concluded that the required risk assessment related to Dwight's past performance was "satisfactory." Albert argues that, [deleted], it was inappropriate for Dwight to receive a "satisfactory" rating. We disagree.

Our Office will question an agency's past performance evaluation only where it lacks a reasonable basis, violates statute or regulation, or is inconsistent with the stated evaluation criteria. An agency may base its evaluation of past performance upon its reasonable perception of prior performance, regardless of whether the contractor disputes the agency's interpretation of the facts. See Birdwell Bros. Painting & Refinishing, B-285035, July 5, 2000, 2000 CPD Para. 129; Quality Fabricators, Inc., B-271431, B-271431.3, June 25, 1996, 96-2 CPD Para. 22 at 7. A protester's mere disagreement with the agency's judgment does not establish that the agency acted unreasonably. Coffman Specialties, Inc., B-284546, B-284546.2, May 10, 2000, 2000 CPD Para. 77 at 5.

As noted above, the solicitation provided that, in evaluating offerors' past performance for purposes of making source selection decisions in the procurement at issue here, each offeror would be given a "risk assessment rating," and that this rating would be based in large part, but not exclusively, on prior performance as reflected in the past performance questionnaires. Agency Report, Tab 5, RFP amend. No. 3, at 314. That is, offerors were advised that the agency would make risk assessments regarding the level of performance that each offeror was likely to provide under the pending solicitaiton, based on considerations of how each offeror had previously performed similar requirements. The solicitation further provided that an offeror could obtain a "satisfactory" risk assessment, notwithstanding minor performance problems, provided those problems had been satisfactorily corrected. Id.

Here, the record shows that, although Dwight encountered problems during its prior performance, it corrected those problems to the satisfaction of the agency. Based on our review of the record, including the information relating to Dwight's prior corrective actions, we find that the contracting officer reasonably made a risk assessment of "satisfactory" with regard to Dwight's proposal. Albert's assertions to the contrary are without merit.

Albert's Supplemental Protest

Following receipt of the agency report responding to the initial protest, Albert filed a supplemental protest, asserting that the agency improperly included Dwight's proposal

in the competitive range. Albert does not dispute that Dwight's final revised proposal was properly rated as technically acceptable; nonetheless, Albert maintains that [deleted] should have precluded Dwight from being given an opportunity to further compete for the requirements. We disagree.

The determination of whether a proposal is in the competitive range is principally a matter within the sound judgment of the procuring agency. Dismas Charities, Inc., B-284754, May 22, 2000, 2000 CPD Para. 84 at 3. While exclusion of technically unacceptable proposals is frequently permissible, it is not generally required. More specifically, the significance of the weaknesses and/or deficiencies in an offeror's proposal, within the context of a given competition, is a matter for which the procuring agency is, itself, the most qualified entity to render judgment. Our Office will review that judgment only to ensure it was reasonable and in accord with the solicitation provisions, and a protester's mere disagreement with an agency's judgment does not establish that the judgment was unreasonable. Abt Assocs. Inc., B-237060.2, Feb. 26, 1990, 90-1 CPD Para. 223 at 3-4; Keco Indus., Inc., B-261159, Aug. 25, 1995, 95-2 CPD Para. 85.

The record here contains the contracting officer's contemporaneous documentation supporting his decision to retain Dwight in the competitive range. Agency Report, Tab 11, Competitive Range Determination. In making the determination, the contracting officer specifically discussed Dwight's proposal in the context of each of the three technical evaluation factors. /9/ [Deleted], the competitive range determination provides a reasonably detailed analysis regarding the specific type of information Dwight would need to provide [deleted]. For example, [deleted]. Agency Report, Tab 11, Competitive Range Determination at 3. With regard to the [deleted], the contracting officer noted that, [deleted]. Id. Based on his analysis that the problems identified by the evaluators were mostly informational in nature, the contracting officer concluded that Dwight's proposal, [deleted], had a reasonable chance of receiving an award.

Based on our review of the entire procurement record, including the agency's contemporaneous documentation reflecting its judgment regarding the significance of the [deleted] in Dwight's initial proposal, we do not find Dwight's initial technical proposal to [deleted] as to require exclusion from further consideration. (That is, of course, not to say that the contracting officer was legally required to keep the proposal in the competitive range.) Dwight's subsequent submission of revisions and additional information which rendered its proposal acceptable -- a fact Albert does not dispute -- supports the reasonableness of the contracting officer's determination. Accordingly, Albert's assertion that Dwight's proposal should have been excluded from the competitive range is without merit.

The protest is denied.

Anthony H. Gamboa General Counsel

1. Each of the three schedules was further divided into four geographic areas.

2. Albert received contract awards for areas 2, 3, and 4 under all three schedules. Accordingly, those portions of the solicitation requirements are not at issue here.

3. Albert also protested that the agency's "very good" past performance rating for

Case 1:07-cv-02323-HHK    Document 24-4    Filed 05/27/2008    Page 12 of 39

Albert was unreasonably low; that the agency's "very good" past performance rating for Ace was unreasonably high; and that Dwight's and Ace's proposed prices were unrealistically low. The agency addressed each of these issues in its report responding to Albert's protest. In its comments following receipt of the agency report, Albert failed to address these issues in any way, focusing only on Dwight's past performance rating. Accordingly, we view Albert as having abandoned its assertions regarding its own and Ace's past performance ratings, and the assertion that Dwight's and Ace's prices were unrealistically low. See Datum Timing, Div. of Datum, Inc., B-254493, Dec. 17, 1993, 93-2 CPD Para. 328 at 5.

4. The record shows that the SAFB TMO completed a performance assessment questionnaire for each of the three offerors. Agency Report, Tab 13. It is clear that these documents were primary considerations regarding each offeror's past performance rating.

5. No responses or "do not know" responses were provided for the remaining questions. [Deleted].

6. In this regard, the agency was relying on the provisions of Federal Acquisition Regulation (FAR), applicable at the time, which state: [t]he contracting officer shall . . . indicate to, or discuss with, each offeror still be considered for award, significant weaknesses, deficiencies, and other aspects of its proposal (such as cost, price, technical approach, past performance, and terms and conditions) that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. FAR Sec. 15.306(b)(1)(i).

7. [Deleted].

8. At that time, Dwight also provided various letters of commendation received from other customers. Agency Report, Tab 13.

9. The solicitation identified the following three technical evaluation factors: management/manpower/experience, understanding the task, and quality control plan.

* DOCUMENT FOR PUBLIC RELEASE

The decision issued on the date below was subject to a GAO Protective Order. This redacted version has been approved for public release.

Board of Contract Appeals
General Services Administration
Washington, D.C. 20405

THIS OPINION WAS INITIALLY ISSUED UNDER
PROTECTIVE ORDER AND IS BEING RELEASED
TO THE PUBLIC IN REDACTED FORM ON NOVEMBER 16, 1998

---

DENIED: October 30, 1998

---

GSBCA 13298, 13507, 13508, 13509, 13510, 13511

ACE-FEDERAL REPORTERS, INC.,

ANN RILEY & ASSOCIATES, LTD.,

ARTI RECORDING, INC.,

CALIFORNIA SHORTHAND REPORTING,

EXECUTIVE COURT REPORTERS,

and

MILLER REPORTING CO., INC.,

Appellants,

v.

GENERAL SERVICES ADMINISTRATION,

Respondent.

Ronald K. Henry and Mark A. Riordan of Kaye, Scholer, Fierman, Hays & Handler, Washington, DC, counsel for Appellants.

John E. Cornell, Office of General Counsel, General Services Administration, Washington, DC, counsel for Respondent.

Before Board Judges PARKER, HYATT, and WILLIAMS.

WILLIAMS, Board Judge.

In these appeals, six court reporting companies seek $4,972,363.85 in lost profits and $2,486,181.90 in consequential damages due to alleged breaches of their mandatory General Services Administration (GSA) multiple award schedule contracts for court reporting services by numerous user agencies. The facts are largely undisputed, and the parties have submitted their cases on the record.[foot #] 1

As a threshold matter, respondent argues that a majority of appellants' claims are barred under the statute of limitations in

the Federal Acquisition Streamlining Act of 1994 (FASA). We disagree. FASA provides that its statute-of-limitations provision takes effect on the date specified in its final implementing regulations. The regulations promulgated pursuant to that statute unambiguously state that the six-year limitation period shall not apply to contracts awarded prior to October 1, 1995, and renders the statute inapplicable to the instant contracts, which were all awarded in 1988.

Respondent has raised several defenses to liability. First, respondent contends that appellants are not entitled to lost profits because, absent bad faith, the termination for convenience clause in the contracts precludes damages for lost profits. Essentially, GSA is arguing that because the user agencies' off-schedule purchases were not made in bad faith, the Board should impose a "constructive termination for convenience" and deny breach damages.[foot #] 2 Second, GSA contends that, based upon the equities, appellants are not entitled to recover because they received orders under the contracts exceeding the estimated quantities stated in the request for proposals (RFP). Third, GSA argues that court reporting for grand jury proceedings is outside the scope of appellants' contracts. Fourth, respondent contends that each off-schedule purchase made at a lower price than schedule pricing was an exception to mandatory use pursuant to the Federal Property Management Regulation (FPMR), 41 CFR 101-26.401-4(f)(1). Fifth, respondent contends that appellants' contracts were illusory because there were numerous exceptions to GSA's promise that the court reporting requirements would be satisfied through these contracts and the exceptions taken together vitiated the value of that promise, respondent's sole consideration.

Appellants vigorously dispute the validity of all of these defenses, but we do not address their applicability because we conclude that appellants have not demonstrated that they are entitled to recover lost profits or consequential damages, under the terms of their contracts. Appellants' claim for recovery of lost profits based upon a diversion theory and their reliance on S&W Tires is misplaced. S&W Tires and other diversion cases are

----------- FOOTNOTE BEGINS ---------

[foot #] 1 The parties filed 131 paragraphs of stipulations.

[foot #] 2 In so arguing, respondent urges the Board to distinguish S&W Tire Services, Inc., GSBCA 6376, 82-2 BCA 16,048, and follow John Reiner & Co. v. United States, 325 F.2d 438 (Ct. Cl. 1963), cert. denied, 377 U.S. 931 (1964), and Kalvar Corp. v. United States, 543 F.2d 1298, 1304 (Ct. Cl. 1976), cert. denied, 434 U.S. 830 (1977).

----------- FOOTNOTE ENDS -----------

distinguishable in a critical respect -- those contracts were

requirements contracts and one contractor was guaranteed all of the users' requirements. Each appellant's multiple award schedule contract at issue here is not a pure requirements contract in that no individual contractor was given the exclusive right to provide all the mandatory user agencies' court reporting services for the contract term. Rather, the solicitation which gave rise to these contracts and formed the basis of the parties' bargain expressly advised offerors that there could be an unspecified number of "multiple" awards for any geographic area for which a vendor chose to submit an offer. Further, the contract did not guarantee to any awardee that any quantities would be ordered. Nor did the contract guarantee to any individual awardee a percentage of the totality of the Government's required court reporting business. Agencies were free to order services based upon considerations other than price. As such, contractors bore the risk they might only receive an unspecified amount of work, possibly none, dependent upon which of the multiple award schedule contractors user agencies elected to hire.

User agencies were not free to order services off-schedule, but the fact that they did so does not give rise to a remedy of either lost profits or consequential damages under the instant contracts. Appellants' effort to operate as a consortium of disappointed vendors claiming breach damages based upon a diversion of the potential universe of work divided proportionally among them must fail. The contracts were not collective endeavors -- each contractor separately and individually offered to provide services at different, independent prices. The structure of the individual contracts cannot be altered post hoc to bestow collective rights and remedies neither originally contemplated nor bargained for.

Findings of Fact

The Request for Proposals

On or about October 30, 1987, GSA issued RFP number FCGA-SS-SS205-N soliciting proposals for court reporting and transcription services contracts. The Statement of Work in the RFP specified:

> The Contractor shall furnish the necessary personnel, materials, and services and otherwise do all things necessary for and incidental to the verbatim reporting and transcription of conferences, courthouse and/or legal hearings, depositions, advisory board and committee meetings, arbitration hearings, personnel grievances and appeal hearings, and other administrative hearings for various Government agencies . . . .

Appeal File, Exhibit 1 at 24.

The RFP as amended sought proposals for transcribing/recording: by electronic device, stenomask, stenotype, and floppy disk. Appeal File, Exhibit 1 at 24. Offerors were required to be able to provide at least two of the above methods of transcribing/recording. Id.

The RFP contemplated multiple awards of what it termed "requirements contracts" under the federal supply schedule (FSS) for professional verbatim reporting and transcript services. Appeal File, Exhibit 1 at 46, 97. Paragraph M.2 of the solicitation provided:

M.2 MULTIPLE AWARDS (M-FSS-305-B) (APR 1984)

The Government may make multiple awards for services listed herein to those responsible offerors whose offers, conforming to the request for proposals, will be most advantages [sic] to the Government, taking into consideration the technical proposal and price for the services offered. Offerors are advised that agencies which contemplate placing orders for services contained in the contracts resulting from this request for proposal[s] will be instructed, except where precluded by administrative expense or urgency considerations, to consider equally those contract sources and other sources to assure that purchases of such services are made to the best advantage of the Government, taking into consideration the technical requirements, price, availability, delivery time and any other pertinent factors.

Appeal File, Exhibit 1 at 97.

Amendment Two to the solicitation clarified Paragraph M.2, Multiple Awards, by adding the following:

Where the Government makes multiple awards, ordering agencies will select a contractor in accordance with the provisions of this clause taking into consideration all factors mandated by the clause: technical requirements, price, availability, delivery time and any other pertinent factors such as capacity. Selections need not be based solely on price.

Respondent's Record Submission, Appendix, Exhibit 2, (Declaration of Doris L. Marsh (Marsh Declaration) (July 14, 1997)), Exhibit 12 at 2.

The solicitation did not advise offerors of any minimum or maximum number of contract awards which would result from the instant solicitation. Paragraph B.1 of the solicitation requested offerors to allow for a minimum of ninety days for acceptance of their offers. Appeal File, Exhibit 1 at 5.

The RFP and the resultant contracts included the Federal Acquisition Regulation (FAR) clause entitled "Requirements (52.216-21) (Apr. 1984)," which provided, in pertinent part:

c) Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule.

Appeal File, Exhibit 1 at 46 (emphasis added).

Amendment One to the RFP stated:

> The solicitation provides for the normal supply requirements of the Federal Government and will be used as a mandatory source for the articles or services listed herein by all departments and independent establishments, including wholly-owned Government corporations, in the executive branch (excluding the U.S. Postal Service, Department of Defense, National Labor Relations Board, and the Equal Employment Opportunity Commission) for deliver[y] within the 48 Contiguous States and Washington, D.C.

> . . . .

> TEMPORARY EXCEPTION TO MANDATORY USE PROVISION:

> Any agency designated above as a mandatory user shall be exempt from the mandatory use provision if prior to issuance of the GSA contract, the agency may have entered into a prior contract on its own with an ordering period conflicting with the GSA contract ordering period. Upon expiration of the agency's previous commitment, the GSA mandatory use provisions shall prevail without exception.

Appeal File, Exhibit 1, Amendment One at 3.

The RFP and the contracts contained standard FAR clauses applicable to service contracts, including "Warranty of Services (52.246-20) (Apr. 1984)" and "Termination for Convenience of the Government (Services) (52.249-4)(Apr. 1984)." Appeal File, Exhibit 1 at 49. The Termination for Convenience clause provided:

> The Contracting Officer, by written notice, may terminate this contract, in whole or in part, when it is in the Government's interest. If this contract is terminated, the Government shall be liable only for payment under the payment provisions of this contract for services rendered before the effective date of termination.

Id.

The RFP's Schedule of Items included line items for each of the forty-eight contiguous states, Alaska, Hawaii, and Puerto Rico, followed by sub-items covering Standard Metropolitan Statistical Areas (SMSAs) or Standard Consolidated Statistical Areas (SCSAs). Each offeror was requested to mark the geographical areas covered by its proposal. Offerors could propose to provide services for an entire state or to provide services within a designated sub-item. Appeal File, Exhibit 1 at 5.

Prior to the contracts at issue in these appeals, GSA's regional office in Ft. Worth, Texas, had awarded a single award schedule contract for court reporting services with one contractor serving as the exclusive source for all of designated

users' requirements in the geographic locale awarded. Marsh
Declaration    1, 6.    The predecessor contract was mandatory for
fourteen agencies. Id.  The RFP at issue was mandatory for over
fifty agencies. Id.    1.  The Department of Justice was not a
mandatory user of the predecessor contract but was a mandatory
user of the contracts that are the subject of these appeals.
Appeal File, Exhibit 18 at 2.    The agencies which were not
covered by the earlier contracts were not asked by GSA to
estimate their requirements prior to award of appellants'
contracts.  Stipulation (July 11, 1997)  39 (citing Appeal File,
Exhibit 18 at 5, General Services Administration Report to the
General Accounting Office (GSA Report) at 10  (Feb. 19, 1993)).
According to the contracting officer, "the estimated requirements
do not vary significantly in most  locations from the historical
data generated by the  prior, single  award schedule  contract."
Marsh Declaration    5.

     In  the  original  solicitation,  paragraph  B.2,  Estimated
Requirements,  provided  total  estimated  requirements  of  $3.5
million  for  the  forty-eight  contiguous  states,  Alaska,  Hawaii,
and  Puerto Rico.    Amendment B  to  the  solicitation  clarified
paragraph B.2 as follows:

               2.    ESTIMATED     REQUIREMENTS    (B-FSS-FCGA-998)
                     (APR 1984)

     This  Request  for   Proposal  includes  estimated
requirements  of  $3.5 million  for  the 48  contiguous
states,  Alaska,  Hawaii,  and  Puerto Rico  to  cover
Government  agencies included  in Section I,  Clause I-
FSS-102.   No guarantee  is given  that any  quantities
will be ordered.   Estimated requirements shown  on the
amended schedule of items are derived from requirements
of  agencies    that were  mandatory  users  under  the
previous GSA contract and do not encompass requirements
of  additional mandatory  users of  resultant contracts
from this RFP.  Resultant contracts from this RFP  will
be mandatory for the majority of Federal agencies.  The

prices paid under previous contracts can be obtained by
contacting the General Services Administration, Special
Programs Division (FCGA), Washington, DC 20406.

B.3  SCHEDULE OF ITEMS

     Estimated dollar  requirements as  clarified above
have been  added for each Special Item  Number.  Delete
pages  6 through 22  from the solicitation  and replace
with pages 1 through 18 of Attachment One.

Appeal File Exhibit 1 at 2 (emphasis added).

     The solicitation as amended contained eighteen pages listing
each geographic location nationwide  for which an  offeror could
propose  services  and  the  estimated  dollar  amount  of  the
requirements  for   each,  including   the  following   locations
pertinent to this case:

                              Special Item
Estimated

| SCSA # | Number | State/City | Reqmnts |
|--------|--------|------------|---------|
|        | 733-4   | California | $140,000 |
| 4480   | 733-4a  | Los Angeles/Lg. Bch. | 60,100 |
| 0360   | 733-4b  | Anaheim/Santa Ana | 5,000 |
| 6780   | 733-4c  | Riverside/S.. | 2,500 |
| 7360   | 733-4d  | San Francisco/Oklnd. | 34,800 |
| 7400   | 733-4e  | San Jose | 2,500 |
| 0680   | 733-4f  | Bakersfield | 0 |
| 2840   | 733-4g  | Fresno | 3,200 |
| 6920   | 733-4h  | Sacramento | 4,500 |
| 7320   | 733-4i  | San Diego | 10,600 |
| 7120   | 733-4j  | Monteray (sic) | 10,000 |
| 7480   | 733-4k  | Santa Barbara | 5,800 |

. . . .

Special Item

| Estimated SCSA # | Number | State/City | Reqmnts |
|------------------|--------|------------|---------|
| 8840 | 733-8 | District of Columbia | $100,000 |
|      |       | Maryland, Northern Virginia | |

. . . .

Special Item

| Estimated SCSA # | Number | State/City | Reqmnts |
|------------------|--------|------------|---------|
|      | 733-12   | Illinois | $33,500 |
| 1600 | 733-12a  | Chicago | 32,000 |
| 7880 | 733-12b  | Springfield | 0 |
| 6120 | 733-12c  | Peoria | 1,500 |

. . . .

Special Item

| Estimated SCSA # | Number | State/City | Reqmnts |
|------------------|--------|------------|---------|
|      | 733-29   | New Jersey | $5,000 |
| 5640 | 733-29a  | Newark | 5,000 |
| 3480 | 733-29b  | Trenton | 0 |

. . . .

Special Item

| Estimated SCSA # | Number | State/City | Reqmnts |
|------------------|--------|------------|---------|
|      | 733-31   | New York | $39,500 |
| 1280 | 733-31a  | Buffalo | 3,000 |
| 5600 | 733-31b  | New York City/N.J. | 27,500 |
| 0160 | 733-31c  | Albany | 3,500 |
| 5380 | 733-33d  | Hempstead | 2,500 |
| 8160 | 733-33e  | Syracuse | 3,000 |

Appeal File, Exhibit 1 at 2, 3, 5, 10, 11.

Offerors were required to propose per-page pricing for each method of transcribing/reporting offered for each geographical area to be covered. Appeal File, Exhibit 1 at 1-22. Offerors were to price three separate delivery times for each method of service offered: (1) daily, which required transcript delivery on the next day by not later than 12:00 noon; (2) regular, which required delivery before 5:00 p.m. (or prior to the close of business day for the agency) of the twentieth day following the hearing; and (3) expedited, which required delivery not later than 5:00 p.m. (or prior to the close of business day for the agency) of the sixth day following the end of the hearing. Id. The RFP also required offerors to state their proposed prices for additional copies and ancillary items such as computer disks. Id. Finally, offerors were obligated to provide transcripts to third parties on whatever basis they are ordered at the same price as the Government for additional copies. Id., Amendment One at 2.

Section F.6 of the RFP provided that the contractor would be paid a minimum of $100 per day for work ordered under its contract under certain listed conditions. Appeal File, Exhibit 1 at 40. Section F.7 of the RFP further provided that the contractor would be paid overtime in accordance with an established formula. Id. at 41.

Amendment One, Paragraph I.10, to the solicitation advised offerors as follows:

> Articles or services will be ordered from time to time in such quantities as may be needed to fill agency requirements determined in accordance with currently applicable supply procedures. Since it is impossible to pre-determine the precise quantities that will be required during the contract term, each contractor is obligated within the scope of this contract to deliver all articles and services ordered.

Appeal File, Exhibit 1, Amendment One at 3.

The RFP did not prohibit subcontracting work, and the Government recognized that appellants proposed to use subcontractors or independent contractors as well as their own full-time employees to fulfill schedule contract requirements. Appeal File, Exhibits 1, 25 at 5, 28 at 5; see Appellants' Record Supplement, Exhibit 1 (Affidavit of Robert Monick, President of Ace-Federal Reporters, Inc. (Ace-Federal) (July 9, 1997)) at 4 ("Ace-Federal would have had no difficulty performing the additional work, because the company had in place a network of subcontractors and independent contractors the company had used in the past when orders exceeded the company's in-house capabilities."); Appellants' Record Supplement, Exhibit 2, Affidavit of Ann Riley (Riley Affidavit) (July 10, 1997) 5 ("Companies in the court reporting business typically use a combination of employees, independent contractors, and subcontractors to perform any work that is ordered."); Appellants' Record Supplement, Exhibit 3, Affidavit of Sandra Tankoos (Tankoos Affidavit) (July 8, 1997) 10; Appellants'

Record Supplement, Exhibit 5, Affidavit of Marijke Elder (Elder Affidavit) (July 3, 1997) 9; Appellants' Record Supplement, Exhibit 7, Affidavit of Michael J. Tallman (July 3, 1997) 7; Appellants' Record Submission, Exhibit 9, Affidavit of Stephen Miller (July 8, 1997) 5, 6; Appellants' Record Supplement, Exhibit 15, Appellant Ace-Federal's Answers to Respondent Interrogatory No. 35. (In addition to some sixty-seven subcontractors and independent contractors, Ace-Federal also "had available to it all of the court reporters listed in the Court Reporters Source Book, published annually by the National Shorthand Reporters Association (now known as the National Court Reporters Association).".}

The Pre-Proposal Conference

    GSA conducted a pre-proposal conference on November 23, 1987. During the conference, representatives of Heritage Reporting Corporation (Heritage) asked a GSA representative, Ms. Trilma Davis, if mandatory users could "get out of using the Federal Supply Schedule." Stipulation 25. Ms. Davis responded that to be excused from the schedule an agency would first have to obtain a waiver, but that GSA had no intention of granting waivers and that she had input into GSA's decisionmaking when responding to requests for waivers. Id.; Appeal File, Exhibit 17 at 12.

Proposals

    The parties stipulated that each of the appellants submitted a proposal in response to the RFP with the expectation that, by receiving award of a schedule contract, each would be able to develop and maintain ongoing relationships with mandatory user federal agencies for which they had not previously worked. Stipulation 43 (citing Appellants' Record Supplement, Exhibits 1, 2, 4, 6, 8, 10).

Award

    GSA awarded a total of ten multiple award contracts covering various geographic regions as a result of the offers received in response to the RFP. Appeal File, Exhibit 3. Alaska, Hawaii, and Puerto Rico were non-mandatory requirements. Id.

    At the time of award, each of the appellants was an established business with a history of performing government contracts; each had one or more established offices in its respective areas of award, and each had made capital investments and developed an organization and structure that permitted it to accommodate fluctuating workloads through the use of piece-work or payment-by-the-page labor. Stipulation 46. For example, as of 1988, Ace-Federal had been in business for twenty-seven years and employed about eighty-four people. Id. The company's 1988 gross receipts approached $3,000,000, and it had invested in equipment necessary to conduct its business, including computer equipment, copiers, stenotype machines, translation systems to produce transcripts, recording equipment, and delivery vehicles, valued in excess of $600,000. Id. Further, Ace-Federal had developed a network of trained subcontractors and independent contractors to whom it could assign work on a piece-work or per-

page basis.  Id.

By letter dated August 24, 1988, GSA advised Ace-Federal that it had been awarded contract number GS-OOF-03036 for reporting and transcription services for SMSA 840, special item number (SIN) 733-8, for the District of Columbia, Maryland, and Northern Virginia.  The letter further advised Ace-Federal: "Multiple awards will be made for SIN 733-8, and your contract will be one of several for the area."  Appellants' Supplemental Appeal File, Exhibit 9.  Ace-Federal's contract ran from August 1, 1988, through July 31, 1989, with two one-year options. Id.

GSA awarded contract number GS-OOF-03035 to Ann Riley & Associates, Ltd. (Ann Riley) for the same term, with two one-year options.  The contract covered court reporting and transcription services for the same District of Columbia metropolitan area. Stipulation 48.  In its notification of award to Ann Riley, GSA stated: "Multiple awards will be made for SIN 733-8 and your contract will be one of several for the area."  Appeal File, Exhibit 29.

By letter dated August 12, 1988, GSA advised Miller Reporting Co., Inc. (Miller) that it had received a multiple award schedule contract for SIN 733-8 and that its contract would "be one of several for the area."  Appeal File, Exhibit 26.  The term of Miller's contract, number GS-OOF-03034, ran from August 1, 1988, through July 31, 1989, with two one-year options and also covered court reporting and transcription services for the District of Columbia metropolitan area. Id.; Stipulation 52.  In this contract, the Government expressly reserved the right to make additional awards under the RFP.  Appeal File, Exhibit 26 at 5.

GSA awarded contract number GS-OOF-03039 to ARTI Recording, Inc. (ARTI), for the term August 19, 1988, through July 31, 1989, with two one-year options.  The contract covered court reporting and transcription services for the New York City metropolitan area, including portions of New Jersey.  The New York portion of this area included Bronx, Kings, New York, Putnam, Queens, Richmond, Rockland, and Westchester Counties; the New Jersey portion included only Bergen County.  Stipulation 49.

By letter dated September 30, 1988, GSA advised California Shorthand Reporting (CSR) that it had been awarded contract number GS-OOF-03045 and that multiple awards had been made for some areas.[foot #] 3    The term of CSR's contract ran from September 26, 1988, through July 31, 1989, with two one-year options, and covered court reporting and transcription services for California (except Los Angeles County) and Hawaii. Stipulation 50.  At the time of award, GSA's contracting officer advised CSR's president that multiple awards had been made in California and that there were two other contractors which received awards in that state.  Appeal File, Exhibit 35 (Letter from Walter Young to Marijke Elder (Nov. 23, 1987)).  CSR acknowledged that it was "very much aware that there [were] other schedule contractors in the State of California . . . ."  Id. (Letter from Marijke Elder to Walter Young (Dec. 13, 1987)).

By letter dated September 23, 1988, GSA notified Executive Court Reporters (Executive) that it had received a multiple award contract for reporting and transcription services covering special item numbers 733-4a, 8, 12a, 31b, and 49. The notification further advised Executive: "Multiple awards will be

---------- FOOTNOTE BEGINS ---------

[foot #] 3 CSR's contract covered a nonmandatory area, Hawaii, and CSR was the only contractor which received an award for this state. Appeal File, Exhibit 3.

---------- FOOTNOTE ENDS -----------

made for some areas." Appeal File, Exhibit 32.[foot #] 4 Executive's contract, number GS-OOF-03043, ran for the term September 23, 1988, through July 31, 1989, with two one-year options. The contract covered court reporting and transcription services in Alaska, Los Angeles County in California, the New York/New Jersey area, the District of Columbia, and the Chicago metropolitan area. The contract defined the Chicago metropolitan area to include Cook, Dupage, Kane, Lake, McHenry, and Will Counties. Id.

GSA awarded contract number GS-OOF-03033 to Heritage, a company which is not an appellant in this case, for the term of August 1, 1988, through July 31, 1989, with two one-year options. The contract covered all types of court reporting and transcription services for the forty-eight contiguous states and the District of Columbia. Appeal File, Exhibit 3.[foot #] 5 In thirty-nine of the contiguous states, Heritage was the sole contractor for mandatory users and in the remaining contiguous states and in Washington, D.C., Heritage was one of several contractors. Id.[foot #] 6

---------- FOOTNOTE BEGINS ---------

[foot #] 4 Executive's contract covered Alaska, which was a non-mandatory area, and according to the schedule, Executive was the only contractor which received an award for this state. Appeal File, Exhibit 3.

[foot #] 5 Heritage filed its own appeal, and the parties settled that matter. Heritage Reporting Corp. v. General

Services Administration, GSBCA 10396 (Aug. 22, 1992).

[foot #] 6 Specifically, Heritage was awarded a contract for SIN 733-4 covering any area in California, including Los Angeles,

Long Beach, and all other California metropolitan areas. Executive also was awarded a contract for Los Angeles and Long Beach, and CSR was also awarded a contract for SINs 733-4(b) through (j), covering the Anaheim, Riverside, San Francisco, San Jose, Sacramento, San Diego, and Salinas areas. Appeal File,

Exhibit 3.    Similarly, Heritage was awarded a contract for any
area in the states of Illinois and New York, including the areas
also awarded to Executive in Illinois, and to ARTI and Executive
in New York. Id.

In its decision partially adopting the allocation of
liability among various agencies resulting from the settlement of
Heritage's appeal, the General Accounting Office recognized that
Heritage's award was a multiple award schedule (MAS) contract and
stated: "A MAS consists of contracts with more than one supplier
for services at varying prices for delivery within the same
geographic area. In this case, Heritage was listed as the sole
contractor for thirty-nine of the forty-eight contiguous states;
in the District of Columbia and the remaining contiguous states,
Heritage was one of several contractors listed." Heritage

Reporting Corp., B-252754, at 6 n.1 (Oct. 6, 1994).

----------- FOOTNOTE ENDS -----------

The contracting officer attested that a mandatory user under the
schedule contract "is obligated to use the contractors that we
have awarded." Appellants' Record Supplement, Exhibit 22,
Deposition of Doris L. Marsh (Heritage Reporting Corp.,
GSBCA 10396) at 10 (emphasis added).

GSA awarded contract number GS-OOF-03040 to a company which
is not an appellant in this case, Argie Reporting Service
(Argie), for the term of August 19, 1988, through July 31, 1989,
with two one-year options. The contract covered court reporting
and transcription services in Illinois, Nebraska, the Des Moines
and Cedar Rapids metropolitan areas in Iowa, the Kansas City,
Topeka, and Wichita metropolitan areas in Kansas, and the
Kansas City, St. Louis, and Springfield metropolitan areas in
Missouri. Stipulation 57.

GSA awarded contract number GS-OOF-03044 to another entity
which is not an appellant in this case, Arlington Typing and
Mailing (Arlington), for the term of September 26, 1988, through
July 31, 1989, with two one-year options. Stipulation 58. The
contract covered court reporting and transcription services in
Massachusetts. Id.

GSA's Responsibility for the Schedule Contracts

Under the multiple award schedule, individual agencies were
to place orders directly with contractors, but GSA had
supervisory responsibility with respect to the schedule
contracts. Appeal File, Exhibit 22 at 2; 48 CFR 8.405 (1988).
The parties stipulated that:

GSA exercises supervisory authority for the
schedule contracts under 40 U.S.C. 481, which
provides that the Administrator of General Services
shall prescribe policies and methods of procurement and
supply of personal property and nonpersonal services. .

. . Pursuant to 41 U.S.C. 252, the civilian portion
of the executive branch is required to make purchases
and contracts for property and services in accordance
with the provisions of this title and implementing
regulations of the Administrator. . . . The
implementing regulations are the Federal Property
Management Regulations (FPMR), found at 41 C.F.R. 101
et seq. 41 C.F.R. 101-26.401 states, in part, that
"[a]ll executive agencies shall procure needed articles
and services from Federal Supply Schedule contracts in
accordance with the provisions of the appropriate
Federal Supply Schedule." The burden of complying with
mandatory supply schedules is on the user agencies
pursuant to 41 C.F.R. 101-26.401(a) which provides
that "prior to initiating procurement directly from
commercial sources, agencies shall determine whether
the required commodities and services or similar
commodities and services serving the required

functional end-use purpose are available from a Federal
Supply Schedule." Under the FAR, the FPMR, and
existing case law, GSA has been recognized as having
overall supervisory responsibility for the GSA schedule
contracts.

Stipulation 36 (citing 48 CFR 38.00 et seq.; 41 CFR
101-26.491 et seq.; Digital Equipment Corporation, GSBCA 9618,
90-2 BCA 22,808; GSA Report at 2-3).

Contract Terms

     Each contract contained all of the above-quoted solicitation
terms, as well as the awardee's schedule of items, which listed
each geographic area, pricing, and the type of court reporting
services the contractor offered. Amendments One and Two to the
RFP were incorporated into the contracts.

     Appellants and Heritage, Argie, and Arlington were listed in
the October 31, 1988, FSS (OOSS 7301, Basic Ed., "Professional
Verbatim Reporting and Transcript Services," Industrial Group
733, IG Class 7339). Appeal File, Exhibit 3.

     The parties stipulated that "mandatory user agencies had no
authority to amend or terminate, in whole or in part, appellants'
schedule contracts for the convenience of the government. Only
GSA's schedule contracting officer had the authority to amend or
terminate appellants' schedule contracts for the convenience of
the government." Stipulation 70 (citing FAR 8.405-6(a)).

Performance

     Upon award of their schedule contracts, appellants began
contacting mandatory user agencies directly to inform the
agencies that mandatory schedule contracts had been awarded and
that the companies were ready to accept orders. Stipulation 65
(citing Elder Affidavit at 5, 6); Tankoos Affidavit at 5,
6.

     GSA was responsible for printing and distributing to user
agencies a catalogue of the supplies or services available under

the contract.  Stipulation  63 (citing  Appeal File, Exhibit 1,
Amendment One; GSA Report at 10, n.7).  Although the terms of the
contract were to  commence as early as August 1,  1988, or in two
cases  in September 1988, the  catalogue for this  multiple award
schedule was not  distributed to  the user  agencies until
October 31, 1988.  Marsh Declaration   7.

During the  terms of  the schedule  contracts, GSA  received
several notifications  from Heritage that mandatory users subject
to  the FSS were  issuing solicitations,  awarding contracts, and
otherwise  procuring court  reporting and  transcription services
off-schedule  in violation  of the contracts.  Stipulation     75
(citing Appeal  File, Exhibits 10, 11,  12, 14, 17).  On various
occasions,  GSA contacted  mandatory user  agencies  to  address
issues of noncompliance with schedule requirements.   Stipulation
 76.


The  contracting  officer described  performance  under this
schedule contract as follows:

> Most schedule contracts  require very little  attention
> on the  part of GSA  after award; agencies  place their
> orders,  the contractor  performs  and is  subsequently
> paid by the agency.  The  schedule contracts for IG-733
> [Industrial    Group    733    Transcripts    Stenographic
> Reporting  Services] were  the exception to this general
> rule.  In  addition to  Ms.  Benson's complaints  that
> agencies which  should have  been mandatory users  were
> going  outside of  the  contracts to  satisfy their
> requirements,  there were  complaints  from schedule
> contractors  that  other  schedule  contractors were
> intruding on their territory, and there were complaints
> from the customer  agencies that on  numerous occasions
> court reporters would  not show up when scheduled, would
> be  late in producing  a transcript, would  produce low
> quality  transcripts, and  that  the contract rates were
> significantly higher than  the agency had been  used to
> paying,  and that the quality of service received under
> the contract  did not  justify the price  differential.
> The issue  of price  was an  ongoing  dispute with  our
> federal  agency  customers, and  there  were many  more
> requests for waivers from mandatory use than was normal
> for  a  schedule  of this  nature.  After  much
> deliberation,  my office  concluded that  we could  not
> solve  these problems  by  tinkering with  the contract
> terms and conditions, and that  it would be in the best
> interest of the  government to not exercise  the option
> period on these  contracts and cancel the  schedule for
> IG-733.

Marsh Declaration   9.

Each appellant received delivery  orders from mandatory user
agencies under  its schedule  contract.  Stipulation   66.   CSR
received  a total of  ******* in  revenue under  its  contract;
Executive,  *******; ARTI,  ******; Ace-Federal, ******; Ann
Riley,  *******;  and  Miller, ********.   Heritage received
**********.  Stipulation, Exhibit 2.

By letters dated April 21, 1989, GSA notified each appellant of GSA's intent to exercise the option of extending each contract for twelve months, for the period August 1, 1989, through July 31, 1990, but later reversed its position and notified each appellant that it would not exercise the option and that "[a]gencies will be advised that they may procure this service on an open market basis after July 31, 1989." Appeal File, Exhibits 13, 15, 27, 30, 33, 36. Twelve agencies formally requested waivers from mandatory use of the schedule contract. Appellants' Record Supplement, Exhibit 20, Respondent's Answers to Appellant's Interrogatories in Heritage Reporting Corp. v. General Services Administration, GSBCA10396 at 5. GSA granted waivers to the Federal Communications Commission, the Federal Energy Regulatory Commission for the Office of Administrative Law Judges only, and the Department of Labor, Branch of Hearings and Review. Id. at 6.

Appellants' contracts remained operative through the scheduled expiration on July 31, 1989, and appellants performed work under their contracts. Stipulation 69.

Mandatory Users Who Procured Off-Schedule Services

The parties stipulated that during the contracts' periods some seventy-one federal agencies or components contracted off-schedule for court reporting and transcription services totaling 3,732,605 original pages. Stipulation 97-98.

On August 28, 1992, the Board granted a joint motion of the parties in the Heritage appeal to enter a stipulated judgment in the amount of $7,254,525.60, based upon their settlement,[foot #] 7 which was subsequently allocated

----------- FOOTNOTE BEGINS ---------

[foot #] 7 The Board did not adjudicate the merits of the Heritage appeal, and did not itself make any findings of fact or conclusions of law. Rather, as is the common practice when the parties settle their claims independent of Board process, the Board awarded the parties' stipulated settlement amount to facilitate payment from the Government's permanent indefinite judgment fund. As such, the settlement in Heritage has no collateral estoppel effect on these claims. E.g., United States v. International Building Co., 345 U.S. 502 (1953) ("Unless we can say that [consent judgments] were an adjudication of the merits, the doctrine of estoppel by judgment would serve an unjust cause: it would become a device by which a decision not shown to be on the merits would forever foreclose inquiry into the merits."); Red Lake Band v. United States, 607 F.2d 930, 934 (Ct. Cl. 1979) ("As a general rule . . . an issue is not 'actually litigated' for purposes of collateral estoppel unless the parties to the stipulation manifest an intent to be bound in a subsequent litigation . . . . Moreover, the intention to be so bound should not be readily inferred."); see generally, Charles

Wright, Arthur Miller, and Edward Cooper, Federal Practice and

Procedure   4443 (1981 & Supp. 1998).   In the Heritage

settlement, the Government did not indicate an intent to admit
liability under any other schedule contracts. Appellant's Record
Supplement, Exhibit 26. Importantly, the merits of the Heritage
case were not "actually litigated," and the issue on which our
decision rests -- the nature of the contracts -- was never
(continued...)

---------- FOOTNOTE ENDS ----------

among   enumerated   mandatory   user   agencies   without   Board
involvement.[foot #] 8

Facts Pertinent to Appellants' Claimed Lost Profits

    The parties stipulated that calculation of the profit rate
which would have been earned by appellants for the original pages
which were ordered off-schedule is determined by examining
appellants' marginal cost of undertaking additional work beyond
the work which was actually received by appellants. Stipulation
117. Payment to labor in the court reporting and transcription
industry is predominantly based upon piece rate or per-page
compensation. Id.   If the pages ordered off-schedule by
mandatory users had been ordered under the schedule contracts,
appellants would have met the increased demand by providing
additional piece-work to employees and by retaining additional
independent contractors and subcontractors. Id. The ability to
handle sharp fluctuations in demand through the use of employees,
independent contractors, and subcontractors operating on a piece-
rate or per-page basis is a characteristic of the court reporting
industry. Id.   118.

    The total number of pages ordered off-schedule by user
agencies is 3,741,487.   Stipulation   111.   The parties
stipulated that based upon appellants' share of the market,
appellants' share of the original pages ordered off-schedule was
1,381,731.   Id.   According to the parties' stipulation,
appellants' share of original pages ordered off-schedule by
mandatory schedule users (1,381,731 pages) times appellants'

---------- FOOTNOTE BEGINS ---------

    [foot #] 7 (...continued)
raised. Moreover, Heritage stood in a different posture than any
of the appellants here, since it was the sole and exclusive
schedule contractor in many locations.

    [foot #] 8 In a proceeding before the General Accounting
Office (GAO), the Department of Justice, the Securities and
Exchange Commission (SEC), and the Federal Maritime Commission
(FMC) challenged the amount of damages allocated to each of their
agencies in connection with the settlement of Heritage's appeal.
Stipulation   100.   GAO denied the Department of Justice's
contention, but agreed that the SEC was not required to reimburse
the judgment fund for the amount attributable to its off-schedule

purchases. GAO found that FMC qualified for a partial exception from the FSS' mandatory use provisions and ordered that its contribution to the $7,254,525.60 judgment be reduced by the proportionate value of 253 pages. Id. (citing Heritage Reporting Corp., B-252754 (Oct. 6, 1994)). Appellants in this case have not sought compensation for the 253 FMC pages. When the adjustment in the FMC's original page count recommended by the GAO is made, the number of original pages acquired off-schedule by these agencies becomes 3,732,352.

---------- FOOTNOTE ENDS ----------

average original page price ($4.393) yields $6,069,944.28 as the amount of lost revenue from the sale of original pages. Stipulation 116.[foot #] 9

    Appellants' average cost per original page for performing additional assignments is $2.55. Stipulation 119. The parties stipulated that the average marginal profit rate that would have been achieved by appellants if additional work had been ordered under the schedule rather than off-schedule by mandatory users is 41.91%. Id. 120. According to the parties' stipulation, appellants' lost revenue for original pages ordered off-schedule ($6,069,944.28) times appellants' profit rate for additional work ordered under the contract yields $2,543,913.65 as appellants' lost profits for original pages ordered off-schedule by mandatory users. Id. 121.

    According to the stipulation, the off-schedule order of original transcript pages by mandatory users deprived appellants of the opportunity to sell copies of those originals. Stipulation 122. The parties agree that applying appellants' market share to the off-schedule original pages which were eligible for copy sales results in 947,503 original transcript pages eligible for copy sales which were lost to appellants. Id. 124. The parties further stipulated that the average number of lost copy sales per eligible original page is 2.33, and that the number of off-schedule original transcript pages eligible for copy sales (947,503) times the average number of lost copy sales per original transcript page (2.33) yields 2,207,682 as the number of copy page sales lost to appellants. Id. 125, 126.

    The parties agree that appellants' weighted average price per copy page was $1.10, and that the number of copy page sales lost to appellants (2,207,682) times appellants' weighted average price per copy page (41.10) yields $2,428,450.20 as the amount of lost copy sale revenue to appellants. Stipulations 127, 128.

    The parties stipulated that "[t]he cost of producing copy pages for sales is nominal. Accordingly, the profit rate for copy sales is set at 100 percent . . . ." Stipulation 129. Appellants claimed direct lost profits totaling $4,972,363.85, consisting of $2,543,913.65 in lost profits from sales of original transcript pages and $2,428,450.20 from sales of copy pages. Id. 130.

----------- FOOTNOTE BEGINS ---------

[foot #] 9 The Federal Supply Schedule for court reporting and transcription services required each offeror to bid basic per-page prices for each category of services. The contracts also provided that the amount paid for individual orders would be increased for additional charges for such items as exhibits or inserts, minimum appearance fees, delivery, overtime, computer disks, and other special services. Stipulation 113.

----------- FOOTNOTE ENDS -----------


Discussion

I. Does FASA's Statute of Limitations Bar Any of Appellants' Claims?

The Federal Acquisition Streamlining Act of 1994 (FASA) amended the Contract Disputes Act of 1978 (CDA) by imposing a limitation on the submission of contractor and Government claims -- "within 6 years after the accrual of the claim." 41 U.S.C. 605(a) (1994); Pub. L. No. 103-355, 2351(a), 108 Stat. 3243, 3322 (1994). FASA was enacted on October 13, 1994. Respondent contends that the six-year limitation on claims took effect on that date. Ace's claim was submitted on February 13, 1995, and Ann Riley's, ARTI's, CSR's, Executive's, and Miller's on September 28, 1995. Because appellants' claims were all submitted after FASA's enactment, and because the contracts ran from August 1, 1988 (or in the case of Executive and CSR, September 23 and 26, 1988, respectively) through July 31, 1989, respondent argues that the first half of Ace Federal's claim should be excluded, and the claims of the remaining appellants should be excluded in their entirety. Respondent's Reply Brief at 4. We disagree.

Section 10001 of FASA sets forth the effective dates and applicability of its various statutory amendments. Section 10001(c) provides that certain enumerated amendments apply as of October 13, 1994. Section 2351, establishing the six-year time limitation for the submittal of claims, is not one of the enumerated amendments.

Section 10001(b) provides that other amendments enacted by FASA apply as of the date specified in final implementing regulations. Specifically, Section 10001(b) states:

(1) An amendment made by this Act shall apply, in the manner prescribed in the final regulations promulgated pursuant to section 10002 to implement such amendment, with respect to any solicitation that is issued, any unsolicited proposal that is received, and any contract entered into pursuant to such a solicitation or proposal on or after the date described in paragraph (3).

(2) An amendment made by this Act shall also apply,

to the extent and in the manner prescribed in the final
regulations promulgated pursuant to section 10002 to
implement such amendment, with respect to any matter
related to--

     (A) a contract that is in effect on the date
described in paragraph (3);

     (B) an offer under consideration on the date
described in paragraph (3); or

     (C) any other proceeding or action that is
ongoing on the date described in paragraph (3).

     (3) The date referred to in paragraphs (1) and (2)
is the date specified in such final regulations. The
date so specified shall be October 1, 1995, or any
earlier date that is not within 30 days after the date
on which such final regulations are published.

Section 10002 of FASA, entitled "Implementing Regulations,"
includes these paragraphs:

     (a) Proposed Revisions - Proposed revisions to the
Federal Acquisition Regulation and such other proposed
regulations (or revisions to existing regulations) as
may be necessary to implement this Act shall be
published in the Federal Register.

     . . . .

     (f) Savings Provision - Nothing in this Act shall be
construed to affect the validity of any actions taken .
. . before the date specified in the regulations
pursuant to section 10001(b)(3) except to the extent
and in the manner prescribed in such regulations.

The implementing regulation referenced in the statute,

FAR 33.206(a), provides:

Initiation of a claim.

     (a)    Contractor claims shall be submitted, in
writing, to the contracting officer for a decision
within 6 years after accrual of a claim, unless the
contracting parties agree to a shorter time period.
This 6-year time period does not apply to contracts
awarded prior to October 1, 1995. . . .

48 CFR 33.206(a) (1997) (emphasis added).

Respondent contends that this regulation is both superfluous
and contrary to the express provisions of FASA. Respondent's
Record Submission at 25. The regulation is hardly superfluous
when the statute expressly provides that certain of its
amendments shall apply in the manner prescribed in the
implementing regulations.

Respondent also contends that the Board should "disregard"

the amendments to FAR 33.206(a) on the ground that those
amendments are contrary to the terms of FASA. Respondent's
Record Submission at 28. Respondent submits that FASA only
authorized regulations necessary to implement the Act and that
FAR 33.206(a) was not "necessary" because of the statement in
FASA Section 2351(a) permitting contractually agreed-upon earlier
statutes of limitations to stand in spite of the Act. Again,
regulations were expressly contemplated by the statute to
establish the effective dates of certain of its provisions.

Other than its interpretation of "necessary," respondent
cites no provision of the regulation which is contrary to FASA.
In fact, the regulation writers took their cue from the statute
and established a bright line rule that the six-year period shall
not apply to contracts awarded prior to October 1, 1995. Thus,
the regulation is consistent with the limited discretion granted
to the regulation writers by the statute on its face.

This regulation is also consistent with precedent addressing
the effective date for the FASA amendments. See, e.g., OAO Corp.
v. Johnson, 49 F.3d 721, 725 (Fed. Cir. 1995) (FASA amendments
not effective until "the date provided in the final regulations
implementing those amendments, or on October 1, 1995, whichever
is earlier"); Ungermann-Bass Networks, Inc. v. Department of the
Navy, GSBCA 13005-C(12977-P), 95-1 BCA 27,344 at 136,269 (1994)
(FASA takes effect on the earlier of October 1, 1995, or such
date as may be prescribed in regulation); Motorola, Inc.,
ASBCA 48841, 96-2 BCA 28,465, at 142,172 (FASA authorizes a
regulation excluding contracts awarded prior to October 1, 1995).

II. Did the Agencies' Failure to Order Court Reporting Services
from Appellants Breach The Multiple Award Schedule Contracts
and Entitle Appellants to Recover Lost Profits?

It is undisputed that mandatory user agencies ordered court
reporting and transcription services from parties other than
schedule contract awardees. Appellants claim this was a breach
of their schedule contracts and collectively claim entitlement to
lost profits in the amount of $4,972,363.85.

In determining whether there was a compensable breach, we
must first examine the terms of the contracts. In their
stipulations, the parties characterize their multiple award
schedule contracts as requirements contracts, but a reading of
each of the contracts as a whole does not support this
characterization. See Stipulations 19, 47-52.

The determination of the type of contract the parties have
entered into is generally a matter of law. E.g., Maintenance
Engineers, Inc. v. United States, 749 F.2d 724, 726 n.3. (Fed.
Cir. 1984) (citing 41 U.S.C. 609(b) (1982)); Torncello v.
United States, 681 F.2d 756, 760 (Ct. Cl. 1982); see also Crown
Laundry & Drycleaners, Inc. v. United States, 29 Cl. Ct. 506
(1993). The stipulations of the parties characterizing
appellants' contracts as requirements contracts are therefore not
binding on a reviewing tribunal. E.g., Al-Kurdi v.
United States, 16 Cl. Ct. 660 (1989); Bromley Contracting Co. v.
United States, 14 Cl. Ct. 69, 74 (1987), aff'd, 861 F.2d 729
(Fed. Cir. 1988). Nor is the tribunal bound by the name or label

given to a contract in the contract itself. Crown Laundry, 29 Cl. Ct. at 515 (citing A-Transport Northwest Co. v. United States, 27 Cl. Ct. 206, 214 (1992) aff'd, 36 F.3d 1576 (Fed. Cir. 1993)); Ralph Construction, Inc. v. United States, 4 Cl. Ct. 727, 731 (1984); Mason v. United States, 615 F.2d 1343, 1346 (Ct. Cl. 1980).[foot #] 10

Further, although the contracts contain the standard Requirements clause, which purports to bind the Government to order "all" its requirements from each awardee, that clause is trumped by other contract provisions. The Requirements clause itself is qualified -- it expressly states "Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule . . . ." The contract "otherwise provides" that this contract neither binds the Government to purchase all of its requirements from any one vendor, nor obligates the Government to purchase any minimum amount from any one vendor. The schedule itself, as well as the cover letters transmitting the contracts, advised vendors that multiple awards were made for all of the mandatory geographic locales at issue.[foot #] 11 Clause M.2, Multiple Awards, made clear that ordering agencies could select any contractor listed on the schedule and that agencies were to consider schedule contractors equally in determining which source was most advantageous to the Government. Clause B.2, Estimated Requirements, expressly provided that "no guarantee is given that any quantities will be ordered."

It is well established that a requirements contract is formed when the seller has the exclusive right and legal obligation to fill all of the buyer's needs for the goods or services described in the contract. Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1305 (Fed. Cir. 1998); Ralph Construction, 4 Cl. Ct. at 731; Mason, 615 F.2d at 1346; Media Press, Inc. v. United States, 215 Ct. Cl. 985, 986 (1977); Hemet Valley Flying Service v. United States, 7 Cl. Ct. 512, 515 (1985).

In Media Press, the Court of Claims concluded that an analogous multiple-award printing contract let by the Government

----------- FOOTNOTE BEGINS ---------

[foot #] 10 As the Court of Appeals for the Federal Circuit has reasoned: "Case law warns that reliance on labels and contract provisions is most risky. In any event the determination of the type of contract the parties entered into is a matter of law and is not controlled by any label or contract provision." Maintenance Engineers, Inc., 749 F.2d at 726 n.5.

[foot #] 11 In the mandatory geographic areas at issue here, there were at least two vendors -- one or more appellants, and Heritage, which held a nationwide contract covering all forty-eight contiguous states and all areas within those states. See

Appeal File, Exhibits 3, 31.

----------- FOOTNOTE ENDS -----------

Printing Office (GPO) was not a requirements contract. Under the terms of that contract, GPO was obligated to first ask the low-priced contractor to determine whether or not it could accept an order; that contractor could only decline if it was unable to meet a shipping schedule. If this occurred, the Government would contact the next low bidder and so on until the job was accepted. The contract provided three exceptions to this method of placing work. Plaintiff claimed that the Government had wrongly invoked one of these exceptions such that all orders were not offered to plaintiff initially. Plaintiff sought lost profits, claiming that the GPO contract was a requirements contract and that each failure on the part of GPO to offer it a printing job constituted a breach. The court held that the contract was not a requirements contract, reasoning:

> A requirements contract has been defined as a contract in which the purchaser agrees to buy all of its needs of a specified material from a particular supplier, and the supplier agrees, in turn, to fill all of the purchaser's needs during the period of the contract. Inland Container, Inc. v. United States, 206 Ct. Cl. 478, 482-83, 512 F.2d 1073 (1975); Ready Mix Concrete Co. Ltd. v. United States, 141 Ct. Cl. 168, 169, 158 F.Supp. 571 (1958); Gemsco, Inc. v. United States, 115 Ct. Cl. 209 (1950); Johnstown Coal and Coke Co. v. United States, 66 Ct. Cl. 616 (1929). Neither party to the instant contract is so tightly and exclusively bound to the other so as to give rise to a requirements type arrangement. The Government retained the right to purchase some of its needs from other printers. Similarly, plaintiff was empowered to refuse orders if it was unable to meet a delivery schedule. We conclude, therefore, that such consideration is insufficient to support plaintiff's construction of the contract as a requirements contract. See, Goldwasser v. United States, 163 Ct. Cl. 450, 454-55, 325 F.2d 722, 724 (1963).

Media Press, 215 Ct. Cl. at 986.

Similarly, in the instant case, Government agencies retained the right to purchase their needs from any of the schedule contractors, and were not bound to use any particular awardee.[foot #] 12     No individual appellant was guaranteed any business, and user agencies were free to utilize any schedule contractor without regard to price. There could have been any number of vendors, and there were two or more vendors in all areas at issue -- none of which was guaranteed the exclusive right to provide all the court reporting services for a

----------- FOOTNOTE BEGINS ---------

[foot #] 12 Although appellants were not free to turn away work, they were free to subcontract it out to other reporters who were not themselves listed on the schedule.

----------- FOOTNOTE ENDS -----------

given      geographic      area.[foot #] 13         As      such,
appellants' schedule contracts are not requirements contracts.

        We  recognize  that  in  an  earlier  decision,    Locke  v.
United States, 283 F.2d 521 (Ct. Cl. 1965), the Court of Claims
suggested in dicta that  a  multiple award federal supply contract
for  typewriter  repair  and  reconditioning was  a  requirements
contract  and  ruled  that  a  contractor whose  schedule had  been
improperly terminated  for default  could  be  entitled  to  breach
damages.    Given  the clarification in subsequent precedent, Media
Press, we conclude that  Locke neither warrants characterizing the
instant  schedule   contract   as  a  requirements   contract  nor
justifies an award of lost profits here.

        Further, Locke  is distinguishable from the instant appeals.
In Locke, plaintiff was removed from the  schedule altogether due
to an improper termination of its contract and had no possibility
whatsoever of performing work, thus prompting the Court of Claims
to  conclude  that  the  termination  deprived  it   of  a  lost
opportunity  which  had  "value."    In  the  instant  case,  all
appellants continued to obtain work throughout the course of the
contract, but  mandatory users,  for unknown  reasons, failed  to
o r d e r   s o m e   s e r v i c e s   f r o m   s c h e d u l e
contractors.[foot #] 14        No     appellant    demonstrated
that  it would  have  received business  from a  particular agency
which  utilized  an  off-schedule  vendor.    Unlike  the  court  in
Locke, we  cannot conclude  that any  particular vendor  received
less  "value"  than  what  it  bargained for  by  virtue  of  the
mandatory user  agencies' ordering off-schedule services -- since

                ----------- FOOTNOTE BEGINS ---------

        [foot #] 13 Regulations in effect at the time describing the
multiple award schedule confirm that more than one contractor was
contemplated:

        (a)  Multiple-Award  Federal   Supply  Schedules  cover
        contracts   made  with   more   than  one  supplier  for

        comparable items at either the same or different prices
        for delivery to the same geographical area.

41  CFR  101-26.408-1  (1981);  accord,  48  CFR  8.403-2  (1988)

("Multiple  award  schedules  cover   contracts  made  with  more  than
one  supplier  for  comparable supplies  and  services.  Contracts
are awarded to suppliers of the same  generic types of items  at
varying prices for delivery within  the same geographic area. . .
.").

        [foot #] 14 Appellants have not alleged or demonstrated that
either GSA, which administered  the schedule, or the  user agencies
that ordered off-schedule acted in bad faith.  Appellants elected
to present their  cases on the record without a hearing, and that
record does  not  reveal why in  every instance  mandatory  user
agencies  elected  to  procure  court  reporting  services  off-
schedule.

----------- FOOTNOTE ENDS -----------

all appellants received  more work than estimated,  and no vendor had been guaranteed any business.

      Moreover,  the  Media  Press  court's  definition  of  a requirements contract has been consistently applied in subsequent cases.  As the  Federal  Circuit  recently recognized  in Coyle's Pest Control, Inc.,  154 F.3d at 1305, "an essential element of a requirements contract is the promise by the buyer to purchase the subject  matter  of  the contract  exclusively  from  the  seller," quoting Modern Systems Technology v. United States, 979 F.2d 200, 205  (Fed. Cir.  1992).   Similarly,  the court in  Torncello  v. United States, 681 F.2d 756, 768-69 (Ct. Cl. 1982), reasoned:

      [I]t is the very essence of a requirements contract . .
      . that the buyer agree to turn to  the supplier for all
      of its needs.   If there  is not a  commitment for  all
      needs,  then  the  relation is  not  different  from an
      indefinite   quantities   contract   with  no   required
      minimum, the  very type  of relation  that the  Supreme
      Court  held in Willard, Sutherland  &  Co. [v.  United
      States, 262 U.S. 489 (1923)], could not be a contract.

Importantly,  the  Federal  Circuit  in Coyle's Pest  Control clarified that "a requirements contract necessarily obligates the Government to purchase  exclusively  f rom  a  single  source." 154 F.3d at 1305;  accord, Franklin Co., ASBCA 10285,  65-2 BCA 5215, aff'd, Franklin Co. v. United States, 381 F.2d 416 (Ct. Cl. 1967)  (Armed Services Board  of Contract Appeals  disagreed with parties' characterization  of contract  as requirements  contract when there  were  concurrent contracts  with  overlapping  work). Thus,  although  each  appellant's  contract  masqueraded  as a requirements contract and contained a misleading label, when read as a whole  each contract is more akin  to an indefinite delivery indefinite quantity  (IDIQ)  contract enforceable only  to  the extent performed.   Federal Electric Corp. v.  United States, 486 F.2d  1337 (Ct. Cl. 1973);  Tennessee Soap Co.  v. United States, 126 F. Supp. 439 (Ct. Cl. 1954).

      The  United States Court of Federal Claims recently analyzed the differences between a requirements contract and an indefinite quantity contract in  Rice Lake Contracting v.  United States, 33 Fed.  Cl.  144  (1995).   There,  the  court,  consistent  with precedent, defined an indefinite quantity contract as follows:

      a contract under which the buyer agrees to purchase and
      the  seller agrees to supply whatever quantity of goods
      the  buyer  chooses to purchase from the seller.   It
      differs  from a requirements  contract in that  under a
      requirements contract the buyer agrees  to purchase all
      his  requirements from the seller.  Under an indefinite
      quantit[y]  contract,  even  if  the  buyer  has
      requirements,  he is not obligated to purchase from the
      seller.
33 Fed.  Cl. at 152 (citing  Mason v. United States,  615 F.2d at 1346 n.5).   The  court  noted that  in order  for  an indefinite

quantity contract to be enforceable there must be a minimum quantity which the buyer was obligated to purchase; without an obligatory minimum quantity, the buyer would be allowed to order nothing, rendering its obligations illusory and, therefore, unenforceable. Id. at 152-53; accord, Coyle's Pest Control, 154 F.3d at 1306. Under the multiple award contracts at issue, there was no minimum quantity that agencies were required to order from any specific contractor, and there was no guarantee that any quantities would be ordered. We conclude that the contracts at issue are analytically most akin to indefinite quantity contracts with no stated mandatory minimum, enforceable to the extent they were performed, and there is no basis in the contracts to award damages for the off-schedule orders. Cf. William W. Goodrich, Jr. and Coralyn G. Mann, Avoiding Disaster in Federal Supply Service Contracts, 15 Pub. Cont. L.J. 1, 12 (1984) ("Awardees of multiple award schedule contracts would appear to have no legal assurance of sales or profit.").

Appellants' collective efforts to obtain an award of damages representing all off-schedule purchases and divide it among themselves based upon assumptions and market share must fail. These contracts do not contemplate such a collective remedy. No amount of post-contract collaboration can alter the fact that each appellant filed a separate claim and had its own contract based upon its individual offer, with different pricing and, in some cases, different services to be performed in different locales. At best, each appellant has shown that there should have been a larger universe of potential work for the schedule contractors. However, this does not mean that every schedule contractor's share of that work should necessarily have been larger. Nor does this diminished universe of potential work trigger Government liability to each schedule contractor.

Any expectation that an individual appellant would have received any portion of the additional amount of work claimed is speculative and not supported by the terms of its multiple award contract -- which expressly warned that there was no guarantee that any quantities would be ordered. As such, in addition to failing to prove a compensable breach, no appellant has demonstrated that its claimed damages were foreseeable at the time of contract formation. Cienega Gardens v. United States, 38 Fed. Cl. 64, 73 (1997) ("To the extent that plaintiffs' damages were foreseeable at the time of contract formation, not at the time of the breach, they are recoverable. Lucas v. United States, 25 Cl. Ct. 298, 310 (1992) (citing Globe Refining Co. v. Landa Cotton Oil Co., 190 U.S. 540, 545-47, 23 S.Ct. 754, 756-57, 47 L.Ed. 1171 (1903).").

Respondent argued that the Board take a different tack in denying liability here -- suggesting that we impose a constructive termination for convenience, deny breach damages, and hold that appellants are entitled only to damages permitted under the Termination for Convenience clause -- in this case nothing. Respondent's argument assumes that breach damages would otherwise be warranted. Given our conclusion that appellants have not demonstrated entitlement to breach damages under the terms of their contracts and appellants' stipulation that they have no termination for convenience costs, we need not address this argument or any of respondent's other arguments here.

Instead, we hold that the contracts were not requirements contracts and, under the bargain the parties struck, the individual schedule contractors cannot recover lost profits for off-schedule purchases.

III. Are Appellants Entitled to Consequential Damages?

Appellants seek consequential damages in the amount of $2,486,181.90. Given our conclusion that appellants have not demonstrated a compensable breach, they cannot recover consequential damages. Further, appellants' claim for consequential damages is based solely upon their loss of incumbency. Appellants' Opening Brief at 53. Appellants rely on their stipulation that they submitted proposals with the expectation that by receiving award of a schedule contract they would each be able to develop and maintain ongoing relationships with user agencies for which they had not previously worked. Appellants contend that it was reasonable to expect that the mandatory user agencies would do business with the awardees for at least a year. Id. at 53-54. Appellants point out that incumbency had a particular value here because history revealed that expiration of mandatory contracts were followed by periods of informal contracting. Appellants derive their consequential damages of $2,486,181.90 by "taking the starting incumbent positions that appellant would have had but for the breach (i.e., $4,972,363.85) and reducing the value of that incumbent position to zero after only one year.

Appellants cite this Board's decision in Stroh Corp. v. General Services Administration, GSBCA 11029, 96-1 BCA   28,265, in support of their claim for consequential damages. This case in no way supports the proposition that appellants are entitled to consequential damages. To the contrary, the Board in Stroh stated:

> Furthermore, Stroh is not entitled to an award of under absorbed home office overhead under its modified Eichleay formula because, in reality, this claim seeks recovery of consequential damages. See Prudential Insurance Co. of America v. United States, 801 F.2d 1295 (Fed. Cir. 1986), cert. denied, 479 U.S. 1086 (1987). To be recoverable, consequential damages must be foreseeable at the time of contract award. Landmovers, Inc., ENGBCA 5656, 92-1 BCA   24,473. Foreseeable means within the contemplation of the parties at the time of award. For damages to be recoverable there must be no intervening incident; the
>
> Government's actions must produce the effect inevitably and naturally. Ramsey v. United States, 121 Ct. Cl. 426, 433 (1951); accord Hart, Clark, and Hirt, IBCA 1508-8-81, 84-1 BCA   17,134, at 85,352-53.

96-1 BCA at 109,791.

Appellants have cited no legal support for their consequential damages claim, and the facts of record do not demonstrate entitlement to such damages. As our appellate authority has recognized, "Remote and consequential damages are

not recoverable in a common law suit for breach of contract . . .
especially . . . in suits against the United States for the
recovery of common law damages, such as the instant case."
San Carlos Irrigation & Draining District v. United States, 111
F.3d 1557, 1563 (Fed. Cir. 1997) (quoting Wells Fargo Bank, N.A.
v. United States, 88 F.3d 1012, 1020 (Fed. Cir.), cert. denied,
117 S. Ct. 1245 (1996), and Northern Helex Co. v. United States,
254 F.2d 707, 713, 720 (Ct. Cl. 1975)).

Decision

    The appeals are DENIED.

_____

                              MARY ELLEN COSTER WILLIAMS
                              Board Judge

We concur:


_____

ROBERT W. PARKER                   CATHERINE B. HYATT
Board Judge                        Board Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| JEREMY KAHN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No.  07-2323 (HHK) |
| | ) | |
| FEDERAL MOTOR CARRIER SAFETY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

## ORDER

Upon consideration of Plaintiff's Motion for Summary Judgment, Defendant's

Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary

Judgment, and the entire record herein, it is this _____ day of

_____, 2008,

ORDERED, that Defendant's Motion for Summary Judgment is GRANTED; and

it is further

ORDERED that Plaintiff's Motion for Summary Judgment is DENIED.

SO ORDERED.


_____
United States District Judge

cc:
Jeremy Kahn
Kahn and Kahn
1730 Rhode Island Avenue, N.W., Suite 810
Washington, D.C. 20036

Beverly M. Russell
U.S. Attorney's Office for the District of Columbia,
 Civil Division
555 Fourth Street, N.W., Suite E-4915
Washington, D.C.  20530
beverly.russell@usdoj.gov